# EXHIBIT A

IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT
IN AND FOR ORANGE COUNTY, FLORIDA

Orlando Museum of Art, Inc.,

      *Plaintiff*,

  v.

Aaron De Groft; Pierce O'Donnell; John
Leo Mangan III, a/k/a Lee Mangan, a/k/a
Leo Mangan; William Michael Force a/k/a
Michael William Force; Taryn Burns;
Basquiat Venice Collection Group, a
California joint venture; MJL Family
Trust LLC, a Colorado limited liability
company; and Richard LiPuma,

      *Defendants*.

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Orlando Museum of Art, Inc. (OMA), sues Defendant Aaron De Groft (De Groft);

and sues Defendants Pierce O'Donnell; John Leo Mangan III, a/k/a Lee Mangan, a/k/a Leo Man-

gan; William Michael Force a/k/a Michael William Force; Taryn Burns; Basquiat Venice Collec-

tion Group, a California joint venture; MJL Family Trust LLC, a Colorado limited liability com-

pany, and Richard LiPuma (collectively, the Owner Defendants), and alleges:

### INTRODUCTION

1.     In June 2022, the FBI raided OMA and seized 26 paintings[1] that were exhibited as

authentic works by renowned artist Jean-Michel Basquiat.[2] Ten months later, in April 2023,

---

[1] The paintings consisted of 24 one-sided works and one two-sided work. Some documents and articles referenced in this Complaint refer to 25 works, counting the two-sided work as one individual work. Thus, OMA clarifies here that the 26 works referred to in this Complaint count each side of the two-sided work as an individual work.

[2] Basquiat is an American artist of Haitian and Puerto Rican descent who rose to prominence in the late 1970s and 1980s as part of the neo-expressionist movement, gaining acclaim for his brand of graffiti-style art that incorporated economic, racial, and political themes. Basquiat's contemporaries included acclaimed American artists Andy Warhol, Keith Haring, and others. The market for Basquiat's art grew to a peak in 2017, when one of his paintings sold for $110.5 million, the second highest (then, the highest) price ever paid at auction for artwork by an American artist.

Michael Barzman, a Los Angeles auctioneer, pled guilty to lying to the FBI and admitted that the paintings were forged and their provenance falsified.[3] The story of how the paintings ended up on the walls of OMA is a truth stranger than fiction, publicly described by Defendant O'Donnell as a "concatenation of unlikely events."  How prophetic those words would later prove to be.

2.     The Owner Defendants claim that Basquiat painted the works in 1982 and sold them for \$5,000 to Thaddeus Q. Mumford Jr., a television producer and writer known for his work on *M\*A\*S\*H* and other popular series.  Then, they claim that Mumford placed the paintings in his storage unit, the contents of which were auctioned off 30 years later to Barzman (the Los Angeles auctioneer), who tossed the paintings in a dumpster, where they were found and ultimately purchased by the Owner Defendants, who have been on a quest to legitimize them ever since. These claims are fiction—a fantastical story designed to inflate the value of the paintings for resale in an anticipated multimillion dollar transaction on the private market.

3.     The truth begins in 2012, when Barzman and his accomplice concocted a scheme to forge the paintings and falsify their provenance, with plans to sell them on eBay.  The pair were seemingly capitalizing on the recent announcement that the Authentication Committee of the Estate of Jean-Michel Basquiat would be disbanding that same year.[4] After purchasing the paintings,

---

Other Basquiat works have sold for tens of millions of dollars.  Basquiat's highest-selling works date from 1981 to 1983, with 1982 often considered Basquiat's most valuable year.  Even after his tragic death at the age of 27 from a drug overdose, Basquiat has become a cultural phenomenon firmly etched in art history: he was the subject of a 1996 biopic, several documentary films, and a Broadway play. *See Jean-Michel Basquiat,* SMITHSONIAN NATIONAL MUSEUM OF AFRICAN AMERICAN HISTORY AND CULTURE, https://nmaahc.si.edu/latinx/jean-michel-basquiat (last visited August 11, 2023); Nate Freeman, *Record-Breaking \$110.5 M. Basquiat Shocks Attendees at Sotheby's \$319.2 M. Postwar and Contemporary Evening Sale,* ARTNEWS (May 18, 2017), https://www.artnews.com/art-news/market/record-breaking-110-5-m-basquiat-shocks-attendees-at-sothebys-319-2-m-postwar-and-contemporary-evening-sale-8374/ (last visited August 11, 2023).

[3] "Provenance is the history of the ownership of a piece of artwork beginning with the hand of the artist to the present owner of the artwork.  Establishing provenance is essential to determining if a piece of artwork is authentic. . . . Exhibiting artwork at museums adds to the authenticity of artwork."  Affidavit of Elizabeth Rivas, FBI Special Agent, June 23, 2022 (Rivas Affidavit), ¶¶ 7, 8 .

[4] The Authentication Committee of the Estate of Jean-Michel Basquiat disbanded in September 2012, when it stopped considering applications for authentication of works purportedly created by Basquiat.  The Authentication Committee

72234736;2

the Owner Defendants perpetuated the original fraud by intentionally misrepresenting that the paintings were authentic and the provenance was genuine, ultimately deceiving OMA.

4.    To facilitate the legitimization and sale of the fake Basquiat paintings required the knowing participation of Defendant De Groft, OMA's then newly hired Executive Director & CEO. The Owner Defendants easily persuaded De Groft to join their conspiracy by promising De Groft a significant cut of the proceeds of the anticipated multimillion dollar sale. De Groft quickly jettisoned his professional, ethical, and fiduciary duties to OMA and agreed to exhibit the paintings before ever seeing them in person. Singularly focused on fast-tracking the exhibition, De Groft and the Owner Defendants hijacked OMA's resources, subverted OMA's mission, and permanently damaged OMA's longstanding reputation as a premier local nonprofit organization.

5.    When OMA's curatorial staff and other key employees sounded the alarm about discrepancies in the falsified provenance, De Groft and the Owner Defendants ignored them. Later, those employees were silenced by De Groft at the behest of the Owner Defendants after they discovered and reported overwhelming evidence that the paintings could not have been created by Basquiat in 1982. One of the paintings, on a piece of cardboard, covered a partially obscured shipping label addressed to Barzman, the Los Angeles auctioneer who purportedly purchased the paintings at the auction of Mumford's storage unit in 2012, but who would have been only four years old in 1982.

6.    Worse still, De Groft and the Owner Defendants maintained that a poem—dubiously attributing the paintings to Mumford and Basquiat, as buyer and seller—functioned as a "receipt" of the original transaction. The poem was seemingly printed on dot matrix printer paper

---

of the Estate of Jean-Michel Basquiat, *Notification From Authentication Committee*, THE ESTATE OF JEAN-MICHEL BASQUIAT    (January    2012),    https://www.basquiat.com/faq/#:~:text=The%20Authentication%20Committee%20was%20in,created%20by%20Jean%2DMichel%20Basquiat (last visited August 11, 2023).

that would have been common in 1982, in addition to bearing the alleged handwritten initials of "JMB" (purportedly for Jean-Michel Basquiat), and referencing "25 paintings bringing riches," which now reads as a perverse prophecy.

7.      OMA spent hundreds of thousands of dollars—and unwittingly staked its reputation—on exhibiting the now-admittedly fake paintings. Consequently, cleaning up the aftermath created by the Defendants has cost OMA even more. OMA was placed on probation by the American Alliance of Museums and its 99-year legacy was shattered. OMA is entitled to legal redress for these harms.

## JURISDICTION, PARTIES, AND VENUE

8.      This is an action for damages in excess of $50,000, exclusive of costs, interest, and attorney's fees. This Court thus has subject matter jurisdiction over this matter under § 26.012, Fla. Stat.

9.      OMA is a Florida 501(c)(3) nonprofit corporation located in Orlando, Florida.

10.     OMA is governed by a Board of Trustees (the "OMA Board"). The responsibilities of the OMA Board include ensuring adequate financial resources, sound fiscal management, and selecting and supervising the Executive Director.

11.     Aaron De Groft is a Florida resident living in Orange County, Florida. This Court has personal jurisdiction over De Groft under § 48.193(2), Fla. Stat., as well as under § 48.193(1)(a)(2), Fla. Stat. because—as described more fully below—De Groft is engaged in substantial and not isolated activity in Florida and committed tortious acts in Florida.

12.     The exercise of personal jurisdiction over De Groft also satisfies the requirements of federal due process because De Groft is a Florida resident.

13.     Upon information and belief, Pierce O'Donnell is a citizen of Texas. This Court

has personal jurisdiction over O'Donnell under §§ 48.193(1)(a)(2), (7), Fla. Stat., because O'Donnell committed tortious acts in Florida and breached a contract in Florida by failing to perform acts required by the contract to be performed in Florida.

14.    The exercise of personal jurisdiction over O'Donnell satisfies the requirements of federal due process because O'Donnell committed an intentional tort outside of Florida that caused an injury in Florida that O'Donnell should have anticipated would be suffered in Florida because he intentionally directed his tortious conduct to Florida.  O'Donnell also committed tortious acts within Florida, and entered into, and breached, an agreement that required performance in Florida. Based on his conduct, O'Donnell reasonably should have anticipated being haled into a Florida court regarding his actions.

15.    Upon information and belief, John Leo Mangan III, a/k/a Lee Mangan, a/k/a Leo Mangan, is a citizen of Colorado.  This Court has personal jurisdiction over Mangan under § 48.193(1)(a)(2), Fla. Stat., because Mangan committed tortious acts in Florida.

16.    The exercise of personal jurisdiction over Mangan satisfies the requirements of federal due process because Mangan committed an intentional tort outside of Florida that caused an injury in Florida that Mangan should have anticipated would be suffered in Florida because he intentionally directed his tortious conduct to Florida.  Mangan also committed tortious acts in Florida.  Based on his conduct, Mangan reasonably should have anticipated being haled into a Florida court regarding his actions.

17.    Upon information and belief, William Michael Force, a/k/a Michael William Force, is a citizen of California.  This Court has personal jurisdiction over Force under §§ 48.193(1)(a)(2), (7), Fla. Stat., because Force committed tortious acts in Florida and breached a contract in Florida by failing to perform acts required by the contract to be performed in Florida.

- 5 -

18.     The exercise of personal jurisdiction over Force satisfies the requirements of federal due process because Force committed an intentional tort outside of Florida that caused an injury in Florida that Force should have anticipated would be suffered in Florida because he intentionally directed his tortious conduct to Florida, and entered into, and breached, an agreement that required performance in Florida.  Force also committed tortious acts in Florida.  Based on his conduct, Force reasonably should have anticipated being haled into a Florida court regarding his actions.

19.     Upon information and belief, Taryn Burns is a citizen of California. This Court has personal jurisdiction over Burns under §§ 48.193(1)(a)(2), (7), Fla. Stat., because Burns committed tortious acts in Florida and breached a contract in Florida by failing to perform acts required by the contract to be performed in Florida.

20.     The exercise of personal jurisdiction over Burns satisfies the requirements of federal due process because Burns committed an intentional tort outside of Florida that caused an injury in Florida that Burns should have anticipated would be suffered in Florida because she intentionally directed her tortious conduct to Florida.  Burns also committed tortious acts in Florida and entered into, and breached, an agreement that required performance in Florida.  Based on her conduct, Burns reasonably should have anticipated being haled into a Florida court regarding her actions.

21.     The Basquiat Venice Collection Group (BVCG) is a California joint venture comprised, upon information and belief, of O'Donnell (with a 34% interest) and Burns and Force (each with a 33% interest).  Under California law, each is jointly and severally liable to third parties for the obligations of the joint venture.

22.     This Court has personal jurisdiction over the BVCG under §§ 48.193(1)(a)(2), (7),

- 6 -

Fla. Stat., because it committed tortious acts in Florida and breached a contract in Florida by failing
to perform acts required by the contract to be performed in Florida.

23.    The exercise of personal jurisdiction over BVCG satisfies the requirements of fed-
eral due process because the BVGC reasonably should have anticipated being haled into a Florida
court because performance of the parties' agreement took place in Florida.

24.    The MJL Family Trust LLC (MJL Trust) is a Colorado limited liability company.
This Court has personal jurisdiction over the MJL Trust under §§ 48.193(1)(a)(2), (7), Fla. Stat.,
because it committed tortious acts in Florida and breached a contract in Florida by failing to per-
form acts required by the contract to be performed in Florida.

25.    The exercise of personal jurisdiction over MJL Trust satisfies the requirements of
federal due process because the MJL Trust committed an intentional tort outside of Florida that
caused an injury in Florida that the MJL Trust should have anticipated would be suffered in Florida
because it intentionally directed its tortious conduct to Florida.  The MJL Trust also committed
tortious acts within Florida and entered into, and breached, an agreement that required performance
in Florida.  Based on its conduct, the MJL Trust reasonably should have anticipated being haled
into a Florida court regarding its actions.

26.    Upon information and belief, Richard LiPuma is a citizen of Colorado.  This Court
has personal jurisdiction over LiPuma under § 48.193(1)(a)(2), Fla. Stat., because he committed
tortious acts in Florida.

27.    The exercise of personal jurisdiction over LiPuma satisfies the requirements of fed-
eral due process because LiPuma committed an intentional tort outside of Florida that caused an
injury in Florida that LiPuma should have anticipated would be suffered in Florida because he
intentionally directed his tortious conduct to Florida.  LiPuma also committed tortious acts in

Florida. Based on his conduct, LiPuma reasonably should have anticipated being haled into a

Florida court regarding his actions.

28.    Venue is proper under § 47.011, Fla. Stat., because De Groft resides in Orange

County, Florida, and because OMA's causes of action accrued in Orange County, Florida.

29.    All conditions precedent to this action have occurred, have been satisfied, or have

been waived.

## FACTUAL ALLEGATIONS[5]

### I.    The "Mumford Collection" is Forged and its Provenance Falsified.

30.    As set forth above, in 2012, Barzman and his accomplice (to date identified only as

"J.F.") concocted a scheme to forge paintings in the style of Basquiat (the "Fraudulent Paintings"),

falsify their provenance (the "False Provenance"), and sell them on eBay.

31.    Having purchased the Fraudulent Paintings for "a modest sum of cash"[6]—and one

that was surely too good to be true[7]—Mangan and Force,[8] together with Burns,[9] began their quest

---

[5] Certain sensitive information is redacted herein and in the attached exhibits, including as required by the Florida Rules of General Practice and Judicial Administration.

[6] This is how O'Donnell would later publicly characterize the transaction.

[7] By way of comparison, in Spring 2012, an authentic Basquiat sold at auction for $16.3 million. *See* Carol Vogel, *Basquiat Painting Brings in $16.3 Million at Phillips Sale*, THE NEW YORK TIMES (May 10, 2012), https://www.ny-times.com/2012/05/11/nyregion/basquiat-painting-brings-16-3-million-at-phillips-sale.html (last visited August 11, 2023).

[8] Mangan and Force have both served time in prison for felony drug trafficking under different names. As reported by *The New York Times*, "Force was arrested in 1973 under the name William Parks, and pleaded no contest to conspiring to import more than half a ton of marijuana from Jamaica by boat." Mangan "was twice convicted on federal charges of trafficking cocaine, in 1979 and in 1991." Also, in 1996, "the U.S. Securities and Exchange Commission arrested him for securities fraud, alleging Mangan was part of a criminal ring that forged documents and illegally issued more than five million shares of bogus stock, earning him more than $8 million in illicit proceeds. Mangan was convicted, and his 1999 sentencing included a lifetime ban on working in the securities trade." Later, the U.S. Federal Trade Commission "accused the debt consolidation companies Mangan co-owned with his wife, Michelle, of defrauding numerous consumers." And in 2008, "the couple paid almost $400,000 to settle the F.T.C. charges without admitting liability." Brett Sokol, *F.B.I. Investigates Basquiat Paintings Shown at Orlando Museum of Art*, THE NEW YORK TIMES (May 29, 2022), https://www.nytimes.com/2022/05/29/arts/design/fbi-basquiat-paintings-orlando-museum.html (last visited August 11, 2023) ; *see also Federal Trade Commission v. Debt-Set, Resolve Credit Counseling, Inc., et al.*, No. 07-cv-00558-RPM, (D. Colo. Feb. 1, 2008); *Securities and Exchange Commission v. Grant R. Curtis et al.*, Litigation Release No. 16349, 71 S.E.C. Docket 100, 1999 WL 1018113 (Nov. 10, 1999).

[9] Upon information and belief, and as represented by O'Donnell, Burns is Force's "life partner."

- 8 -

to legitimize them as authentically Basquiat.

32.    At first, Mangan, Force, and Burns told Barzman that they needed him to say that the Fraudulent Paintings were found in Mumford's storage unit (after they found out that Barzman was in possession of Mumford's Emmy Award), but Barzman said that was not true and he could never say it was true.

33.    In fact, Barzman did not even purchase the contents of Mumford's storage unit. Rather, the contents of Mumford's storage unit were purchased by someone else, who then sold Barzman Mumford's Emmy Award.

34.    Mangan, Force, and Burns offered Barzman $5,000 to sign documents authenticating the Fraudulent Paintings, and then $10,000 or $15,000 (which was allegedly never paid) to sign an affidavit attesting that the paintings came from Mumford's storage unit.

35.    Mangan and Force also attempted to contact Mumford to legitimize the False Provenance. Apparently believing that Mumford was in financial distress,[10] Mangan and Force offered to use some of the proceeds from the anticipated future sale of the Fraudulent Paintings to finance a television show that Mumford would produce, in exchange for Mumford's confirmation that the Fraudulent Paintings had belonged to him. Mumford told Mangan and Force that he had never owned the Fraudulent Paintings, and at one point he ripped up a notarized document that Mangan and Force had asked him to sign.

36.    Mangan and Burns also contacted Mumford's attorney with a "business proposal" for Mumford.

37.    Mangan and Force apparently unnerved Mumford so much that he gave an

---

[10] Mangan and Force helped Mumford to pay fees associated with Mumford's car being in an impound lot. *See* Rivas Affidavit, ¶ 29(c), n.6. O'Donnell would later claim that Mangan "gave Mumford some money for food and medicine."

interview to law enforcement in October 2012.

38.     Seven of the Fraudulent Paintings (recall that one is double-sided) were eventually transferred to BVCG, the California joint venture comprised of O'Donnell, Force, and Burns. The other 19 Fraudulent Paintings were ultimately transferred to MJL Trust, a limited liability company associated with Mangan and managed by LiPuma. Neither BVCG nor MJL Trust were unsophisticated—in fact, both were represented by counsel during all relevant times.

39.     Upon forming BVCG, O'Donnell, an attorney and active member of the State Bar of California,[11] quickly began seeking evidence of the Fraudulent Paintings' authenticity.

40.     In May and June 2017, O'Donnell, like Mangan, Force, and Burns before him, contacted Mumford (through his lawyer) seeking a signed declaration from Mumford that he had once owned 28 (notably, not 25 or 26) Basquiat paintings.[12] In return, O'Donnell offered Mumford a

---

[11] O'Donnell has been suspended from practicing law at least three times. First, O'Donnell was suspended after, as part of a plea agreement, he was convicted of five California misdemeanor counts of using a false name in making political contributions, which O'Donnell stipulated involved moral turpitude or other misconduct warranting discipline. O'Donnell had pledged to raise $50,000 in political contributions for a Los Angeles mayoral candidate. Unable to raise the money, O'Donnell, through his assistant, advised his law firm staff members that he would reimburse them for their political contributions. As a result, O'Donnell and his assistant caused 26 individuals to make political contributions with the understanding that O'Donnell would reimburse each of them. *See In Re Pierce Henry O'Donnell*, Member No. 81298, Case No. 04-C-12303-RAP (State Bar Ct. of Cal., Sep. 30, 2010).

While he was subject to the disciplinary proceedings arising out of his California campaign finance violations, O'Donnell submitted an application to be associated as counsel for a defendant in a case in another state, and on that application misrepresented that he was not currently subject to any disciplinary proceedings. Later, at a hearing, he represented that he would not be disciplined. O'Donnell stipulated that his representations were intended to mislead a judge or judicial officer by an artifice or false statement of fact or law and was suspended a second time. *See In Re Pierce Henry O'Donnell*, Bar No. 81298, Case No. 09-O-17211 (State Bar Ct. of Cal., Jan. 5, 2011).

O'Donnell was suspended a third time after he was convicted of two federal misdemeanor counts of making illegal campaign contributions in the name of another person. Like before, O'Donnell had pledged to raise $50,000 in political contributions, only this time for a U.S. presidential candidate. O'Donnell asked his secretary to solicit employees of his law firm to make political contributions that O'Donnell would subsequently reimburse. O'Donnell pled guilty and stipulated to a sentence including 60 days' imprisonment followed by one year of supervised release, including 120 days in a residential facility. *See In Re Pierce H. O'Donnell*, Bar No. 81298, Case No. 08-C-12900-RAP (State Bar Ct. of Cal., Jan. 28, 2013).

[12] Curiously, throughout the storied history of the alleged provenance, the actual number of Fraudulent Paintings has fluctuated.

- 10 -

10 percent share of the proceeds from the anticipated future sale of 26 of the paintings. O'Donnell also offered to pay Mumford's lawyer's attorney fees to document the deal, and separately, O'Donnell offered Mumford's lawyer a 10 percent ownership interest in exchange for evidence that Mumford had owned the Fraudulent Paintings.

41.    O'Donnell told Mumford's attorney that John Cheim, a member of the Authentication Committee of the Estate of Jean-Michel Basquiat for 15 years, had viewed the Fraudulent Paintings and opined that they were real. O'Donnell also claimed that Cheim had since passed away. But Cheim was still alive, had not opined that the Fraudulent Paintings were real, and later opined that they were fake.

42.    In July 2017, the members of BVCG apparently decided that bribing Mumford to establish the False Provenance for the Fraudulent Paintings was a lost cause, and one of their members, Burns, stepped up to sign a declaration alleging that Mumford had left her a voicemail four years earlier, on February 11, 2013, stating that he "now recalled that he had purchased paintings from Jean-Michel Basquiat." She attested that Mumford left her a second voicemail on the same day stating he wanted "to verify his earlier message." Neither purported voicemail has ever been produced.

43.    One month later, in August 2017, Mumford signed an affidavit for the FBI, attesting: "At no time in the 1980s or at any other time did I meet with Jean-Michel Basquiat, and at no time did I acquire or purchase any paintings by him. Furthermore, at no time did I store any Basquiat paintings at Ortiz Brothers Moving and Storage or anywhere else."

44.    O'Donnell, Mangan, Force, and/or Burns also tried to legitimize the Fraudulent Paintings by having them exhibited in other museums. In 2019, Michael Klein, a New York art dealer and friend of O'Donnell's, approached the Mennello Museum of American Art—across the

street from OMA in Orlando—with an offer to exhibit the Fraudulent Paintings. The director of
the Mennello Museum of American Art rejected the offer because she doubted the Fraudulent
Paintings' authenticity.

45.     O'Donnell also tried to enlist art dealers to sell the seven works owned by BVCG.
In or around December 2020, O'Donnell reached out to an art dealer telling him he would like to
sell BVCG's Fraudulent Paintings for about $1.5 million each. In an email to the dealer, O'Donnell
explained: "These are attractive prices, no one gets hung up about the authenticity since they will
not hold the painting for long term, and the tax benefit is sweet"—an apparent reference to the tax
benefits achieved by donating artwork of questionable provenance to a nonprofit organization as
authentic to realize an inflated deduction on the donor's taxes.

46.     In short, by the time De Groft and O'Donnell would become acquainted in early
2021, Barzman had told Mangan, Force, and Burns that he could not prove the False Provenance;
Mangan, Force, Burns, and O'Donnell had all reached out to Mumford or his lawyer and had all
been told that Mumford had never owned the Fraudulent Paintings; O'Donnell had lied about an
expert—who he claimed was deceased—authenticating the Fraudulent Paintings; Mangan, Force,
Burns, and/or O'Donnell had offered the Fraudulent Paintings to at least one museum, which had
rejected the offer doubting that the Fraudulent Paintings were authentic; and O'Donnell had
acknowledged to an art dealer that authenticity was an issue, but not so important due to the "at-
tractive prices" and "tax benefit[s]".

47.     At least, then, by the time the Owner Defendants would later come into contact
with De Groft, they knew that the Fraudulent Paintings were fake and that the False Provenance
was a sham.

72234736;2

## II.    OMA Hires De Groft, and De Groft Almost Immediately Becomes Co-Conspirator with the Owner Defendants.

48.    On January 20, 2021, with the aid of a professional search firm, the OMA Board hired De Groft as OMA's Executive Director & CEO. De Groft holds a Ph.D. in art history and has years of experience running art museums. As OMA's Executive Director & CEO, De Groft served "ex-officio, with a voice but without a vote," on the OMA Board, per OMA's Amended and Restated Bylaws.

49.    The Bylaws define De Groft's duties as Executive Director as follows:

> [OMA] shall employ a full-time Executive Director, who shall be the pro-
> fessional administrator of [OMA's] affairs and implement the policies and
> directives of the [OMA Board]. The Executive Director shall be the Chief
> Executive Officer of [OMA]. The Executive Director shall have such duties
> as shall be assigned by the [OMA Board] in accordance with its policies and
> in accordance with any employment contract between [OMA] and the Ex-
> ecutive Director.

50.    As detailed in his OMA employment contract, De Groft was entrusted with "full responsibility for the day-to-day operations of the Museum, including supervision and control of all artistic and administrative personnel . . . employed by the Museum and the programs, exhibitions and future planning initiated by the Museum." In short, OMA entrusted its good name and financial wellbeing to De Groft, who was in turn obligated to act in OMA's best interests as an ex officio board member, officer, and employee.

51.    Corporate directors and officers are fiduciaries. Thus, as an ex officio board member, chief executive officer, and employee, De Groft had a fiduciary relationship with OMA. That is, a relation of trust and confidence existed between De Groft and OMA, under which De Groft had a duty to act for OMA's benefit. De Groft, however, began acting contrary to his fiduciary duties almost immediately after being hired.

52.    One of De Groft's first acts as Executive Director & CEO was to email a private

- 13 -

owner of a painting purportedly by the Renaissance "Old Master" artist known as Titian.[13]  De

Groft had previously proclaimed the painting to be an authentic Titian, which was then on display

at the Muscarelle Museum of Art at the College of William & Mary in Williamsburg, Virginia—

where De Groft had previously been the director.  In the email chain, the two discussed how De

Groft "would like to be consummated [sic] if [De Groft was] able to sell the Titian".  **Exhibit 1**.

Later, De Groft obligated OMA to enter into a loan agreement to exhibit the painting he claimed

was by Titian.

53.    Such an arrangement would violate common museum ethical standards, and is pro-

hibited by the American Alliance of Museums ("AAM"), the foremost museum accreditation body,

of which OMA is a member, which provides:

> . . . Loyalty to the mission of the museum and to the public it serves is the essence
> of museum work, whether volunteer or paid.  Where conflicts of interest arise—
> actual, potential or perceived—the duty of loyalty must never be compromised.  No
> individual may use his or her position in a museum for personal gain or to benefit
> another at the expense of the museum, its mission, its reputation and the society it
> serves. . . .  [D]isposal of collections through sale, trade or research activities is
> solely for the advancement of the museum's mission.  Proceeds from the sale of
> nonliving collections are to be used consistent with the established standards of the
> museum's discipline, but in no event shall they be used for anything other than
> acquisition or direct care of collections. . . .  [C]ollections-related activities promote
> the public good rather than individual financial gain. . . .[14]

54.    The proposed agreement also violated OMA's Code of Ethics for Trustees, Staff &

Volunteers (OMA's Ethical Code) and OMA's Personnel Policies in effect at that time—both of

which De Groft acknowledged in writing on March 3, 2021.

---

[13] "Tiziano Vecellio (ca. 1485/90?–1576), known as Titian, was the greatest Venetian artist of the sixteenth century, eventually gaining international fame. . . . Titian contributed to all of the major areas of Renaissance art, painting altarpieces, portraits, mythologies, and pastoral landscapes with figures." *Titian (ca. 1485/90?–1576)*, THE METROPOLITAN MUSEUM OF ART, https://www.metmuseum.org/toah/hd/tita/hd_tita.htm (last visited August 11, 2023).

[14] *AAM Code of Ethics for Museums*, AMERICAN ALLIANCE OF MUSEUMS, https://www.aam-us.org/programs/ethics-standards-and-professional-practices/code-of-ethics-for-museums/ (last visited August 11, 2023).

72234736;2

55.    OMA's Ethical Code provides that "all employees and volunteers owes a duty to the OMA to: i. avoid conflicts of interest, ii. discharge his/her duties in good faith, iii. act so as to avoid any appearance of conflict of interest with, or violation of the policies of, the OMA, iv. avoid use of his/her position with the OMA for personal gain or to benefit another at the expense of the OMA, its mission, its reputation, and the community it serves"; that "[a] Trustee's, employee's or volunteer's association with the OMA may not be used as a springboard for additional personal gain that would not be available except for the Trustee's, employee's, or volunteer's connection with the OMA"; that "employees and volunteers should maintain in confidence information learned in the course of their service to the OMA when such information concerns the administration or activities of the OMA and its staff which is not generally available to the public"; that operations of OMA "may be diverted in no part to accrue to the personal gain of any individual no matter how privileged his/her position with the OMA"; and that "OMA's property . . . and services are given by the public or purchased in the public interest and held as a public trust. These items are not to be construed as being at the disposal of any person's personal use."

56.    Critically, OMA's ethical code prohibits employees "from making any appraisals (including offhand, verbal, etc. appraisals) of works brought to the OMA, as evaluations and authentication lie outside the OMA's range of concerns," and from "engag[ing] in the business of making evaluations or appraisals of works of art for a fee."

57.    Likewise, OMA's Personnel Policies caution that "[a] conflict of interest arises whenever an employee engages in an activity in which his/her personal gain or private interests compete with those of the established purpose of the Orlando Museum of Art"; "[a] conflict of interest can arise when a Museum employee uses his/her position, status or privileged 'inside information' . . . for personal gain . . . . An employee's association with the Museum may not be

72234736;2

used as a springboard for additional personal gain that would not be available except for the em-

ployee's connection with the Museum"; "[t]he operations of the Orlando Museum of Art . . . are

designed to meet a public need and may be diverted in no part to accrue to the personal gain of

any individual no matter how privileged his/her position with the Museum"; "[t]he Orlando Mu-

seum of Art's property . . . are given by the public or purchased in the public interest and held as a

public trust. These items are not to be construed as being at the disposal of any employee's per-

sonal use"; and "[e]mployees may not engage in the business of making evaluations or appraisals

of works of art for a fee and may not charge a fee to assist donors in obtaining tax advantages

through their donations."

58.    Soon after emailing the private owner of the purported Titian, De Groft emailed a

friend (who was apparently also involved with the Titian) about the *Comstock Pollock* (also known

as *Pink Spring*), a painting of disputed provenance purportedly by the acclaimed American abstract

expressionist painter Jackson Pollock. De Groft expressed a desire to exhibit the *Comstock Pollock*

at OMA. De Groft also intimated that he could help sell it—suggesting that "we have a huge

collector in Orlando." *See* **Exhibit 2**.

59.    On or about March 30, 2021, De Groft's friend introduced him to O'Donnell—the

owner of the *Comstock Pollock*—via email. That email stated: "Aaron and i [sic] have collabo-

rated on a likewise unique and fascinating provenance reconstruction of a 1539 Titian . . . which

will soon arrive [at] the Orlando Museum of Art (OMA)." De Groft's friend went on to claim that

"*Pink Spring* [i.e., the *Comstock Pollock*] can benefit enormously under [De Groft's] rare and

highly respected abilities, enhancing its recognition and value." *See* **Exhibit 3**.

60.    De Groft expressed in a follow-up email to O'Donnell that the *Comstock Pollock*

"is right," (De Groft's shorthand for real, or authentic) and that he wanted to show it at OMA and

"promote it internationally."  During this time period, De Groft and O'Donnell began communi-
cating using both De Groft's personal email address and his OMA email address.[15]  *See id.*

61.    Soon after, on or around April 9, 2021, De Groft's communications with O'Donnell
drifted from the *Comstock Pollock* to BVCG's "Basquiats."  De Groft expressed great enthusiasm
about showing the paintings at OMA, despite acknowledging O'Donnell's desire to sell them.  *See*
**Exhibit 4**.  As the Executive Director & CEO of an accredited museum, De Groft should have
known that such an arrangement was unethical, threatened OMA's accreditation and reputation,
and violated his fiduciary duties.  Yet, he persisted.

62.    On April 9, 2021, O'Donnell suggested that De Groft "showcas[e]" the Basquiats
for OMA's upcoming Centennial celebration.  O'Donnell alluded to the fact that he may be able to
"get" Diego Cortez—a former member of the Authentication Committee of the Estate of Jean-
Michel Basquiat widely credited as "discovering" Basquiat—for a "big symposium etc."[16] O'Don-
nell's suggestion to De Groft on how to "showcas[e]" the paintings was met with enthusiasm and
a willingness on De Groft's part to do anything necessary to exhibit the Basquiats, even though he
knew they were for sale.  De Groft replied unequivocally: "We could showcase them in September
for sure. . . . I know you want to sell them and I am fine with that."  *Id.*

63.    Two days later, on April 11, 2021, O'Donnell again emailed De Groft to set up a
time when O'Donnell could provide De Groft with his suggestions on how the exhibition should
unfold.  The subject line of O'Donnell's email was "Black artists matter!", one of the first of many

---

[15] OMA's Personnel Policies provided that "[t]he Museum accounts are to be used for professional, research and/or
educational purposes", and only permitted "[i]ncidental and occasional personal use of e-mail and the Internet . . . as
long as such personal use is not for profit, does not require substantial expenditures of time or otherwise violate
[OMA's] Acceptable Use Policy."

[16] O'Donnell later gave Cortez's phone number to De Groft and urged De Groft to contact Cortez about helping with
the Exhibition.  Cortez died before he and De Groft were able to speak.  The nature of the relationship between
O'Donnell and Cortez is not known.

- 17 -

overt references to Basquiat's race by O'Donnell and De Groft.  **Exhibit 5**.

64.    Five days after that, on April 16, 2021, and without ever seeing the Fraudulent

Paintings in person or performing any due diligence regarding their authenticity, De Groft an-

nounced in an email to OMA's Associate Curator that they would be "getting all 25 Basquiats!"

**Exhibit 6**.

65.    This was a fortuitous turn of events for the Owner Defendants, as De Groft was the

critical missing piece of their scheme to profit from the Fraudulent Paintings after legitimizing

them through a museum exhibition.  Seizing on the opportunity, O'Donnell immediately proceeded

to take full advantage of De Groft's willing refusal to question the Fraudulent Paintings or the

False Provenance and his corresponding eagerness to display artwork that he had never seen, ef-

fectively deputizing De Groft—and unwittingly, OMA—for the Owner Defendants' benefit.

66.    On April 27, 2021, after numerous phone conversations, O'Donnell sent De Groft

a draft letter offering to show the Fraudulent Paintings, with instructions for De Groft to cut and

paste the letter onto OMA letterhead.  O'Donnell wrote the letter in De Groft's voice (it states, for

example: "My professional background entails discovering, authenticating, and exhibiting 'lost

art' by Rembrandt, Titian, and da Vinci.") and officially offered, on OMA's behalf, to show

BVCG's seven Fraudulent Paintings, promote them in local media, publish a catalogue about the

paintings, and bear the costs of shipment, insurance, framing, and "the like."  The letter was drafted

as though it represented an arm's length transaction; in reality, O'Donnell was responsible for both

drafting and accepting the offer.

72234736;2

| From: | O'Donnell, Pierce[podonnell@ ████████ |
| Sent: | Tue 4/27/2021 12:36:31 AM (UTC-04:00) |
| To: | Aaron H. DeGroft[adegroft@ █████ |
| Subject: | Draft letter to Pierce |
| Attachment: | Draft letter from de Groft.docx |

Aaron

Here is the draft letter that we discussed. There are a few things (XXXX) that you need to fill in. Please let me
know if you have any questions.

Diego can be reached at ██████████

Thanks.

**Exhibit 7**.

67.     Little more than seven hours later, at 8 a.m. that same day, a "special" meeting of

the OMA Board was convened.[17] At the start of the special meeting, which was conducted virtually

due to the Covid-19 pandemic, the then-Chair of the OMA Board introduced a "four-point plan"

for OMA's upcoming Centennial.  The "four-point plan" had been developed by De Groft, who

presented it to the Executive Committee of the OMA Board the day before, and involved: (a) ren-

ovations to Lockhaven (OMA's campus); (b) an endowment fund effort or capital campaign; (c)

"blockbuster exhibitions"; and (d) new museum annex downtown.

68.     De Groft's presentation included *Heroes & Monsters: Jean-Michel Basquiat and

the Basquiat Venice Collection*[18] as one of the "blockbuster exhibitions,"[19] even though, at this

time, De Groft had neither seen the Fraudulent Paintings nor had he entered into any loan

---

[17] Per the OMA Bylaws, the OMA Board convenes regular meetings four times per year.  The Chair, or any two
members of the OMA Board, are also empowered to call "special" meetings under the OMA Bylaws.

[18] The final name of the Exhibition was *Heroes & Monsters: Jean-Michel Basquiat, The Thaddeus Mumford Jr. Venice
Collection*, which is referred to herein as the "Exhibition."

[19] *Jackson Pollock and the Comstock Pollock (Pink Spring): Newly Discovered, First Time Exhibited (with three other
major Pollocks on loan for context)* was also included as one of the "blockbuster exhibitions," and was also repre-
sented to be "[f]ree," plus shipping, to OMA.

- 19 -

agreement to exhibit the Fraudulent Paintings. De Groft's presentation materials reflected that the cost of exhibiting the Fraudulent Paintings would be "[f]ree," other than the cost of shipping—even though O'Donnell's letter required OMA to bear various costs—and noted that the exhibition would open "September 23" and be "ongoing."

69.    Of course, by this time, OMA's exhibition schedule had already been planned well in advance, such that moving forward with De Groft's "blockbuster exhibitions" required a complete overhaul of the existing exhibition schedule. To do so, De Groft circumvented the Collections and Exhibitions Committee, the Standing Committee of the OMA Board responsible for reviewing, considering, and approving actions necessary to the furtherance and benefit of the collection and exhibitions of OMA. De Groft also circumvented OMA's professional curatorial staff, who reported that exhibitions take two to three years to curate—not the five months that De Groft was proposing.

70.    In what now appears designed to distract the OMA Board from the "blockbuster exhibitions," De Groft's presentation was almost entirely focused on the last point of the "four-point plan," which was to add a museum annex in downtown Orlando.

71.    That same day, at 8:14 p.m., O'Donnell forwarded De Groft an article titled *Are We in for a Basquiat Auction Boom? A Fashion Executive's Rare Skull Painting Could Fetch Over $50 Million at Christie's*, saying "Our timing couldn't be better." **Exhibit 8**.

72.    Shortly after midnight two days later, on April 29, 2021, and still before any loan agreement for the Fraudulent Paintings was signed—and before De Groft had ever seen the Fraudulent Paintings in person or reviewed the False Provenance—De Groft bragged to a friend that he had "discovered" 19 "Basquiats", and also referenced "a big Pollock that has never been seen," both as an "[e]mbarrassment of riches":

- 20 -

| From: | aaron.degroft@ ██████████ [aaron.degroft@ ████████ |
| Sent: | Thur 4/29/2021 12:14:23 AM (UTC-04:00) |
| To: | ████████████████████ |
| Subject: | Hello ██ |

We are loving life in Orlando. We Ave some big plans to relaunch the Museum is late September. I would like to talk to you about framing 19 Basquiats I have discovered that have never been seen or published. I need them sensitively framed. You up for it this summer perhaps? We are also getting a big Pollock that has never been seen. Painted in 1949. Embarrassment of riches. Hey, you know me. Would I be doing anything else. Love to ██ Can I ring you tomorrow?

Aaron H. De Groft, Ph.D.

████████████

**Exhibit 9**.

73.    Later that same day, De Groft pasted the contents of O'Donnell's letter, without any substantive changes, onto OMA letterhead and sent it back to O'Donnell as if he had independently authored it. *See* **Exhibit 10**.

74.    Also on April 29, 2021, De Groft sent O'Donnell a proposed loan agreement, in which the value of the seven BVCG works was already filled in as "$25 million." **Exhibit 11**. A checklist was attached for O'Donnell to fill in the "Insurance Value" of each work.

75.    The next day, April 30, 2021, O'Donnell, either individually or as an authorized representative of BVCG, signed the loan agreement and handwrote the "Insurance Value" of each work on the attached checklist. O'Donnell also handwrote that the total value of the collection was "$25,000,000." However, the individual values of each work only added up to $23,700,000. Also, O'Donnell double counted the value of the double-sided work. *See* **Exhibit 12**.

76.    Later, when OMA's Registrar notified De Groft of these discrepancies in the value of the BVCG works, De Groft did not share her concerns, replying only: "We are happy to insure at $25 million. I imagine he is counting the front and back works as two works. Makes sense to me." **Exhibit 13**.

- 21 -

72234736;2

77.    After O'Donnell was notified of these discrepancies, he clarified that the double-sided work should not be double counted for insurance valuation purposes, provided different values for certain of the works, and said the total value was $19,700,000. However, the individual values of each work still did not add up to O'Donnell's total. After O'Donnell was notified of this remaining discrepancy, he admitted that he had made a mistake on the valuation of one of the works. OMA and O'Donnell then entered into a new loan agreement to reflect the newly provided values totaling $19,700,000. Later, a third loan agreement was entered into, which changed the "Owner" to "Basquiat Venice Collection Group, c/o Pierce O'Donnell and Taryn Burns." **Composite Exhibit 14**.

78.    On May 5, 2021, O'Donnell sent De Groft a letter thanking De Groft for his "letter of April 27th"—the letter previously drafted by O'Donnell—and "enthusiastically accept[ing] [De Groft's] proposal." **Exhibit 15**.

79.    De Groft and O'Donnell then started working to persuade the MJL Trust to allow OMA to exhibit the other 19 Fraudulent Paintings.

80.    On May 12, 2021, O'Donnell drafted and sent De Groft a nearly identical letter—on OMA letterhead—offering the same deal to the MJL Trust to display the other 19 works. The letter stated that "I [De Groft] understand Pierce O'Donnell will be the liaison for your nineteen works and this is wonderful" and "You cannot believe what this means to us and we are beyond excited to "discover' your paintings and to make the world aware of them." **Exhibit 16**.

81.    Also during this time, O'Donnell started pressing De Groft to have OMA obtain and pay for "new insurance with much higher coverage" for the BVCG works, notwithstanding that De Groft had previously represented to the OMA Board that the exhibition would be "[f]ree." O'Donnell told De Groft that "[m]y paintings will need at least $300 million"—more than 12 times

the value of the works as represented in the loan agreements. **Exhibit 17**.

82.     Insurance valuation was also a concern for the MJL Trust, which insisted on re-viewing OMA's insurance policy. Specifically, LiPuma explained that the MJL Trust wanted the insurance to be based on a certain appraisal that they had previously obtained, instead of having the 19 works insured at "fair market value", which "could lead to ambiguity or difficulty in the event of a loss." **Exhibit 18**.

83.     LiPuma also confirmed that the 19 MJL Trust works were also for sale, and indeed, could be sold during the Exhibition: "Please understand that we are currently negotiating a poten-tial sale of these works. Our buyer knows that a sale would be subject to the terms of the Loan-Out Agreement." *Id.*

84.     On July 2, 2021—more than two months after De Groft presented the Exhibition to the OMA Board—the MJL Trust, "c/o Mr. Richard LiPuma, Manager," and OMA entered into a loan agreement, similar to the BVCG agreement, which valued the 19 works at "$57.6 M." **Ex-hibit 19**.

85.     After returning the signed agreement to De Groft, LiPuma wrote that De Groft's suggestion "to invite potential buyers to the Opening" was a "great idea." LiPuma also offhand-edly mentioned that the Authentication Committee of the Estate of Jean-Michel Basquiat not only had not authenticated the works, but also required it to be made "clear in any catalogues or pro-motional material that, 'The Estate of Jean-Michel Basquiat has not rendered any opinion on the authenticity of any of the works in this collection'", and that "it occurs to [LiPuma] that [De Groft] ha[d] not had a chance to see our provenance documents"—promising to send them soon. **Exhibit 20**. In other words, De Groft executed the loan agreement with the MJL Trust—and was discussing selling its works—before ever reviewing their provenance or seeing them in person.

- 23 -

86.     De Groft did not question the required disclaimer revealed by LiPuma only after

the loan agreement had been signed, instead replying unequivocally: "We can make this disclaimer.

The group disbanded. This irrelevant is [sic]. No worries at all." *Id.* In another reply sent 15

minutes later, De Groft claimed that O'Donnell—rather than Basquiat's Estate—"is the real expert

on these works. He has spant [sic] years but he is involved with possible outcomes." *Id.* De Groft

went on to claim: "I am second in line. I have immersed myself for months on these and JMB",

casting himself as a Basquiat expert notwithstanding that none of his previous academic or mu-

seum work was related to Basquiat. De Groft's ulterior motives in exhibiting the Fraudulent Paint-

ings at OMA were clear, as he assured LiPuma that LiPuma was "sitting on platinum encrusted

with diamonds:"

| From: | aaron.degroft@███████  aaron.degroft@█████ |
| Sent: | Sat 7/3/2021 10:13:41 PM (UTC-04:00) |
| To: | Richard LiPuma[rich@██████████] |
| Cc: | ████████████████ |
| Subject: | Re: Invite potential buyers to VIO opening to see the entire collection together? |
| Attachment: | MJL-OMA Loan Agt - Executed.pdf |

Rich,
They would of course want their outside "expert" but let us use that moniker loosely. Pierce is
the real expert on these works. He has spant years but he is involved with possible outcomes. I
am second in line. I have immersed myself for months on these and JMB. We have made
amazing discoveries on these paintings making them masterpieces. I am the only person writing
on the last days of Basquiat comprehensively. Not a cheer for me but insights. No one has made.
It is part of our exhibition. Do not sell you and your representatives short which I know you will
not do. You all are sitting on platinum encrusted with diamonds. I stake my reputation on it. As I
say again they would be fools to not have an outside representative look at the originals in the
flesh. They just need them to do it fast. We need the works to photograph them In high res.
There are many fingerprints on the works that I believe undoubtedly to be JMB. This with your
iron clad provenance makes a hermetic case.

Let me know how I can help.

Happy fourth!

*Id.* De Groft also declared the False Provenance to be "iron clad," making a "hermetic case," after

having received only some of the "provenance documents" from LiPuma a day earlier. *Id.*

87.    At no time before O'Donnell/BVCG and the MJL Trust entered into the loan agree-
ments, did any of the Owner Defendants inform De Groft of their failed attempts to authenticate
the Fraudulent Paintings through interactions with Mumford and his lawyer, including that Mum-
ford did not have any relationship with Basquiat or the works, or that Mangan, Force, and Burns
had been told by Barzman that Barzman could not prove the False Provenance.  Nor did De Groft
attempt to authenticate the artwork on his own, as one would expect an art director with a Ph.D.
and years of prior experience to do.[20]

### III.    De Groft and the Owner Defendants Curate the Exhibition and Create the Exhibition Catalogue to Market the Fraudulent Paintings for Sale.

88.    From the beginning, O'Donnell directed every aspect of the curation of the Exhibi-
tion, including telling De Groft to "find a couple," referring to "Blacks in art" and "women," to
contribute to the catalogue for the Exhibition (the "Catalogue"):

| | |
|---|---|
| From: | O'Donnell, Pierce [podonnell@█████ |
| on behalf of | O'Donnell, Pierce <podonnell@█████      [podonnell@████████ |
| Sent: | 5/19/2021 12:53:04 AM |
| To: | Aaron De Groft [aaron.degroft@█████ |
| Subject: | Re: ███ is out. |

Good try. With all due respect, three males, two white males and no blacks or women?!?

We have time to find a couple. Take a look at the article re top
Blacks in art. Some super candidates. Thanks

### Exhibit 21.

89.    De Groft ceded—and O'Donnell took—editorial control over the Catalogue, which

OMA was contractually obligated to create, at OMA's expense, under the loan agreements.

90.    The Catalogue contained several essays, including essays by De Groft, O'Donnell,

James Blanco (an expert who O'Donnell hired years earlier to authenticate the Fraudulent

---

[20] An FBI agent would later attest, in connection with the Fraudulent Paintings and the False Provenance, that: "[A]
large cache of artwork, by a significant artist, that was never previously documented, is a red flag for possible fraud
and requires increased scrutiny of the provenance documentation." Rivas Affidavit, ¶ 10.

72234736;2

Paintings),[21] Klein (the New York art dealer and friend of O'Donnell's who previously approached, and was rebuffed by, the Director of the Mennello Museum of Art about exhibiting the Fraudulent Paintings), and others who were paid for their contributions by OMA and at the direction of O'Donnell.

91.     For his part, O'Donnell's essay was primarily about his efforts to authenticate and sell the Fraudulent Paintings—so much so that LiPuma, Mangan, and Burns objected to his first draft.

92.     In the published version of O'Donnell's essay, he wrote that he "hire[d] renowned experts in several disciplines." The first was Blanco, a "document examiner[ ]" who concluded that Basquiat "had initialed Mumford's elegant poem" and that "[o]ut of the 25 works, all but a few had some form of identifiable marking commonly used by Basquiat on his paintings and drawings."[22] The second was Dr. Jordana Moore Saggese, a professor at the University of Maryland, who prepared a "73-page work," which O'Donnell described as "a masterful study of Basquiat's life, themes, historical significance, and the reasons why she concluded that our paintings were done by the hand of Basquiat." The third was Cortez, the former member of the Authentication Committee of the Estate of Jean-Michel Basquiat widely credited as "discovering" Basquiat. O'Donnell wrote that Mangan told him that "Cortez had reviewed [the 19 MJL Trust works] and had written letters of authenticity for the set of 19 and each of them individually." Thereafter, O'Donnell wrote that Cortez issued "unqualified letters of authentication" for the seven BVCG

---

[21] Blanco was previously involved with attempts to authenticate certain "Fictitious Pollocks" owned by Mangan. Rivas Affidavit, ¶ 33. Mangan represented to the FBI, in connection with a separate investigation involving the Fictitious Pollocks, that Blanco tested the handwriting and "confirmed the signature was correct." *Id.* Later, the man who sold the Fictitious Pollocks to Mangan pled guilty to wire fraud in connection with a nine-year scheme to defraud art collectors who purchased more than 60 works purported to be by Pollock and other artists and was sentenced to 5 years in prison. *See id.* at ¶ 34.

[22] Blanco's report, as provided by O'Donnell, only discussed 20 works.

works.[23]

93.     O'Donnell also referenced Richard Marshall as a "luminary for Basquiat," who al-

legedly agreed to write a letter to Mangan expressing his opinion that the Fraudulent Paintings

were authentically Basquiat.  However, per O'Donnell (and with a striking similarity to the story

that O'Donnell made up about Cheim, the member of the Authentication Committee of the Estate

of Jean-Michel Basquiat who purportedly authenticated the Fraudulent Paintings and then died),

Marshall died before issuing a written opinion.[24]

94.     O'Donnell's essay now reads like the closing argument in his own "high stakes

lawsuit[ ]" to prove the Fraudulent Paintings and the False Provenance are real.  O'Donnell wrote:

"I can always lose a trial.  But in the Case of the 25 Basquiats, I see a jury finding them not just

authentic but declaring them to be masterpieces."  O'Donnell also invoked the names and reputa-

tions of two former U.S. Supreme Court justices to plead his case: Justice Louis D. Brandeis, who

O'Donnell quoted as saying: "Most of the things worth doing in the world had been declared

---

[23] By O'Donnell's telling, obtaining Cortez's letter was near impossible: "Diego was a notoriously private person who had defected from the New York art scene and initially lived in North Carolina. Aloof and guarded, it was well known that what I wanted Diego simply did not want to do." However, the FBI agent would later attest, in connection with the Fraudulent Paintings and the False Provenance, that: "[Cortez] previously sought payment for writing a favorable report authenticating works of Basquiat. An art gallery employee that I interviewed informed me that he was aware of a collector who bought a 1980 piece of artwork and asked [Cortez] if [Cortez] would authenticate the work, and [Cortez] responded that he would authenticate the piece if he were paid a certain amount." Rivas Affidavit, ¶ 44.

Very recently, Artnet News published the article *He Was the Legendary Impresario Who Put Jean-Michel Basquiat on the Map. But Now Former Friends Reveal Another, Darker Side of Diego Cortez*, which reported: "that Cortez double-dipped on art transactions; that he borrowed money and never paid people back; that he sold works that didn't belong to him. He was a bully. He authenticated artworks that turned out to be fakes. He would do anything for money when he needed it." Katya Kazakina, *He Was the Legendary Impresario Who Put Jean-Michel Basquiat on the Map. But Now Former Friends Reveal Another, Darker Side of Diego Cortez*, ArtNet (July 28, 2023), https://news.artnet.com/news-pro/the-darker-side-of-diego-cortez-2337669 (last visited August 11, 2023). The article specifically referenced the Exhibition: "The scale of Cortez's bad behavior—and potentially his late-life desperation—became apparent to many of his friends when the news broke, after his death, about the fake Basquiat paintings at the Orlando Museum of Art. That group of artworks was personally authenticated by Cortez between 2018 and 2019 after he left New York and could barely make ends meet."

[24] The same FBI agent would later attest: "I also know that individuals engaged in fraud often use the names of deceased persons in authentication documents, which prevents buyers or others from questioning the veracity of the opinion." Rivas Affidavit, ¶ 45.

impossible before they were done"; and Justice Potter Stewart, who O'Donnell quoted as writing
"I know it when I see it," referring to hard-core pornography not protected by the First Amendment
of the U.S. Constitution.

95.     Likewise, one of De Groft's essays in the Catalogue declared the Fraudulent Paint-
ings as "undeniably" Basquiat and appraised them at "$500 million" (a far inflated figure com-
pared to the underlying loan agreements, which valued them collectively at less than $100 million).

96.     De Groft went farther still, musing "what it must have been like to be a Black man
artist in a white man's artist's [sic] world." De Groft not only misappropriated, but also rewrote,
the lives and legacies of Basquiat and Mumford to fit the narrative of the Fraudulent Paintings and
the False Provenance: "Both were Black men in a white man's world and while more privileged
than most, both men felt racism and oppression acutely, and images and reference to it came out
in the works of both."

97.     De Groft even proclaimed, for the first time, and based on nothing more than rank
speculation, that Basquiat committed suicide: "The night of his death, he injected himself to the
point of suicide and dying. How do we know this? On the specifics of his death, the bathroom
was described as above. Why would anyone punch out a bathroom window or any other window?
And then write on the wall 'Broken Heart?' I have had experience with suicide and sun rising due
to a sad and terrible situation with an employee, and I saw this very thing. A tormented Basquiat
was trapped in a world he had a hand in creating. He wanted out. How do you get out? Smash a
window and 'escape.' His heart was broken. He was an artist for everyone else who owned him.
No one has ever said that Basquiat killed himself, but that it was an accidental overdose of a
'speedball'—a lethal mixture of cocaine and heroin."

98.     In an email sent at 12:30 a.m. on June 26, 2021, while the Exhibition was being

- 28 -

curated and the Catalogue was being created, De Groft boasted to O'Donnell that his "new contribution to the world on Basquiats [sic]" was that "[h]e killed himself," in order to justify his "expertise" to "the potential owners" (i.e., the potential purchasers), who De Groft speculated could include "Jay Z," or "the Chinese," or "Arabs," or "the Russians":

| | |
|---|---|
| From: | O'Donnell, Pierce [podonnell@█ |
| on behalf of | O'Donnell, Pierce <podonnell@█ ▬ ▬ > [podonnell@█ ▬ ▬ |
| Sent: | 6/26/2021 1:10:19 PM |
| To: | Aaron De Groft [aaron.degroft@█ ▬ |
| Subject: | Re: The night Basquiat died. |

Wow!!! So powerful, personal and tragic at the same time. Kudos☐☐

Sent from my iPhone

Pierce O'Donnell
Attorney at Law
Biography

podonnell@█

Greenberg Glusker LLP
2049 Century Park East, Suite 2600
Los Angeles, CA 90067
GreenbergGlusker.com

This message is intended solely for the use of the addressee(s) and is intended to be privileged and confidential within the attorney client privilege. If you have received this message in error, please immediately notify the sender at Greenberg Glusker and delete all copies of this email message along with all attachments. Thank you.

On Jun 26, 2021, at 12:30 AM, Aaron De Groft <aaron.degroft@█ ▬ wrote:

This is who I am. I am going to publish as part of our things. If the potential owners want to know my expertise in Basquiat, then this is my new contribution to the world on Basquiats. He killed himself. No one has said this but read my stuff. My argument on that he did it. Changes the narrative to our control and not the media and scholars. We own this.

We own the narrative on the Mumford twenty five. Do not get cold feet. Jay Z buys them all as a collection for his media purposes then fine. $250 million as a unique collection that is universally important or they do not. Then sell them individually. Make more money. My bet if Nets do not buy them as a collection, then the Chinese, or Arabs or the Russians will. Either way you are golden my friend.

## Exhibit 22.

99.    Blanco's essay for the Catalogue was almost entirely about why the paintings were authentic. In actuality, it was O'Donnell who drafted and provided to Blanco—the so-called "expert" —the summary of how O'Donnell envisioned his article:

- 29 -

| From: | O'Donnell, Pierce [podonnell@ ████████ |
| Sent: | 6/1/2021 4:34:46 PM |
| To: | Jim Blanco ████████ |
| CC: | Aaron H. DeGroft [adegroft@ ████████ |
| Subject: | Your article |
| Attachments: | Blanco article .docx |

Jim

Here is a summary of how I envision your article for the catalogue for the Orlando Museum of Art exhibition.  Please call me later today.  Thanks.

Pierce

**Exhibit 23**.

100.    O'Donnell and De Groft used OMA funds to hire Deborah Krieger, a graduate stu-

dent and daughter of one of O'Donnell's law partners, to research and put together a timeline of

Basquiat's activities in Los Angeles in 1982, the year and location in which he allegedly created

the Fraudulent Paintings. *See* **Exhibit 24**.

101.    O'Donnell and De Groft placed strict constraints on Krieger's research, including

barring her from contacting known associates of Basquiat in Los Angeles in 1982, including, spe-

cifically, Fred Hoffman,[25] who apparently worked and painted with Basquiat during his time in

California:

---

[25] According to his website, Hoffman "worked closely with Jean-Michel Basquiat from 1982-1984 in Venice, California.  During that time period Basquiat and Hoffman produced six, now highly recognized silk screen limited editions." *About Fred Hoffman*, FRED HOFFMAN FINE ART, https://fredhoffmanfineart.com/about (last visited on August 11, 2023).  Hoffman also arranged for Basquiat's first European museum exhibition, and he placed the first work by Basquiat into a major collection at The Museum of Modern Art in 1984.  *See id.*  For several years, Hoffman also served on the Authentication Committee of the Estate of Jean-Michel Basquiat.  *See id.*

- 30 -

| From: | Aaron H. DeGroft[/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=33cbae2830b34d6dbfc8b696f7edd140-Aaron H. De] |
|---|---|
| Sent: | Mon 6/14/2021 2:37:37 PM (UTC-04:00) |
| To: | Deborah Krieger |
| Subject: | Re: JMB in LA |

Fred is not contributing and Pierce waned to steer clear of him. I will call you this afternoon to plow through  you will do great.

Get Outlook for iOS

From: Deborah Krieger
Sent: Monday, June 14, 2021 2:17:29 PM
To: Aaron H. DeGroft <adegroft@
Subject: Re: JMB in LA

Hi Aaron,
I'm kind of hitting a dead end in terms of the essay right now. Would it be possible for me to connect with Fred Hoffman—I think Pierce mentioned he was contributing?—to talk about what he's writing for the catalogue? I can also flesh out the timeline but I'm not loving my attempts at a thesis and am wondering if expanding the timeline itself into something more essayistic is a better move?
Deborah

**Exhibit 25**.

102.    Ultimately, the limitations put on Krieger by O'Donnell and De Groft thwarted her attempts. In June 2021, she wrote "[h]ere are some of the issues which have slowed the progress: . . . 2) Regarding interviews: the limitations on who I can contact for my piece have made it a little challenging to get first-hand accounts of people who knew Basquiat." **Exhibit 26**.

103.    Of the three people that Krieger had been permitted to contact, Blanco, O'Donnell's handwriting expert, was one of them. And, neither of the other two contributors appeared to have ever met or worked with Basquiat.

104.    O'Donnell also introduced De Groft to Stevenson A. Dunn, Jr., founder and owner of The Bishop Gallery, and directed De Groft to offer Dunn $10,000 to write an essay for the Catalogue. As instructed, De Groft dutifully sent Dunn a letter, on OMA letterhead, memorializing

72234736;2

the agreement for OMA to pay him $10,000 in exchange for his essay. Dunn later sent OMA, c/o De Groft, an invoice indicating: "It was great doing business with you."

## IV.     OMA's Curatorial Staff and Other Key Employees Discover and Report Serious Concerns about the Fraudulent Paintings and the False Provenance.

105.    OMA's professional curatorial staff was led by the Chief Curator and also included an Associate Curator and a Registrar, along with preparators. The Associate Curator and the Registrar, and other key employees, discovered and reported serious concerns about the Fraudulent Paintings and the False Provenance to De Groft throughout the organization and curation of the Exhibition. De Groft ignored or silenced these concerns in furtherance of his conspiracy with the Owner Defendants.

106.    In Summer 2021, the Associate Curator began researching the Fraudulent Paintings and emailed her supervisor, the Chief Curator, and his supervisor, De Groft. Specifically, she sent links to several articles indicating that there may have been more works in the Mumford Collection than those that were to be exhibited at OMA, one of which, titled *Helicopter*, purportedly had the same False Provenance as the Fraudulent Paintings. *See* **Exhibit 27**.

107.    Undeterred, De Groft pronounced that *Helicopter* was fake but oddly credited O'Donnell with exposing the forgery. He dismissed the remainder of the Associate Curator's comments in what would become a pattern by De Groft of obfuscation and diversion. *See id.*

108.    Also during Summer 2021—two months after first agreeing to exhibit the Fraudulent Paintings in April, and only three months before the Exhibition was scheduled to open in September—De Groft traveled to Crozier Fine Arts in New York, where the Fraudulent Paintings were stored, to see them for the first time. The Associate Curator made the trip with De Groft and reported concerns about how the Fraudulent Paintings were stored and handled.

109.    The Associate Curator and the Registrar later exchanged an email detailing certain

- 32 -

concerns about "discrepancies" in the False Provenance, with the express purpose of creating a

record, because they felt their concerns were being ignored by De Groft:

| From: | ████████████ /O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP |
| | (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=431D5128817D476C881723109E467F45████████ |
| Sent: | 7/22/2021 12:06:34 PM |
| To: | ████████████████ |
| Subject: | Discrepancies |

• Number of artworks varies: 26, 20, 19 or 18 paintings are mentioned in the documents; since no photo/checklist attachments are included in any of the documents in the LiPuma Provenance packet it is impossible to confirm which pieces were transferred at any one time.

• Declaration of Taryn Burns (Saggese's Report on the Basquiat Venice Collection, Appendix B p.1) states that in Oct 1, 2012 her partners Lu Quan and William Force purchased 26 paintings by JMB (25 cardboard and 1 on wood) and directly from Michael Barzman.

• In Barzman's documentation (attachment 4) dated May 18, 2012, Barzman signs a transfer of ownership to a redacted individual or group, which is inconsistent with Taryn Burns info.

• Barzman's later documentation shows his transferring the work to Fiducia Dei Borgia (20 pieces), but another individual (Taryn Burn) has also claimed having purchased the work (26 pieces), which appears as if the work was sold twice with inconsistent numbers.

• Attachment 5 shows La Fiducia dei Borgia (Partner Family Trust) as being the owners of 18 (March 12, 2015). Then in July 15, 2015 it is noted in the transfer of ownership from Barzman to Fiducia dei Borgia (attachment 6) that 20 paintings were transferred to them in May 2012, it appears attachment 5 is potentially identifying them as the redacted individual on Barzman's documentation (attachment 4) dated May 18, 2012.

• Documents specifically state that:
○ The Estate has not authenticated the works
○ MLJ intends on marketing them as "By JMB" and not merely "attributed to JMB"
○ The documents fluctuate between "attributed to" on attachment 4, "unauthenticated/attributed to" on attachment 5, "attributed to" on attachment 6, "attributed to" on attachment 8, to finally "by" on attachment 9 when the works are in the MLJ ownership interest (March 2018); then in Sept 2018 Cortez gives an opinion letter of authenticity.

• Pages 2 to 9 of James A. Blanco's Report of Authenticity bear spelling mistakes on the artist name (top of each page 2-9; and in last sentence of his report on p.9)

• Spelling mistake on Thaddeus Mumford name (Barzman, attachment 3)

Provenance from MLJ documentation seems to be:

Thad Mumford
Ortiz Bros
Barzman
MLJ under a previous redacted name
Borgia - then after Torie Geisler's death:
Norberg
MLJ

Where does Taryn Burns fit? She's included in Pierce's info but not in MLJ docs.

- 33 -

72234736;2

**Exhibit 28**.

110. The OMA Board at large only later discovered the concerns of its curatorial staff and key employees after the Exhibition opened, largely because De Groft's conduct during the curation of the Exhibition and creation of the Catalogue discouraged transparency and whistle-blowing. OMA employees were under the impression that De Groft was "working for" the Owner Defendants, and they feared for their jobs and professional reputations if they did anything to speak out against the Exhibition.

111. For himself, and despite attending numerous meetings of the OMA Board, the Executive Committee of the OMA Board, and other Standing Committees of the OMA Board, De Groft failed to elevate any of the concerns about the Exhibition.

## V.    De Groft and the Owner Defendants Attribute the Poem to Mumford and Basquiat, and Misrepresent it as a "Receipt" For the Fraudulent Paintings.

112. While the Catalogue was being drafted and in the process of being finalized, the Owner Defendants directed De Groft to change one of the most significant details about the provenance: the origin of the poem. De Groft, again, dutifully complied.

113. The origin of the poem went through several concocted iterations. First, the story was that it had been presented to one or more of the Owner Defendants by Loretta Swit, the actress who played the character "Hot Lips" Houlihan in *M\*A\*S\*H* (written and produced by Mumford). De Groft announced this version of the story at a meeting of OMA staff. In a draft of his essay for the Catalogue, O'Donnell also wrote: "With the assistance of Loretta Swit—Major Margaret "Hot Lips" Houlihan on *M\*A\*S\*H*—Lee [Mangan] had obtained an untitled, typed poem." LiPuma revised O'Donnell's draft essay to delete reference to the actress and wrote: "not true." **Exhibit 29**.

114. Around the same time, an entirely different story was posted to bvcg.org, a website

- 34 -

created by O'Donnell to market the BVCG works. O'Donnell sent a link to the website to De
Groft, who shared it with OMA employees, who noticed that the website stated that the poem had
been found in the archives of the Smithsonian Institution.

115.    After reviewing a draft essay for the Catalogue by De Groft's Curatorial Assistant,[26]
Mangan emailed O'Donnell and LiPuma and asked "how [the Curatorial Assistant] determined in
[her] Catalogue essay that the Poem written by Basquiat was written by Mumford?" Stunningly,
O'Donnell replied and told Mangan and LiPuma that "Aaron [De Groft] was changing this to
written by JMB [Jean-Michel Basquiat]." Upon reviewing the email chain forwarded by O'Don-
nell, De Groft explained that he and the Curatorial Assistant "believed" that Mumford wrote the
poem but that there was "no problem in modifying this." De Groft knowingly continued, "You
know Mumford typed it however. Right."

---

[26] The Curatorial Assistant was not part of OMA's professional curatorial staff. She was a part-time employee who
had been hired by De Groft to assist with the Exhibition after he met her socially.

To:       O'Donnell, Pierce[podonnell@███████████]
From:     Aaron H. DeGroft[/o=ExchangeLabs/ou=Exchange Administrative Group
(FYDIBOHF23SPDLT)/cn=Recipients/cn=33cbae2830b34d6dbfc8b696f7edd140-Aaron H. De]
Sent:     Sat 1/22/2022 3:10:37 PM (UTC-05:00)
Subject:  Re:████████████Essay

Her and my belief was from studying how and what Basquiat wrote. No problem in modifying this. You know Mumford
typed it however. Right.

Get Outlook for iOS

---

**From:** O'Donnell, Pierce <podonnell@███████████>
**Sent:** Saturday, January 22, 2022 7:39:00 AM
**To:** Aaron H. DeGroft <adegroft@███████████
**Subject:** Fwd:████████Essay

Sent from my iPhone

Pierce O'Donnell
Attorney at Law
Biography
podonnell@███████████

Greenberg Glusker LLP
2049 Century Park East, Suite 2600
Los Angeles, CA 90067
GreenbergGlusker.com
This message is intended solely for the use of the addressee(s) and is intended to be privileged and confidential within the attorney client privilege. If
you have received this message in error, please immediately notify the sender at Greenberg Glusker and delete all copies of this email message
along with all attachments. Thank you.

Begin forwarded message:

> **From:** "O'Donnell, Pierce" <podonnell@███████████
> **Date:** January 22, 2022 at 6:38:12 AM CST
> **To:** Lee Mangan <lmangan227@███████████
> **Cc:** Richard LiPuma <rich@███████
> **Subject: Re:**████████**Essay**

Aaron said he was changing this to written by JMB.

Sent from my iPhone

On Jan 21, 2022, at 10:31 PM, Lee Mangan <lmangan227@████████ wrote:

Just want to know how this person determined in their catalogue essay that the poem written by
Basquiat was written by Mumford?

**Exhibit 30.** The Assistant Curator's essay was ultimately revised to characterize the poem as

"believed to be written between him [Mumford] and Jean-Michel Basquiat," as a compromise,

- 36 -

after she reported to other OMA employees that she felt like she was being bullied by De Groft and the Owner Defendants to write something that she did not agree with.

116.    De Groft had previously emailed O'Donnell and emphasized the need to "stick with the poem of twenty five. It is our document evidence attesting to the covenant between Mumford and Basquiat":

| | |
|---|---|
| **From:** | Aaron De Groft |
| **Sent:** | 7/11/2021 1:36:10 PM |
| **To:** | Pierce O'Donnell] [/] |
| **Subject:** | [Chat #155] |

I am now convinced this work that sold as Mumford is forged for multiple reasons not the least of which is the signature. The "E" has a spine. He never signed that way. Also there are so many more things wrong with it. After being immersed in Basquiat 24/7 for almost six months, I got it. That is why we stick with the poem of twenty five. It is our document evidence attesting to the covenant between Mumford and Basquiat. Last night I watched a long interview with Mumford. He was Basquiat…in his world…talk in 10? Had my phone off all day writing and working. Just turned it back on. Heading back to Museum after lunch break. Your essay is wonderful my friend.

**Exhibit 31**.

117.    O'Donnell ultimately wrote in his Catalogue essay: "Lee [Mangan] had obtained from Mumford an untitled, typed poem in my opinion written by Basquiat. Printed on 1980s-era dot matrix printer paper, the poem—21 lines of free verse with three stanzas of seven lines each— was initialed 'JMB' on the bottom. . . . At this point, I was convinced that this remarkable autobi-ographical poem celebrated two fertile creative minds and recorded the similarities and shared experiences of two African American men who had closely bonded in such a short time."[27]

118.    This conflicted with the draft of O'Donnell's essay, revised by LiPuma, in which O'Donnell claimed that the poem "appeared to me to be a collaboration between Basquiat and

---

[27] Only a page later, O'Donnell described the poem as "Mumford's elegant poem," arguably conflicting with O'Don-nell's prior statement, and the position of the other Owner Defendants, that Basquiat had authored the poem. In one of his essays in the Catalogue, De Groft described the poem as "a remarkable autobiographical poem that they [Basquiat and Mumford] likely derived together . . . . Mumford likely typed it up as a veteran screenwriter would do, and Basquiat initialed it." Another essay in the Catalogue states that the poem was "written by Mumford and initialed by Basquiat . . . ."

- 37 -

Mumford which was likely typed by Mumford himself." LiPuma struck through this sentence and wrote: "speculative and untrue-we believe Basquiat wrote and signed the Poem, and there is no way to know who typed the words." Ex. 29.

119.    Multiple OMA employees raised concerns about the changing provenance of the poem to De Groft, and in one instance, De Groft told an employee to "trash" evidence of any version that conflicted with O'Donnell's final essay in the Catalogue.

120.    OMA employees also alerted De Groft to another apparent inconsistency in the False Provenance recited in the Catalogue: the implausible claim by the Owner Defendants that the Fraudulent Paintings were purchased from Barzman on one day in May 2012 and then transferred to the MJL Trust the very next day.[28] De Groft emailed certain OMA employees that the "provenance page with the purchase of the works on one day and the transfer to the trust is inaccurate and Rich Lipuma [sic] is fixing it." **Exhibit 32**. Of course, provenance is the permanent, actual history of a piece of art and is not something that can be "fix[ed]."

121.    Based on Mumford and his lawyer's unequivocal denials that Mumford knew Basquiat, that he purchased his works, or that he stored them in his storage unit—in addition to the numerous facial discrepancies and the fact that Barzman had told Mangan, Force, and Burns that he could not prove that Mumford came into possession of the Fraudulent Paintings in 1982— the Owner Defendants knew that the False Provenance, and the concocted origin story of the poem, was fabricated from the beginning. By cavalierly agreeing to go along with the Owner Defendants' directives regarding the poem and other discrepancies in the False Provenance, De Groft was

---

[28] This claim also conflicted with the Burns declaration, discussed in paragraph 42 *supra*, and which stated: "In October, 2012, my partners Lu Quan and William Force purchased 26 paintings by Jean-Michel Basquiat. . . . We purchased them from an auctioneer Michael Barzman of Barzman Auctions. Barzman had purchased the paintings from Ortiz Brothers Moving and Storage . . . . The paintings came from Locker #2125 that had been rented for a long time to Thaddeus Q. Mumford, Jr."

72234736;2

complicit in the Owner Defendants' conspiracy to defraud OMA into exhibiting the Fraudulent
Paintings.

## VI.    De Groft and the Owner Defendants Finalize the Exhibition and their Plans to Sell the Fraudulent Paintings and Profit Handsomely.

122.    At all stages of the curation of the Exhibition, the Owner Defendants directed De
Groft in his performance of OMA's obligations under the loan agreements. As explained above,
O'Donnell directed De Groft to obtain (through OMA and at OMA's expense) $300 million of
insurance coverage, he directed the racial and gender composition of those contributing to OMA's
Catalogue (which, as explained below, could only be seen as an illicit marketing scheme to sell the
Fraudulent Paintings), and he and the other Owner Defendants directed and editorialized the con-
tent of the Catalogue behind the scenes.

123.    As another example, O'Donnell messaged De Groft extensively with suggestions
for how OMA should promote the Exhibition—suggesting in one communication a "blockbuster
video narrated by [De Groft] about the Mumford Collection to be run on [OMA's] website,
YouTube, social media etc."[29]  **Exhibit 33**.

124.    And De Groft—for his part—expressed interest in the Fraudulent Paintings far be-
yond OMA's Exhibition; for example, he discussed with Klein (O'Donnell's friend the art dealer)
the possibility of displaying the Fraudulent Paintings in other countries (like the United Arab Emir-
ates) and eventually negotiated an agreement to send the Fraudulent Paintings to Italy after exhib-
iting them at OMA.

125.    Over time, De Groft was behaving more and more like he worked for O'Donnell—

---

[29] Such a video was, in fact, produced and later posted on O'Donnell's bvcg.org website. *See Virtual Exhibition: Heroes & Monsters by Jean-Michel Basquiat,* BASQUIAT VENICE COLLECTION GROUP, https://www.bvcg.org/oma-video-guided-tour (last visited August 11, 2023). In the video, and like his unsubstantiated claim that Basquiat com-mitted suicide, De Groft claimed without substantiation that Basquiat had AIDS. The Catalogue was also posted on the website. As of today, the website (parts of which are password protected) is still active and still references "OMA."

72234736;2

not OMA. De Groft and O'Donnell also had (for two professionals allegedly involved in an arm's length transaction) a bizarrely close relationship. At one point, De Groft told O'Donnell, "I really like talking to you. I am out tonight." O'Donnell replied, "Yes. And separated at birth my brother." In another email, De Groft bragged about being "half a lawyer" and told O'Donnell, "[l]ove you my friend." **Exhibit 34.**

126.    O'Donnell did not represent OMA in any official capacity, nor did OMA ever enter into any agency relationship with O'Donnell. Even so, as De Groft and O'Donnell prepared for the Exhibition, O'Donnell wrote several letters to third parties as if they were from OMA, which De Groft then forwarded verbatim in his capacity as OMA's Executive Director & CEO.

127.    Around the same time, De Groft used his personal email account to correspond with O'Donnell, suggesting that O'Donnell represent De Groft in selling the Titian painting discussed in paragraph 52 *supra*. De Groft further alluded to a scheme to authenticate, and then sell, the *Comstock Pollock* and the Fraudulent Paintings as a predicate to selling the Titian. O'Donnell agreed to the woefully improper arrangement—responding, "Very good. Thanks."

| From: | O'Donnell, Pierce[podonnell@███████] |
|---|---|
| Sent: | Thur 6/10/2021 10:17:38 AM (UTC-04:00) |
| To: | Aaron De Groft[aaron.degroft@████████] |
| Cc: | Pierce O'Donnell[pierceodonnellhome@████████] |
| Subject: | Re: Titian |

Very good. Thanks


Sent from my iPhone


Pierce O'Donnell
Attorney at Law
Biography:
podonnell.a.████████

Greenberg Glusker LLP
2049 Century Park East, Suite 2600
Los Angeles, CA 90067
GreenbergGlusker.com
This message is intended solely for the use of the addressee(s) and is intended to be privileged and confidential
within the attorney client privilege. If you have received this message in error, please immediately notify the sender
at Greenberg Glusker and delete all copies of this email message along with all attachments. Thank you.

> On Jun 9, 2021, at 7:56 PM, Aaron De Groft <aaron.degroft@███████>
> wrote:


One of the lawyers who represents 50 percent ownership.

He was here last week checking me out. He is concerned I would broker the
painting but then authenticate it. I told him I would be represented by legal
counsel (you). I can set up the sale then it would be up to you and them to sell it. I
can still authenticate it at arms length. You good with that?  This is of course after
Basquiat and Pollock to build the lost art resume. Right?

## Exhibit 35.

128.    Just days later, O'Donnell and De Groft discussed the "Titian boys" and their ap-

parent desire "to be in the game," with De Groft eventually suggesting a "quick call" to discuss.

## Exhibit 36.

129.    A couple months later, O'Donnell emailed De Groft a YouTube video produced by

the auction house Sotheby's, promoting the sale of Titian's *A Sacra Conversazione*—with an

72234736;2

estimated value of $15–20 million.

130.    Later, in an otherwise unrelated email to O'Donnell from his personal email ad-

dress, and in addition to improperly disclosing confidential OMA business, De Groft mentioned

the *Comstock Pollock* and stated: "I hope we can early next week solidify our business agreement

if that is ok with you." **Exhibit 37**.

131.    De Groft and O'Donnell entered into an arrangement for De Groft to authenticate

and exhibit the Fraudulent Paintings and the *Comstock Pollock* to legitimize them for, and share

in the profits from, their eventual sales.

132.    In a text to O'Donnell from around the same time, De Groft mused that LiPuma

and the MJL Trust owners need to "share" because any sale of their Fraudulent Paintings would

be impossible were OMA not bearing the costs of the Exhibition (only a few months after De Groft

represented to the OMA Board that the Exhibition would be "[f]ree"). De Groft also noted that

the "same goes for the *Pollock*," while mentioning a person with whom O'Donnell had at one point

joined in a joint venture to sell the *Pollock*.

| | |
|---|---|
| From: | Aaron De Groft |
| Sent: | 7/13/2021 9:57:38 PM |
| To: | [Pierce O'Donnell] [/] |
| Subject: | [Chat #161] |

Thanks for the talk tonight. Rich and Lee need to be acutely aware that the introduction of the Basquiats to the world and the subsequent sale of the works coins not happen without the entire thing on your back, my back and all the costs being Norge back of the OMA. We are one the same page my friend. Thank you. Same goes for the Pollock. What did            do to further this. Nothing but you did I did and the OMA did. They have not lifted a finger. Thus if a sale by our efforts. They need to share. Simple as that. Thanks.

**Exhibit 38**.

## VII.    The FBI Contacts De Groft and Issues Subpoenas.

133.    On July 2, 2021, in what would turn out to be only 17 days before the FBI first

makes contact, De Groft received a call from someone in Palm Beach who told him the Fraudulent

Paintings were "fakes." De Groft delighted in "crushing" the caller, who "cried proverbially," and bragged about it to the Associate Curator and his Curatorial Assistant:

| From: | Aaron De Groft[aaron.degroft@ ███████ |
|---|---|
| Sent: | Fri 7/2/2021 11:02:07 PM (UTC-04:00) |
| To: | ███████████████ ; ████ |
| Subject: | I cannot wait to tell you both about how a guy called me today from Palm Beach. |

And told me our Basquiats are fakes. I crushed him…he cried proverbially.

Have a great 4th! We are going to Sarasota.

**Exhibit 39**.

134.    Later that day, De Groft bragged to LiPuma that "we have made so many discoveries" and claimed that because of his efforts, "[y]our works are worth double."

| From: | Aaron De Groft[aaron.degroft@ █████ |
|---|---|
| Sent: | Fri 7/2/2021 10:35:26 PM (UTC-04:00) |
| To: | Aaron H. DeGroft[adegroft@ ██████ ]; Rich LiPuma[rich@ ██████ |
| Cc: | ████████████████ |
| Subject: | Re: Basquiat Mumford Collection |

Just so you know, we have made so many discoveries that the works are the best of his career. You will come to understand why because of my efforts. Your works are worth double. Do not give that up. I will show you why. In our exhibition and catalogue. I am deadly serious. We can talk about this. Not just my bravado. Real. This was the last time he painted for himself. Afterwards he was owned by everyone. Your provenance is iron rock solid.

**Exhibit 40**.

135.    On July 19, 2021, an FBI agent emailed De Groft and the Chief Curator and informed them that the FBI was investigating an issue with the Fraudulent Paintings and asked them to keep the communication in confidence.

136.    De Groft immediately informed O'Donnell about the FBI investigation (in violation

of the FBI's request), but did not inform the OMA Board at large.

137.    Within hours, both the Chief Curator and the Associate Curator forwarded information to De Groft about the FBI agent, concluding that it "[s]eems like he is real." The Associate Curator also sent De Groft a recent press release from the U.S. Attorney's Office for the Southern District of New York announcing the arrest of an individual for his role in a scheme to sell forged artworks purportedly created by Basquiat and other renowned artists, and said "not sure it's connected to our pieces in particular but this article is dated July 9, 2021 so it's very recent." **Exhibit 41**.

138.    Unfazed, and immediately after his call with the FBI, De Groft emailed the Chief Curator and Associate Curator and declared "we marshal on." **Exhibit 42**.

139.    Later, the FBI, by email, asked De Groft for the Owner Defendants' contact information and expressly warned De Groft not to tell the Owner Defendants about the FBI investigation. De Groft responded to the FBI with an email in which he *openly* copied O'Donnell and LiPuma. By doing so, De Groft again violated the FBI's direction and ignored his fiduciary duties to OMA, effectively severing any semblance of trust between OMA and the FBI.

140.    On July 27, 2021, at 8:04 p.m., the FBI emailed De Groft two subpoenas for documents and records, one to De Groft individually and one to OMA. A warning at the bottom of the FBI's transmittal email stated:

> This communication is transmitted to you by the FBI and may include confidential, sensitive, or privileged information. The content of this communication is intended solely for the original addressees. **Unauthorized interception, forwarding, or dissemination of all, or part of this communication, is prohibited and a violation of applicable state and federal laws.** (emphasis added).

In addition to the subpoenas, the FBI also emailed De Groft "non disclosure letters," which instructed:

- 44 -

> Because this subpoena relates to an ongoing criminal investigation, **we request
> that you not disclose the existence of our compliance with the subpoena**. Prem-
> ature disclosure could impede the investigation. We request that you give us ad-
> vance notice if you plan to disclose the existence of or compliance with the sub-
> poena. (emphasis added).

Ignoring those warnings, and before contacting anyone else, De Groft forwarded the subpoenas to

O'Donnell just 30 minutes later, notwithstanding De Groft's fiduciary duty to OMA to comply

with the FBI's directives.

141.    Approximately three minutes later, De Groft texted O'Donnell:

| | |
|---|---|
| From: | Aaron De Groft |
| Sent: | 7/27/2021 8:37:12 PM |
| To: | Pierce O'Donnell] [/] |
| Subject: | [Chat #190] |

I just received a federal subpoena. Need to talk ASAP.

**Exhibit 43**.

142.    In response, O'Donnell texted De Groft "[w]e will get through this TOGETHER!!!"

**Exhibit 44**.

143.    The next day, O'Donnell undertook unauthorized efforts to seek legal advice on

behalf of De Groft and OMA and forwarded the FBI subpoena to OMA to a California attorney

who had not been engaged for legal advice by OMA.[30]  That attorney provided his legal opinion

regarding OMA's obligations for complying with the FBI subpoenas in an email to O'Donnell and

copying De Groft.

144.    Around the same time, De Groft claimed that a "catastrophic event"—which alleg-

edly occurred just 10 days before the FBI subpoenas were served, and a mere two days before the

---

[30] De Groft and the then-Chair of the OMA Board did later retain the undersigned counsel in connection with the FBI
subpoenas. After counsel was retained, a communication was drafted to inform the OMA Board at large about the
retention and the FBI subpoenas, but the communication was never sent.

72234736;2

FBI called—destroyed all of the data on his cell phone, which he used for personal and OMA
business, and which was a subject of the FBI subpoenas.

145.    Worse still, unbeknownst to OMA and without any authorization, De Groft improp-
erly forwarded attorney-client privileged communications from OMA's retained counsel to
O'Donnell. In doing so, De Groft solicited advice and input from O'Donnell to second guess
OMA's retained counsel's advice on responding to the FBI subpoenas, again violating his fiduciary
duties.

146.    Undeterred, but with the realization that the September 2021 opening for the Exhi-
bition was no longer feasible, De Groft and O'Donnell decided to take advantage of the "extra
time." O'Donnell appealed to De Groft's ego:

| From: | Pierce O'Donnell |
|-------|------------------|
| Sent: | 7/29/2021 1:30:20 AM |
| To: | "aaron.degroft@     [Aaron De Groft (owner)]" [/] |
| Subject: | [Chat #197] |

Aaron I have some gestating ideas how we can profitably use the extra time to make YOUR revelation of the 25
lost masterpieces even more of a sensation and put you and OMA in the stratosphere.

**Exhibit 45**.

147.    O'Donnell optimistically laid out how the "extra time" could benefit the Fraudulent
Paintings and "make the works and OMA untouchable and celebrated." **Exhibit 46**.

148.    De Groft and the Owner Defendants also spun the delayed opening as a conscious
decision to make the Exhibition coincide with Black History Month in February 2022, further
exploiting the legacies of Basquiat and Mumford.

149.    Meanwhile, De Groft kept O'Donnell informed about the FBI investigation and the
impact on the Exhibition. On August 4, 2021, he texted O'Donnell that "[w]e are moving forward
and all good . . . ." He also discussed OMA's compliance with the FBI subpoenas—again violating

the FBI's confidentiality directives and disclosing OMA's attorney-client privileged information—by telling O'Donnell that the "[FBI] will not discuss with our legal team the details of their inquiry at this time. Not bad news, just is what it is for now. . . ." **Exhibit 47**.

## VIII.    The Fraudulent Paintings Arrive at OMA, and More Discrepancies are Discovered and Ignored by De Groft and the Owner Defendants.

150.    In October 2021, the Fraudulent Paintings arrived at OMA. OMA hired an outside conservator to "condition report" the artwork and then allowed the paintings time to acclimate to the temperature and climate inside the building.

151.    OMA's professional curatorial staff was present when the works were first being "condition reported." This is when they noticed a shipping label affixed to the back of the work titled *Cat & Fire Truck*, which appeared to have been painted over, but which was still partially visible. They thought the shipping label was significant to the extent it could be used to date the work and establish the provenance, one way or the other. They made a note of the shipping label and took photographs to research and observe more closely later.





152.    In November 2021, when they started researching the shipping label, they discovered that the name on the label was "Michael Barzman," which they immediately recognized from the provenance documents provided by the Owner Defendants as the name of the Los Angeles auctioneer who supposedly purchased the works from Mumford's storage unit. OMA's curatorial staff then observed that the shipping label (the Barzman label) appeared to be underneath two layers of paint, in such a way that it must have been there *before* the painting on the other side was purportedly created by Basquiat in 1982. In other words, Basquiat could only have painted this work after the Barzman label had been affixed, and after paint on the back of the work covering the Barzman label had been applied, which has then covered by Basquiat's paint that seeped over from the front of the work. They also discovered that Barzman would have only been four years old in 1982 and not living at the address on the shipping label.

153.    Simply put, from a provenance perspective, in order for Basquiat to have painted *Cat & Fire Truck* on the cardboard affixed with the Barzman label, the following would have had

- 48 -

to have been true: (a) in 1982 (or earlier), a then-four-year-old Barzman would have had to have

received a cardboard box shipped to him at the address noted on the Barzman label (where he

apparently also lived or worked 40 years later); (b) after young Barzman's receipt of the cardboard

box, it would have had to have made its way to Basquiat, who was visiting Los Angeles in 1982;

(c) paint would have had to have been applied over the Barzman label; (d) Basquiat would then

have had to have painted *Cat & Fire Truck* on the front of the cardboard (with Basquiat's paint

from the front covering the paint that was already covering the Barzman label on the back); (e) the

cardboard—now bearing Basquiat's work—would have had to have made its way from Basquiat

to Mumford; (f) at some point between 1982 and 2012, Mumford would have had to have put the

work in his storage unit; (g) Mumford would then have had to have defaulted on his storage fees,

thereby entitling the storage company to seize and auction off the contents of his unit in 2012; and

(h) Barzman, then 44 (and living or working at the same address where he lived 40 years earlier),

would have had to have successfully bid on the contents of Mumford's storage unit without know-

ing the contents thereof.

154.    When OMA's curatorial staff was discussing how to present this obvious prove-

nance discrepancy to De Groft, De Groft happened to walk by their offices. De Groft provided

several implausible justifications, which OMA's curatorial staff did not believe to be credible.

Frustrated, De Groft reacted by exclaiming: "If they're fakes, then they're the best damn fakes the

art world has ever seen." De Groft's reaction was overhead by multiple OMA employees. Later

that evening, OMA's Registrar sent De Groft an email, copying the Chief Curator and the Associate

Curator, about the Barzman label for the express purpose of creating a record. De Groft then

forwarded the Registrar's email about the Barzman Label to O'Donnell as an "FYI."

| From: | Aaron H. DeGroft[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=33CBAE2830B34D6DBFC8B696F 7EDD140-AARON H. DE] |
| Sent: | Wed 11/3/2021 5:11:27 PM (UTC-04:00) |
| To: | Pierce O'Donnell[podonnell@█████████████] |
| Subject: | Fwd: Basquiat - Michael Barzman Label Images |

FYI.

Get Outlook for iOS

From: Aaron H. DeGroft <adegroft@█████████>
Sent: Wednesday, November 3, 2021 5:11:05 PM
To: █████████████████████
Cc: ██████████████████████████████████████
Subject: Re: Basquiat - Michael Barzman Label Images

Given the purple paint has a sharp edge, it looks the colored piece is adhered to the back.

Get Outlook for iOS

From: ████████████████
Sent: Wednesday, November 3, 2021 5:06:37 PM
To: Aaron H. DeGroft <adegroft@███████████>
Cc: ██████████████████████████████████████
Subject: Basquiat - Michael Barzman Label Images

Hi Aaron,

I've attached the images we spoke about earlier today of the Michael Barzman shipping label on the back of the Basquiat piece, *Cat & Fire Truck*, for your review and records.

It looks to me like the label was adhered to the box underneath the paint on the back of the work, however I'm not qualified to make that official assessment.

All the best,

████

**Exhibit 48**.

155.    During the "condition reporting" process, De Groft also instructed the Associate
Curator to be on the lookout for fingerprints so that they could be captured by the professional
photographers hired to be on site and take high resolution photographs of the works.

72234736;2

156.    De Groft bragged to O'Donnell that "[o]nce the fingerprints are verified, FBI game over." **Exhibit 49**.

157.    O'Donnell likewise wrote in his essay in the Catalogue: "Over my four decades in the trenches, cases have been won or lost based on a single piece of evidence—matching a fingerprint . . . . If this sounds like Perry Mason, it is. . . . My generation grew up with Perry Mason dramatically exposing forged documents as he secured his client's acquittal."[31]

158.    In an emboldened rush to counter the FBI's investigation, De Groft and O'Donnell sought to compare the apparent fingerprints on the Fraudulent Paintings to samples of Basquiat's fingerprints.

159.    Ultimately, De Groft hired, with OMA funds, a fingerprint analyst recommended by O'Donnell to examine the fingerprints allegedly found on the Fraudulent Paintings.

160.    O'Donnell obtained a sample of what he believed to be Basquiat's fingerprints from an unknown source on the "Internet," which De Groft provided to the fingerprint analyst to compare against the fingerprints on the Fraudulent Paintings.  OMA employees believe that De Groft provided the fingerprint analyst with a computer printout of the cover of the album *Shades of . . .*, which was released in 2010 by *Gray*, a band that Basquiat co-founded in 1979 and which had reunited after Basquiat's death.

161.    During this process,  De Groft told the Owner Defendants that OMA's counsel recommended seeking the assistance of—and discussing with—the FBI the existence of Basquiat's

---

[31] O'Donnell's biography in the Catalogue refers to him as "one of the nation's foremost and sought-after trial lawyers. With numerous notable successes in a variety of fields, Pierce has represented Hollywood celebrities, motion picture studios, television networks, most of the Fortune 10 corporations, cities and estates, the Republic of France, professional athletes, leading entrepreneurs, an NBA basketball team, art museums, art collectors, and 350,000 Katrina flood victims.  Dubbed the Perry Mason of Hollywood, Tom Brady of trial attorneys and the Billion Dollar Litigator, Pierce has recovered over $7 billion for his clients over his storied 50-year career."  The biography does not mention O'Donnell's three suspensions from the practice of law or O'Donnell's criminal convictions.

purported fingerprints on the Fraudulent Paintings, and OMA's plans to retain a fingerprint analyst
to verify them.

162.    O'Donnell wrote a detailed letter to De Groft and advised him to ignore OMA's
counsel's advice to enlist the FBI for help in examining the fingerprints because, in part, "I firmly
believe that reaching out to the FBI at this point for *any* reason is ill advised. . . . There is no good
that can come from contacting them. . . . You never do something like this until you know the
answer." **Exhibit 50**.

163.    As if his advice to De Groft was not enough, O'Donnell concluded by reminding
him, "as owners of the paintings, we do not authorize providing the prints from our paintings to
the FBI for it to do its own analysis for the reasons stated above." *Id.*

164.    Always wanting O'Donnell's approval, De Groft reassured him that he understood
the message about not contacting the FBI to assist with the fingerprint analysis:

| From: | Aaron H. DeGroft[/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=33cbae2830b34d6dbfc8b696f7edd140-Aaron H. De] |
|---|---|
| Sent: | Mon 11/1/2021 11:29:31 PM (UTC-04:00) |
| To: | O'Donnell, Pierce[podonnell@ ] |
| Subject: | Re: Letter re Fingerprints |

I understand the position to not get into the weeds.

Get Outlook for iOS

---

**From:** Aaron H. DeGroft <adegroft@ >
**Sent:** Monday, November 1, 2021 11:28:55 PM
**To:** O'Donnell, Pierce <podonnell@ >
**Subject:** Re: Letter re Fingerprints

Just for clarification and the record, I and neither the museum wanted to reach out to the fbi to
ask about the fingerprints analysis. This was suggested by the lawyers. I was against. It. A small
thing but important.

**Exhibit 51**.

- 52 -

165.    LiPuma, on behalf of the MJL Trust, also expressed concerns about contacting the

FBI with respect to fingerprint verification. De Groft assuaged LiPuma's concerns by reassuring

him: "To be clear I am not sending the prints to the FBI. . . . The lawyers suggested to our Board

Chair that they call the authorities to let them know that we were going to have the fingerprints

analysed [sic]. I very [sic] disagreed with this and want to get the analysis done and when the

results came [sic] back that they are Basquiat's, we then notify them as such. My Board Chair

disagreed with me on that. The fingerprints are you [sic] property and I would not release them

with out [sic] asking you and Pierce" **Exhibit 52**.

166.    O'Donnell's analyst hired by OMA was originally scheduled to perform the finger-

print examination before the Exhibition opened in February 2022. But, due to his professed con-

cerns about traveling to OMA during the Covid-19 pandemic, he did not perform the examination

until afterward.

167.    OMA employees who observed the fingerprint examination would later describe it

as a farce and not legitimate. The fingerprint analyst mishandled the works, including by propping

the framed works up on his lap. He selected only a few fingerprint samples from the works, miss-

ing or dismissing several other samples that were clearly visible. For the samples he did examine,

he did so over the plexiglass protecting the works, using only a dirty magnifying glass that looked

like a loupe, which he would slide across the plexiglass, scratching it at times. The fingerprint

analyst spent between 5 and 30 seconds per fingerprint on average, and the fingerprint examination

took less than two hours total. The fingerprint analyst did not take photographs, recordings, or

notes.

168.    Not surprisingly, with only the "Internet" exemplars of Basquiat's fingerprints as

comparators, the examination was inconclusive.

- 53 -

169.    De Groft, however, unequivocally attributed the fingerprints to Basquiat in one of his essays published in the Catalogue *before* the fingerprint examination took place: "Interestingly, there are several sets of Basquiat's fingerprints around the edges found on the exposed cardboard. More Basquiat fingerprints and partial prints are found on many of the Mumford Collection work [sic] both in the images themselves and around the edges. This may be the first time this is noted and recorded in the Basquiat literature."

170.    De Groft still did not inform the OMA Board at large about the Barzman label, or any of the other discrepancies and concerns raised by OMA's curatorial staff and other key employees.

171.    On December 23, 2021, an artist who was a previous recipient of OMA's "Florida Prize in Contemporary Art" emailed the Chief Curator. Simply put, the artist, a friend of OMA's, was concerned that the Fraudulent Paintings were "fake."

| From: | ████████████ |
| Sent: | Thur 12/23/2021 1:14:29 PM (UTC-05:00) |
| To: | ████████████ |
| Subject: | Basquiat exhibition |
| Attachment: | event-featured-OMAorlando-1626728403.jpeg |
| Attachment: | f5dd1cb2-1379-f46f-ca75-742956047da3.png |

Dear ████████,

I recently saw the press for a forthcoming Basquiat exhibition at Orlando Museum. The two images being shared publicly so far seem like fake Basquiats.

wanted to ask you if you actually had these works seen by a professional or by the Basquiat Estate?

I used to be an advisor and worked with Emanuel Javogue who owned and organized various Basquiat exhibitions in the 1990s and early 2000s. I could tell which works where fake and which where real. These works attached do not look like "real' Basquiats. They look like copies based on "Skull" (1982) and the other is a composite of various works. Basquiat never painted hands the way it is being shown here.

Just concerned about those works by the late Thaddeus Mumford Jr.

sincerely



### Exhibit 53.

172.    The Chief Curator forwarded the email to De Groft but no one else.  For that, De Groft praised him as the "quiet smart one of us" and told the Chief Curator: "Hope it does not all blow up.  Need your help.  You are stuck with me." **Exhibit 54**.

173.    The Chief Curator followed the chain of command and brought up questions about the Exhibition to his supervisor, De Groft, who he felt had the duty to raise any concerns to the OMA Board at large.  De Groft did not do so, instead downplaying the concerns that had been raised internally.  The Chief Curator, and other OMA employees, understood from De Groft that if they raised red flags about the Exhibition, then they could lose their jobs.  De Groft threatened

OMA's employees with retribution if they spoke out against the Exhibition.

IX.    **De Groft and the Owner Defendants Market the Fraudulent Paintings for Sale.**

174.    In December 2021, De Groft tasked the OMA Marketing and Public Relations De-
partment with developing a "cheerleading plan" for him to present to the Owner Defendants. **Ex-
hibit 55**. De Groft said his "ass was on the line" with the Owner Defendants regarding various
aspects of the Exhibition, including the "cheerleading plan."

175.    In January 2022, the Director of Marketing and Communications, along with De
Groft and the Chief Curator, received an email from Brett Sokol, who was reporting for *The New
York Times*, asking about the Exhibition. De Groft then sent Sokol all of the provenance documents
provided by the Owner Defendants and sat for multiple telephone interviews with Sokol. O'Don-
nell and LiPuma also spoke with Sokol.

176.    During one of De Groft's interviews, Sokol and De Groft specifically discussed
preprinted FedEx typeface on the back of the work titled *Crown Face II* that stated: "Align top of
FedEx shipping label here" in Univers 67 Bold Condensed font. Sokol explained that he had
shown the FedEx typeface to the person who designed it, who confirmed that the typeface was his
own creation, and that he had not created it until 1994. This was 12 years *after* the Fraudulent
Paintings were allegedly created by Basquiat, six years *after* Basquiat died, and the same year
Federal Express shortened its name to "FedEx."

177.    O'Donnell would later send a lengthy email to Sokol—copying LiPuma and Man-
gan—attempting to "debunk" the FedEx typeface issue. The tone of O'Donnell's email was
overtly defensive and referred to "Wikipedia" as a source. **Exhibit 56**.

178.    Confident that the Owner Defendants had quashed the FedEx typeface issue, De
Groft told OMA's curatorial staff: "Evidence has been found and shared that Federal Express was
using and referring to itself in the 1970s", presumably referring to O'Donnell's Wikipedia

reference. He also said that the "NYT writer agreed", which was not true, and concluded: "Think

we are good on that one. Thanks!" **Exhibit 57**.

179.    De Groft also brushed Sokol's questions about the FedEx typeface aside, and piv-

oted to a discussion with Sokol of the fingerprints on the works. De Groft told Sokol that the

fingerprints were definitive proof that the works had been created by Basquiat, but De Groft could

not have known that at the time because no fingerprint examination had been conducted. (The

fingerprint examination that was conducted later was inconclusive.) Sokol told De Groft that the

fingerprints could have been from anyone.

180.    Again, De Groft failed to inform the OMA Board at large about these issues, instead

proceeding full steam ahead with the Exhibition.

## X.    The Exhibition Opens and Quickly Implodes.

181.    In February 2022, De Groft again emailed the private owner of the Titian, inviting

him to attend the opening of the Exhibition. In that email, De Groft was shockingly candid about

his illicit motivations:

| | |
|---|---|
| Sent: | Tue 2/1/2022 2:01:57 AM (UTC-05:00) |
| To: | █████████████████ |
| Subject: | You want to come to my Basquiat show opening. |

New York Times and Forbes here on Wednesday. This is all part of the plan of exhibiting and
selling masterpieces. You all could not to do this without me. Face it. If we sell thii or s $100
million I need 30 percent. I have a high end LA lAwyer who I I workj f with to sell these $200
million BasquiIats and another $200 million Pollock. I can do this ██████ You boys need to o P
sun up for my expertise and access. I know you will do th math. One more dollar than the day
before is a good. Let's not get greedy. Let me sell these Basquiats and Pollock and then Titian is
up next with a track record. Then I will retire with mazeratis and Ferraris. Fuck the world
shenanigans we when you have money. Tell the girls. You have to all to have to play well. We
are in the galactic atmosphere of Art sales. They snd you boys need to act like it. You are on my
d we orld now.

**Exhibit 58**.

182. De Groft also invited an art appraiser from Christie's Auction House, stating: "You all may have an interest. They are in a private collection and we have written a book on them."

183. On February 5, 2022, several days before the Exhibition opened, OMA's Director of Marketing and Communications received an inquiry from a local reporter, inquiring: "We're hearing of an FBI investigation into the authenticity of the Basquiat works soon to be on exhibition at the OMA. . . can you confirm? We're told the FBI visited and removed some of your computers. . . is that factual?" **Exhibit 59**.

184. De Groft informed O'Donnell of the local media inquiry but did not notify the OMA Board at large. Instead, De Groft and O'Donnell apparently discussed a proposed response on the phone. Two days later, with a copy to Mangan and LiPuma, O'Donnell emailed De Groft the response that the Owner Defendants wanted De Groft to send to the local reporter. The response rephrased the reporter's questions as "whether the FBI visited the museum and whether they seized computers," and then answered the rephrased questions unequivocally: "I can tell you that neither of these things ever happened. Neither the FBI nor other law enforcement agencies have ever come to the museum. Nor did they take or seize any computers or other items." Of course, while the answers to the rephrased questions were technically correct, they omitted that OMA had pre-viously complied with the FBI subpoenas by producing documents, a fact known by the Owner Defendants. And, by completely failing to address the reporter's quest to confirm the existence of an FBI Investigation, the Owner Defendants' response hid that fact. **Exhibit 60**.

185. The next day, De Groft cut and pasted the Owner Defendants' response and sent it to the local reporter, verbatim. *See* **Exhibit 61**.

186. On February 11, 2022, the day before the Exhibition opened, Dr. Saggese, one of the experts referenced by O'Donnell in the Catalogue, sent De Groft and O'Donnell an email

stating that she was "in no way authorized to authenticate unknown works by Jean-Michel

Basquiat and want[ed] no involvement with this show . . . [and did not] want to be further associ-

ated with any promotion of these works for financial gain or otherwise." **Exhibit 62**. In response,

and throughout the day and into the night, De Groft sent a stream of emails berating Dr. Saggese:

| From: | Aaron H. DeGroft[/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=33cbae2830b34d6dbfc8b696f7edd140-Aaron H. De] |
| Sent: | Sat 2/12/2022 4:13:43 AM (UTC-05:00) |
| To: | Jordana Moore Saggese ████████████; podonnell@████████████ █████podonnell@██████████████ |
| Subject: | Re: Cease and Desist Request |

You want us to put out there you got $60 grand to write this? Ok then. Shut up. You took the money. Stop being holier than thou. You did this not me or anybody else. Think Maryland would like to know? Be quiet now is my best advice. These are real and legit. You know this. You are threatening the wrong people. Do your academic thing and stay in your limited lane.

Get Outlook for iOS

---

From: Aaron H. DeGroft <adegroft@█████████████
Sent: Saturday, February 12, 2022 3:59:25 AM
To: Jordana Moore Saggese █████████████; podonnell@████████████
<podonnell@██████████
Subject: Re: Cease and Desist Request

Jordana,

You are already stuck in oblivion. Trust me. I have been involved with academic fools. Got three decades on you. You are only an obscure footnote. Do not worry about your non existent Basquiat reputation. If you every threaten me again that would be bad. Wake up. Who are you. A nobody. I say this with utmost respect for academics who do not have a clue as to the world. you did not give us. Respect. You have nothing to you do with this. You poked the wrong bear. Learn from this with all your bravado. Seriously who do you think are making demands. A joke. I hope i meet you one day to shake your hand. Do not ever do this again. You are out of your league.

Get Outlook for iOS

---

From: Aaron H. DeGroft <adegroft@██████████
Sent: Friday, February 11, 2022 6:35:40 PM
To: Jordana Moore Saggese ████████████; podonnell@████████████
<podonnell@█████████
Subject: Re: Cease and Desist Request

Sorry I should have signed this more professionally as you did. Next time address me as Dr. De Groft. I have way more books than you do.

Aaron H. De Groft, PH.D.
Director & CEO

187.    Only five days later, on February 16, 2022, Dr. Saggese would be interviewed by

the FBI. She told the FBI that she was paid approximately $60,000 by several people and entities associated with the Mumford Collection, including O'Donnell, to provide a report detailing her professional opinion of the Mumford Collection.

188.    De Groft did not remove reference to Dr. Saggese from the Catalogue; instead, De Groft continued to hold out Dr. Saggese as an "expert" who had attributed the Fraudulent Paintings to Basquiat.

189.    During the pre-opening events leading up to the Exhibition, O'Donnell directed OMA employees to provide copies of the Catalogue to individuals who appeared to be potential buyers and gallerists. O'Donnell also asked OMA employees for an electronic version of the Catalogue to send to potential buyers.

190.    In effect, then, the pre-opening events, the Catalogue, and the Exhibition itself were little more than an elaborate sales pitch for the Fraudulent Paintings—unwittingly paid for and hosted by OMA at the direction of De Groft and the Owner Defendants.

191.    Also on February 16, 2022, the *New York Times* published its first article about the Exhibition, written by Sokol and titled *In Orlando, 25 Mysterious Basquiats Come Under the Magnifying Glass*.[32] The article discussed some of the issues with the Fraudulent Paintings and the False Provenance—including the FedEx typeface preprinted on the back of *Crown Face II* and about which Sokol had questioned De Groft before publishing the article.

192.    In response, O'Donnell wrote a demand letter to *The New York Times*, stating that he represented the owners of the Fraudulent Paintings and demanded that it supplement or retract its article. *The New York Times* declined to do so.

---

[32] Brett Sokol, *In Orlando, 25 Mysterious Basquiats Come Under the Magnifying Glass,* The New York Times (February 16, 2022), https://www.nytimes.com/2022/02/16/arts/design/basquiat-painting-orlando-mumford-museum.html (last visited August 11, 2023).

- 61 -

193.    O'Donnell also contacted one of his paid experts, Blanco, by email copying LiPuma and Mangan, suggesting that he wanted a report rebutting *The New York Times* article and telling Blanco: "this is not Univers 67 Bold Condensed typeface." O'Donnell forwarded the email to De Groft, telling him "we are working on this." **Exhibit 63**.

194.    Only four days later, Blanco issued a report concluding, as O'Donnell directed, that the FedEx typeface on the back of *Crown Face II* was not Univers 67 Bold Condensed and that *The New York Times* article was thus "indisputably erroneous."

195.    At some point, one or more of the Owner Defendants posted a "$10,000 Reward for the First Person Finding FedEx Shipping Box (Used in the 1970s or 1980s)," which included a photograph of the same FedEx typeface on the back of Crown Face II. **Exhibit 64.**

196.    During the ensuing controversy and compounding of doubts as to the False Provenance and the Fraudulent Paintings, then on full display at OMA, O'Donnell's presence was ubiquitous.

197.    For example, with Mangan and LiPuma copied, O'Donnell told De Groft to "hang in there. Typical media feeding frenzy." O'Donnell continued by devising the media strategy for OMA and told De Groft that, "[a]ny public statement should [be] short and sweet." **Exhibit 65**.

198.    In the wake of *The New York Times* article, the Chief Curator affirmatively reached out to De Groft to assure him that he did not "leak" any information to Sokol. In doing so, he said that he had also told the Associate Curator and the Registrar not to question the Exhibition. De Groft praised this behavior and criticized other employees that were doing "this talking thing", further confirming for the Chief Curator that De Groft was targeting those who spoke up against the Exhibition.

199.    Later, on February 22, 2022, De Groft sent an intimidating email to the Chief

- 62 -

Curator, the Associate Curator, and the Registrar:

| From: | Aaron H. DeGroft[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=33CBAE2830B34D6DBFC8B696F 7EDD140-AARON H. DE] |
|---|---|
| Sent: | Mon 2/21/2022 12:55:03 PM (UTC-05:00) |
| To: | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| Attachment: | Ltr. to Sokol.docx |

Given Blancos report I hope whoever spoke to the Times about the FedEx box feels like a naive fool.

We are getting a new story that we will blow up nationally. You can be sure of that.

**Exhibit 66**.

200.    On February 25, 2022, O'Donnell obtained and emailed to De Groft, copying Mangan and LiPuma, the Declaration of Talin Maltepe. *See* **Exhibit 67**. O'Donnell referenced Maltepe in his Catalogue essay as a gallerist who had previously worked with Mangan "to prepare the Mumford Collection for a potential sale." In her declaration, Maltepe stated that she had been approached by the owners of a collection of 19 paintings on cardboard commonly referred to as the "Mumford Collection," who wanted her assistance and advice on marketing the works. She stated that she wanted to perform some independent due diligence to satisfy herself that the paintings were authentic: "I knew that Thad Mumford was still alive, and I decided to call him directly. I spoke to Mr. Mumford by telephone in or around the Spring of 2017." Maltepe's declaration goes on to recite the story of the False Provenance, as apparently recounted to her by Mumford, and which the Owner Defendants knew to be fake.

201.    Several days later, De Groft, O'Donnell, Mangan, and LiPuma exchanged emails about purported additional forthcoming declarations "from respected documentarians who spoke to Mumford in the fall of 2017"—exactly the same time period when Mumford signed the affidavit

- 63 -

for the FBI *repudiating* the False Provenance. No such additional declarations were produced.

Mangan stated: "With a little more luck, like we have not had enough with Diego [Cortez] Et Al

already, a recording or serious notes shall be provided by a party none of us has ever met or spoken

to that shall shock even the best (worst) of the world!" De Groft implored in reply:

On Mar 1, 2022, at 4:39 PM, Aaron H. DeGroft <adegroft@▮▮▮▮▮▮▮> wrote:

What unknown party if you do not mind me asking. I am trying to preserve my
job and want to know what I need to know. You guys business is yours but we are
the public institution and we all getting our ass kicked with nothing but lies.

**Exhibit 68**.

202.    The Owner Defendants' and De Groft's numerous belated attempts to buttress the

False Provenance were actions taken in furtherance of their conspiracy.

203.    Also in February 2022, a blogger named Anita Senkowski began publishing a series

of blog posts questioning both the Fraudulent Paintings and the Defendants' motives.

204.    These blog posts, along with *The New York Times* coverage, prompted Tessa Solo-

mon, a reporter with *ARTnews*, to reach out to De Groft with a set of questions. Rather than

respond to her questions, De Groft forwarded them to O'Donnell and Mangan, asking for their

"help with these inconsistencies" raised in Solomon's questions. **Exhibit 69**.

205.    As he had done with the prior inquiry from the local reporter, O'Donnell drafted

and sent to De Groft the proposed response from OMA and told De Groft to, "unleash the dogs!!!"

**Exhibit 70**.

206.    O'Donnell then began sending a series of belligerent letters to Solomon and to the

general counsel of *ARTnews*'s parent corporation, vehemently defending the Fraudulent Paintings

and the False Provenance, and threatening litigation.

207.    Solomon continued to seek answers about many of the obvious holes in the False

Provenance, such as the inconsistent number of works in the Mumford Collection and the poem's fluctuating origin story. Solomon also questioned how De Groft could authenticate works purportedly by Basquiat, when his Ph.D dissertation was about Ringling and his focus was "Old Masters," and asked for comment on how that was possible and ethical.

208.    Despite the mounting pressure on OMA, De Groft and O'Donnell apparently remained optimistic about selling the Fraudulent Paintings. In March 2022, for example, O'Donnell emailed De Groft a list of sales prices for other Basquiat paintings and said: "Amazing!" **Exhibit 71**.

209.    In another example, Mangan emailed O'Donnell, De Groft, and LiPuma and asked, "How are you pitching this? I am getting pressed to give the offering price from both the Samsung and Hyundai family's [sic]. What is that price?" Mangan was replying to an email from O'Donnell about his introduction to a "billionaire art collector," to whom O'Donnell had sent the Catalogue. **Exhibit 72**. De Groft's inclusion on this email chain is significant because it has nothing to do with the Exhibition and is entirely about selling the Fraudulent Paintings.

210.    As a result of *The New York Times* article and ensuing public controversy, in April 2022, the OMA Board voted to end the Exhibition early. The OMA Board also voted not to move forward with De Groft's other "blockbuster exhibition" of O'Donnell's *Comstock Pollock*.[33]

211.    On May 29, 2022, *The New York Times* published another article written by Sokol titled *F.B.I. Investigates Basquiat Paintings Shown at Orlando Museum of Art*.[34] This was the first

---

[33] Further evidencing De Groft's interest in O'Donnell's works beyond OMA's interests, and even after the *Comstock Pollock* exhibition was cancelled, De Groft nonetheless continued to attempt to authenticate the *Comstock Pollock* for O'Donnell. For example, De Groft reached out to Pollock experts, offering one $25,000 and first-class travel accommodations—presumably to be paid for by OMA—to help authenticate the work. The experts refused. **Exhibit 73**.

[34] Brett Sokol, *F.B.I. Investigates Basquiat Paintings Shown at Orlando Museum of Art*, THE NEW YORK TIMES (May 29, 2022), https://www.nytimes.com/2022/05/29/arts/design/fbi-basquiat-paintings-orlando-museum.html (last visited August 11, 2023).

72234736;2

time the entire OMA Board at large was made aware of the FBI subpoenas, having been deprived of this information by De Groft for almost a year.

212. On June 24, 2022, FBI agents raided OMA pursuant to a search warrant and seized the Fraudulent Paintings.

213. In support of the FBI raid, the FBI made public the application and Rivas Affidavit in support for a warrant to search and seize, which detailed the threatening email exchanges between De Groft and Dr. Saggese several months earlier.

214. As a result, the OMA Board terminated De Groft.

215. Upon information and belief, the FBI seized the Fraudulent Paintings to prevent De Groft and the Owner Defendants from transferring the works to Italy.[35] OMA has also incurred legal expenses in connection with this failed arrangement.

216. De Groft was a fiduciary for OMA with years of experience managing art museums. De Groft knew or should have known that his actions put OMA at great risk. De Groft was presented with one red flag after another (by OMA's curatorial staff and other key employees; by the former Florida Prize winning artist; by the anonymous caller from Palm Beach; by the FBI agents; by the fingerprint analyst; by reporters from the *New York Times*, *ARTnews*, and a local media outlet; and by Dr. Saggese, among others) warranting, at the very least, both reconsideration of the Exhibition and disclosure to the OMA Board at large.

217. As another art museum director commented—with only a fraction of the information De Groft had:

"There's just one red flag after another," says Gary Vikan, former director of the

---

[35] The Rivas Affidavit states that the Fraudulent Paintings were originally scheduled to travel to Italy after June 30, 2023, but that their international departure was moved up by a year. "Based on my training and experience, I believe that the significantly advanced date of the international departure of the Mumford Collection from OMA is to avoid further scrutiny of the provenance and authenticity of the works by the public and law enforcement." Rivas Affidavit, ¶ 55.

Walters Art Museum in Baltimore. "Ignoring the request from the FBI, the $60,000 payment to someone in Maryland [Dr. Saggese]. The whole idea seemed to be to just to put these paintings in the public domain, claim them to be authentic and then maybe the FBI goes away. I assume for De Groft the aim was to give himself enhanced job credentials."[36]

218.    But De Groft was in it for more than the credentials. As his emails and texts to O'Donnell reveal, the two had agreed to use OMA as a vehicle to authenticate and sell paintings that were provably fake—first the Fraudulent Paintings, then the *Comstock Pollock*, and finally the *Titian*—for Defendants' gain.

219.    Even setting aside the great risk to OMA's reputation, Defendants must have known that De Groft diverting OMA resources for their benefit violated De Groft's fiduciary duties to OMA. Further, O'Donnell and the other Owner Defendants must have known that entering into an arrangement with De Groft to authenticate, exhibit, and share in the profits from the sale of the Fraudulent Paintings and others further violated his fiduciary duties to OMA and created irreconcilable conflicts of interest.

220.    Worse still, even aside from the red flags, including those raised by OMA's own curatorial staff and key employees, O'Donnell and the other Owner Defendants knew or should have known that the Fraudulent Paintings were fake. They knew long before engaging with OMA, and certainly throughout the curation of the Exhibition, that the False Provenance, originating with the purported sale from Basquiat to Mumford, was untrue. De Groft, nonetheless, denied these damning facts, to OMA's detriment.

221.    Still, O'Donnell and the other Owner Defendants held the paintings out to OMA and the public as authentic, took advantage of O'Donnell's inappropriate relationship with De

---

[36] Daniel Grant, *Following Basquiat Forgery Scandal, Orlando Museum Of Art Placed On Probation By US Museums Group*, THE ART NEWSPAPER (Jan. 24, 2023), https://www.theartnewspaper.com/2023/01/24/orlando-museum-art-probation-american-alliance-museums-basquiat-exhibition-fbi-raid (last visited August 11, 2023).

72234736;2

Groft, induced De Groft to violate his fiduciary duties to OMA, converted OMA's resources for

their own personal gain, and tried to sell the Fraudulent Paintings by exploiting OMA's reputation.

**XI.    OMA suffered, and is suffering, grave damage because of Defendants' actions.**

222.    All told, OMA spent hundreds of thousands of dollars on the Exhibition.

223.    OMA was also forced to incur hundreds of thousands of dollars more in profes-

sional services—such as communications and legal services—because of the fallout surrounding

the Exhibition.

224.    Beyond that, OMA has also suffered severe reputational damage, as highlighted by

the aptly titled *New York Times* article *After Basquiat Raid, Orlando Museum Faces Crisis of

Credibility*,[37] among other numerous media reports.

225.    The tangible effects of this reputational damage can already be seen in that some

donors have transferred their support to other institutions.  Others are expressing concern about

being associated with OMA.

226.    OMA lost several longstanding employees in the wake of the scandal surrounding

the Exhibition, which has deeply impacted OMA's ability to carry out its mission.

227.    As a direct result of De Groft's violations of his fiduciary duties (which the Owner

Defendants were aware of and substantially assisted), each of the Defendants' fraud and conspiracy

to defraud OMA, and the breach of the loan agreements by O'Donnell/BVCG and the MJL Trust,

OMA unwittingly staked its entire reputation on displaying fake artwork and has undeniably suf-

fered.

228.    And the scandal is still the focus of much journalistic interest.  In May 2023, almost

---

[37] Brett Sokol, *After Basquiat Raid, Orlando Museum Faces Crisis of Credibility*, The New York Times (August 12, 2022), https://www.nytimes.com/2022/08/12/arts/design/basquiat-raid-orlando-museum-rollins.html (last visited August 11, 2023).

72234736;2

one year after the FBI raid, *Vanity Fair* published a lengthy article discussing the saga.[38]  Mangan

was interviewed for the article and told yet another story about the poem: "Mangan said he ac-

quired the work via the novelist Adriana Trigiani," which is apparently supported by yet another

"sworn affidavit" that was not produced.

229.    In addition, the AAM placed OMA on probation in early 2023, as a result of the

FBI raid and related events.  The resulting damage to OMA's reputation cannot be understated—

at any given time, fewer than 1% of accredited museums are on probation.  That is, probation is an

*extremely* serious sanction.

230.    OMA has further lost its expected increase in visitors to the museum had the Fraud-

ulent Paintings been real and had the Defendants not exploited OMA and its reputation for their

personal gain.  As O'Donnell noted in the loan agreement cover letter that he prepared on behalf

of De Groft and OMA, "with breakthrough and never-before-done exhibitions such as Heroes &

Monsters, we expect our yearly attendance to double."

231.    Based on Defendants' actions, OMA was forced to cancel its next three "block-

buster exhibitions" organized by De Groft, losing budgeted revenue and deposits.

232.    The AAM's probation letter perhaps provides the best summary of the damage De-

fendants have caused:

> While the museum board is trying to remedy the situation, we see a museum still
> in turmoil . . . putting the museum's operations, funding, reputation, and overall
> viability at great risk.

233.    It will take OMA decades of work to rebuild its standing, recover donors, and repair

the damage Defendants have caused, if doing so is even possible.

---

[38] Nate Freeman, *How 25 Dubious Basquiats Created a Massive Museum Scandal—And Exposed Some Dark Art Truths*, VANITY FAIR (May 24, 2023), https://www.vanityfair.com/style/2023/05/basquiat-museum-scandal (last visited August 11, 2023).

72234736;2

234.   OMA has retained the law firm of Akerman LLP, and have agreed to pay their reasonable attorneys' fees and expenses to represent OMA in this action.

## CLAIMS FOR RELIEF

### COUNT I
### Fraud
### (Against All Defendants)

235.   OMA re-alleges and reincorporates the allegations in paragraphs 1–234.

236.   This is a claim against Defendants for common law fraud under Florida law.

237.   Defendants are liable for fraud because they represented to OMA that the Fraudulent Paintings were authentic when they knew that the works and their False Provenance—including the poem and the critical connection between Mumford and Basquiat—were fake. Yet they presented the False Provenance to OMA and De Groft as true without any disclosure of their falsity or the attendant risks.

238.   All Defendants certainly knew that the Fraudulent Paintings and False Provenance were fake no later than November 3, 2021, when the Barzman label was discovered and disclosed, yet all Defendants disregarded the concerns of OMA's professional curatorial staff and other key employees, instead marshaling on and continuing to manufacture the False Provenance to further conceal that the Fraudulent Paintings were false.

239.   But for Defendants' fraud, OMA would not have curated the Exhibition, prepared the Catalogue, funded or hosted the pre-Exhibition events, or spearheaded the media offensive in support of the Fraudulent Paintings.

240.   OMA has been damaged as a result of Defendants' fraud, including suffering significant reputational harm, lost profits, and the costs curating the Exhibition, including transporting, insuring, and tailoring exhibition space for the Fraudulent Paintings. OMA further incurred

the costs of marketing and promoting the Fraudulent Paintings—in violation of widely accepted ethical standards—for the exclusive benefit of Defendants. After the Fraudulent Paintings were seized by the FBI, OMA further incurred, and continues to incur, costs to manage and mitigate the damages caused by Defendants' fraud.

WHEREFORE, Plaintiff Orlando Museum of Art, asks this Court to enter a judgment:

a.      Awarding damages in an amount to be proven at trial; and

b.      Awarding such other and further relief as the Court deems appropriate.

<div align="center">

**COUNT II**
**Breach of Fiduciary Duty**
**(Against De Groft)**

</div>

241.    OMA re-alleges and reincorporates the allegations in paragraphs 1–234.

242.    This is a claim against De Groft for breach of fiduciary duty under Florida law.

243.    De Groft breached his fiduciary duties to OMA. Rather than working in OMA's best interests—as he was required to do as a fiduciary—De Groft furthered his own economic and personal interests, and those of the Owner Defendants, at OMA's expense.

244.    As detailed above, De Groft entered into a business relationship with O'Donnell and the Owner Defendants in which he would use OMA's reputation and financial resources to "discover," authenticate, and exhibit disputed works, including the Fraudulent Paintings, with the purpose of increasing the value and legitimacy of those works. In return, the Owner Defendants promised to compensate De Groft with a share of the profits from any eventual sale. De Groft further capitalized on OMA's reputation and financial resources to gain personal fame and notoriety from his role in these business transactions as a "discoverer" of found art.

245.    As described above, De Groft disregarded all obvious signs that the Fraudulent Paintings were fake, such as: the inconsistent and unsupported False Provenance, the Barzman

<div align="center">- 71 -</div>

Label, the FedEx preprinted typeface, and the existence of an FBI investigation. Based on this and other information available to him, De Groft knew or should have known that the Fraudulent Paintings were fake. Rather than act to protect OMA, De Groft disregarded and failed to inform the OMA Board at large of any of the red flags. De Groft also improperly shared confidential and privileged information about the FBI subpoenas and internal OMA operations with the Owner Defendants.

246.    De Groft's breaches of his fiduciary duties directly caused OMA to participate in the curation of the Exhibition, the preparation of the Catalogue, the funding and hosting of the pre-Exhibition events, and the media offensive in support of the Fraudulent Paintings.

247.    OMA has been damaged as a result of De Groft's breaches of fiduciary duty, including suffering significant reputational harm, lost profits, and the costs of curating the Exhibition, including transporting, insuring, and tailoring exhibition space for the fake Fraudulent Paintings. OMA further incurred the costs of marketing and promoting the Fraudulent Paintings—in violation of widely accepted ethical standards—for the exclusive benefit of Defendants. After the Fraudulent Paintings were seized by the FBI, OMA further incurred, and continues to incur, costs to manage and mitigate the damages caused by De Groft's violations of his fiduciary duties.

248.    De Groft is not entitled to any of the immunities available under Florida law as his breaches of fiduciary duty were reckless, intentional, and involved self-dealing.

WHEREFORE, Plaintiff Orlando Museum of Art, asks this Court to enter a judgment:

a.    Awarding damages in an amount to be proven at trial; and

b.    Awarding such other and further relief as the Court deems appropriate.

72234736;2

## COUNT III
### Aiding and Abetting Breach of Fiduciary Duty
### (Against Owner Defendants)

249.    OMA re-alleges and reincorporates the allegations in paragraphs 1–234 and 242–248.

250.    This is a claim against Defendants for aiding and abetting breach of fiduciary duty under Florida law.

251.    As explained above, De Groft violated his fiduciary duties to OMA.

252.    The Owner Defendants knew of those violations. The Owner Defendants were aware that a director, officer, and employee of a nonprofit corporation owes fiduciary duties to the corporation. Indeed, the Owner Defendants knowingly aided and abetted De Groft in violating his fiduciary duties in several ways: (a) they knew about the business arrangement with De Groft by which they and De Groft would split some portion of the proceeds from any sale of the Fraudulent Paintings, the *Comstock Pollock*, and/or the Titian; (b) they must have known that this violated De Groft's duties to OMA, as evidenced in part by the fact that De Groft never discussed their "arrangement" using his OMA email; (c) they further knew that the Fraudulent Paintings and the False Provenance were fake and that aiding De Groft in presenting the Fraudulent Paintings as authentic was aiding De Groft in violating his fiduciary duties to OMA; (d) they knew that De Groft disclosed the FBI's investigation to them contrary to the FBI's directive and asked him to second guess the advice of OMA's retained counsel; and (e) they knew that De Groft had allowed them to direct OMA's curation of the Exhibition and media strategy, including in response to the controversy surrounding the Fraudulent Paintings.

253.    The fact that the Owner Defendants attempted to paper their transactions with OMA as though they were conducted at arm's length only further suggests their knowledge of their

- 73 -

inappropriate nature.

254.    Finally, the Owner Defendants substantially assisted De Groft's violations of fidu-

ciary duty.  Indeed, the Owner Defendants were the principal architects of the entire conspiracy:

drafting most of the relevant paperwork and instructing De Groft in his communications with third

parties—including the FBI, the media, and the public.

WHEREFORE, Plaintiff Orlando Museum of Art, asks this Court to enter a judgment:

a.    Awarding damages in an amount to be proven at trial; and

b.    Awarding such other and further relief as the Court deems appropriate.

### COUNT IV
### Conspiracy
### (Against All Defendants)

255.    OMA re-alleges and reincorporates the allegations in paragraphs 1–234.

256.    As explained above, Defendants entered into an agreement to conspire to defraud

OMA, and for De Groft to breach his fiduciary duties to OMA, with the assistance of the Owner

Defendants, in connection with OMA's Exhibition of the Fraudulent Paintings.

257.    Each of the Defendants committed overt acts in furtherance of the conspiracy.

258.    But for Defendants' conspiracy, OMA would not have participated in the curation

of the Exhibition, the preparation of the Catalogue, the funding and hosting of the pre-Exhibition

events, or the media offensive in support of the Fraudulent Paintings.

259.    OMA has been damaged as a result of Defendants' conspiracy, including suffering

significant reputational harm, lost profits, and the costs of curating the Exhibition, including trans-

porting, insuring, and tailoring exhibition space for the Fraudulent Paintings.  OMA further in-

curred the costs of marketing and promoting the Fraudulent Paintings—in violation of widely ac-

cepted ethical standards—for the exclusive benefit of Defendants.  After the Fraudulent Paintings

were seized by the FBI, OMA further incurred, and continues to incur, costs to manage and mitigate the damages caused by Defendants' conspiracy.

WHEREFORE, Plaintiff Orlando Museum of Art, asks this Court to enter a judgment:

a.     Awarding damages in an amount to be proven at trial; and

b.     Awarding such other and further relief as the Court deems appropriate.

## COUNT V
### Breach of Contract
### – In the Alternative –
### (Against O'Donnell, BVCG, Burns, and Force)

260.   OMA re-alleges and reincorporates the allegations in paragraphs 1–234.

261.   OMA entered into a loan agreement with O'Donnell, either individually or on behalf of BVCG, which is joint venture comprised of O'Donnell, Burns, and Force, in which O'Donnell agreed to loan OMA seven authentic works by Basquiat valued alternately at $25 million, $23.7 million, or $19.7 million.  The loan agreement constitutes a binding and enforceable contract.

262.   OMA timely performed all of its obligations under the loan agreement and incurred substantial costs in carrying out its obligations under the loan agreement.

263.   O'Donnell, BVCG, Burns, and Force materially breached the loan agreement by failing to provide seven authentic works by Basquiat to OMA, instead providing seven forged, worthless works.

264.   As a legal and proximate result of these breaches, OMA has been damaged.

WHEREFORE, Plaintiff Orlando Museum of Art, asks this Court to enter a judgment:

a.     Awarding damages in an amount to be proven at trial; and

b.     Awarding such other and further relief as the Court deems appropriate.

72234736;2

## COUNT VI
### Breach of Contract
### (Against MJL Trust)

265.    OMA re-alleges and reincorporates the allegations in paragraphs 1–234.

266.    OMA entered into a loan agreement with MJL Trust in which MJL Trust agreed to loan OMA 19 authentic works by Basquiat and a poem valued at $57.6 million. The loan agreement constitutes a binding and enforceable contract.

267.    OMA performed all of its obligations under the loan agreement and incurred substantial costs in carrying out its obligations under the agreement.

268.    MJL Trust materially breached the loan agreement by failing to provide 19 authentic works to OMA, instead providing 19 forged, worthless works and a forged, worthless poem.

269.    As a legal and proximate result of these breaches, OMA has been damaged.

WHEREFORE, considering the above, Plaintiff Orlando Museum of Art, asks this Court to enter a judgment:

a.    Awarding damages in an amount to be proven at trial; and

b.    Awarding such other and further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

OMA demands a jury trial on the claims asserted herein.

## RESERVATION OF RIGHT TO AMEND

OMA reserves its right to amend to add claims for punitive damages pursuant to § 768.72, Fla. Stat.

Dated: August 14, 2023.

Respectfully submitted,

/s/ E. Ginnette Childs
E. Ginnette Childs, Esq.
Florida Bar Number:  0298130

- 76 -

Email: ginny.childs@akerman.com
Secondary Email: theresa.snow@akerman.com
Secondary Email: suzy.miller@akerman.com
Sara A. Brubaker, Esq.
Florida Bar Number: 0105769
Email: sara.brubaker@akerman.com
Secondary Email: theresa.snow@akerman.com
AKERMAN LLP
Post Office Box 231
Orlando, FL 32802-0231
Phone: (407) 423-4000
Fax: (407) 843-6610

# EXHIBIT 1

| From: | ███████████ |
|---|---|
| Sent: | Fri 1/29/2021 4:05:13 PM (UTC-05:00) |
| To: | Aaron De Groft[aaron.degroft@███████ |
| Subject: | RE: Titian |
| Attachment: | 2014 Gift Tax Appraisal  pg 1-34.pdf |
| Attachment: | 2014 Gift Tax Appraisal  pg 35-43.pdf |

Aaron

I thought you were going to send me a draft 'transport & loan agreement'  as well as how you would like to be consummated if you are able to sell the Titian

I have attached the 2014 Gift Tax appraisal that was done on August 1, 2014c

IMO ████ and/or the Estate attorney do not control what happens with the painting





*************

This email and any files transmitted with it may contain PRIVILEGED or CONFIDENTIAL information and is intended solely for the use of the individual or entity to whom it is addressed.  This communication may contain material protected by the attorney-client privilege.  If you are not the intended recipient or the person responsible for delivering the email to the intended recipient, be advised that you have received this email in error and that any use, dissemination, distribution,

forwarding, printing, or copying of this email is strictly prohibited.  If you have received this email in error, please purge it and immediately notify the sender by reply email or contact █████████

•••••••••••••

This e-mail is protected by 18 U.S.C. §§ 2510-2521 and attorney-client privilege, and is attorney work product.

**From:** Aaron De Groft <aaron.degroft@███████>
**Sent:** Wednesday, January 27, 2021 8:08 PM
**To:** ████████████
**Subject:**

Let me know when you go through this.  It is the most up to date.  Do not believe your brother. ████ still thinks she controls the painting or the estate attorney does.

Thanks.

Aaron H. De Groft, Ph.D.


Sent from Mail for Windows 10

**PLEASE NOTE THE FOLLOWING**
CONFIDENTIALITY NOTE: The information contained in this e-mail message is legally privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, the dissemination, distribution or copy of this email is prohibited. If this email was received in error, please immediately notify us by telephone or return the original message to us. Thank you!

WARNING: Computer viruses can be transmitted via email. The recipient should check this email and any attachments for the presence of viruses. The organization accepts no liability for any damage caused by any virus transmitted by this email.

Reliable Data Solutions, Inc.

# EXHIBIT 2

| | |
|---|---|
| **From:** | ▮▮▮▮▮▮▮ |
| **Sent:** | Sun 2/21/2021 9:36:32 PM (UTC-05:00) |
| **To:** | Aaron De Groft[aaron.degroft@▮▮▮▮▮ |
| **Subject:** | Re: Pink Spring POLLOCK Appendix .... Re: ▮▮▮▮▮ - Rancho Monte Alegra - Santa Barbara |

I am trying to speak w my friend before contacting Pierce directly, very concerned now as no tele, text and nor email reply. I text his close Harvard MBA roommate friend and will follow up tomorrow. I will call Pierce if i do not reach my friend, my introduction to Pierce tomorrow. I will call you before i call Pierce for your description of best case loan term, etc, so i present exactly as you prefer. I would like to forward an email with your contact which i will add your stellar CV and announcement of OMA Directorship.

Pierce should appreciate the opportunity as certainly excellent exhibition for painting and provenance history which is quite a good and compelling bit of important Pollock history.

Crashing early as little sleep last night having too much good fun a Coral Ridge Yacht Club Fleet Review Awards Dinner Dance.... Aboard Mystic Star late.. good folks you will enjoy. Will text short videos for vicarious fun.

Very best. ▮

iPhone - Please excuse typos

> On Feb 21, 2021, at 8:31 PM, Aaron De Groft <aaron.degroft@▮▮▮▮▮ >
> wrote:
>
> ▮▮▮, I cannot download this. I got the illustrated document but is this something
> else. Would it even be possible to borrow this painting?  Thanks.
> Aaron
>
> Aaron H. De Groft, Ph.D.
> ▮▮▮▮▮▮
>
> Sent from my iPhone
>
>> On Feb 20, 2021, at 2:46 PM, ▮▮▮▮▮▮▮▮▮▮
>> wrote:
>>
>> Have text, voice message and email pending re latest update re Pink
>> Spring....

iPhone - Please excuse typos

> On Feb 20, 2021, at 1:06 AM, Aaron De Groft
> <aaron.degroft@█████████> wrote:
>
> Let me look this over again. Been a few years. I would love to show it and pose the question publically. We have a huge collector in Orlando. I will look at its size. Is it available?
>
> Aaron H. De Groft, Ph.D.
> ███████████
>
> Sent from my iPhone
>
>> On Feb 20, 2021, at 12:37 AM, ██████
>> █████████████████ wrote:
>>
>>
>>
>>> On Feb 19, 2021, at 10:50 PM, Aaron De
>>> Groft <aaron.degroft@███████> wrote:
>>>
>>> Beautiful! Tell me the status of your Pollock.
>>>
>>> Aaron H. De Groft, Ph.D.
>>> ███████████
>>>
>>> Sent from my iPhone
>>>
>>>> On Feb 19, 2021, at 9:00
>>>> PM, ██████████
>>>> ████████████
>>>> wrote:

# EXHIBIT 3

| | |
|---|---|
| **From:** | Aaron De Groft[aaron.degroft@█████████] |
| **Sent:** | Wed 3/31/2021 7:13:39 PM (UTC-04:00) |
| **To:** | O'Donnell, Pierce[podonnell@████████████]; Aaron H. DeGroft[adegroft@██████████] |
| **Subject:** | Re: Dr Aaron DeGroft - Google Search |

I will do this. Thank you.

Get Outlook for iOS

---

**From:** O'Donnell, Pierce <podonnell@██████████████>
**Sent:** Wednesday, March 31, 2021 10:12:40 AM
**To:** Aaron De Groft <aaron.degroft@█████████>
**Subject:** Re: Dr Aaron DeGroft - Google Search

Hello

Please call me tomorrow at ████████. Thanks

Sent from my iPhone

Pierce O'Donnell
Attorney at Law
Biography
████████

podonnell@greenbergglusker.com

Greenberg Glusker LLP
2049 Century Park East, Suite 2600
Los Angeles, CA 90067
GreenbergGlusker.com
This message is intended solely for the use of the addressee(s) and is intended to be privileged and confidential within the attorney client privilege. If you have received this message in error, please immediately notify the sender at Greenberg Glusker and delete all copies of this email message along with all attachments. Thank you.

> On Mar 30, 2021, at 7:01 PM, Aaron De Groft <aaron.degroft@██████████> wrote:

Dear Mr. O'Donnell,

Would you be willing to speak about the Pollack. We wound love to celebrate it and showcase it here in Orlando where we lead the country in tourism with an excess of 73 million tourists. We would of course promote it internationally. I have discussed this with ██████ and read much about the work. It is right. I would

be happy to fly to LA to talk to you in person. I am happy to talk. Thank you very much.

Best wishes,

Aaron De Groft, PH.D.
Director & CEO
Orlando Museum of Art.

Get Outlook for iOS

---

**From:** ▇▇▇▇▇▇▇▇
**Sent:** Tuesday, March 30, 2021 6:56:37 AM
**To:** Pierce O'Donnell <PODonnell@▇▇▇▇▇
**Cc:** Aaron H. De Groft, PHD <aaron.degroft@▇▇▇▇▇ ; ▇▇▇▇▇

**Subject:** Dr Aaron DeGroft - Google Search

Good morning, Pierce,

Please familiarize yourself with the sterling pedigree and accomplishments of art historian, scholar and Museum Director Aaron DeGroft and contact him directly via the CC email address above or his personal cell phone ▇▇▇▇▇ regarding his sincere interest in Pink Spring and the recognition of the paintings unique and fascinating provenance.

Aaron and i have collaborated on a likewise unique and fascinating provenance reconstruction of a 1539 Titian since 2009, which will soon arrive the Orlando Museum of Art (OMA) where he too arrived as the new and only 4th Director in 100 years. OMA is an especially well endowed private museum of 80,000 sq ft, and an institution well suited and appreciative of Aaron's nationally respected intellect and renown creativity.

Pink Spring can benefit enormously under his rare and highly respected abilities, enhancing its recognition and value.

I am sincerely hopeful you gentleman will communicate and together realize the viability and deserved valuation of Pink Spring.

Appreciative best wishes.



# EXHIBIT 4

| From: | Aaron H. DeGroft[/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=33cbae2830b34d6dbfc8b696f7edd140-Aaron H. De] |
|---|---|
| Sent: | Fri 4/9/2021 10:27:48 PM (UTC-04:00) |
| To: | O'Donnell, Pierce[podonnell@ █████████] |
| Subject: | Re: Basquiats |

Pierce,

This is very interesting and exciting. How many of these cardboard paintings do you control? Are they framed as such. Just asking. You may have mentioned twenty five? I am definitely interested. We could showcase them in September for sure. Give me a few more details. The paintings are fantastic and important. I know you want to sell them and I am fine with that.

I hope you have a wonderful weekend. Pollock here in January is awesome. I am very flexible as I hope you know.

Best wishes,

Aaron

Get Outlook for iOS

---

From: O'Donnell, Pierce <podonnell@ █████████>
Sent: Friday, April 9, 2021 5:24:13 PM
To: Aaron H. DeGroft <adegroft@ ██████>
Subject: Re: Basquiats

How about showcasing them for your big 100th launch in September. I might be able to get Diego Cortez and others for a big symposium etc. Big Splash!!!

Thoughts?

> On Apr 9, 2021, at 1:25 PM, Aaron H. DeGroft <adegroft@ ███████ > wrote:
>
> Pierce,
>
> These are spectacular! Unbelievable…
>
> Do you have all twenty-five of these paintings? We have to plan to borrow them if you allow that. We would absolutely love to do this over the next year if possible.
>
> What do you think? We can work out any details.

You made my weekend!

Best wishes,

Aaron

<image001.png>

**From:** Aaron De Groft <aaron.degroft@███████████>
**Sent:** Friday, April 9, 2021 2:33 PM
**To:** Aaron H. DeGroft <adegroft@███████████>
**Subject:** Fwd: Basquiats

Aaron H. De Groft, Ph.D.
████████████

Sent from my iPhone

Pierce O'Donnell
Attorney at Law
Biography
████████████
podonnell@███████████

Greenberg Glusker LLP
2049 Century Park East, Suite 2600
Los Angeles, CA 90067
GreenbergGlusker.com
This message is intended solely for the use of the addressee(s) and is intended to be privileged and confidential within the attorney client privilege. If you have received this message in error, please immediately notify the sender at Greenberg Glusker and delete all copies of this email message along with all attachments. Thank you.

Begin forwarded message:

> **From:** "O'Donnell, Pierce" <podonnell@███████████>
> **Date:** April 9, 2021 at 1:54:04 AM EDT
> **To:** Aaron De Groft <aaron.degroft@███████████>
> **Cc:** "O'Donnell, Pierce" <podonnell@███████████>
> **Subject:** Basquiats
>
> https://na01.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww

.bvcg.org%2F&amp;data=04%7C01%7C%7Ca73226c13e1f408de1e808d8fb
1be0fe%7C84df9e7fe9f640afb435aaaaaaaaaaaa%7C1%7C0%7C637535444
437295737%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJ
QIjoiV2luMzIiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C1000&amp;sdata=liD
o9qXdrc58TfKbL4Z6mPlp5OdvCp%2FZwHNIhzxDx1A%3D&amp;reserved=0

password: ███████

Sent from my iPad

Pierce O'Donnell
Attorney at Law

███████

podonnell@ ████████████

Greenberg Glusker
2049 Century Park East, Suite 2600
Los Angeles, CA 90067
GreenbergGlusker.com

This message is intended solely for the use of the addressee(s)
and is intended to be privileged and confidential within the attorney client
privilege. If you have received this message in error, please immediately
notify
the sender at Greenberg Glusker and delete all copies of this email
message
along with all attachments. Thank you.

# EXHIBIT 5

| | |
|---|---|
| **From:** | Aaron De Groft[aaron.degroft@ ▉ |
| **Sent:** | Sun 4/11/2021 2:16:28 AM (UTC-04:00) |
| **To:** | O'Donnell, Pierce[podonnell@ ▉ |
| **Subject:** | Re: Black artists matter! |

Your paintings are magnificent. If we can get the others than it is icing on the cake. You tell me what is possible.
Your six are great on there own to be sure.

Aaron H. De Groft, Ph.D.

▉

Sent from my iPhone

> On Apr 11, 2021, at 1:39 AM, O'Donnell, Pierce <podonnell@ ▉           > wrote:
>
>
> Aaron
> I have some ideas about how to make your exhibition historic. There have been few major Basquiat exhibitions in
US outside of NY. None in the South to my knowledge. Talk tomorrow.  Thanks
> Sent from my iPad
>
>
> Pierce O'Donnell
> Attorney at Law
> ▉
> podonnell@ ▉
>
> Greenberg Glusker
> 2049 Century Park East, Suite 2600
> Los Angeles, CA  90067
> GreenbergGlusker.com
>
> This message is intended solely for the use of the addressee(s)
> and is intended to be privileged and confidential within the attorney client
> privilege. If you have received this message in error, please immediately notify
> the sender at Greenberg Glusker and delete all copies of this email message
> along with all attachments. Thank you.
>

# EXHIBIT 6

| | |
|---|---|
| **From:** | Aaron De Groft[aaron.degroft@ ███████ |
| **Sent:** | Fri 4/16/2021 12:20:35 AM (UTC-04:00) |
| **To:** | ████████████████ |
| **Subject:** | Just got off the phone with LA. We are getting all 25 Basquiats! |

Happy Birthday!

Get Outlook for iOS

# EXHIBIT 7

| From: | O'Donnell, Pierce[podonnell@ ▇▇▇▇▇▇ |
| --- | --- |
| Sent: | Tue 4/27/2021 12:36:31 AM (UTC-04:00) |
| To: | Aaron H. DeGroft[adegroft@ ▇▇▇▇ |
| Subject: | Draft letter to Pierce |
| Attachment: | Draft letter from de Groft.docx |

Aaron
Here is the draft letter that we discussed. There are a few things (XXXX) that you need to fill in.  Please let me know if you have any questions.

Diego can be reached at ▇▇▇▇▇

Thanks.

Pierce O'Donnell
Attorney at Law
Biography

podonnell@ ▇▇▇▇

**Greenberg Glusker LLP**
2049 Century Park East, Suite 2600
Los Angeles, CA  90067
GreenbergGlusker.com

This message is intended solely for the use of the addressee(s) and is intended to be privileged and confidential within the attorney client privilege. If you have received this message in error, please immediately notify the sender at Greenberg Glusker and delete all copies of this email message along with all attachments. Thank you.

7514114_00049989

**[Orlando Museum of Art letterhead]**

April 27, 2021

Mr. Pierce O'Donnell
Basquiat Venice Collection Group
2049 Century Park East, 21st Floor
Los Angeles, California 90067

               Re:    **Basquiat Exhibition**

Dear Pierce:

On behalf of the Orlando Museum of Art, I am pleased to provide you a summary of our preliminary plans for the world premiere exhibition of your group's six spectacular paintings by Jean-Michel Basquiat. Preliminarily, I want to tell you again how thrilled my Board of Trustees, curatorial staff, and I are to be able to introduce these unique, iconic works to the global art world. We are planning an extraordinary presentation in conjunction with the launch of our centennial celebration.

Our museum, housed in an 80,000 square foot facility, has a diverse collection of primarily modern and contemporary art, including works by Robert Rauschenberg, Philip Pearlstein, and John Chamberlain. Annually, we mount about a dozen on-site exhibitions and a similar number of off-site exhibitions. We attract about XXXX visitors per year.

Our museum is the major cultural institution in central Florida and one of the leading art museums in the South. Besides our 5,000 members, we enjoy the generous financial support of such donors as Walt Disney World Company, Bank of America, National Endowment for the Arts, Celebrity Cruises, State of Florida, and City of Orlando, among many others. For the second year in a row, Charity Navigator has awarded us its coveted Four Star rating as a non-profit that exceeds industry standards and outperforms other comparable non-profits.

Orlando is an exciting market for showcasing your Basquiats. Annually, Orlando attracts over 75 million domestic and international visitors who are drawn by its world-class theme parks, entertainment, stores, and more. Orlando has become the No. 1 United States travel destination. A heavily-promoted showcasing of your never-before-exhibited masterpieces will undoubtedly attract some of these visitors in addition to Floridians and art lovers who will visit Orlando for the purpose of viewing your paintings.

While the specifics will have to be worked out, this is what we are already planning to do:

1. We will mount a major exhibition of your six paintings beginning around September XX, 2021 and running until about ▮▮▮▮▮▮▮▮

2. We will heavily promote the exhibition in local, national, and international media.

3. We will seek to obtain one or more corporate and/or institutional sponsors to help underwrite the costs.

4. We will conduct a symposium of leading Basquiat experts.

5. We will create an exhibition catalogue in both print and electronic formats to which Diego Cortez and others will be asked to contribute.

6. We are exploring traveling the exhibition to other museums in the United States and

abroad.

As we have discussed and the Loan Out Agreements provides, we will be responsible for all expenses relating to shipment, insurance, framing, new high-quality photographs, and the like.

I have shared with you why I see this as a once-in-a-lifetime opportunity for the paintings' owners and our museum. My professional background entails discovering, authenticating, and exhibiting "lost art" by Rembrandt, Titian, and da Vinci. I know what will captivate and excite the art world and attract worldwide media attention, and your treasures are guaranteed to enthrall art lovers around the world. We therefore have a mutual interest in prominently heralding the discovery of these jewels created in the year of Basquiat's greatest creativity and originality.

Pierce, I once again wish to thank you for entrusting to us the debut of your incomparable collection. I can assure you that your confidence in us is well placed, and you will be pleased with your decision to collaborate with the Orlando Museum of Art.

Finally, as we discussed, in light of all the planning that must be done, resources to be invested, and the need to know whether we will proceed with your exhibition or another one, I would like to know fairly soon whether we are a "go" on this project. I would be grateful if you could give me a commitment by May 1st. Thank you very much.

Sincerely,

Aaron De Groft
Director and Chief
Executive Officer

7514114_00049990

# EXHIBIT 8

| | |
|---|---|
| **From:** | O'Donnell, Pierce[podonnell@█████████] |
| **Sent:** | Tue 4/27/2021 8:14:16 PM (UTC-04:00) |
| **To:** | Aaron H. DeGroft[adegroft@██████] |
| **Subject:** | Are We in for a Basquiat Auction Boom? A Fashion Executive's Rare Skull Painting Could Fetch Over $50 Million at Christie's | Artnet News |

Aaron
Our timing couldn't be better.
Pierce

https://news.artnet.com/market/skull-vs-medici-the-season-of-dueling-basquiats-at-auction-1961925?utm_content=from_www.artnet.com&utm_source=Sailthru&utm_medium=email&utm_campaign=US%2010%3A07%20a.m.%20newsletter%20for%204%2F27%2F21&utm_term=US%20Daily%20Newsletter%20%5BMORNING%5D

# Are We in for a Basquiat Auction Boom? A Fashion Executive's Rare Skull Painting Could Fetch Over $50 Million at Christie's | Artnet News

April 26, 2021



Jean-Michel Basquiat, *In This Case* (1983). Photo: Christie's Images Ltd

The season of dueling Basquiats is upon us, with two major paintings up for sale next month—one at Christie's, the other at Sotheby's. Together, they may bring in $100 million.

Christie's will offer *In This Case* (1983), a large skull on a red background, in its New York evening sale of 21st century art on May 11. The canvas has an unpublished estimate of about $50 million. The

following day, *Versus Medici* (1982) will be part of Sotheby's contemporary art evening auction, where it is estimated to bring in between $35 million to $50 million.

"It's going to be Basquiat versus Basquiat," said Alberto Mugrabi, a private art dealer and collector. "They are both great paintings."

The works come to market as demand for Basquiat is surging, according to dealers and auction executives. Just last month, Basquiat's *Warrior* (1982) fetched $41.8 million at Christie's Hong Kong, a new record for a Western artist in Asia. Last year, hedge-fund manager Ken Griffin paid more than $100 million for a major 1982 Basquiat owned by newsprint magnate Peter Brant during the pandemic lockdown.

The seller of the skull at Christie's is Italian businessman Giancarlo Giammetti, a co-founder of the Valentino fashion house, according to a person familiar with the work. It used to hang in Giammetti's Manhattan apartment, where it was photographed above his dining table in a 2013 *Architectural Digest* spread. Christie's declined to comment on the identity of the seller. Giammetti could not be immediately reached for comment.



Installation view of Basquiat's retrospective at the Fondation Louis Vuitton in Paris. Photo:
Christie's.

Skulls are among Basquiat's most sought-after works. The symbol is
part *momento mori*, an icon of death; part self-portrait; and part
memorable logo, harkening back to Basquiat's origins as a street artist.

Giammetti purchased the painting for $999,500 at Sotheby's in 2002. It
is the last of three large skull canvases Basquiat made in successive
years, according to Christie's.

*In This Case* was included in the late artist's blockbuster retrospective
in 2018 at the Fondation Louis Vuitton, where the three skulls hung
together. The other two are an untitled blue skull from 1982 that
Japanese billionaire Yusaku Maezawa bought for $110.5 million in
2017, and a blue-and-peach one from 1981 in the collection of the
Broad museum in Los Angeles. Maezawa's work holds Basquiat's

auction record.

Christie's rival Sotheby's is hoping to strike gold with the seven-foot-tall *Versus Medici*, which Basquiat painted soon after an influential trip to Italy in 1981. The painting is among the artist's "most forceful visual challenges to the Western art establishment, in which the young artist boldly crowns himself—the son of immigrants from Haiti and Puerto Rico—as successor to the artistic throne as established by the masters of the Italian Renaissance," according to the house.



Art handlers with Basquiat's *Versus Medici* (1982). Courtesy of Sotheby's.

Only two other works by the artist have sold for more than $50 million at auction.

"Everything that relates to the new generation of Black artists, he was

the beginning of all this," said Alex Rotter, Christie's chairman of 20th and 21st century art. "Without Basquiat, art history of the past 40 years would have been very different. He's the most desirable artist at the moment."

Follow Artnet News on Facebook:

Want to stay ahead of the art world? Subscribe to our newsletter to get the breaking news, eye-opening interviews, and incisive critical takes that drive the conversation forward.

Pierce O'Donnell
Attorney at Law
Biography

podonnell@

Greenberg Glusker LLP
2049 Century Park East, Suite 2600
Los Angeles, CA 90067
GreenbergGlusker.com

This message is intended solely for the use of the addressee(s) and is intended to be privileged and confidential within the attorney client privilege. If you have received this message in error, please immediately notify the sender at Greenberg Glusker and delete all copies of this email message along with all attachments. Thank you.

# EXHIBIT 9

| From: | aaron.degroft@ ▆▆▆▆▆ [aaron.degroft@ ▆▆▆▆▆ |
|---|---|
| Sent: | Thur 4/29/2021 12:14:23 AM (UTC-04:00) |
| To: | ▆▆▆▆▆▆▆▆▆▆▆ |
| Subject: | Hello ▆ ! |

We are loving life in Orlando. We Ave some big plans to relaunch the Museum is late September. I would like to talk to you about framing 19 Basquiats I have discovered that have never been seen or published. I need them sensitively framed. You up for it this summer perhaps? We are also getting a big Pollock that has never been seen. Painted in 1949. Embarrassment of riches. Hey, you know me. Would I be doing anything else. Love to ▆ ! Can I ring you tomorrow?

Aaron H. De Groft, Ph.D.

▆▆▆▆▆▆

Sent from my iPhone

# EXHIBIT 10

| From: | Aaron H. DeGroft[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=33CBAE2830B34D6DBFC8B696F 7EDD140-AARON H. DE] |
|---|---|
| Sent: | Thur 4/29/2021 5:07:06 PM (UTC-04:00) |
| To: | Pierce O'Donnell[podonnell@ |
| Subject: | Basquiat Loan Letter |
| Attachment: | Pierce O'Donnell Loan Letter for the Basquiats signed.pdf |

Dear Pierce,

Attached please find our Loan Agreement Request Letter for the Basquiats.

I will send the official Loan Agreement Terms and Conditions on Monday when my Head of Collections is back in the office.

Best wishes,

Aaron



** O R L**
**A N D**
**O M °A**

**AARON H. De GROFT, PH.D.**
DIRECTOR & CEO
**ORLANDO MUSEUM°ART**

2416 N. Mills Ave.
Orlando, FL 32803

**LEARN WHAT'S NEW AT THE ORLANDO MUSEUM OF ART:** *Subscribe to our newsletter »*
**EMPOWER YOUR COMMUNITY. YOUR DONATION RECEIVES A 15% MATCH:** *United Arts of Central Florida's Collaborative Campaign »*

**FEATURED EXHIBITIONS:**
*A Boundless Drop to a Boundless Ocean »* on view through 5.2.21
*Louis Dewis: An Artist's Life in France »* on view through 5.2.2021
*Voices & Conversations: Expressions of Individuality and Community »* on view through 5.2.2021
*American Journey: Two Centuries of Art and Culture »* on view through 6.30.21

**UPCOMING EXHIBITION:**

*Florida Prize in Contemporary Art 2021 »* on view 6.4.21 through 8.22.21

ORL
AND
OM°A

ORLANDO MUSEUM'ART

**ORLANDO MUSEUM OF ART**

2416 N. Mills Ave
Orlando, FL 32803
407.896.4231

omart.org

## BOARD OF TRUSTEES

CHAIR OF THE BOARD
Cynthia Brumback

OFFICERS
Ted R. Brown
Carolyn Fennell
Frankie Jo Knapp
Francine Newberg
Mark more Pritchard
Winifred Sharp
Andrew Snyder
Robert Summers
Drew Walker Jr.
Michael Winn
Nancy Wolf

TRUSTEES
Lewin Andrews (Ex Official)
Sher Bickr
Dustin Becker
Michael Braun
Caroline Brukenburgh
Allison Chacin
Eric Chicendon Jr.
William Deuchler
Mark Elliott (Ex Official)
Elizabeth Francesci (Ex Official)
Chase Hershman
Amelia McLeod
John Martines
Zak Oehmsen
Jennifer O'Mara
Paul Perkins Jr.
Valerie Paterson Baker
Dana Stonsakin
Jill Toole (Ex Official)
Bruce Douglas (Emeritus)

EXECUTIVE DIRECTOR

Aaron De Groft, Ph. D.

April 27, 2021

Mr. Pierce O'Donnell
Basquiat Venice Collection Group
2049 Century Park East, 21st Floor
Los Angeles, California 90067

Re:   Basquiat Exhibition

Dear Pierce:

On behalf of the Orlando Museum of Art, I am pleased to provide you a summary of our preliminary plans for the world premiere exhibition of your group's six spectacular paintings by Jean-Michel Basquiat that we are titling, Heroes & Monsters: Jean-Michele Basquiat, Sothern California 1982. Preliminarily, I want to tell you again how thrilled my Board of Trustees, curatorial staff, and I are to be able to introduce these unique, iconic works to the global art world. We are planning an extraordinary presentation in anticipation of our centennial celebration in 2024

Our museum, housed in an 80,000 square foot facility, has a diverse collection of primarily modern and contemporary art by the greatest such artists working in the twentieth and twenty-first century. Annually, we mount about a six to eight major exhibitions on-site and a similar number of off-site exhibitions. We routinely attract about 190,000 visitors per year, non-Covid, however with the re-launch of the Museum beginning in September 2021, and with breakthrough and never-before-done exhibitions such as Heroes & Monsters, we expect our yearly attendance to double.

Our museum is the major cultural institution in central Florida and one of the leading art museums in the South. Besides our 5,000 members, we enjoy the generous financial support of such donors as Walt Disney World Company, Bank of America, National Endowment for the Arts, Celebrity Cruises, State of Florida, and City of Orlando, among many others. For the second year in a row, Charity Navigator has awarded us its coveted Four Star rating as a non-profit that exceeds industry standards and outperforms other comparable non-profits.

Orlando is an exciting market for showcasing your Basquiats. Annually, Orlando attracts over 75 million domestic and international visitors who are drawn by its world-class theme parks, entertainment, stores, and more. Orlando has become the No. 1 United States travel destination. A heavily-promoted showcasing of your never-before-exhibited masterpieces will undoubtedly attract some of these visitors in addition to Floridians and art lovers who will visit Orlando for the purpose of viewing your paintings.

While the specifics will have to be worked out, this is what we are already planning to do:

1.     We will mount a major exhibition of your six paintings September 23, 24, 25 2021 and will continue well into 2022 (we can discuss possibilities).

ORL
AND
O M °A

ORLANDO MUSEUM'ART

2. We will heavily promote the exhibition in local, national, and international media.
3. We will seek to obtain one or more corporate and/or institutional sponsors to help underwrite the costs.
4. We will conduct a symposium of leading Basquiat experts.
5. We will create an exhibition catalogue that I will curate and write, in both print and electronic formats to which we would include such distinguished Basquiat scholars, Diego Cortez and others will be asked to contribute.
6. We are exploring traveling the exhibition to other museums in the United States and abroad.

As we have discussed and the Loan Out Agreements provides, we will be responsible for all expenses relating to shipment, insurance, framing, new high-quality photographs, and the like.

I have shared with you why I see this as a once-in-a-lifetime opportunity for the paintings' owners and our museum. My professional background entails discovering, authenticating, and exhibiting "lost art" by Rembrandt, Titian, and Leonardo da Vinci. I know what will captivate and excite the art world and attract worldwide media attention, and your treasures are guaranteed to enthrall art lovers around the world. We therefore have a mutual interest in prominently heralding the discovery of these jewels created in the year of Basquiat's greatest creativity and originality.

Pierce, I once again wish to thank you for entrusting to us the debut of your incomparable collection. I can assure you that your confidence in us is well placed, and you will be pleased with your decision to collaborate with the Orlando Museum of Art.

Finally, as we discussed, in light of all the planning that must be done, resources to be invested, and the need to know whether we will proceed with your exhibition or another one, I would like to know fairly soon whether we are a "go" on this project. I would be grateful if you could give me a commitment by May 7th. Please do not hesitate with any questions what so ever.

You cannot believe what this means to us and we are beyond excited to "discover' your paintings and to make the world aware of them. This is a very rare occurrence and most especially in the stratosphere of the art world where Basquiat inhabits.

With much appreciation and best wishes,

Aaron H. De Groft, Ph.D.
Director &

7514114_00049207

# EXHIBIT 11

| From: | Aaron H. DeGroft[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=33CBAE2830B34D6DBFC8B696F 7EDD140-AARON H. DE] |
|---|---|
| Sent: | Thur 4/29/2021 5:15:28 PM (UTC-04:00) |
| To: | Pierce O'Donnell[podonnell@ |
| Cc: | |
| Subject: | Basquiat Loan Agreement |
| Attachment: | Loan Agreement - O'Donnell_FILLABLE.pdf |

Dear Pierce,

I managed to lay hands of the Loan Agreement. Look it over and give me your thoughts. The concluding date and the beginning loan dates we should discuss. Ideally, we would like to get all the Basquiats framed in NYC of DC before they come down here. Better to ship them framed. I know amazing framers in each location.

Thanks and best wishes,

Aaron



**LEARN WHAT'S NEW AT THE ORLANDO MUSEUM OF ART:** *Subscribe to our newsletter »*
**EMPOWER YOUR COMMUNITY. YOUR DONATION RECEIVES A 15% MATCH:** *United Arts of Central Florida's Collaborative Campaign »*

**FEATURED EXHIBITIONS:**
*A Boundless Drop to a Boundless Ocean »* on view through 5.2.21
*Louis Dewis: An Artist's Life in France »* on view through 5.2.2021
*Voices & Conversations: Expressions of Individuality and Community »* on view through 5.2.2021
*American Journey: Two Centuries of Art and Culture »* on view through 6.30.21

**UPCOMING EXHIBITION:**

*Florida Prize in Contemporary Art 2021 »* on view 6.4.21 through 8.22.21

**FOLLOW US:** Facebook | Twitter | Instagram

**O R L**
**A N D**
**O M 'A**
ORLANDO MUSEUM OF ART

2416 North Mills Avenue
Orlando, FL 32803
T. 407-896-4231
F. 407-896-9920
www.omart.org

# Loan Agreement

For Works of Art
Borrowed by
the Museum

| | |
|---|---|
| OWNER: | Pierce O'Donnell |
| Address: | 5108 Woodley Ave. |

| | | | | | | |
|---|---|---|---|---|---|---|
| City: | Encino | State: | CA | | Zip: | 91436 |
| Work #: | | Home #: | | | Cell#: | ▮ |
| Email: | podonnell@ | Website: | | | Fax | |

SPECIFICATION: ▯ Incoming ▯ Outgoing / ▯ Lender ▯ Borrower   PURPOSE: ▯ Exhibition ▯ Extended ▯ Temporary

Exhibition Title: Museum display

| Exhibition Dates: | TBD | Loan Dates: | August 1, 2021 – April 30, 2022 | Dates vary based on shipping schedule |
|---|---|---|---|---|

| DESCRIPTION: | Artist: See attached checklist | Nationality: | | Life Dates: | |
|---|---|---|---|---|---|
| Title: | See attached checklist | Date: | See attached checklist | | |
| Medium: | See attached checklist | Edition No. | | | |
| Dimensions: | See attached checklist | Frame Size: | See attached checklist | | |
| Weight: | | ID Number: | | | |
| Credit Line: | | (If you wish to remain anonymous, please use Private Collection) | | | |

INSURANCE:   If you wish to insure the work under your own Fine Arts Policy, please request a waiver of subrogation or a Certificate of Insurance that includes the Orlando Museum of Art as an additional insured from your provider.

Value in US currency: $ 25 million     To be carried by: ▯ Borrower ▯ Lender

SHIPPING:   Is work framed?    ▯ yes ▯ no   Will work be packed by Owner for shipment?    ▯ yes ▯ no

Special handling or installation instructions:

CATALOG & PUBLICITY:   Unless declined, The Orlando Museum of Art may photograph, film, tape and/or reproduce in any media the above object to be used only for catalogue, educational, and publicity purposes only. If declined, initial here:

Are digital images available for publication?    ▯ yes ▯ no

AUTHORIZATION:   Sign and return one copy of this Loan Agreement to the Orlando Museum of Art in the envelope provided.

By the signature affixed below, the Borrower and Lender verify they have read and agree to the conditions above and on the reverse side of this agreement and certify they have full authority to enter into this agreement.

Signature of Borrower: ▮▮▮▮▮▮    Date: 4/13/2021
Orlando Museum of Art

Signature of Lender: _____    Date: _____

Signature of Owner or Authorized Signee with Title

7514114_00049209

### 1. Care, Preservation, & Exhibition

The Borrower will exercise the same precautions with respect to this loan that it would for the safekeeping of comparable property of its own. Objects will be protected by the Borrower by fire, theft and/or damage of any kind. Evidence of any damage during the period of the loan not described in the condition report at the time of receipt will be reported immediately to the Lender. The Lender will be requested to provide written authorization before any alteration, restoration or repair is executed.

The Orlando Museum of Art retains the right to determine when, if and for how long objects it borrows or lends will be exhibited or loaned.

### 2. Transportation & Packing

The Lender certifies that the object(s) lent are packed and in such a condition as to withstand ordinary strains of transportation and handling. The Borrower must agree to return the object(s) packed in the same or similar materials and will abide by any special instructions included under the "Shipping Information" section on the face of this document.

Condition reports will be made by the Orlando Museum of Art upon arrival and departure of all objects borrowed or loaned. Lenders to the museum are responsible to make the Orlando Museum of Art aware of any special conditions.

The method of shipment must be agreed upon by both parties as specified under "Shipping Information" on the face of this document. The Borrower will be responsible for costs of all shipping unless previous arrangements have been made in writing. Costs of customs formalities will be assumed by the Borrower. Government regulations will be adhered to for all international shipments.

### 3. Insurance

Unless otherwise specified under the "Insurance" section on the face of this document, the Borrower will be responsible for the insuring of all works while in transit to and from the borrowing institution or individual and throughout the entire loan period, whether on display or in storage. The object(s) will be insured in the amount specified on the face of this document which must reflect fair market value. If the Lender fails to indicate an amount, the Borrower will, with implied concurrence of the Lender, set a value for purposes of insurance for the period of the loan. This value is not to be considered an appraisal.

If the Lender elects to maintain its own insurance coverage, the Borrower requires a Certificate of Insurance naming themselves as additional insured for the object(s) during the period of the loan. In the case of long-term loans, it is the responsibility of the Lender to notify the Borrower of current insurance valuations.

If insurance is waived by the Lender, this waiver shall constitute the agreement of the Lender to release and hold harmless the Borrower from any liability for damage to or loss of the object(s) lent.

### 4. Reproduction & Credit

The Borrower reserves the right to photograph, telecast or reproduce the object(s) lent for educational, catalogue and publicity purposes unless otherwise notified in writing by the Lender. The Borrower agrees to give credit in any publications to the Lender as specified under "Credit Line" on the face of this document unless otherwise instructed in writing.

It is understood that an object on exhibition may not be photographed by the general public unless granted permission by the Lender in writing.

### 5. Change in Ownership and/or Address

It is the responsibility of the Lender or its agent to notify the Borrower promptly in writing if there is a change in ownership of the object(s) lent or if there is a change in identity or address of the Lender. The Orlando Museum of Art assumes no responsibility to search for a Lender who cannot be reached at the address of record.

### 6. Return of Loans

Unless otherwise agreed in writing, a loan terminates on the date specified on the face of this document under "Loan Period Dates." If no date is specified, the loan shall be for a reasonable period of time but in no event will it exceed three years. The object(s) lent will be returned only to the Lender at the address on the face of this document unless other arrangements have been made in advance. Any object(s) included in this loan will be returned to the Lender on or before the date requested.

If after three years from the termination date on the face of this document the Lender has not reclaimed the loan or the museum has been unable to return the object(s) due to an unknown change of address, the object(s) shall be considered for reasons of maintenance and safeguarding as an unrestricted gift to the Orlando Museum of Art.



**JEAN-MICHEL BASQUIAT**
*One More King-Czar*
Date:
Mixed media on cardboard
9 ½ x 10 in.

Insurance Value:



**JEAN-MICHEL BASQUIAT**
*He Didn't*
Date:
Mixed media on cardboard
20 x 25 in.

Insurance Value:



**JEAN-MICHEL BASQUIAT**
*Horn*
Date:
Mixed media on cardboard
20 x 25 in.

Insurance Value:



**JEAN-MICHEL BASQUIAT**
*Batman with Top-Hat*
Date:
Mixed media on board
12 x 12 in.

Insurance Value:



**JEAN-MICHEL BASQUIAT**

*Colorful Face*

Date:

Mixed media on cardboard

8 x 11 in.

Insurance Value:



**JEAN-MICHEL BASQUIAT**

*Reptile with Claws and Crown "King of Creatures"*

Date:

Mixed media on cardboard

15 x 14 5/8 in.

Insurance Value:



**JEAN-MICHEL BASQUIAT**

*Mystery Creature*

Date:

Mixed media on cardboard

15 x 14 5/8 in.

Insurance Value:

# EXHIBIT 12

**From:** O'Donnell, Pierce[podonnell@

**Sent:** Fri 4/30/2021 6:40:02 PM (UTC-04:00)

**To:** De Groft Aaron[aaron.degroft@

**Subject:** Loan Agreement

Here are last two pages. Thanks





Sent from my iPhone

Pierce O'Donnell
Attorney at Law
Biography


podonnell@

**Greenberg Glusker LLP**
2049 Century Park East, Suite 2600
Los Angeles, CA 90067
GreenbergGlusker.com
This message is intended solely for the use of the addressee(s) and is intended to be privileged and confidential
within the attorney client privilege. If you have received this message in error, please immediately notify the sender at
Greenberg Glusker and delete all copies of this email message along with all attachments. Thank you.

| | |
|---|---|
| **From:** | O'Donnell, Pierce[podonnell@ ▮▮▮▮▮ |
| **Sent:** | Fri 4/30/2021 6:36:23 PM (UTC–04:00) |
| **To:** | De Groft Aaron[aaron.degroft@ ▮▮▮▮ |
| **Subject:** | Loan Agreement |

Hello

I have signed the Loan Agreement. I will send a clean scan next week. We are in business!

Thanks



Sent from my iPhone

Pierce O'Donnell
Attorney at Law
Biography
▮▮▮▮▮
podonnell@▮▮▮▮

Greenberg Glusker LLP
2049 Century Park East, Suite 2600
Los Angeles, CA 90067

7514114_00051851

# EXHIBIT 13

**From:**   Aaron H. DeGroft[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE
GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=33CBAE2830B34D6DBFC8B696F
7EDD140-AARON H. DE]

**Sent:**   Thur 7/15/2021 4:03:53 PM (UTC-04:00)

**To:**   ██████████████████

**Subject:**   RE: Basquiat - Pierce's Loan Agreement, Questions

Reach out to Pierce and ask. We are happy to insure at $25 million. I imagine he his
counting the front and back works as two works. Makes sense to me.



**From:** ████████████
**Sent:** Thursday, July 15, 2021 2:46 PM
**To:** Aaron H. DeGroft <adegroft@ █████████
**Subject:** Basquiat - Pierce's Loan Agreement, Questions

Good afternoon Aaron,

As I'm going over Basquiat information I'm realizing some questions that came up on Pierce's loan
agreement (attached) I was hoping to clarify with you!

When added up, the total value on his loan agreement is actually $23,700,000, not $25,000,000,
however he lists total collection at the bottom as $25,000,000. Would you be able to clarify this with
him?

I am also realizing that both *Mystery Creature* and *Reptile with Claws and Crown "King of Creatures"*
are both valued at $4,900,000. With them technically being one piece, front and back, can I clarify if
Pierce wants them valued at $4,900,000 for the entire piece (front and back included) or $9,800,000
for the piece (front and back included)?

Please let me know the answers to these questions whenever you next speak with Pierce next, if you
are able. Or if you would rather I reach out, I'm happy to do so.

I'd love to get the updated information to ███████ before the conservation happens next week. Depending on Pierce's answers, we might need to request an updated and correct loan agreement – just so all of our documentation is 100% accurate moving forward.

Thank you for your time!

All the best,

███



REGISTRAR

ORLANDO MUSEUM°ART

2416 N. Mills Ave.
Orlando, FL 32803

LEARN WHAT'S NEW AT THE ORLANDO MUSEUM OF ART: *Subscribe to our newsletter »*

**FEATURED EXHIBITIONS:**
*Florida Prize in Contemporary Art 2021 »* on view through 8.22.21
*Louis Dewis: An Artist's Life in France »*  on view through 7.22.2021
*American Journey: Two Centuries of Art and Culture »* on view through 6.30.21

**FOLLOW US:** Facebook | Twitter | Instagram | OMA Website

# EXHIBIT 14

**ORLANDO MUSEUM OF ART**
2416 North Mills Avenue
Orlando, FL 32803
T. 407-896-4231
F. 407-896-9920
www.omart.org

# Loan Agreement

For Works of Art
Borrowed by
the Museum

| | |
|---|---|
| OWNER: | Pierce O'Donnell |
| Address: | 5108 Woodley Ave. |
| City: | Encino | State: | CA | Zip: | 91436 |

Work #: _____  Home #: _____  Cell #: _____

Email: podonnell@____  Website: _____  Fax _____

SPECIFICATION: ☐ Incoming ☐ Outgoing / ☐ Lender ☐ Borrower    PURPOSE: ☐ Exhibition ☐ Extended ☐ Temporary

Exhibition Title: Museum display

Exhibition Dates: TBD          Loan Dates: October 1, 2021 – June 30, 2022    Dates vary based on shipping schedule

DESCRIPTION: Artist: See attached checklist    Nationality: _____    Life Dates: _____

Title: See attached checklist    Date: See attached checklist

Medium: See attached checklist    Edition No. _____

Dimensions: See attached checklist    Frame Size: See attached checklist

Weight: _____    ID Number: _____

Credit Line: Basquiat Venice Collection Group    (If you wish to remain anonymous, please use Private Collection)

INSURANCE: If you wish to insure the work under your own Fine Arts Policy, please request a waiver of subrogation or a Certificate of Insurance that includes the Orlando Museum of Art as an additional insured from your provider.

Value in US currency: $19,700,000.00    To be carried by: ☐ Borrower ☐ Lender

SHIPPING: Is work framed?  ☐ yes ☐ no    Will work be packed by Owner for shipment?    ☐ yes ☐ no

Special handling or installation instructions: _____

CATALOG & PUBLICITY: Unless declined, The Orlando Museum of Art may photograph, film, tape and/or reproduce in any media the above object to be used only for catalogue, educational, and publicity purposes only. If declined, initial here: _____

Are digital images available for publication?    ☐ yes ☐ no

AUTHORIZATION: Sign and return one copy of this Loan Agreement to the Orlando Museum of Art in the envelope provided.

By the signature affixed below, the Borrower and Lender verify they have read and agree to the conditions above and on the reverse side of this agreement and certify they have full authority to enter into this agreement

Signature of Borrower: _____    Date: 9/20/2021

Signature of Lender: _____    Date: September 20, 2021

Signature of Owner or Authorized Signee with Title

7514114_00187617

## 1. Care, Preservation, & Exhibition

The Borrower will exercise the same precautions with respect to this loan that it would for the safekeeping of comparable property of its own. Objects will be protected by the Borrower by fire, theft and/or damage of any kind. Evidence of any damage during the period of the loan not described in the condition report at the time of receipt will be reported immediately to the Lender. The Lender will be requested to provide written authorization before any alteration, restoration or repair is executed.

The Orlando Museum of Art retains the right to determine when, if and for how long objects it borrows or lends will be exhibited or loaned.

## 2. Transportation & Packing

The Lender certifies that the object(s) lent are packed and in such a condition as to withstand ordinary strains of transportation and handling. The Borrower must agree to return the object(s) packed in the same or similar materials and will abide by any special instructions included under the "Shipping Information" section on the face of this document.

Condition reports will be made by the Orlando Museum of Art upon arrival and departure of all objects borrowed or loaned. Lenders to the museum are responsible to make the Orlando Museum of Art aware of any special conditions.

The method of shipment must be agreed upon by both parties as specified under "Shipping Information" on the face of this document. The Borrower will be responsible for costs of all shipping unless previous arrangements have been made in writing. Costs of customs formalities will be assumed by the Borrower. Government regulations will be adhered to for all international shipments.

## 3. Insurance

Unless otherwise specified under the "Insurance" section on the face of this document, the Borrower will be responsible for the insuring of all works while in transit to and from the borrowing institution or individual and throughout the entire loan period, whether on display or in storage. The object(s) will be insured in the amount specified on the face of this document which must reflect fair market value. If the Lender fails to indicate an amount, the Borrower will, with implied concurrence of the Lender, set a value for purposes of insurance for the period of the loan. This value is not to be considered an appraisal.

If the Lender elects to maintain its own insurance coverage, the Borrower requires a Certificate of Insurance naming themselves as additional insured for the object(s) during the period of the loan. In the case of long-term loans, it is the responsibility of the Lender to notify the Borrower of current insurance valuations.

If insurance is waived by the Lender, this waiver shall constitute the agreement of the Lender to release and hold harmless the Borrower from any liability for damage to or loss of the object(s) lent.

## 4. Reproduction & Credit

The Borrower reserves the right to photograph, telecast or reproduce the object(s) lent for educational, catalogue and publicity purposes unless otherwise notified in writing by the Lender. The Borrower agrees to give credit in any publications to the Lender as specified under "Credit Line" on the face of this document unless otherwise instructed in writing.

It is understood that an object on exhibition may not be photographed by the general public unless granted permission by the Lender in writing.

## 5. Change in Ownership and/or Address

It is the responsibility of the Lender or its agent to notify the Borrower promptly in writing if there is a change in ownership of the object(s) lent or if there is a change in identity or address of the Lender. The Orlando Museum of Art assumes no responsibility to search for a Lender who cannot be reached at the address of record.

## 6. Return of Loans

Unless otherwise agreed in writing, a loan terminates on the date specified on the face of this document under "Loan Period Dates." If no date is specified, the loan shall be for a reasonable period of time but in no event will it exceed three years. The object(s) lent will be returned only to the Lender at the address on the face of this document unless other arrangements have been made in advance. Any object(s) included in this loan will be returned to the Lender on or before the date requested.

If after three years from the termination date on the face of this document the Lender has not reclaimed the loan or the museum has been unable to return the object(s) due to an unknown change of address, the object(s) shall be considered for reasons of maintenance and safeguarding as an unrestricted gift to the Orlando Museum of Art.



EXH.2021.05.01
JEAN-MICHEL BASQUIAT
*One More King-Czar*
1982
Mixed media on cardboard
9 ½ x 10 in.
Basquiat Venice Collection Group

Insurance Value: $2,400,000



EXH.2021.05.02
JEAN-MICHEL BASQUIAT
*He Didn't*
1982
Mixed media on cardboard
20 x 25 in.
Basquiat Venice Collection Group

Insurance Value: $4,900,000



EXH.2021.05.03
JEAN-MICHEL BASQUIAT
1982
*Horn*
Mixed media on cardboard
20 x 25 in.
Basquiat Venice Collection Group

Insurance Value: $2,800,000



EXH.2021.05.04
JEAN-MICHEL BASQUIAT
*Batman with Top-Hat*
1982
Mixed media on board
12 x 12 in.
Basquiat Venice Collection Group

Insurance Value: $3,500,000



EXH.2021.05.05
JEAN-MICHEL BASQUIAT
Colorful Face
1982
Mixed media on cardboard
8 x 11 in.
Basquiat Venice Collection Group

Insurance Value: $1,200,000



EXH.2021.05.06
JEAN-MICHEL BASQUIAT
Reptile with Claws and Crown "King of Creatures"
1982
Mixed media on cardboard
15 x 14 5/8 in.
Basquiat Venice Collection Group

Insurance Value: $4,900,000



EXH.2021.05.07
JEAN-MICHEL BASQUIAT
Mystery Creature
1982
Mixed media on cardboard
15 x 14 5/8 in.
Basquiat Venice Collection Group

Insurance Value: On back of Reptile with Claws and Crown "King of Creatures"

**O R L**
**A N D**
**O M °A**
ORLANDO MUSEUM ART

2416 North Mills Avenue
Orlando, FL 32803
T. 407-896-4231
F.407-896-9920
www.omart.org

# Loan Agreement

For Works of Art
Borrowed by
the Museum

OWNER: Basquiat Venice Collection Group, c/o Pierce O'Donnell and Taryn Burns

Address: 5108 Woodley Ave.

City: Encino    State: CA    Zip: 91436

Work #:    Home #:    Cell#:

Email: podonnell@    Website:    Fax

SPECIFICATION: ■ Incoming ☐ Outgoing / ■ Lender ☐ Borrower    PURPOSE: ■ Exhibition ☐ Extended ■ Temporary

Exhibition Title: Museum display

| | | | | | | Dates vary based on shipping schedule |
|---|---|---|---|---|---|---|
| Exhibition Dates: | TBD | | Loan Dates: | October 1, 2021 – June 30, 2022 | | |
| DESCRIPTION: | Artist: See attached checklist | | Nationality: | | Life Dates: | |
| Title: | See attached checklist | | Date: | See attached checklist | | |
| Medium: | See attached checklist | | | Edition No. | | |
| Dimensions: | See attached checklist | | | Frame Size: | See attached checklist | |
| Weight: | | | ID Number: | | | |
| Credit Line: | Basquiat Venice Collection Group | | | (If you wish to remain anonymous, please use Private Collection) | | |

INSURANCE: If you wish to insure the work under your own Fine Arts Policy, please request a waiver of subrogation or a Certificate of Insurance that includes the Orlando Museum of Art as an additional insured from your provider.

Value in US currency: $19,700,000.00    To be carried by: ■ Borrower ☐ Lender

SHIPPING: Is work framed? ■ yes ☐ no    Will work be packed by Owner for shipment? ☐ yes ☐ no

Special handling or installation instructions:

CATALOG & PUBLICITY: Unless declined, The Orlando Museum of Art may photograph, film, tape and/or reproduce in any media the above object to be used only for catalogue, educational, and publicity purposes only. If declined, initial here:

Are digital images available for publication?    ☐ yes ☐ no

AUTHORIZATION: Sign and return one copy of this Loan Agreement to the Orlando Museum of Art in the envelope provided.

By the signature affixed below, the Borrower and Lender verify they have read and agree to the conditions above and on the reverse side of this agreement and certify they have full authority to enter into this agreement.

Signature of Borrower:    Date: 10/19/2021

Orlando Museum of Art
Signature of Lender:    Co-Manager BVCG Date: 10/19/2021
Signature of Owner or Authorized Signee with Title

Signature of Lender:    Date: 10/20/21
Signature of Owner or Authorized Signee with Title

### 1. Care, Preservation, & Exhibition

The Borrower will exercise the same precautions with respect to this loan that it would for the safekeeping of comparable property of its own. Objects will be protected by the Borrower by fire, theft and/or damage of any kind. Evidence of any damage during the period of the loan not described in the condition report at the time of receipt will be reported immediately to the Lender. The Lender will be requested to provide written authorization before any alteration, restoration or repair is executed.

The Orlando Museum of Art retains the right to determine when, if and for how long objects it borrows or lends will be exhibited or loaned.

### 2. Transportation & Packing

The Lender certifies that the object(s) lent are packed and in such a condition as to withstand ordinary strains of transportation and handling. The Borrower must agree to return the object(s) packed in the same or similar materials and will abide by any special instructions included under the "Shipping Information" section on the face of this document.

Condition reports will be made by the Orlando Museum of Art upon arrival and departure of all objects borrowed or loaned. Lenders to the museum are responsible to make the Orlando Museum of Art aware of any special conditions.

The method of shipment must be agreed upon by both parties as specified under "Shipping Information" on the face of this document. The Borrower will be responsible for costs of all shipping unless previous arrangements have been made in writing. Costs of customs formalities will be assumed by the Borrower. Government regulations will be adhered to for all international shipments.

### 3. Insurance

Unless otherwise specified under the "Insurance" section on the face of this document, the Borrower will be responsible for the insuring of all works while in transit to and from the borrowing institution or individual and throughout the entire loan period, whether on display or in storage. The object(s) will be insured in the amount specified on the face of this document which must reflect fair market value. If the Lender fails to indicate an amount, the Borrower will, with implied concurrence of the Lender, set a value for purposes of insurance for the period of the loan. This value is not to be considered an appraisal.

If the Lender elects to maintain its own insurance coverage, the Borrower requires a Certificate of Insurance naming themselves as additional insured for the object(s) during the period of the loan. In the case of long-term loans, it is the responsibility of the Lender to notify the Borrower of current insurance valuations.

If insurance is waived by the Lender, this waiver shall constitute the agreement of the Lender to release and hold harmless the Borrower from any liability for damage to or loss of the object(s) lent.

### 4. Reproduction & Credit

The Borrower reserves the right to photograph, telecast or reproduce the object(s) lent for educational, catalogue and publicity purposes unless otherwise notified in writing by the Lender. The Borrower agrees to give credit in any publications to the Lender as specified under "Credit Line" on the face of this document unless otherwise instructed in writing.

It is understood that an object on exhibition may not be photographed by the general public unless granted permission by the Lender in writing.

### 5. Change in Ownership and/or Address

It is the responsibility of the Lender or its agent to notify the Borrower promptly in writing if there is a change in ownership of the object(s) lent or if there is a change in identity or address of the Lender. The Orlando Museum of Art assumes no responsibility to search for a Lender who cannot be reached at the address of record.

### 6. Return of Loans

Unless otherwise agreed in writing, a loan terminates on the date specified on the face of this document under "Loan Period Dates." If no date is specified, the loan shall be for a reasonable period of time but in no event will it exceed three years. The object(s) lent will be returned only to the Lender at the address on the face of this document unless other arrangements have been made in advance. Any object(s) included in this loan will be returned to the Lender on or before the date requested.

If after three years from the termination date on the face of this document the Lender has not reclaimed the loan or the museum has been unable to return the object(s) due to an unknown change of address, the object(s) shall be considered for reasons of maintenance and safeguarding as an unrestricted gift to the Orlando Museum of Art.



EXH.2022.02.01
JEAN-MICHEL BASQUIAT
*One More King-Czar*
1982
Mixed media on cardboard
9 ½ x 10 in.
Basquiat Venice Collection Group

Insurance Value: $2,400,000



EXH.2022.02.02
JEAN-MICHEL BASQUIAT
*He Didn't*
1982
Mixed media on cardboard
20 x 25 in.
Basquiat Venice Collection Group

Insurance Value: $4,900,000



EXH.2022.02.03
JEAN-MICHEL BASQUIAT
1982
*Horn*
Mixed media on cardboard
20 x 25 in.
Basquiat Venice Collection Group

Insurance Value: $2,800,000



EXH.2022.02.04
JEAN-MICHEL BASQUIAT
*Batman with Top-Hat*
1982
Mixed media on board
12 x 12 in.
Basquiat Venice Collection Group

Insurance Value: $3,500,000



**EXH.2022.02.05**
**JEAN-MICHEL BASQUIAT**
*Colorful Face*
1982
Mixed media on cardboard
8 x 11 in.
Basquiat Venice Collection Group

Insurance Value: $1,200,000



**EXH.2022.02.06**
**JEAN-MICHEL BASQUIAT**
*Reptile with Claws and Crown "King of Creatures"*
1982
Mixed media on cardboard
15 x 14 5/8 in.
Basquiat Venice Collection Group

Insurance Value: $4,900,000



**JEAN-MICHEL BASQUIAT**
*Mystery Creature*
1982
Mixed media on cardboard
15 x 14 5/8 in.
Basquiat Venice Collection Group

Insurance Value: On back of Reptile with Claws and Crown "King of Creatures"

# EXHIBIT 15



Pierce O'Donnell

PODonnell@ ▮▮▮▮▮▮
File Number: 62996.00002

May 5, 2021

**<u>Via U.S. Mail</u>**

Dr. Aaron H. De Groft
Director
Orlando Museum of Art
2416 N. Mills Avenue
Orlando, FL 32803

      Re:   **Basquiat Exhibition**

Dear Dr. De Groft :

      Thank you for your letter of April 27th in which you propose to mount a world premiere exhibition of our six Basquiat paintings at the Orlando Museum of Art starting on September 23rd and extending well into 2020. On behalf of the Basquiat Venice Collection Group, we enthusiastically accept your proposal. We are thrilled that your outstanding museum will be the venue for introduction of our never-before-exhibited masterpieces to the art world.

      I stand ready to assist you in any way necessary. We look forward to collaborating with you. Again, many thanks.

                Sincerely,

                Pierce O'Donnell

PO/bg

# EXHIBIT 16

| | |
|---|---|
| **From:** | O'Donnell, Pierce[podonnell@ ███████████ ] |
| **Sent:** | Wed 5/12/2021 10:30:55 PM (UTC-04:00) |
| **To:** | Aaron H. DeGroft[adegroft@ █████ ] |
| **Subject:** | Please call me to fix a couple of things |
| **Attachment:** | Mr. LiPuma Loan Request Letter for Basquiats.docx.pdf |

Pierce O'Donnell
Attorney at Law
████████

podonnell@ ████████████

Greenberg Glusker
2049 Century Park East, Suite 2600
Los Angeles, CA 90067
GreenbergGlusker.com

This message is intended solely for the use of the addressee(s)
and is intended to be privileged and confidential within the attorney client
privilege. If you have received this message in error, please immediately notify
the sender at Greenberg Glusker and delete all copies of this email message
along with all attachments. Thank you.

**ORLANDO MUSEUM OF ART**

2416 N. Mills Ave
Orlando, FL 32803
407.896.4231

omart.org

## BOARD OF TRUSTEES

CHAIR OF THE BOARD
Cynthia Brumback

OFFICERS
Ted R. Brown
Carolyn Fennell
Patrick J. Knipe
Francine Newberg
Sibille Hart Pritchard
Winifred Sharp
Andrew Snyder
Robert Summers
Lance Walker Jr.
Michael Winn
Nancy Wolf

TRUSTEES
Leslie Andrese (Ex Officio)
Shari Bartz
Dustin Becker
Michael Brown
Caroline Blydenburgh
Allison Choate
Earl Crittenden Jr.
William Deuchler
Mark Elliott (Ex Officio)
Elizabeth Francetic (Ex Officio)
Chase Hesvener
Amelia McLeod
John Martinez
Zakir Odhwani
Jennifer O'Mara
Paul Perkins Jr.
Valeria Robinson-Baker
Daisy Staniszkis
Jill Toole (Ex Officio)
Bruce Douglas (Emeritus)

DIRECTOR & CEO

Aaron H. De Groft, Ph.D.

May 12, 2021

Mr. Richard LiPuma
Manager
MJL Family Trust, LLC
1635 Foxtail Dr.
Loveland, Colorado 80538

Re:     Basquiat Exhibition

Dear Mr. LiPuma:

On behalf of the Orlando Museum of Art, I am pleased to provide you a summary of our preliminary plans for the world premiere exhibition of your group's nineteen spectacular paintings by Jean-Michel Basquiat that we are titling, Heroes & Monsters: Jean-Michele Basquiat, Sothern California 1982. Preliminarily, I want to tell you again how thrilled my Board of Trustees, curatorial staff, and I are to be able to introduce these unique, iconic works to the global art world. We are planning an extraordinary presentation in anticipation of our centennial celebration in 2024.

Our museum, housed in an 80,000 square foot facility, has a diverse collection of primarily modern and contemporary art by the greatest such artists working in the twentieth and twenty-first century. Annually, we mount about a six to eight major exhibitions on-site and a similar number of off-site exhibitions. We routinely attract about 190,000 visitors per year, non-Covid, however with the re-launch of the Museum beginning in September 2021, and with breakthrough and never-before-done exhibitions such as Heroes & Monsters, we expect our yearly attendance to double.

Our museum is the major cultural institution in central Florida and one of the leading art museums in the South. Besides our 5,000 members, we enjoy the generous financial support of such donors as Walt Disney World Company, Bank of America, National Endowment for the Arts, Celebrity Cruises, State of Florida, and City of Orlando, among many others. For the second year in a row, Charity Navigator has awarded us its coveted Four Star rating as a non-profit that exceeds industry standards and outperforms other comparable non-profits.

Orlando is an exciting market for showcasing your Basquiats. Annually, Orlando attracts over 75 million domestic and international visitors who are drawn by its world-class theme parks, entertainment, stores, and more. I understand Pierce O'Donnell will be the liaison for your nineteen works and this is wonderful.

Orlando has become the No. 1 United States travel destination. A heavily- promoted showcasing of your never-before-exhibited masterpieces will undoubtedly attract some of these visitors in addition to Floridians and art lovers who will visit Orlando for the purpose of viewing your paintings.

While the specifics will have to be worked out, this is what we are already planning to do:

1. We will mount a major exhibition of your six paintings September 23, 24, 25 2021 and will continue well into 2022 (we can discuss possibilities).
2. We will heavily promote the exhibition in local, national, and international media.
3. We will seek to obtain one or more corporate and/or institutional sponsors to help underwrite the costs.
4. We will conduct a symposium of leading Basquiat experts.
5. We will create an exhibition catalogue that I will curate and write, in both print and electronic formats to which we would include such distinguished Basquiat scholars, Diego Cortez and others will be asked to contribute.
6. We are exploring traveling the exhibition to other museums in the United States and abroad.

As we can discuss and the Loan Out Agreements provides, we will be responsible for all expenses relating to shipment, insurance, framing, new high-quality photographs, and the like.
I can share with you, as can Pierce O'Donnell, why I see this as a once-in-a-lifetime opportunity for the paintings' owners and our museum. My professional background entails discovering, authenticating, and exhibiting "lost art" by Rembrandt, Titian, and Leonardo da Vinci. I know what will captivate and excite the art world and attract worldwide media attention, and your treasures are guaranteed to enthrall art lovers around the world. We therefore have a mutual interest in prominently heralding the discovery of these jewels created in the year of Basquiat's greatest creativity and originality.

Mr. LiPuyma, I once again wish to thank you for entrusting to us the debut of your incomparable collection. I can assure you that your confidence in us is well placed, and you will be pleased with your decision to collaborate with the Orlando Museum of Art.

Finally, in light of all the planning that must be done, resources to be invested, and the need to know whether we will proceed with your exhibition or another one, I would like to know fairly soon whether we are a "go" on this project. I would be grateful if you could give me a commitment by May 24th. Please do not hesitate with any questions what so ever.

You cannot believe what this means to us and we are beyond excited to "discover" your paintings and to make the world aware of them. This is a very rare occurrence and most especially in the stratosphere of the art world where Basquiat inhabits.

Sincerely and with best wishes,

Aaron H. De Groft, Ph.D.
Director

# EXHIBIT 17

| From: | O'Donnell, Pierce[podonnell@ ███████████] |
|---|---|
| Sent: | Thur 5/13/2021 2:23:41 PM (UTC-04:00) |
| To: | De Groft Aaron[aaron.degroft@ ████████] |
| Subject: | Insurance |

Hello
How are you coming on getting new insurance with much higher coverage?
How high will the coverage be? My paintings will need at least $300 million. Thanks

Sent from my iPhone


Pierce O'Donnell
Attorney at Law
████████████
podonnell@ ███████████

Greenberg Glusker
2049 Century Park East, Suite 2600
Los Angeles, CA  90067
GreenbergGlusker.com

This message is intended solely for the use of the addressee(s)
and is intended to be privileged and confidential within the attorney client
privilege. If you have received this message in error, please immediately notify
the sender at Greenberg Glusker and delete all copies of this email message
along with all attachments. Thank you.

# EXHIBIT 18

| | |
|---|---|
| **From:** | Aaron H. DeGroft[/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=33cbae2830b34d6dbfc8b696f7edd140-Aaron H. De] |
| **Sent:** | Fri 5/28/2021 10:38:23 PM (UTC-04:00) |
| **To:** | Pierce O'Donnell[podonnell@ ████████] |
| **Subject:** | Fwd: Basquiat show. |
| **Attachment:** | Loan Agreement - Basquiat LiPuma_210528.pdf |

A good day. This is all easy to fix and modify. All good. You did it!


Get Outlook for iOS

---

**From:** Richard LiPuma <rich@ ████████>
**Sent:** Friday, May 28, 2021 11:28:01 AM
**To:** Aaron H. DeGroft <adegroft@ ████████>
**Cc:** ████████████████
**Subject:** Re: Basquiat show.

Sorry, I forgot to attach the Loan Out Agreement - here it is.
Rich

On Fri, May 28, 2021 at 9:26 AM Richard LiPuma <rich@ ████████    wrote:

Dear Dr. DeGroft:

Thank you! MJL Trust wishes to proceed as a participant in your proposed "Heroes and Monsters" Exhibition. I have filled in most of the fillable sections. I am also attaching our appraisal summary. Here are some additional comments that should be addressed before I sign:

Paragraph 2 - I do not believe I can represent or certify that these paintings can withstand ordinary transportation and handling. Our paintings are oil on cardboard in the raw and untouched state. They are not conserved or framed. Paint can chip off and damage could occur through ordinary handling. We have always used professional art handlers and transportation through Crozier Fine Arts in NYC to move the paintings to and from the storage facility. I would imagine that similar precautions would be needed to transport the paintings to Orlando.

Paragraph 3 - My clients would like to review the insurance policy before we sign. We do not expect to obtain separate insurance, so we would like to confirm that the policy you provide will be sufficient to protect us. We think the insurance policy should specify that coverage is for the "appraised value" with specific reference to Patricia Dillon's July 2020 appraisal. We are afraid that if we insure for something more vague, like "fair market value," that could lead to ambiguity or difficulty in the event of a loss.

Paragraph 6 - My clients would like to know the anticipated exhibition dates before signing. Please understand that we are currently negotiating a potential sale of these works. Our buyer knows that a sale would be subject to the terms of the Loan-Out Agreement. In the event a sale is closed, we would want to be able to transfer possession as soon as possible. We will obviously encourage any buyer to work with you in extending the exhibition, and traveling it, as much as possible. But our intent in the event of the sale is to allow the buyer to make decisions about further exhibition. Therefore, we would opt for a shorter initial time commitment, with extensions by consent of the owners. As long as we own the paintings, consent will be freely given. In the event of sale, extensions will be at the discretion of the buyer. Let me know your thoughts on this.

Also, my clients do not like the last sentence of paragraph 6 - if we change address without notice, the paintings will be deemed a gift to OMA. I think I understand what you're suggesting, but I'd like to tweak that language in the next draft.

Finally, I have a great deal of information that we have gathered in relation to our collection of 19 paintings. I'm not sure what would be useful to you, so maybe we could discuss this further. I'd like to set up a telephone or zoom conference next week, if possible. I could be free next Thursday June 3 any time; or Friday June 4 prior to 1 pm Mountain (3 pm Eastern). Let me know your availability. Thanks again for your efforts here. We are very excited to move this forward.

Rich

On Wed, May 26, 2021 at 3:24 PM Aaron H. DeGroft <adegroft@      > wrote:

Dear Mr. LiPuma,

It was nice to speak with  you when I was with Pierce the day before yesterday. Also nice to meet you.

Please accept the attached loan agreement that is illustrated.

Let me know any questions.

Best wishes,

Aaron



**LEARN WHAT'S NEW AT THE ORLANDO MUSEUM OF ART:** *Subscribe to our newsletter »*

**EMPOWER YOUR COMMUNITY. YOUR DONATION RECEIVES A 15% MATCH:** *United Arts of Central Florida's Collaborative Campaign »*

**FEATURED EXHIBITIONS:**

*A Boundless Drop to a Boundless Ocean »* on view through 5.2.21

*Louis Dewis: An Artist's Life in France »* on view through 5.2.2021

*Voices & Conversations: Expressions of Individuality and Community »* on view through 5.2.2021
*American Journey: Two Centuries of Art and Culture »* on view through 6.30.21

**UPCOMING EXHIBITION:**

*Florida Prize in Contemporary Art 2021 »* on view 6.4.21 through 8.22.21

**FOLLOW US:** Facebook  |  Twitter  |  Instagram

--
Richard LiPuma
LiPuma Law Associates, LLC
1635 Foxtrail Drive
Loveland, CO 80538

rich@ ████████

This message and its contents are confidential. If you received this message in error, do not
use or rely upon it. Instead, please inform the sender and then delete it. Thank you.


--
Richard LiPuma
LiPuma Law Associates, LLC
1635 Foxtrail Drive
Loveland, CO 80538

rich@ ████████

This message and its contents are confidential. If you received this message in error, do not use
or rely upon it. Instead, please inform the sender and then delete it. Thank you.

# EXHIBIT 19

**O R L**
**A N D**
**O M °A**
ORLANDO MUSEUM ART

2416 North Mills Avenue
Orlando, FL 32803
T. 407-896-4231
F.407-896-9920
www.omart.org

# Loan Agreement

For Works of Art
Borrowed by
the Museum

OWNER: MJL Family Trust, LLC, c/o Mr. Richard LiPuma, Manager

Address: 1635 Foxtail Dr.

City: Loveland     State: CO     Zip: 80538

Work #:     Home #:     Cell#:

Email: RICH@     Website:     Fax

SPECIFICATION: ■ Incoming ☐ Outgoing / ■Lender ☐ Borrower     PURPOSE: ■ Exhibition ☐ Extended ■ Temporary

Exhibition Title: *Heroes & Monsters: Jean-Michel Basquiat Thaddeus Mumford, Venice Collection*

Exhibition Dates: September 24, 2021 – 2022 (TBD)     Loan Dates: August 1, 2021 – August 1, 2022     *Dates will vary based on shipping schedule*

DESCRIPTION: Artist: Jean-Michel Basquiat     Nationality: American     Life Dates: 1960 - 1988

Title: *See attached checklist*     Date: 1982

Medium: *See attached checklist*     Edition No.

Dimensions: *See attached checklist*     Frame Size:

Weight:     ID Number:

Credit Line: PRIVATE COLLECTION (If you wish to remain anonymous, please use Private Collection)

INSURANCE: If you wish to insure the work under your own Fine Arts Policy, please request a waiver of subrogation or a Certificate of Insurance that includes the Orlando Museum of Art as an additional insured from your provider.

Value in US currency: $ 57.6 M     To be carried by: ■ Borrower ☐ Lender

SHIPPING: Is work framed?     ☐ yes ■ no     Will work be packed by Owner for shipment?     ☐ yes ■ no

Special handling or installation instructions:     Crozier Fine Art will be packing the artwork for transport

CATALOG & PUBLICITY: Unless declined, The Orlando Museum of Art may photograph, film, tape and/or reproduce in any media the above object to be used only for catalogue, educational, and publicity purposes only. If declined, initial here:

Are digital images available for publication?     ☐ yes ☐ no

AUTHORIZATION: Sign and return one copy of this Loan Agreement to the Orlando Museum of Art in the envelope provided.

By the signature affixed below, the Borrower and Lender verify they have read and agree to the conditions above and on the reverse side of this agreement and certify they have full authority to enter into this agreement.

Signature of Borrower:     Date: 6/30/2021

Orlando Museum of Art

Signature of Lender:     Date: 7/2/2021

Signature of Owner or Authorized Signee with Title

### 1. Care, Preservation, & Exhibition

The Borrower will exercise the same precautions with respect to this loan that it would for the safekeeping of comparable property of its own. Objects will be protected by the Borrower by fire, theft and/or damage of any kind. Evidence of any damage during the period of the loan not described in the condition report at the time of receipt will be reported immediately to the Lender. The Lender will be requested to provide written authorization before any alteration, restoration or repair is executed.

The Orlando Museum of Art retains the right to determine when, if and for how long objects it borrows or lends will be exhibited ~~or loaned~~.                    RTL

### 2. Transportation & Packing

The Lender certifies that the object(s) lent are in such a condition as to withstand ordinary strains of transportation and handling. The Borrower must agree to return the object(s) packed in the same or similar materials and will abide by any special instructions included under the "Shipping Information" section on the face of this document.

Condition reports will be made by the Orlando Museum of Art upon arrival and departure of all objects borrowed or loaned. Lenders to the museum are responsible to make the Orlando Museum of Art aware of any special conditions.

The method of shipment must be agreed upon by both parties as specified under "Shipping Information" on the face of this document. The Borrower will be responsible for costs of all shipping unless previous arrangements have been made in writing. Costs of customs formalities will be assumed by the Borrower. Government regulations will be adhered to for all international shipments.

### 3. Insurance

Unless otherwise specified under the "Insurance" section on the face of this document, the Borrower will be responsible for the insuring of all works while in transit to and from the borrowing institution or individual and throughout the entire loan period, whether on display or in storage. The object(s) will be insured in the amount specified on the face of this document which must reflect fair market value. If the Lender fails to indicate an amount, the Borrower will, with implied concurrence of the Lender, set a value for purposes of insurance for the period of the loan. This value is not to be considered an appraisal.

If the Lender elects to maintain its own insurance coverage, the Borrower requires a Certificate of Insurance naming themselves as additional insured for the object(s) during the period of the loan. In the case of long-term loans, it is the responsibility of the Lender to notify the Borrower of current insurance valuations.

If insurance is waived by the Lender, this waiver shall constitute the agreement of the Lender to release and hold harmless the Borrower from any liability for damage to or loss of the object(s) lent.

### 4. Reproduction & Credit

The Borrower reserves the right to photograph, telecast or reproduce the object(s) lent for educational, catalogue and publicity purposes unless otherwise notified in writing by the Lender. The Borrower agrees to give credit in any publications to the Lender as specified under "Credit Line" on the face of this document unless otherwise instructed in writing.

It is understood that an object on exhibition may not be photographed by the general public unless granted permission by the Lender in writing.

### 5. Change in Ownership and/or Address

It is the responsibility of the Lender or its agent to notify the Borrower promptly in writing if there is a change in ownership of the object(s) lent or if there is a change in identity or address of the Lender. The Orlando Museum of Art assumes no responsibility to search for a Lender who cannot be reached at the address of record.



Jean-Michel Basquiat
*Big Red Head*
1982
Oilstick and acrylic paint on cardboard
56 x 36 ½ in.

Insurance Value:



Jean-Michel Basquiat
*Cat & Fire Truck*
1982
Oilstick & acrylic paint on cardboard
24 ¾ x 21 in.

Insurance Value:



Jean-Michel Basquiat
*Blue Skull*
1982
Oilstick & acrylic paint on cardboard
10 ½ x 10 ½ in.

Insurance Value:



Jean-Michel Basquiat
*Red Face & Lizard*
1982
Oilstick & acrylic paint on cardboard
25 x 51 in.

Insurance Value:



Jean-Michel Basquiat
*Crown Face*
1982
Oilstick & acrylic paint on cardboard
12 ½ x 7 ½ in.

Insurance Value:



**Jean-Michel Basquiat**
*Self Portrait*
1982
Oilstick & acrylic paint on cardboard
12 ½ x 7 ½ in.

Insurance Value:



**Jean-Michel Basquiat**
*Milk Face*
1982
Oilstick & acrylic paint on cardboard
12 ½ x 9 in

Insurance Value:



**Jean-Michel Basquiat**
*Yellow & Black Buildings*
1982
Oilstick & acrylic paint on cardboard
9 x 12 in

Insurance Value:



**Jean-Michel Basquiat**
*Crown Face II*
1982
Oilstick & acrylic paint on cardboard
9 ¾ x 10 ¾ in

Insurance Value:



**Jean-Michel Basquiat**
*Baseball*
1982
Oilstick & acrylic paint on cardboard
19 x 12 in

Insurance Value:



**Jean-Michel Basquiat**
*Two Blue Trucks*
1982
Oilstick & acrylic paint on cardboard
6 x 17 in

Insurance Value:



**Jean-Michel Basquiat**
*Eyeballs / Eat*
1982
Oilstick & acrylic paint on cardboard
22 x 26 in

Insurance Value:



**Jean-Michel Basquiat**
*Dog & Wolf*
1982
Oilstick & acrylic paint on cardboard
6 ½ x 10 in

Insurance Value:



**Jean-Michel Basquiat**
*Face (With Orange Halo)*
1982
Oilstick & acrylic paint on cardboard
10 x 7 in

Insurance Value:



**Jean-Michel Basquiat**
*Head With Halo*
1982
Oilstick & acrylic paint on cardboard
13 x 8 in

Insurance Value:



Jean-Michel Basquiat
*Red Face & Yellow Crown*
1982
Oilstick & acrylic paint on cardboard
11 ½ x 8 ½ in.

<mark>Insurance Value:</mark>



Jean-Michel Basquiat
*Stop Sign / Hit The Brakes*
1982
Oilstick & acrylic paint on cardboard
9 x 14 in

<mark>Insurance Value:</mark>



Jean-Michel Basquiat
*Three Birds, Car & TV*
1982
Oilstick & acrylic paint on cardboard
15 x 19 in

<mark>Insurance Value:</mark>



Jean-Michel Basquiat
*ACME Toy*
1982
Oilstick & acrylic paint on cardboard
56 x 32 in

<mark>Insurance Value:</mark>



Jean-Michel Basquiat
*Receipt / Poem*
1982
Oilstick & typewritten text on perforated computer paper
(continuous feed)
12 x 8 in

<mark>Insurance Value:</mark>

| | |
|---|---|
|  | Jean-Michel Basquiat<br>*Big Red Head*<br>1982<br>Oilstick and acrylic paint on cardboard<br>56 x 36 ½ in.<br><br>Insurance Value: $15,000,000 (USD) |
|  | Jean-Michel Basquiat<br>*Cat & Fire Truck*<br>1982<br>Oilstick & acrylic paint on cardboard<br>24 ¾ x 21 in.<br><br>Insurance Value: $3,000,000 (USD) |
|  | Jean-Michel Basquiat<br>*Blue Skull*<br>1982<br>Oilstick & acrylic paint on cardboard<br>10 ½ x 10 ½ in.<br><br>Insurance Value: $2,000,000 (USD) |
|  | Jean-Michel Basquiat<br>*Red Face & Lizard*<br>1982<br>Oilstick & acrylic paint on cardboard<br>25 x 51 in.<br><br>Insurance Value: $2,800,000 (USD) |



**Jean-Michel Basquiat**
*Baseball*
1982
Oilstick & acrylic paint on cardboard
19 x 12 in

Insurance Value: $2,800,000 (USD)



**Jean-Michel Basquiat**
*Two Blue Trucks*
1982
Oilstick & acrylic paint on cardboard
6 x 17 in

Insurance Value: $1,600,000 (USD)



**Jean-Michel Basquiat**
*Eyeballs / Eat*
1982
Oilstick & acrylic paint on cardboard
22 x 26 in

Insurance Value: $2,800,000 (USD)



**Jean-Michel Basquiat**
*Dog & Wolf*
1982
Oilstick & acrylic paint on cardboard
6 ½ x 10 in

Insurance Value: $350,000 (USD)



**Jean-Michel Basquiat**
*Face (With Orange Halo)*
1982
Oilstick & acrylic paint on cardboard
10 x 7 in

Insurance Value: $500,000 (USD)

JMB

**Jean-Michel Basquiat**

*Receipt / Poem*

1982

Oilstick & typewritten text on perforated computer paper
(continuous feed)

12 x 8 in

Insurance Value: $150,000 (USD)

| | | |
|---|---|---|
| 1. | Untitled (Cat & Fire Truck) | 3,000,000.00 |
| 2. | Untitled (Red Face & Lizard) | 2,800,000.00 |
| 3. | Untitled (Blue Skull) | 2,000,000.00 |
| 4. | Untitled (Crown Face) | 1,400,000.00 |
| 5. | Untitled (Self Portrait) | 1,800,000.00 |
| 6. | Untitled (Big Red Head) | 15,000,000.00 |
| 7. | Untitled (Acme Toy Co) | 12,000,000.00 |
| 8. | Untitled (Milk Face) | 1,000,000.00 |
| 9. | Untitled (Crown Face 2) | 1,800,000.00 |
| 10. | Untitled (Yellow and Black Buildings) | 1,700,000.00 |
| 11. | Untitled (Baseball) | 2,800,000.00 |
| 12. | Untitled (Two Blue Trucks) | 1,600,000.00 |
| 13. | Untitled (Eyeballs/Eat) | 2,800,000.00 |
| 14. | Untitled (Face w Orange Halo) | 500,000.00 |
| 15. | Untitled (Dog & Wolf) | 350,000.00 |
| 16. | Untitled (Head w Halo) | 950,000.00 |
| 17. | Untitled (Red Face & Yellow Crown) | 750,000.00 |
| 18. | Untitled (Stop Sign/Hit the Brakes) | 1,200,000.00 |
| 19. | Untitled (Three Birds, Car & TV) | 4,000,000.00 |
| 20. | Poem by JMB | 150,000.00 |

Total Marketable Cash Value:            $57,600,000.00

Total Value if Sold as a Collection:        $65,000,000.00

# EXHIBIT 20

| From: | aaron.degroft@⬛⬛⬛⬛ [aaron.degroft@⬛⬛⬛⬛ |
|---|---|
| Sent: | Sat 7/3/2021 10:13:41 PM (UTC-04:00) |
| To: | Richard LiPuma[rich@⬛⬛⬛⬛ |
| Cc: | ⬛⬛⬛⬛ |
| Subject: | Re: Invite potential buyers to VIO opening to see the entire collection together? |
| Attachment: | MJL-OMA Loan Agt - Executed.pdf |

Rich,

They would of course want their outside "expert" but let us use that moniker loosely. Pierce is the real expert on these works. He has spant years but he is involved with possible outcomes. I am second in line. I have immersed myself for months on these and JMB. We have made amazing discoveries on these paintings making them masterpieces. I am the only person writing on the last days of Basquiat comprehensively. Not a cheer for me but insights. No one has made. It is part of our exhibition. Do not sell you and your representatives short which I know you will not do. You all are sitting on platinum encrusted with diamonds. I stake my reputation on it. As I say again they would be fools to not have an outside representative look at the originals in the flesh. They just need them to do it fast. We need the works to photograph them In high res. There are many fingerprints on the works that I believe undoubtedly to be JMB. This with your iron clad provenance makes a hermetic case.

Let me know how I can help.

Happy fourth!

Aaron

Aaron H. De Groft, PH.D.
Director & CEO
Orlando Museum of Art
⬛⬛⬛⬛

Sent from my iPhone

> On Jul 3, 2021, at 9:58 PM, Aaron De Groft <aaron.degroft@⬛⬛⬛⬛ wrote:
>
> We can make this disclaimer. The group disbanded. This irrelevant is. No worries at all.
>
> Aaron H. De Groft, PH.D.
> Director & CEO
> Orlando Museum of Art
> ⬛⬛⬛⬛

Sent from my iPhone

On Jul 2, 2021, at 1:31 PM, Richard LiPuma <rich@ ███████ wrote:

Aaron: Thanks for everything! The Loan Agreement is attached. Let me know when you have the insurance set - I'm assuming MJL Family Trust is a named insured too?

Yes, great idea to invite potential buyers to the Opening! I'll do that and let you know their responses. I would definitely like to attend. The buyers are moving painfully slow, so they have not yet scheduled a time to speak with you. But I'll definitely let you know the next steps as soon as I know them. Let me and ███████ know what we can do to assist you too!

Oh, and this has been in the back of my mind. I informally agreed with Basquiat's Estate lawyer that we would make clear in any catalogues or promotional material that, "The Estate of Jean-Michel Basquiat has not rendered any opinion on the authenticity of any of the works in this collection." In fact it occurs to me that you have not had a chance to see our provenance documents and other information relating to these 19 paintings. I will send you our information under separate cover. Thanks again!!!

Rich

On Wed, Jun 30, 2021 at 6:36 PM Aaron De Groft
<aaron.degroft@ ███████ <mailto:aaron.degroft@ ███████ >> wrote:
Seems like a reasonably good idea? Right? So hold Thursday, September 23rd for that. Do they still want to talk to me? No worries

Get Outlook for
iOS<https://na01.safelinks.protection.outlook.com/?url=https%3A%2F%2Faka.m
s%2Fo0ukef&data=04%7C01%7C%7C4bd21efb9dab44872bd808d93d7f21ad%7
C84df9e7fe9f640afb435aaaaaaaaaaaa%7C1%7C0%7C637608438923428684%7
CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzli
LCJBTiI6Ik1haWwwiLCJXVCI6Mn0%3D%7C1000&sdata=5mmAQQNBZk7IT
CSceeSdXBl4Ol5TWRh7n3vm5lSzM4g%3D&reserved=0>


--
Richard LiPuma
LiPuma Law Associates, LLC
1635 Foxtrail Drive
Loveland, CO 80538

rich@ ███████ <mailto:rich@ ███████

This message and its contents are confidential. If you received this message in error, do not use or rely upon it. Instead, please inform the sender and then delete it. Thank you.

# EXHIBIT 21

| | |
|---|---|
| **From:** | O'Donnell, Pierce [podonnell@ ▮ ] |
| **on behalf of** | O'Donnell, Pierce <podonnell@ ▮ > [podonnell@ ▮ ] |
| **Sent:** | 5/19/2021 12:53:04 AM |
| **To:** | Aaron De Groft [aaron.degroft@ ▮ ] |
| **Subject:** | Re: ▮ is out. |

Good try. With all due respect, three males, two white males and no blacks or women?!?

We have time to find a couple. Take a look at the article re top
Blacks in art. Some super candidates. Thanks


Sent from my iPhone




Pierce O'Donnell
Attorney at Law
Biography

▮
podonnell@ ▮

Greenberg Glusker LLP
2049 Century Park East, Suite 2600
Los Angeles, CA 90067
GreenbergGlusker.com

This message is intended solely for the use of the addressee(s) and is intended to be privileged and confidential within the attorney client privilege. If you have received this message in error, please immediately notify the sender at Greenberg Glusker and delete all copies of this email message along with all attachments. Thank you.

On May 18, 2021, at 9:41 PM, Aaron De Groft <aaron.degroft@ ▮ > wrote:


She is overwhelmed with projects. She thinks ours is awesome and suggested ▮ . She is done with Basquiat stupidly but she is an academic. If we have Diego and ▮ and me, which I have some serious street creds, I am good with that. We are good.
As I am on it.

I am getting me LA arrangements fixed. Thanks so much.



Seems my new phone is fu crooning well.

Get Outlook for iOS

# EXHIBIT 22

| | |
|---|---|
| **From:** | O'Donnell, Pierce [podonnell@███████] |
| **on behalf of** | O'Donnell, Pierce <podonnell@███████████> [podonnell@███████] |
| **Sent:** | 6/26/2021 1:10:19 PM |
| **To:** | Aaron De Groft [aaron.degroft@████████] |
| **Subject:** | Re: The night Basquiat died. |

Wow!!! So powerful, personal and tragic at the same time. Kudos☐☐

Sent from my iPhone

**Pierce O'Donnell**
Attorney at Law
Biography

podonnell@███████

**Greenberg Glusker LLP**
2049 Century Park East, Suite 2600
Los Angeles, CA 90067
GreenbergGlusker.com

This message is intended solely for the use of the addressee(s) and is intended to be privileged and confidential within the attorney client privilege. If you have received this message in error, please immediately notify the sender at Greenberg Glusker and delete all copies of this email message along with all attachments. Thank you.

On Jun 26, 2021, at 12:30 AM, Aaron De Groft <aaron.degroft@███████ wrote:

This is who I am. I am going to publish as part of our things. If the potential owners want to know my expertise in Basquiat, then this is my new contribution to the world on Basquiats. He killed himself. No one has said this but read my stuff. My argument on that he did it. Changes the narrative to our control and not the media and scholars. We own this.

We own the narative von the Mumford twenty five. Do not get cold feet. Jay Z buys them all as a collection for his media purposes then fine. $250 million as a unique collection that is universally important or they do not. Then sell them individually. Make more money. My bet if Nets do not buy them as a collection, then the Chinese, or Arabs or the Russians will. Either way you are golden my friend.

Aaron H. De Groft, PH.D.
Director & CEO
Orlando Museum of Art

Sent from my iPhone

Begin forwarded message:

**From:** Aaron De Groft <aaron.degroft@███████
**Date:** June 26, 2021 at 3:11:19 AM EDT
**To:** ████████████████████████████████
**Subject: The night Basquiat died.**

Little known interview on those who who were there. We make history here. Follow me. I do my best thinking and writing at night. No one has said this about Basquiat before. But who am I but a country boy from Virginia...

On the night of April 12, 1998 John-Michel Basquiat died by morning. In the bathroom by his bedroom was found according to in situ observers were bloody syringes and gauze as well as a punched out bathroom window with access to the outside and an inscription in Basquiat's own blood, the words "broken hearted." He had told people in the two weeks and one week leading up to this that he was clean and not using any drugs. This is called sun rising. This term describes people that are now happy because they have decided to have no more worries and therefore they are happy in their decision. The night of his death he injected himself with the point of suicide and dying. How do we know this. In this never before referenced interview on the specifics of his death the bathroom was described. Why would any one punch out a bathroom window or any other window? And then write in their own blood on the walk "heart broken?" I have had experience with suicide and and sun rising. Basquiat was trapped in a world he had half a hand in creating. He wanted out. How do you get out. Smash a window and "escape". His heart was broken. He was an artist for everyone else who owned him.

The Mumford Collection was the last time Basquiat painted for himself. After that everyone "owned" him for commissions or gallery shows. The works get so much thinner. Our works are deep, painterly deep after Basquiat was described as a drawer, not a painter. Our works are paintings. Rich and deep and personal like no others. They are not drawings. Though drawing is a great part of our paintings. Expressions of raw creativity for himself. Why? He made them for himself because of his creative and real life needs. Drugs. He was a heroine addict. He was in a new place, Southern California that he was learning and acclimating to. He had a girl friend that he himself said would be famous. Madonna who debuted her first single song at the very same time. He remarked and said to the world that he did not want to be a black artist, he wanted to be a famous artist. After late 1982, Basquiat was owned by others. That is why these cardboard paintings are so unique. They were his, undeniably. And he gave them to a friend. Thaddeus Munford. He then after this was on a terrible path of self destruction. In the end he owned himself back. This is so often what suicide is. A taking back of ones one life. It is mine. No matter what anyone else says. I want out. I break this window and I am free but I am broken hearted to have to resort to this.

Get Outlook for iOS

# EXHIBIT 23

| From: | O'Donnell, Pierce [podonnell@██████████] |
|---|---|
| Sent: | 6/1/2021 4:34:46 PM |
| To: | Jim Blanco███████████ |
| CC: | Aaron H. DeGroft [adegroft@█████████] |
| Subject: | Your article |
| Attachments: | Blanco article.docx |

Jim

Here is a summary of how I envision your article for the catalogue for the Orlando Museum of Art exhibition.   Please call me later today.  Thanks.
Pierce



Pierce O'Donnell
Attorney at Law
Biography
██████████████
podonnell@█████████████

Greenberg Glusker LLP
2049 Century Park East, Suite 2600
Los Angeles, CA  90067
GreenbergGlusker.com

This message is intended solely for the use of the addressee(s) and is intended to be privileged and confidential within the attorney client privilege. If you have received this message in error, please immediately notify the sender at Greenberg Glusker and delete all copies of this email message along with all attachments. Thank you.

Basquiat's Universe As Expressed in the Venice Collection
By James Blanco

This never-before-exhibited collection of 25 paintings created by Jean-Michel Basquiat in Venice, California in 1982 offer a remarkable and unique opportunity to explore the multi-faceted universe of his imagination. These motifs, themes, and subjects are brilliantly expressed in these works and presage some of his most acclaimed works painted later in 1982 and the following year. We find heroes, monsters, ghosts, royalty, the streets, ghastly heads and faces, reptiles, bats, Abraham Lincoln, anti-militarism, cowboys, Native American symbolism, autobiographical references, and a shout out to his patron and celebrated African-American television writer Thaddeus Q. Mumford, Jr. who purchased the entire collection.

While some of these works can be seen as a sketchbook, they are much more. For example, *Self-portrait* (1982) is a more developed and impressive painting in color than the later black and white version. Several of the skulls (*Horn* (1982), *Big Red Head* (1982), and *Blue Skull* (1982)) capture key elements of those skull paintings that have recently sold for fantastic prices—*Untitled* (1982) [$110.5 million], *In This Case* (1983) [$93.1 million], and *Flexible* (1984) [$45.3 million]. Many works in the Venice Collection embody elements found in the dozen highest-priced Basquiat paintings. *See* [ HYPERLINK "https://www.artnews.com/list/art-news/artists/jean-michel-basquiat-most-expensive-works-1234585981/jean-michel-basquiat-untitled-1982/" ]

All in all, this treasure trove of Basquiat creations—from the breakthrough year of his best work—richly enhances our understanding and appreciation for his genius. These exquisite paintings comprising the Basquiat Venice Collection further cement his iconic stature as a gifted artist whose all-too-brief career from graffiti tagger to stardom left us with works of singular beauty, sophistication, and multi-faceted social, political, and racial messaging. It was here in California during 1982, far from the market pressures that would later overwhelm him, that the young artist demonstrated the clarity of his vision and expressed his compelling narrative characteristic of his masterpieces.

# EXHIBIT 24

| | |
|---|---|
| **From:** | O'Donnell, Pierce [podonnell@███████████] |
| **Sent:** | 6/1/2021 4:54:25 PM |
| **To:** | Deborah Krieger██████████ |
| **CC:** | Aaron H. DeGroft [adegroft@████████] |
| **Subject:** | Re: BASQUIAT ESSAY |

Deborah

Yes, focus is JMB in California in 1982 and 1982 itself. He painted here several times and had his first Gagosian exhibition. (Eli Broad purchased 13 paintings at some time in 1982 and maybe later—they are featured in the reopened Broad and there is likely a catalogue or other written discussion of them.) I want you to explore how the California milieu influenced and benefited him. Madonna, parties, drugs, money, reckless behavior, going to Warner Bros, craving fame, etc. There are some published articles and references in Hoban's biography, and your email below identifies some other excellent potential sources. But we would like you to go beyond and original interviews with as many players as possible.
We will also want a 1982 timeline for Basquiat—where he was, where he had exhibitions, famous works that he painted, etc.

You will also find as many photos, original video and film sources, etc.
This should be done in conjunction with Dr. De Groft's staff who are going to produce a video for the exhibition.

Talk at 6 pm EST.
Thanks.
Pierce

On May 26, 2021, at 3:40 PM, Deborah Krieger ██████████████████ wrote:

Hi Pierce,

Thanks so much for chatting with me today. As I understood it, here's the project:

1) Deadline of June 30 for 1st draft. Roughly 5000 words on Basquiat in California in 1982.

Text sources (can I bill you for reimbursements?):
-Hoban 2016 (I already have this)
-Fretz 2010 (I also ready have this)
-Saggesse Getty reader 2021
-Saggesse 2021
-Clement 2014
-Hoffman 2005
-Nairne 2020
-Buchhart 2010
-Mayer 2010
-Almiron 2020
-Buchhart 2019
-Dayton Hermann 2019
-Buchhart 2017
-Buchhart 2015
-likely other single articles as I find them on Jstor, which I have access to as a Swarthmore alum.

Film sources (ditto reimbursement?):
-Schnabel film
-Radiant Child documentary
-Boom for Real documentary
-Rage to Riches documentary
-Downtown 81

Interviews I will pursue with yours and Dr. De Groft's permission:
-Phoebe Hoban
-Dr. Saggesse
-Larry Gagosian (I understand this one may be complicated)

2) Images of Basquiat in CA in 1982

I will need a subscription to Newspapers.com to search through their database and other newspapers as needed.
May I get reimbursed for this and other research expenses?

I will let you know when I've arranged a call with Dr. De Groft.

Thanks!

_____

Deborah Krieger (she/her pronouns)
M.A. '21, Public Humanities | Brown University
Freelance Arts and Culture Writer
Curatorial Fellow 2019-2021, David Winton Bell Gallery | Brown University
http://www.i-on-the-arts.com

Pierce O'Donnell
Attorney at Law
Biography

podonnell@█████████████

Greenberg Glusker LLP
2049 Century Park East, Suite 2600
Los Angeles, CA 90067
GreenbergGlusker.com

This message is intended solely for the use of the addressee(s) and is intended to be privileged and confidential within the attorney
client privilege. If you have received this message in error, please immediately notify the sender at Greenberg Glusker and delete all
copies of this email message along with all attachments. Thank you.

# EXHIBIT 25

| From: | Aaron H. DeGroft[/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=33cbae2830b34d6dbfc8b696f7edd140-Aaron H. De] |
|---|---|
| Sent: | Mon 6/14/2021 2:37:37 PM (UTC-04:00) |
| To: | Deborah Krieger █████████████████ |
| Subject: | Re: JMB in LA |

Fred is not contributing and Pierce waned to steer clear of him. I will call you this afternoon to plow through  you will do great.

Get Outlook for iOS

---

**From:** Deborah Krieger █████████████████
**Sent:** Monday, June 14, 2021 2:17:29 PM
**To:** Aaron H. DeGroft <adegroft@████████>
**Subject:** Re: JMB in LA

Hi Aaron,

I'm kind of hitting a dead end in terms of the essay right now. Would it be possible for me to connect with Fred Hoffman—I think Pierce mentioned he was contributing?—to talk about what he's writing for the catalogue? I can also flesh out the timeline but I'm not loving my attempts at a thesis and am wondering if expanding the timeline itself into something more essayistic is a better move?
Deborah

---

Deborah Krieger (she/her pronouns)
M.A. '21, Public Humanities | Brown University
  Freelance Arts and Culture Writer
Curatorial Fellow 2019-2021, David Winton Bell Gallery | Brown University
http://www.i-on-the-arts.com
████████████████

On Jun 13, 2021, at 9:14 PM, Aaron H. DeGroft <adegroft@████████ wrote:

 I worries. I am nyc looking at the 25 Basquiats. Back on Wednesday night. You are doing a good job.

Get Outlook for iOS

---

**From:** Deborah Krieger █████████████████
**Sent:** Sunday, June 13, 2021 9:13:03 PM
**To:** Aaron H. DeGroft <adegroft@████████>
**Subject:** Re: JMB in LA

Great! I'll also have a draft timeline to you tomorrow.

_____

Deborah Krieger (she/her pronouns)
M.A. '21, Public Humanities | Brown University
Freelance Arts and Culture Writer
Curatorial Fellow 2019-2021, David Winton Bell Gallery | Brown University
http://www.i-on-the-arts.com
███████████

> On Jun 13, 2021, at 9:08 PM, Aaron H. DeGroft
> <adegroft@██████ wrote:
>
> Try it. Nothing gained if not.
>
> Get Outlook for iOS

---

**From:** Deborah Krieger ████████████████
**Sent:** Sunday, June 13, 2021 9:04:39 PM
**To:** Aaron H. DeGroft <adegroft@██████
**Subject:** Re: JMB in LA

Could try to reach out to some of the artists who were in the
show—Mike Glier, Lynton Wells, Pedro Perez?

_____
<clip_79522411.jpeg>
Deborah Krieger (she/her pronouns)
M.A. '21, Public Humanities | Brown University
Freelance Arts and Culture Writer
Curatorial Fellow 2019-2021, David Winton Bell Gallery | Brown
University
http://www.i-on-the-arts.com
███████████

> On Jun 13, 2021, at 8:39 PM, Deborah Krieger
> ████████████████████████ wrote:
>
> According to LA Times, Janus Gallery was in July.
>
> _____
>
> Deborah Krieger (she/her pronouns)
> M.A. '21, Public Humanities | Brown University
> Freelance Arts and Culture Writer

Curatorial Fellow 2019-2021, David Winton Bell
Gallery | Brown University
http://www.i-on-the-arts.com

▮▮▮▮▮▮

On Jun 13, 2021, at 8:38 PM, Aaron H.
DeGroft <adegroft@▮▮▮▮▮> wrote:

Says April 82 on postmark. His first drawing show at
Janus Gallery.

Get Outlook for iOS

**From:** O'Donnell, Pierce
<podonnell@▮▮▮▮▮▮▮>
**Sent:** Sunday, June 13, 2021 3:49:53 PM
**To:** Michael Klein ▮▮▮▮▮
**Cc:** Aaron H. DeGroft <adegroft@▮▮▮▮▮
Krieger Deborah
▮▮▮▮▮▮▮

**Subject:** Re: JMB in LA

I think the postmark is 1982. This was his first LA
exhibition.

Sent from my iPhone

Pierce O'Donnell
Attorney at Law
Biography

podonnell@▮▮▮▮▮

Greenberg Glusker LLP
2049 Century Park East, Suite 2600
Los Angeles, CA 90067
GreenbergGlusker.com

This message is intended solely for the use of the
addressee(s) and is intended to be privileged and
confidential within the attorney client privilege. If you
have received this message in error, please
immediately notify the sender at Greenberg Glusker
and delete all copies of this email message along with
all attachments. Thank you.

On Jun 13, 2021, at 12:20 PM, Michael
Klein ▮▮▮▮▮▮▮▮ wrote:

&lt;unnamed-10.jpg&gt;

&lt;unnamed-9.jpg&gt;

--
*Michael Klein*
**Michael Klein Arts LLC**
**An agent for Artists and Artists**
**Estates**
www.michaelkleinarts.com

# EXHIBIT 26

| | |
|---|---|
| **From:** | O'Donnell, Pierce[podonnell@████████████] |
| **Sent:** | Mon 6/14/2021 5:43:02 PM (UTC-04:00) |
| **To:** | Deborah Krieger████████████ |
| **Cc:** | Pierce O'Donnell[pierceodonnellhome@████████; Aaron H. DeGroft[adegroft@████████  Aaron De Groft[aaron.degroft@████████ |
| **Subject:** | Re: Project Updates |

Looks great.  Two things.

1. How long was JMB in California starting in November? This was when he painted our 25 paintings.
2. Aaron today found Queen lyrics in a couple of paintings. Can you find anything about Basquiat liking their music, meeting them, etc?
Thanks.

> On Jun 14, 2021, at 2:22 PM, Deborah Krieger ████████████████████ wrote:
>
> Hi Pierce,
> Thank you for clarifying! Please let me know how I can improve the 1982 timeline I sent earlier today. (I am also sending it now.)
>
> I will let you know how the interviews go.
>
> Do I have permission to try and contact Deborah McLeod, who I've found was director of the Janus Gallery at least in 1983 (LA Times)? I think that would be a great interview especially for figuring out how that Janus show came about! She's at Gagosian now, so I figured I'd ask.
>
> Deborah
> https://www.linkedin.com/in/deborah-mcleod-63a1451b2/
>
> _____
>
> Deborah Krieger (she/her pronouns)
> M.A. '21, Public Humanities | Brown University
> Freelance Arts and Culture Writer
> Curatorial Fellow 2019-2021, David Winton Bell Gallery | Brown University
> http://www.i-on-the-arts.com
> ████████████
>
> > On Jun 14, 2021, at 5:14 PM, O'Donnell, Pierce

<podonnell@ ███████████ >    wrote:

Deborah

Thanks for the update.
I wanted a timeline/chronology for **1982 with a California emphasis.** That is much less time consuming. The article is an essay and the timeline is secondary.

Don't worry about copyright permissions. The museum will do that once a final decision is made about what will go in your or other articles.

Three interviews look promising.

With the refined scope of work, we would hope that you might be able to get Aaron a first draft by July 15th. Is that good?

Thanks.

> On Jun 14, 2021, at 1:56 PM, Deborah Krieger
> ███████████    wrote:

Hi Pierce,

I'm just writing to update you on the project for the Basquiat show. I've sent along the draft of the 1982 timeline, and I am making progress, but given that the project has evolved in a number of respects, I will not be able to complete the essay in a satisfactory manner by July 1.

Here are some of the issues which have slowed the progress:

1) I am not sure which particular images and/or videos you would like the rights to, and it will take time to find the relevant images from 1982, research the copyright holders, and get permission from them, which may not happen in two weeks. It will be helpful to know the specific items as soon as possible.

2) Regarding interviews: the limitations on who I can contact for my piece have made it a little challenging to get first-hand accounts of people who knew Basquiat. In addition to the Jim Blanco interview which you arranged, I have been able to secure an interview with Peter Relic, who knew the late Matt Dike, who was Basquiat's assistant at Gagosian in 1982. I am also in contact with Roberto Juarez, one of the artists from the July, 1982 Janus Gallery show that has not been discussed in the scholarly literature, but was reviewed in the LA Times. Assuming I am able to schedule something with him, that will be three interviews around which I can build my essay—Jim Blanco, Peter Relic, and Roberto Juarez.

3) The addition of the requested timeline through 1988 will require substantial time and effort.

Additionally, I am scheduled to begin a new job here in Rhode Island the first week in July. I will be able to continue to work on the essay, but I will have much less time available. I should be able to complete it to my satisfaction by early August. Please let me know if that works for you.

I am speaking with Aaron a little later today and will discuss this with

him as well.

Thank you,
Deborah

Deborah Krieger (she/her pronouns)
M.A. '21, Public Humanities | Brown University
Freelance Arts and Culture Writer
Curatorial Fellow 2019-2021, David Winton Bell Gallery | Brown
University
http://www.i-on-the-arts.com

Pierce O'Donnell
Attorney at Law
Biography

podonnell@

Greenberg Glusker LLP
2049 Century Park East, Suite 2600
Los Angeles, CA 90067
GreenbergGlusker.com

This message is intended solely for the use of the addressee(s) and is intended to
be privileged and confidential within the attorney client privilege. If you have
received this message in error, please immediately notify the sender at Greenberg
Glusker and delete all copies of this email message along with all attachments.
Thank you.

<Clean Timeline_Word.docx>

Pierce O'Donnell
Attorney at Law
Biography

podonnell@

Greenberg Glusker LLP
2049 Century Park East, Suite 2600
Los Angeles, CA 90067
GreenbergGlusker.com
This message is intended solely for the use of the addressee(s) and is intended to be privileged and confidential
within the attorney client privilege. If you have received this message in error, please immediately notify the sender
at Greenberg Glusker and delete all copies of this email message along with all attachments. Thank you.

**TIMELINE 1982**

**JANUARY 82**

Wolfgang Puck opens Spago

LA Artists For Survival (anti-nuclear artist group) has first meeting

1/6-1/24: Paul McCarthy, "Humanoid," LACE

1/13: Hank Aaron and Frank Robinson are inducted into the Baseball Hall of Fame

1/15-2/20: Lynda Benglis "Flux & Fusion: An Exhibition of Sculpture," Margo Leavin Gallery

1/17: Death of Thelonius Monk

1/20: Ozzy Osbourne bites the head off a bat on stage in Des Moines, Iowa

1/24: San Francisco 49ers beat Cincinnati Bengals in Super Bowl XVI at Pontiac Silverdome in MI

1/26-2/27: Allen Ruppersburg, "Searching for Passion and Sex" at LAICA

**FEB 82**

2/1: "Late Night with David Letterman" premieres, Bill Murray is first guest, NBC

2/6-3/6: New Paintings by Jay McCafferty, Cirrus Gallery

2/16-3/13: Marcel Duchamp, Jasper Johns: The End Game Opposition & Sister Squares are Reconciled at LA Louver

2/19: Wes Craven *Swamp Thing* released in theaters

2/24-3/28: Jim Morris, Drawings, LACE

**MARCH 82**

3/5: John Belushi dies of a drug overdose

**3/6-4/1: Basquiat at Annina Nosei, NYC**

3/19: Blake Edwards, *Victor/Victoria*

3/25: *Cagney & Lacey* premieres, CBS

3/26-5/22: John Outterbridge at Brockman Gallery

3/29: Johnny Carson hosts 54th Academy Awards. *Chariots of Fire* wins Best Picture

3/29: "Ebony and Ivory," Paul McCartney featuring Stevie Wonder

**APRIL 82**

A Flock of Seagulls releases debut album

4/4-5/30: National Studio Artists (Spring 1982) at MOMA PS1 includes Kenny Scharf

4/3-5/8: Julian Schnabel: Recent Paintings & Drawings, Margo Leavin Gallery

**4/8-5/8: Basquiat, Larry Gagosian Gallery**
    Reviewed *LA Times*, William Wilson, April 16
    Reviewed *LA Weekly*, Hunter Drohojowska, April 23-29 edition (Schnabel at Margo Leavin also
reviewed in this article)

4/16 – 5/16: 5th Annual Downtown Artists Show, LACE

4/22-5/23: Julian Schnabel at LACMA Gallery Six

**4/22-7/4: Basquiat in group show "Running '82" at New York Road Runners Club. Includes Keith
Haring, de Kooning, Kiki Smith, etc.**

**MAY 82**

Sisters of Survival, "Shovel Defense" performance

**Bruno Bischofberger learns that Basquiat has left Nosei's Gallery**

5/8-5/16: New York Islanders win Stanley Cup in four games against Canucks

5/14: John Milius, *Conan the Barbarian*

5/16-6/20: John Baldessari, Long Beach Museum of Art

5/20-6/19: Ellsworth Kelly at Margo Leavin Gallery

5/21: John Huston, *Annie*

**5/23: *LA* Times reports Basquiat will be in the upcoming documenta show**

5/27-6/8: LA Lakers win NBA Championship against Philadelphia 76ers, 4 games to 2

5/28: Sylvester Stallone, *Rocky III*

5/31: Survivor's "Eye of the Tiger" is released

**JUNE 82**

"Between Modernism and the Media," Summer 1982 edition of *Art in America,* Hal Foster writes:
        "The graffitists have turned the walls o f the city into spaces of response —for response outside the
media of          TV, magazines, etc. For response is precisely what these media replace with the given
rituals of consumption          and "participation" (call-ins, polls, letters to the editor). So what do the
media —into which the art                    world is tapped —do in response to this response of the
graffitists? Mediate it, absorb it. The underground is              pulled into a TV studio, the Bleecker
Street Station is redrawn in a West Broadway gallery. There are other              reasons why graffiti
was ordained an art —its economic value could not be assured without such a taxonomic              shift
—but surely the subversion of the subversive is a principal motive. The official reclaims the unofficial,
        the galleries absorb the graffitists. Thus the street-artist Samo becomes **Jean-Michel Basquiat**,
the new art-          world primitive/prodigy; and the work of Keith Haring, a mediatory figure in graffiti-

become-art, appears on          the huge Spectacolor sign atop Times Square January 1982). Graffiti, the act of antimedia response, becomes          an art in the media of irresponsibility."

Frank Zappa song "Valley Girl" is released

6/4: Nicholas Meyer, *Star Trek II: The Wrath of Khan*

6/4-6/26: "Jancar/Kuhlenschmidt Closing Exhibition." The gallery opened in May 1980 and showed Richard Prince, William Leavitt, et al

**6/4-7-9: Basquiat participates in "Pressure to Paint" group show at Marlborough Gallery, NYC. Also includes Diego Cortez and Haring**

6/9-7/9: Lari Pittman, Sunday Paintings, LACE

6/10-7/3: David Hockney at LA Louver

6/11: Larry Holmes defeats Gerry Cooney for boxing heavyweight title in Last Vegas. Cooney was considered the "great white hope" of boxing

6/11: Steven Spielberg, *E.T. The Extra-Terrestrial.* **Basquiat note: I think *Colorful Face* from the Venice Collection looks kind of like ET**

**6/11-7/15: Basquiat participates in "Fast" group show at Alexander F. Milliken Inc., NYC**

6/15: Studio Museum in Harlem opens its 144 West 125th Street location

**6/19-9/28: Basquiat documenta 7, Kassel, West Germany. He is the youngest of 176 artists including Warhol, Beuys, Twombley, Richter, Haring, et al**

**6/23-7/30: Basquiat participates in BlumHelman group show, NYC**

6/24-7/25: Tony Berlant, LACMA Gallery Six

6/25: John Carpenter, *The Thing*

6/25: Ridley Scott, *Blade Runner*

**JULY 82**

7/2-7/31: Tony Berlant at LA Louver

7/3: Martina Naratilova beats Chris Evert at Wimbledon (6-1, 3-6, 6-2)

7/10: *Green Card: An American Romance* by Bruce and Norman Yonemoto presented, LACE

7/8: Diet Coke is "unveiled" (it will not be sold until August)

7/9: Steven Lisberger, *TRON*

**7/16: Basquiat is in "Drawings/Vision: New York" at Janus Gallery, LA is reviewed by in *LA Times* and includes Mike Glier, Roberto Juarez, Lynton Wells, Pedro Perez. It closes July 31. <u>This show is not in Hoban or Saggesse.</u>**

7/23: George Roy Hill, *The World According to Garp*

## AUG 82

8/1: Formal Hall of Fame induction ceremony for Hank Aaron

8/6-8/9: Target LA Art Festival Art Festival commemorating the bombings of Hiroshima and Nagasaki

8/13: Amy Heckerling, *Fast Times at Ridgemont High*

## SEPT 82

9/17: Alan Parker and Gerald Scarfe, *Pink Floyd—The Wall* (film)

9/19: 34th Primetime Emmy Awards on ABC. *Hill Street Blues* and *Barney Miller* win Outstanding Drama and Comedy, respectively

9/20: NFL players begin 57-day strike

9/21: Janet Jackson, *Janet Jackson* (debut album)

9/25-10/23: Alexis Smith, "Satan's Satellites," at Rosamund Felsen and "Christmas 1943" at Margo Leavin, reviewed by William Wilson *LA Times* 10/1

9/30: Bruce Springsteen, *Nebraska*

9/30: *Cheers* debuts on NBC

## OCT 82

Grandmaster Flash debut album *The Message* released

10/1: Epcot Center opens, Florida

10/1: *Remington Steele* premieres on NBC starring Stephanie Zimbalist and Pierce Brosnan

10/6: Madonna's debut single "Everybody" is released

10/9-11/13: Keith Haring, Tony Shafrazi, NYC

10/12-10/22: MLB World Series, St. Louis Cardinals beat Milwaukee Brewers 4 games to 3

10/16-1/19/83: *Zeitgeist* show at Martin Gropius Bau in Berlin. Group show including Warhol, Stella, Schnabel, et al

10/22: Ted Kotcheff, *Rambo: First Blood*

10/27: Prince, *1999*

**10/30: Basquiat performs with Rammellzee, Diego Cortez, Triconology, Iconoklast Panzerism at Squat Theater, NYC**

## NOV 82

**Basquiat is in Venice, CA, working on new Gagosian gallery work for 1983 show, including silkscreens**

11/2: Los Angeles Mayor Tom Bradley loses CA gubernatorial election to George Deukmejian

11/16: NFL strike ends

**11/4-12/11: Basquiat's solo exhibition at Fun Gallery opens, NYC**

11/13: Maya Lin's Vietnam War Memorial opens, Washington DC

11/30: Michael Jackson's *Thriller* is released

## DEC 82

*Live Evil* (live album) by Black Sabbath released

12/7-12/31: Richard Diebenkorn, LA Louver

12/8: Richard Attenborough, *Gandhi*

12/10: Alan J. Pakula, *Sophie's Choice*

12/12: Chris Evert defeats Martina Naratilova 6-3, 2-6, 6-0, Australian open

12/17: Sydney Pollack, *Tootsie*

12/26: *TIME Magazine's* "Man of the Year" is the personal computer

# EXHIBIT 27

From:     Aaron H. DeGroft [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
          (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=33CBAE2830B34D6DBFC8B696F7EDD140-AARON H. DE]
Sent:     6/29/2021 4:30:58 PM
To:       ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉; ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
CC:
Subject:  RE: Other Basquiats in Mumford collection?

Helicopter was a fake and the guy is currently in prison because of Pierce. The show in Long Beach never happened.

Johnny pump was sold by an unremarkable gallery for an unremarkable price. It may or may not have been part of Mumford.



**AARON H. De GROFT, PH.D.**
DIRECTOR & CEO
**ORLANDO MUSEUM°ART**

2416 N. Mills Ave.
Orlando, FL 32803

From: ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
Sent: Monday, June 28, 2021 12:00 PM
To: Aaron H. DeGroft <adegroft@▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
Cc: ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
Subject: Other Basquiats in Mumford collection?

Please see below for a few links that hint to the fact there may have been more pieces in the Mumford Collection. The first link states: Helicopter "was originally purchased directly from the artist, as part of a group of Basquiat artworks, in 1982, by Emmy-winning television producer Thaddeus 'Thad' Mumford. The works were subsequently stored by Mr. Mumford at Ortiz Brothers Moving and Storage [in Los Angeles, CA.] However, the contents were seized for non-payment and subsequently auctioned, through Barzman Auctions, in 2012. The work was purchased by my clients at that auction". I like that it gives details on the actual storage and initial auction house.

• HELICOPTER: https://www.prnewswire.com/news-releases/j-levine-to-auction-rarely-seen-jean-michel-basquiat-painting-on-may-11-300642998.html (and here's some research that was done on the drama associated with this piece: http://glisteningquiveringunderbelly.blogspot.com/2018/07/paint-by-numbers-david-damantes-scheme.html)

• SELF PORTRAIT WITH BOY AND DOG IN A JOHNNYPUMP: https://www.julienslive.com/lot-details/index/catalog/160/lot/68305/?url=%2Fview-auctions%2Fcatalog%2Fid%2F160%2Flot%2F%3Fpage%3D2%26sort%3D2%26dir%3D0%26items%3D10

also mentioned here I think are our 25 Basquiats: https://www.lamag.com/culturefiles/patrick-painter-new-gallery/ Aaron do you happen to know if the exhibition of the 25 Basquiats mentioned here ever happened at the Patrick Painter gallery? The trail seems to go cold after that article and it looks like that gallery has now permanently closed. The only

other mention of it I could find was here: https://www.instagram.com/p/B4YVR6qlGAN/ but I can't find any photos of the event/installation.



ASSOCIATE CURATOR

ORLANDO MUSEUM°ART

2416 N. Mills Ave.
Orlando, FL 32803

**FOLLOW US:** Facebook | Twitter | Instagram

# EXHIBIT 28

| From: | [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP |
| | (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=431D5128817D476C881723109E467F45-CORALIE CLA] |
| Sent: | 7/22/2021 12:06:34 PM |
| To: | |
| Subject: | Discrepancies |

• Number of artworks varies: 26, 20, 19 or 18 paintings are mentioned in the documents; since no photo/checklist attachments are included in any of the documents in the LiPuma Provenance packet it is impossible to confirm which pieces were transferred at any one time.

• Declaration of Taryn Burns (Saggese's Report on the Basquiat Venice Collection, Appendix B p.1) states that in Oct 1, 2012 her partners Lu Quan and William Force purchased 26 paintings by JMB (25 cardboard and 1 on wood) and directly from Michael Barzman.

• In Barzman's documentation (attachment 4) dated May 18, 2012, Barzman signs a transfer of ownership to a redacted individual or group, which is inconsistent with Taryn Burns info.

• Barzman's later documentation shows his transferring the work to Fiducia Dei Borgia (20 pieces), but another individual (Taryn Burn) has also claimed having purchased the work (26 pieces), which appears as if the work was sold twice with inconsistent numbers.

• Attachment 5 shows La Fiducia dei Borgia (Partner Family Trust) as being the owners of 18 (March 12, 2015). Then in July 15, 2015 it is noted in the transfer of ownership from Barzman to Fiducia dei Borgia (attachment 6) that 20 paintings were transferred to them in May 2012, it appears attachment 5 is potentially identifying them as the redacted individual on Barzman's documentation (attachment 4) dated May 18, 2012.

• Documents specifically state that:
o    The Estate has not authenticated the works
o    MLJ intends on marketing them as "By JMB" and not merely "attributed to JMB"
o    The documents fluctuate between "attributed to" on attachment 4, "unauthenticated/attributed to" on attachment 5, "attributed to" on attachment 6, "attributed to" on attachment 8, to finally "by" on attachment 9 when the works are in the MJL ownership interest (March 2018); then in Sept 2018 Cortez gives an opinion letter of authenticity.

• Pages 2 to 9 of James A. Blanco's Report of Authenticity bear spelling mistakes on the artist name (top of each page 2-9; and in last sentence of his report on p.9)

• Spelling mistake on Thaddeus Mumford name (Barzman, attachment 3)


Provenance from MJL documentation seems to be:

Thad Mumford
Ortiz Bros
Barzman
MJL under a previous redacted name
Borgia - then after Torie Geisler's death:
Norberg
MJL


Where does Taryn Burns fit? She's included in Pierce's info but not in MJL docs.



ASSOCIATE CURATOR

ORLANDO MUSEUM°ART

2416 N. Mills Ave.
Orlando, FL 32803

**FOLLOW US:** Facebook | Twitter | Instagram

# EXHIBIT 29

| From: | Richard LiPuma[rich@&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;] |
|---|---|
| Sent: | Sun 11/7/2021 11:41:13 AM (UTC-05:00) |
| To: | O'Donnell, Pierce[podonnell@&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;; Aaron H. DeGroft[adegroft@&#9608;&#9608;&#9608;&#9608;; Aaron De Groft[aaron.degroft@&#9608;&#9608;&#9608; |
| Cc: | &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;; Lee Mangan[lmangan227@&#9608;&#9608;&#9608;&#9608;&#9608; |
| Subject: | Lost and Found Article |
| Attachment: | 11.1.21 Revised Lost and Found-RTL Rev.docx |

Pierce and Aaron: Thanks again for sharing Pierce's latest draft of the article. I am suggesting further revisions (but without a re-write as before). In the attachment, I used the MS Word "track changes" feature to show my suggestions line by line, and I also added parenthetical comments on topics that require further discussion. If possible, could we set up a conference call to discuss this?

Also, we are hoping for an update (good news, hopefully) as soon as Aaron gets any preliminary indications about the fingerprint analysis. Let me know when would be a good time for a quick call. Thanks!!!

Rich

--

Richard LiPuma
LiPuma Law Associates, LLC
1635 Foxtrail Drive
Loveland, CO 80538
&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

rich@&#9608;&#9608;&#9608;&#9608;&#9608;

This message and its contents are confidential. If you received this message in error, do not use or rely upon it. Instead, please inform the sender and then delete it. Thank you.

## LOST AND FOUND

## THE MUMFORD BASQUIAT VENICE COLLECTION

The distance from Venice, California to Orlando, Florida—some 2,528 miles—can be flown by commercial aircraft in less than five hours and driven by car in two and one-half days. A fit hiker can make the trip in about 850 hours over the span of several months. In the case of 25 paintings comprising Thaddeus Mumford, Jr.'s Basquiat Venice Collection—created by the artist in 1982—the journey lasted nearly 40 years. This is the true story of that improbable odyssey.

### The Hottest Artist on the Planet

My involvement (along with others) in finding and bringing these lost gems to the art world comprises the last leg of the journey. In the spring of 2017, three Californians[do we really want to mention three? Only one is Billy and why mention anyone else?] approached me, claiming that they owned six paintings by Jean-Michel Basquiat which they had acquired five years earlier. In 2012, they had purchased them for a small sum from an auctioneer who had bought them from a Los Angeles art storage company. The six paintings, along with others, had been stored there since 1982 by a celebrated television writer (Thaddeus Q. Mumford, Jr.) who had paid Basquiat $5,000 in cash for them. The owner's failure to pay about $7,000 in past due monthly storage fees led to them being seized and sold.

The only reason that these folks were calling me—and not Sotheby's or Christies auction houses—was an unfortunate fact: no authoritative source had authenticated them. The six paintings had not been included in the two scholarly collections of Basquiat's paintings: the two-volume catalogue raisonné by Enrico Navarro (2000, 2010) and the compendium of paintings and drawings collected by Richard Marshall (1992). Likewise, they were not among the more than 2,000 works reviewed by the Basquiat Estate's Authentication Committee ("the Basquiat Committee") (1994-2012) ['This is false'].

Why had they not been authenticated? Because these six paintings were in Mumford's storage locker for 30 years until 2012—the year in which the Basquiat Committee disbanded and long after the scholarly works had been published. For all intents and purposes, these creations were all but lost to the art world.

I already knew that a work's omission from the sanctioned publications did not mean that it was inauthentic. For example, in the Pollock world, a supplement to the original catalogue raisonné collected numerous new paintings, and the authors noted that undoubtedly more were to be found. The absence from the accepted official collection, however, was usually an insurmountable obstacle to a sale.

Two of the owners came to my law offices in Los Angeles with the six Basquiat paintings. Four were on cardboard, one on paperboard, and the other on plywood. Something about them instantly captivated me. They were colorful, richly detailed, and eye-catching in

**Formatted:** Highlight

**Deleted:** a Coloradan and

**Deleted:** 25

**Deleted:** 25

**Deleted:** formed to wage battle against the growing number of fakes in the Basquiat market

**Deleted:** 25

**Deleted:** of the

their originality—unlike anything that I had ever seen before. After taking photos, I rushed to Rizzoli Bookstore in Beverly Hills to purchase every book on Basquiat.

Over the weekend, I did what I had done for over forty years as a trial lawyer handling complex civil litigation: I immersed myself in the subject matter. I knew little about Jean-Michel Basquiat except that his works were selling for tens of millions of dollars at auction.

Son of a Haitian father and Puerto Rican mother who grew up middle class mostly in Brooklyn. Basquiat had a troubled youth: he never completed high school, ran away from home at 15, abused drugs and alcohol, and roamed the streets of New York, at times living in a cardboard box. With his pal Al Diaz, his canvas was the city's walls as they spray painted distinctive creations presaging Basquiat's later body of work during his all-too-brief brief ten-year career. Starting in the spring of 1977, their trademark SAMO©—, [not precisely true—see Wikipedia]—and pithy sayings—SAMO© AS AN ANTI-ART FORM—mocked the conventional art establishment. Their unique expressions—a quixotic mixture of cryptic prophecies, jokes, and poems—captured the attention of the *Village Voice, New York Post,* and connoisseurs of an emerging new genre of American art.

Deleted: an acronym for Same Old Shit

Besides city walls, Basquiat, who lived off the kindness of friends and strangers, resourcefully used acrylic, oil paint stick, crayons, markers, and spray paint on scrap materials, a radiator, refrigerator, football helmet, linen, metal, apartment walls, cardboard, and even the inside of a FedEx box. The teenager survived by painting T-shirts and making small postcards, drawings, and collages that he sold in front of Washington Square Park, the Museum of Modern Art and the Metropolitan Museum of Art. Basquiat was driven to be a consequential artist—telling his father: "Dad, one day I will become very, very famous."

Basquiat was "discovered" by Diego Cortez, a mid-thirties, *avant-garde* art curator and filmmaker. Cortez took the 20-year-old artist off the streets and gave him some art supplies to paint in his studio. Cortez curated the influential 1981 post-punk art show *New York/New Wave* at MoMA PS1, debuting Basquiat and launching his dazzling career. His fame spread like a prairie fire with collectors flocking to a succession of exhibitions in just 1981 and 1982 in Modena, Italy, New York, Los Angeles, Zurich, Rome, Los Angeles, Rotterdam, and Kassel, Germany. Remarkably, as the prices for his works soared, Basquiat showed in approximately 45 one-and two-artist exhibitions and collaborations before he died in 1988 at age 27 of a drug overdose.

Deleted: m

Art critics almost universally heralded his works as revolutionary, provocative, and autobiographical. With a restless mind and keen intellectual curiosity, Basquiat's works reflect his interest in history, poetry, anatomy, and abstract expressionism. Basquiat challenged the *status quo* with respect to poverty, wealth, and racism as he expressed solidarity with vulnerable, voiceless, and forgotten people around the world. Some observers praised his drawing skills.

My preliminary research about prices for Basquiat's paintings yielded stunning results. Between 2013 and 2017, auction buyers paid from $29.3 million (2013) to $110.5 million (2017). In this five-year span, 12 paintings sold in this rarified eight-and nine-figure range.

Seven were created in 1982, the year generally regarded as his best work and the year in which he painted for Mumford. As I contemplated this undertaking, Basquiat was the hottest artist on the planet. No artist in history had ever enjoyed such a meteoric rise to stardom.

**Frolic and Detour**

Over that first weekend with Basquiat, I compared the six paintings with over 100 known Basquiats in the compendiums. I jotted down my initial amateur's impression on a legal pad: "striking similarities to many authenticated Basquiats—crowns, halos, signatures, skulls, ghosts, bats, handwriting, and overall look and feel." I was intrigued.

On Monday, I called one of the owners wanting to know what they had in mind for me to do.

"We want you to get them authenticated and sold," Billy replied. "We have taken them as far as we can with no success."

"Why me?" I followed up.

"I am familiar with your efforts with the Pollock," Billy answered.

Billy was referring to my efforts since 2011 to authenticate and sell a majestic 3.5' x 8' Jackson "drip painting" attributed to legendary Jackson Pollock. Like the six Basquiats, the Pollock had not been included in the artist's catalogue raisonné or authenticated by a panel of experts selected by the family. In a real sense, they had been lost—the Basquiats in storage and the Pollock in a private home—during the time period when they could have been blessed as authentic.

"My efforts trying to sell the Pollock are hardly a reason to engage me since I haven't sold it yet," I quipped.

Deleted: ¶

"Your Pollock is the real deal," Billy assured me. "Just be patient."

Fortunately, patience was one thing that I had in abundance. When you do what I do for a living, it is best to be a marathoner and not a sprinter. High stakes lawsuits can last for years, sometimes a decade or more. A steady, deliberate investigation of all the facts, exploring diligently every potentially relevant piece of evidence, can lead to favorable outcomes that no one imagined possible. Framed on my office wall is a quote by Supreme Court Justice Louis D. Brandeis: "Most of the things worth doing in the world had been declared impossible before they were done."

Over my four decades in the trenches, cases have been won or lost based on a single piece of evidence—matching a fingerprint, authenticating handwriting, forensic analysis, and finding a "smoking gun" document buried in millions of pages of records. If this sounds like Perry Mason, it is. Success in the courtroom is 90% perspiration (preparation) and only 10% inspiration.

3

Given my years of frustration with the Pollock, I should have immediately declined the invitation to take on the Basquiats. Six years of hitting my head against the wall had taught me that "undocumented paintings"—those lacking the official imprimatur of universally-accepted proof of authenticity via the catalogue raisonné or a favorable letter from the official committee formed by the artist's heirs—rarely sold. The art world's gatekeepers—the ruling triumvirate of auction houses, galleries, and art advisors for wealthy private collectors—were understandably unwilling to take any risk of buying fakes when works were selling for millions and tens of millions of dollars and authenticated works by renowned artists were available.

Highly-publicized scandals—like the 40 fake paintings attributed to Motherwell, Pollock, and Rothko, authenticated by renowned experts, and sold by the venerable Knoedler Art Gallery in New York—heightened the insistence on authenticated paintings. No one seemed willing to take a chance on a paperless painting, no matter how much impressive scholarship and how many experts attested to its genuineness. Thus, for many lonely years and $400,000 in expenses, disappointment and rejection had been my constant companions in my campaign to sell a painting for which a half dozen leading Pollock connoisseurs had not only vouched but deemed a masterpiece. It might as well have been a paint drop cloth.

"Okay, Bill, I'm in," I told him. We quickly made our financial arrangement. In exchange for an agreed upon percentage of any sale proceeds, I would undertake to authenticate, market, and sell some or all of the six Basquiats. When I told a close friend familiar with my Pollock labors about taking on the Basquiats as "a client," he bluntly chided me for undertaking another "frolic and detour."

With the daunting challenge ahead, I knew that I would need to hire renowned experts in several disciplines. I raised a budget by turning to family and friends to invest in the paintings. My super-savvy wife Carmen fully supported this adventure, investing and offering a welcome mixture of wise advice, encouragement, and devil's advocacy. This would turn out to be a shared journey.

### Selling Out The Back Door

In the art world, proving authenticity boils down to three questions: (1) how solid is the provenance (history of ownership), (2) whether science can shed any light, and (3) what do the experts (connoisseurs) think. First and foremost is provenance. Without a solid, documented chain of title from the artist to the current owner, it is game over.

In any investigation, I start with the documents. Witnesses can have faulty and selective memories, shade the truth, or just outright lie. However, the written record, made at the time of the events at issue, is usually much more reliable. Some documents speak for themselves—and loudly.

It was obviously vital that we establish that the paintings had in fact been owned by Mumford. So, where were they found? Were there documents incontestably proving his ownership and obtaining them from Basquiat?

4

The challenge was formidable. The owners had no gallery sales records. At the time of Mumford's purchase of the paintings in late 1982, Basquiat was living and working in a large studio in the basement of the Venice home of Larry Gagosian. An already celebrated gallerist only four years after opening his first gallery, Gagosian (nicknamed "Go-Go") had conducted the 22-year-old phenom's first sell-out Los Angeles exhibition in April/May 1982. Basquiat was now there for six months to paint large canvases for the second Gagosian exhibition in March/April 1983.

Basquiat always needed walking around money for his cocaine addiction, partying, and lavish lifestyle, explaining why "he liked to be paid for works of art quickly in cash" as one art historian noted. Not wanting to tip off Gagosian by using the canvases that he gave him to paint works for his upcoming exhibition [this is speculative, negative, and could cause an adverse response from Gagosian], Basquiat did what he had done all his life—he improvised. As noted, the once homeless street artist was proficient at painting with readily available materials.

> Formatted: Highlight

It therefore came as no surprise that Basquiat would scrounge for free cardboard at local stores. Indeed, I could see from photographs that the edges of some of the works perfectly lined up where the larger cardboard piece had been cut in half. The evidence supported the story that, consistent with his practice of selling paintings himself directly to buyers, Basquiat had sold the paintings "out the back door" to Mumford to avoid detection by Gagosian. [speculative, same]

> Formatted: Highlight

**The Trash Dumpster**

Not only did we have no sales receipts, we lacked any correspondence, other documents suggesting that Basquiat painted the works, photographs of Basquiat and Mumford together, or photographs of Basquiat with the paintings. We needed tangible evidence that the paintings passed from the artist to Mumford. I got my first break.

I had been told that the paintings were obtained from Mumford's locker in a Los Angeles storage facility Ortiz Bros. Moving & Storage. I first wanted to know if the company existed in 1982 when Mumford supposedly placed them there. Good news: this is a third-generation family business founded in 1949.

One of the Basquiat owners had obtained the last dunning notice, dated April 4, 2012, sent by the storage facility to Mumford at a Beverly Hills address which I confirmed had once been his residence. The balance owed on his storage locker # 2125 was $6,888.81, representing several years of unpaid monthly fees. Mumford's storage contract contained a standard warehouseman's lien allowing Ortiz Bros. to seize and sell his locker's contents if he failed to pay his fees. Exercising that lien, the facility sold the items to a small-time Los Angeles auctioneer on May 17, 2012. I had a sworn statement in which he confirmed that he had purchased the contents of Mumford's locker, including paintings on cardboard, his baseball memorabilia, and his Emmy and Writers Guild of America [the Emmy was there, I was not aware of the WGA trophy; I think this may be false] trophies. He also provided color photographs of some of these locker contents with Mumford's name on them.

> Formatted: Highlight

Why did Mumford allow his stored items to be sold? Had he forgotten about the paintings? Did the personal items, commemorating significant achievements in a lifetime of excellence, not have any sentimental value to him? After all, besides his recognitions as one of Hollywood's greatest tv writers and producers, Mumford was the first African-American batboy for the New York Yankees.

The truth was distressing. Mumford was one of the most accomplished, sought after tv writers and producers in the 1970s, 1980s, and 1990s. An African-American born in 1951 in Washington, D.C, he had overcome institutional discrimination and written and/or produced episodes of *Saturday Night Live, Alf, A Different World, Home Improvement, NYPD Blue, The Duck Factory, The Cosby Show, Maude, Roots: The Next Generation, Electric Company, Sesame Street, Judging Amy,* and *M\*A\*S\*H,* among others. Mumford was highly-regarded by his peers, garnering nine nominations for Daytime and Primetime Emmy and Writers Guild of America Awards and winning for *The Electric Company* and *M\*A\*S\*H.*

Since 2004, Mumford had been unemployed as Hollywood turned to younger writers and producers. A creative, versatile luminary for three decades who wrote hundreds of hours of high-quality television of varying genres, Mumford had been involuntarily retired. By 2012, he was strapped for money, virtually destitute, and in poor health. For years, Mumford simply could not afford to pay the modest monthly fees for his locker.

The auctioneer had no clue about the paintings' creator or their conceivable value. The baseball memorabilia and Hollywood mementos were immediately sold. The worthless cardboard paintings were unceremoniously tossed into a trash dumpster![Not sure if this is true; this is based on Barzman hyperbole; raises more negative questions – were they damaged when they were in a dumpster?]

The world would have never seen these incredible works but for two longtime friends being at the right time and place, possessing keen entrepreneurial instincts, and serendipitously seeing a photograph of them. Here is what they credibly told me in separate conversations.

Billy related that a fellow named Lee and he were close pals who had first met as teenagers in Pompano Beach, Florida in 1974 and had hung out together for several summers. When I met Lee, he remembered that "Billy had a special talent even then. He would go to pawnshops and buy and sell these expensive watches. He had an insane collection." Lee got married and moved away, starting several successful businesses and raising a family.

These long-time friends stayed touch. One way was buying art. Sometime around 2008, Billy and Lee did a deal together. Billy had found a painting that looked like an original Jackson Pollock "drip painting."[do we want to mention this] He needed some cash to purchase it. Lee happened to have a little extra money that he could contribute to the cause. From that time on, both friends honed their art collecting skills. For Billy, it was a career; for Lee, a hobby.

In the art world, Billy was known as an "art picker." Building on his skills as a young man trading in expensive watches, he developed an uncanny eye for art. While not formally trained in art, Billy was reportedly in a league of his own, devoting much of his adult life

6

**Deleted:** mementos

**Formatted:** Highlight

**Formatted:** Highlight

attending estate and yard sales, scouring thrift stores, and rummaging around garages and attics. He carved out a decent living finding, buying, and selling his discoveries. A hardy treasure hunter in the antiques and fine arts world, Billy was always looking for that diamond in the rough painting, some misidentified gem that would fetch many times what he would pay the owner.

In May of 2012, while out doing what he loved to do (searching for hidden art treasures), a local art dealer showed Billy a blurry photograph depicting a number of paintings, some of which appeared to be signed by a "Jean-Michel." The dealer asked him if they were worth anything. Billy replied that he needed to do some research.

Billy was the first person to realize that the cardboard paintings in Mumford's storage unit were authentic Basquiats. He wanted to buy the entire collection, but he did not have the resources at the time, but his old pal Lee did. Billy telephoned Lee who happened to be visiting Los Angeles. When Lee picked up, Billy said:

"Get some cash! I'm sending you an address. Meet me there as soon as possible."

Miraculously, the paintings were still in the dumpster, undamaged [Lee and Billy drove to Barzman's home and picked up the paintings]. Billy and Lee met at the auctioneer's home, paid him a modest sum of cash, and drove away with the entire remaining collection. Two of the paintings had already been sold, but Billy went on a quest to recover them. He eventually found the ebay buyer and bought them back. The original Mumford Collection was intact.

Lee left California a short time later, moving his family to Boulder, Colorado. He took with him the 19 paintings that are now included in his group of paintings, commonly referred to as "The Mumford Collection." After buying the previously sold paintings, Billy has since maintained the other six paintings, commonly referred to as the "Basquiat Venice Collection." Both Billy and Lee knew they needed to verify the authenticity of these paintings. Lee made the first breakthrough.

**$5,000 In Cash**

The Mumford storage locker documents were compelling evidence that he owned them. I could not imagine any other plausible explanation why they would be in his storage locker. But I was not fully satisfied. I wanted some confirmation from Mumford himself.

I tried in vain to reach Mumford. By 2017, gravely ill and suffering from long-term memory loss, he was in and out of convalescent homes. His former lawyer could not help me. Sadly, after a long illness, Mumford died on September 6, 2018 at his father's home in Silver Spring, Maryland. He was 67.

While I could not interview Mumford, I spoke with Billy and Lee who had met twice with Mumford after they purchased his paintings. I interviewed them separately, and they had consistent, credible recollections of what Mumford told them about his acquisition.

7

**Formatted:** Highlight

When they first met over breakfast in late 1982, Billy and Lee were shocked to find that Mumford was in such a distressed physical condition, with braces on his arms and largely debilitated by illness and fatigue. They had expected to find the vibrant and witty intellectual who had reached the pinnacle of his profession. Instead, sitting before them, was a broken, needy man, tired and worn, who wanted to talk about treatment options for his ailments more than his glorious past. Lee was so moved by Mumford's condition that he returned a day later and gave Mumford some money for food and medicine.  Another visit in 2013 found Mumford's condition unimproved.

Mumford was able to recall meeting Basquiat in 1982 when he was writing for *M*A*S*H*. Mumford confessed somewhat sheepishly that Basquiat's works were "not my kind of art," but friends had persuaded him that he should buy some of his paintings. Mumford paid $5,000 in cash to Basquiat for the works, put them in his temperature-controlled storage unit, and never saw them again.  He told Lee and Billy that he was unaware that his locker's contents had been sold.

More corroboration of Mumford's purchase came from two voice messages that he left in 1983 on the phone of Bill's life partner Taryn.  While the recordings had long ago been erased, she had contemporaneous notes of the February 11, 2013 messages and gave me a sworn declaration.  On the same day a few hours apart, Mumford said that he purchased the paintings from Basquiat when he was working on *M*A*S*H*, had money to buy them and therefore the paintings that came out of his locker belonged to him.  I confirmed that Mumford worked on *M*A*S*H* in the 1982 and 1983 seasons.

All this mounting evidence convinced me that Mumford purchased the works from Basquiat.  In my line of work, however, more evidence is better.  I wanted something conclusively proving that Basquiat knew Mumford and sold him these paintings.

### Provenance in Poetry

A trip to Colorado to meet Lee, who still had the 19 Basquiats, paid huge dividends.  Lee is engaging, intelligent, and savvy with a quick wit.  A true believer, he had put his proverbial money where his mouth was, expending tens of thousands of dollars—and countless hours—in trying to authenticate the paintings since 2012.  We immediately hit it off, sharing a passion for proving that Basquiat was the indisputable creator.  Along with his talented lawyer Rich LiPuma, we forged a close working relationship as we went forward to establish that all 25 paintings were authentic.

Mumford had been unable to find a receipt from Basquiat confirming his purchase.  What he did locate, however, was an extraordinary piece of evidence that literally brought tears of joy to Lee's eyes.  [not true]Lee had obtained from Mumford an untitled, typed poem.  [speculative and untrue-we believe Basquiat wrote and signed the Poem, and there is no way to know who typed the words.  Printed on a 1980s-era dot matrix printer paper, the poem—21 lines of free verse with three stanzas of seven lines each—was initialed "JMB" on the bottom.

8

**Deleted:** p

**Deleted:** With the assistance of Loretta Switt—Major Margaret "Hot Lips" Houlihan on *M*A*S*H*—

**Deleted:** It appeared to me to be a collaboration between Basquiat and Mumford which was likely typed by Mumford himself...

*The start of a new day*
*No longer outsiders*
*Industry insiders golden crowns receiving*
*Brooklyn brothers hands creating*
*Drawing writing bridging gaps*
*LA summer bright*
*Beware the fleeing wretched loneliness*

*25 paintings bringing riches*
*Sing along Dr. Thad sing along*
*Breaking bread this our summer*
*Wrapping close last scene of war*
*Eat drink celebrate*
*Choices made intriguing*
*A serious quest we undertake*

*Raw emotions of a child*
*Did you know*
*We film, we write, we film, we paint*
*Crowning glory brings cheers and statues*
*Oh how grand we feel*
*Oh how lovely our life will be*
*A baseball a bird a television our play a future bright*

If this poem was indeed authentic, it was a treasure trove of information linking the artist and writer in numerous poignant ways. Among other things, the poem mentioned:

*themes relating to Basquiat's and Mumford's lives;

*"25 paintings bringing riches" (Basquiat painted at least 25 paintings sold to Mumford);

*"Sing along Dr. Thad sing" (Mumford created the popular character, and he was the voice for, Dr. Thad on *Sesame Street*);

*"Wrapping close last scene of war" (Mumford was writing the final episode for *M\*A\*S\*H* that aired in early 1983);

*"Brooklyn brothers hands creating" (Basquiat was born in Brooklyn Hospital and frequented the Brooklyn Museum, while Mumford spent his formative years in the Bronx);

*They are artistic brothers ("hands creating"): Basquiat "[d]rawing" and Mumford "writing;"

*"We film, we write, we film, we paint" (Basquiat the painter, and Mumford the writer for filmed television episodes);

9

| Deleted: also grew up in Brooklyn |

*These two accomplished brothers are artistic pioneers among African-Americans who are "bridging gaps," "[n]o longer outsiders" but instead "[i]ndustry insiders golden crowns receiving;"

*The references to "golden crowns" and "crowning glory" are allusions to Basquiat's frequent use of a three-pointed crown as his signature on his paintings (including several in our collection); and

*In the last line, the poem references three images appearing in the 25 paintings: "[a] baseball a bird a television."

[add reference to "statues"?—Mumford had won the Emmy by then; see also the other edits in my previous re-draft]

At this point, I was convinced that only these two fertile creative minds could have written this autobiographical poem about the similarities and shared experiences of two African-American men who had so closely bonded in such a short time.[Basquiat wrote the Poem, and there is no evidence of collaboration]  But our investigation as to the poem was not completed.

My attention then turned to the "JMB" initials inscribed on the bottom of the poem. Could it be Basquiat's handwriting?  If so, this was even further written proof that the poem documented a close relationship between Basquiat and Mumford in 1982 and Basquiat gave the paintings to Mumford.

As I had on several occasions, I turned to James Blanco. One of the nation's foremost document examiners, Jim had over 30 years of experience in government and private practice as a forensic document examiner testifying about signatures and other marks on documents that either established or refuted authorship.  He had rendered over 8,000 expert opinions.  In the art arena, he had analyzed works attributed to Picasso, Pollock, Matisse, Rembrandt, de Kooning, Dali, Erté, and others.

More than anything, Jim was a straight shooter; I could trust his judgment. A few years earlier, this master art sleuth had concluded that "JA Comstock" inscribed on the verso of the Pollock was in fact the handwriting of Pollock's wife, Lee Krasner, who handled his business affairs and sent the painting to Pollock's friend Dr. John Adams Comstock, thereby proving provenance.

"Pierce, it's Jim," the caller announced one day.

"Jim, I'm dying to know the answer," I breathlessly replied.  So much depended on his opinion.

"Sure enough, I can match the 'JMB' and known exemplars of Basquiat's handwriting," he matter-of-factly reported.  "It's 100% Basquiat's initials."

Formatted: Highlight

I am known to be an emotional, expressive person, but that morning I outdid myself.

"Yes!!!" I bellowed, pumping my right clenched fist in the air several times. "Yes!!!"

Jim later sent me a report documenting his opinion. His graphics drew arrows between the J and M and B on the poem and samples of Basquiat's penmanship, leading him to conclude that the artist had initialed Mumford's elegant poem. "Due to the numerous similarities in handwriting features, Jean-Michel Basquiat is identified as the author of the 'JMB' hand printed initials appearing on the poem." Jim also confirmed that the poem "was not printed on any modern printer because the typed alpha-characters are consistent with impact typewriters from the 1982 time period when the poem was thought to be created".

When I told Lee and Rich and sent them Jim's report, they were thrilled. This was a momentous breakthrough. [Richard Marshall and Diego Cortez were both willing and qualified – we just hadn't reached out yet]. For example, Rich's request that the Basquiat Estate bless the paintings had been flatly rejected by its lawyers with a terse statement that the Basquiat Authentication Committee "had been disbanded in September 2012 and no longer considers applications."

**A Celebration of Celebrity**

Based on the documents, I had established to my satisfaction that Basquiat sold 25 paintings to Mumford. Now, could I also prove that Basquiat actually painted them? That may sound like a silly question if the young artist sold them to Mumford, but I needed all the substantiation that I could muster to persuade an ultra-skeptical art community that they were the real deal. You never knew which straw will break the camel's back.

It was now time to enlist science in support of authenticity.

One of the conventional ways to establish a painting's authenticity is to identify the artist's signature on the front or verso. While not every artist signed his/her works and some (like Pollock) were inconsistent, the presence of some identity mark would enhance the case for legitimacy. My research found that artists' signatures on their paintings dated from the Renaissance when "art production shifted from co-operative guild systems to a celebration of individual creativity. A signature was the perfect way to differentiate your talent from that of lesser peers." (Holly Black, "7 important things to know about artist signatures," Christies, July 24, 2017 (https://www.christies.com/features/7-things-to-know-about-artist-signatures-8365-1.aspx)

Forensic analysis of handwriting is a science dating from the early 17th century when an Italian professor in Bologna, Camilio Baldi, wrote a pioneering treatise introducing modern graphology as the study of identity. Today, graphologists routinely opine on authenticity of

11

signatures in court cases. My generation grew up with Perry Mason dramatically exposing forged documents as he secured his client's acquittal.

Artists' signatures come in all shapes and sizes from full cursive or block signings to initials to a distinctive mark, symbol, or logo. The literature noted that Basquiat—whose markings were notoriously almost illegible—had a printed version as well as two script signatures. Not all Basquiat's paintings and drawings were signed.

As we knew, Basquiat professed that he wanted to be famous in his lifetime; he would not die in obscurity like Van Gogh. "Since I was seventeen, I thought I might be a star. I'd think about all my heroes, Charlie Parker, Jimi Hendrix. . . . I had a romantic feeling about how these people became famous." Basquiat "wanted to build up a name for myself."

Becoming a well-known brand would be one sure way to cement his celebrity. Basquiat often used as a proxy signature his distinctive three-pointed crown, symbolizing not only his criticism of class and race but also his own self-proclaimed royal status as a king of art. The commercially-savvy artist was establishing his unique logo, not unlike the graffiti tag SAMO© sprayed by Al Diaz and him on the walls of New York City between 1977 and 1980.

Many of the 25 paintings had signatures of varying types that said "Jean-Michel Basquiat" either in block or cursive writing. Others had his three-pointed crown. Some had both.

Once again, I called upon Jim Blanco. Armed with the two-volume catalogue raisonné by Enrico Navarro and Richard Marshall's collection of paintings and drawings, Jim performed his characteristically thorough analysis of all known examples of Basquiat's signatures and uses of a crown on his works. Jim's conclusion was stunning.

Out of the 25 works, all but a few had some form of identifiable marking commonly used by Basquiat on his paintings and drawings. The crown was present on 11, his signature on seven, and both crown and signature on five. Remarkably, Jim found SAMO© on one and SAMO© and a crown on another. Interestingly, on a few paintings, the crown was an integral part of the composition and not just a signature.

I also wanted to find and match any fingerprints. We found several on the versos, and we had exemplars of Basquiat's known fingerprints. [Probably need to update this section depending on outcome of pending examination] [We don't want to say an expert found they were too smudged and unusable when we are currently re-investigating this with the hope that the fingerprints are legible and usable]. Fortunately, I had my numerous "signatures" indisputably

12

Deleted: our

Formatted: Highlight

Deleted: Unfortunately, my expert determined that those lifted from the paintings were too smudged and not usable

proving that Basquiat painted those paintings. Provenance and science had been established. But what would the experts—so called connoisseurs—say about our 25 paintings?

### The Knowing Eyes

In his concurring opinion in an obscenity case (*Jacobellis v. Ohio*), Supreme Court Justice Potter Stewart remarked that when it came to hard-core pornography: "I know it when I see it." Much the same can be said about the subjective way art historians and critics opine about whether a work was done by the hands of a certain artist. Two putative specialists—what Francis O'Connor called connoisseurs "with a knowing eye" for identifying an artist's complex characteristics in making an image in a particular way—can view the same work and in good faith reach contrary opinions about its quality, meaning, and authorship.

### Richard Marshall

One such luminary for Basquiat was Richard Marshall.

Lee informed me that in June 2014, he contacted Marshall to solicit his opinion about the Mumford Collection. A long-time curator at the Whitney Museum of American Art, Marshall was best known for his efforts as director of the Lever House Art Collection from 2003-2014. More to the point, Marshall had curated a major Basquiat retrospective exhibition at the Whitney in 1992, served on the Basquiat Committee, and had published a widely recognized, comprehensive survey of Basquiat's known works under the simple title *Jean-Michel Basquiat*. Marshall graciously accepted Lee's invitation to independently review the works and traveled to New York to view the paintings.

Lee recalls that Marshall turned flush upon seeing the paintings, and the first words that came from his mouth were, "Are these paintings for sale?" After Marshall extensively inspected the paintings, he assured Lee of his conviction that these were authentic paintings by the hand of Jean-Michel Basquiat. He further told Lee that he would write a letter expressing his opinion confirming this fact. Lee was rightly convinced that Marshall's favorable opinion would silence any naysayers.

Lee never received Marshall's opinion. On August 10, 2014, Leo heard from a mutual acquaintance that Marshall had died, suddenly and unexpectedly, two days earlier. Filled with sadness and sympathy, Lee waited for a few months before confirming with family members that, unfortunately, a draft opinion letter had not been found after Mr. Marshall's death.

Understandably, in the art world, an oral authenticity opinion never reduced to writing carries no weight.

### Dr. Jordana Moore Saggese

13

With Marshall's death and no letter from him, we needed written expert validation that these 25 paintings were Basquiat's creation. As I had for decades in my law practice, I set out to determine the names of the leading scholars on Basquiat. I was surprised that the amount of serious research and writing about this supernova of the modern art world was limited. Fortunately, one person stood head and shoulders over all other academics.

When I reached Dr. Jordana Moore Saggese in the summer of 2017, she was Assistant Professor of Contemporary Art and Theory at California College of the Arts. (Dr. Saggese is now Associate Professor of American Art at the University of Maryland and Editor-in-Chief of the College Art Association's respected *Art Journal*.) Trained as an art historian, she taught courses on modern and contemporary art with an emphasis on the expressions and theorizations of blackness. Her first book, *Reading Basquiat: Exploring Ambivalence in American Art*, reexamined the painting practice of the often-mythologized Basquiat. Published by the University of California Press in the summer of 2014, the pathbreaking work won the PEN Center USA Award for Exceptional First Book.

"Hello, Dr. Saggese, this is Pierce O'Donnell in Los Angeles," I began my call.

"Yes, Mr. O'Donnell," the ever-polite scholar responded. "Thank you for your patience."

She was referring to my pestering her with phone messages and emails as I pressed to connect with her.

"I appreciate you speaking with me," I let her know. "Were you able to look at the photos that I sent you?"

"I quickly perused them," she cautiously replied. "Did you tell me that they are painted on cardboard?"

"All but one which is painted on plywood," I responded.

"They seem to have much in common with his early, best works," she volunteered.

Sensing an opening, I immediately asked: "Would it be possible to bring six of the originals for you to view in San Francisco?" I held my breath as the phone seemed to go dead.

"That would be fine," she finally told me.

On July 18, 2017, along with Billy's life partner Taryn, I met this charismatic African-American scholar in an empty classroom. She asked us to leave the six paintings with her for a couple of hours. I unpacked them, leaving each painting on top of a desk.

This may have been the longest two hours of my life.

14

Returning to her classroom, I sheepishly asked her what she thought. Her answer—in the form of an extemporaneous critique of our paintings—catapulted my authentication efforts to a whole new level.

"These are marvelous works in excellent condition that have many of the distinctive elements of Basquiat's best paintings," she slowly began. "A lot of his early works were opportunistic of what materials were available. Cardboard is not out of the realm of possibility."

Dr. Saggese then gave an analysis of each painting which she attributed to Basquiat.

> *One More King-Czar*: "looks very good;" "an early work with familiar markers;" "crown resembles first crowns;" "feathers are a common theme;" "the writing and repetition of 'a' are very common."

> *He Didn't*: "this painting has commonality seen in similar works, including the arms come around and are extended;" "the general shape of the aura and crown are commonly seen elements;" "there are many more common motifs such as a lot of doodling, references to music, anatomy of the lungs and heart, and others."

> *Horn*: "This is a very beautiful one;" "the use of multiple 's's" is seen in similar works such as *Net Weight* in 1981;" "the eyes, nose, and head are typical and very popular in Basquiat's works;" "the copyright symbol © lived past the days of SAMO, identifying his ownership in his own career."

> *Batman With Top-Hat*: "This is the most exciting of the whole works, a very strong piece;" "many elements are common, including the cowboy figure, the ghost, skyscrapers and cityscapes, painting over things, several layers of underpainting, and the signature spelling out his full name."

> *Colorful Face*: "This is very exciting. The piece is not as similar as the other works. The shape of the head, the roundness, the teeth, two different shapes of the eyes is not seen often."

> *Reptile With Claws and Thorns:* The front of the unique two-sided painting (*King of Creatures*): "This reptile with a crown is strikingly comparable to a known work. The upraised arms are common elements, revealing the arm and the joint. Very interesting. This has hints of reptilian with comparison of works of dinosaurs. The almost cartoonish reference to 'BAT BAT, BAT' has an element of monster humor. There are multiple outlines which is commonly seen in Basquiat's works. There are a lot of nuances. This has a deeper meaning. There is nothing indicative of a rush job."
> The verso (*Mystery Creature*): "The interesting head is similar to later works. This is a fantastic work in striking superb condition."

Dr. Saggese agreed to serve as a consultant and prepare a report on the six paintings. Her 73-page work, completed on November 30, 2017 is a masterful study of Basquiat's life, themes,

15

historical significance, and the reasons why she concluded that our paintings were done by the hand of Basquiat.

> "[I]t is my professional opinion that [these six paintings] may be attributed to Jean-Michel Basquiat based on their comparison to known works, with which these paintings share imagery and icons. The paintings contain many of the most popular symbols of Jean-Michel Basquiat, including: crowns, figures with halos, arrows, figures with top hats, skulls, and bird-like figures. We also see several examples of cars and trucks, which held a personal significance for the artist given his childhood experience of being hit by a car. The constellation of images that appear on the surfaces operate outside of a specific narrative; it seems instead that the works have been radically distilled to include only the most salient symbols, as if an attempt is made here to represent the artist only via specific reference to his best-known works. Here, the symbols themselves become a type of currency, a recognition of the artist's marketability and significance on a global scale."

Dr. Saggese's report relied in part on a study by Jim Blanco meticulously comparing all 25 paintings with known Basquiats in terms of handwritings, signatures, word usage, numbers, monograms, symbols, and various other markings, sketches, and doodles. (Richard Marshall's work was one of his primary sources.) Jim's methodical analysis scours every inch of the paintings' surfaces in search of similarities. The result is a monumental achievement identifying scores of similarities, leading him to conclude that "Jean-Michel Basquiat authored all 25 paintings."

I called Lee with the exciting news about Blanco's latest report. We now had three pairs of knowing eyes (two in writing) who concluded that the Mumford paintings were created by Basquiat. All three legs of the stool—provenance, science, and connoisseurship—were present. What more was needed to make our case?

### Basquiat on a Box

In my profession of persuasion as a trial lawyer, you must anticipate potential opposition to your position. Art is no different. What would our detractors, skeptics, and naysayers argue against the paintings' authenticity and value?

One obvious fact was that 24 were painted on cardboard or paperboard and one on wood. Artists using wood was not uncommon, but cardboard as a substrate—as opposed to canvas or paper—struck me as unusual. But was it?

Shortly after I undertook this assignment, I hired Deborah Krieger, a recent honors graduate of Swarthmore College with a B.A. in Art History and an aptitude, ingenuity, and tenacity for challenging research impressive for any age. The daughter of one of my law partners at Greenberg, Glusker, Deborah was just starting her career as a curatorial assistant at the Delaware Art Museum in Wilmington. A few years later, she would graduate *summa cum laude* from Brown University with an M.A. in Public Humanities.

**Deleted:** I called Lee with the exciting news about Dr. Saggese's report.¶

"That's terrific," he told me, unable to contain his enthusiasm.¶

"Yes, she reaches the same unqualified conclusion as Richard Marshall did."¶

"Wouldn't it make sense that if the six are good, so are the 19?" Lee asked.¶

"Absolutely," I immediately replied. "Better yet, she looked at photographs of them."¶

"And?" Lee fired back.¶

"Even though the images are not high resolution, she identified ten of the 19 as painted by Basquiat's hand," I reported. "She will need to see originals of the other ten someday to render an opinion on them.¶

**Deleted:** our 25

Over the summer and early fall of 2017, Deborah investigated the history of famous artists' and Basquiat's usage of cardboard. Her conclusions about common uses by prominent artists were both stunning and reassuring. Not only did her findings provide a strong defense, she gave us ammunition to argue persuasively that the paintings' worth was enhanced by being painted on cardboard by an artist who once painted on postcards (xeroxed images pasted on cardboard) and lived on the streets in a cardboard box.

*"Despite its humble nature, cardboard has a long history as an artist medium in its own right, with some of the most revered artists in the Western canon using it as a substrate for a two-dimensional work, or as a material for a three-dimensional sculpture."

*Renowned artists who painted on cardboard include Edvard Munch (*The Scream*), Degas, Toulouse-Lautrec, van Gogh, Picasso, Rauschenberg, and Klein.

*These giants "used cardboard either due to its intrinsic properties that distinguish it from paper, panel, or canvas; due to its ubiquitous and inexpensive nature; or some combination of both."

*"[C]ardboard clearly has a long and fruitful history as an artists' medium that belies its quotidian connotations. When it comes to Basquiat, the accessible nature of cardboard is key, as it would allow the voracious, developing artist to create very cheaply."

*Basquiat began painting on cardboard as a teenager and continued throughout his career.

*"Any notion that cardboard/paperboard works were inferior in terms of value was laid to rest in the May 17, 2017 Sotheby's auction when an *Untitled* oil-stick on cardboard (60x40 in.), drawn in 1982, sold for $8,647,500."

Krieger thoughtfully perceived the significance of the collection in terms of Basquait's development as an artist who used the low-pressure environment of Venice, California to paint what he wanted to paint and not what his pushy gallerist Nina Nosie and her wealthy collectors in New York demanded. She also opined about the paintings' value.

"The high quality of the seven[six; or use [...]; confusing to refer to seven here without explanation!] paintings in the Basquiat Venice Collection attest to the fact that his use of cardboard, paperboard, and wood did not hinder his creativity. Indeed, a strong case can be made that the use of these substrate challenged Basquiat to paint in some new ways that produced these fortuitously discovered treasures. One thing is certain: these paintings should not be devalued because they are not painted on canvas."

[The following sections are irrelevant and cast the paintings in a negative light. These revelations might impact future sales efforts. Lee and his family strongly object to these sections]

17

Formatted: Highlight

"Wow"

Lee and I had stayed in close contact, sharing information and brainstorming about how to develop a critical mass of evidence to attract buyers and convince their art advisors that all of the 25 paintings were Basquiat's creation. One day, he excitedly told me that Toronto art seller Jason Halter, who had been engaged to market the 19 paintings, had succeeded in persuading legendary Diego Cortez to inspect the paintings. Not long thereafter, Lee breathlessly told me that Cortez had reviewed them and had written letters of authenticity for the set of 19 and each of them individually.

I was dumbstruck.

"Congratulations, Lee," I told him. "That's awesome!"

"Yes, it is, indeed," Lee replied. "Hopefully, it will be a game changer."

"I would hope so," I shot back. "After all, Cortez discovered Basquiat, was his dealer for a while, and co-founded the Basquiat Committee. He is *the* authority."

Cortez was the genuine Basquiat connoisseur, a legendary figure in the art world without whom Basquiat would likely have lived and died in obscurity. As everyone knows, Jean-Michel was a New York City street artist when Cortez spotted his raw talent, then met him on the Mudd Club dance floor, literally brought him into his studio, and gave him $200 to purchase paint, brushes, and canvas. His first gallerist, Cortez remained close to the artist up to the time of his death.

Even after Basquiat died, Cortez assisted his father in managing the sale and promotion of his son's increasingly valuable paintings and drawings. Along with Jean-Michel's father, Cortez co-founded the Basquiat Committee where he was the most knowledgeable member. (The father died in 2013.) In short, no more qualified expert existed with the credentials to authenticate Mumford's paintings.

Lee told me how it had come to pass that Diego had authenticated the 19 works.

Following Richard Marshall's death in 2014, Lee did not give up on the idea of having the paintings examined by a prominent expert who had had served on the Basquiat Committee before it was disbanded in 2012. That dream was finally realized in September 2018, when Diego Cortez independently reviewed and certified the authenticity of the 19 paintings and the poem.

Lee had been working to prepare the Mumford Collection for a potential sale with Talin Maltepe of Sevan Art Gallery. Maltepe is a prominent art consultant, dealer and broker based in Toronto. She has a unique niche in the art world, specializing in consulting on due diligence for paintings that are not catalogued. She, in turn, brought in a colleague, Jason Halter, a respected architect who also serves as an adjunct professor at the University of Toronto teaching architecture, landscape, and design.

18

**Deleted: No in Five Languages¶**

A year into my assignment, I thought that I had put together an air-tight case for the authenticity, significance, and value of the collection. I was ready to go to trial and win over the judge and jury. That's what I did for a living, and why should securing a victory (sale) for six paintings be any different?¶

In support of my case and with the creative assistance of Jim Buckley, Patty Kelley, and Matt Bean, we created a private, password-protected website collecting all the papers written by our consultants plus several pieces that I wrote, including a scrolling introduction discussing our Basquiat collection as reflecting the "hallmarks of his creative genius," an analysis of the poem, and salient marketing facts. I also engaged a trio of successful, savvy art sellers: Dr. Ronald Parker, Scott Foreman, and Patrick Painter, all of whom genuinely believed in the paintings' authenticity and significance. It would only be a matter of time and not long, I convinced myself, that the paintings would be sold for millions of dollars.¶

Well, I was wrong, dead wrong, perhaps as wrong as any neophyte in the ultra-skeptical art world could be wrong.¶

Using the materials on the website and working their impressive network of buyers, galleries, and art advisors, Ron, Scott, and Patrick—who had over a century of combined fine art selling experience—diligently sought out buyers. Their contacts, ingenuity, and resourcefulness were impressive to say the least. No owner could ever ask for more.¶

Sadly, nobody wanted to buy any of the paintings. Some prospective purchasers would express initial interest, compliment their beauty, and even come to view them. There was always a reason why no offer was made. The two most frequent were that they were not in the catalogue raisonné or authenticated by the estate's committee, and they were painted on substrates other than canvas. ¶

The website attracted collectors and their art advisors on four continents. I spoke directly with some of them, trying to strike a proper balance between total candor and salesmanship. Every time, however, I struck out. I heard variations of "no" in five languages—English, French, Russian, Chinese, and Spanish. For all of 2018, it was death by a thousand cuts.¶

**Flakes, Snakes, and Fakes¶**

With fine art prices skyrocketing, the unregulated and exceptionally opaque global art market is increasingly vulnerable to fraud. My dealings with players in the fi[...] [1]

**Deleted:** ¶

As 2019 dawned, my sales efforts were dead in the water. I needed a breakthrough. Something that radically altered the status quo.

**Deleted:** our

The owner of his own collection of uncatalogued Basquiat drawings, Halter made the initial contact with Diego Cortez. He learned that Cortez was most reluctant to independently examine works and had rarely commented on paintings by his former protégé. Nevertheless, after several weeks of gentle persuasion, Cortez realized that the Mumford Collection, having been stored for thirty years, did not have a fair opportunity for review. Therefore, Cortez agreed to travel to New York City to view the Mumford paintings as well as Halter's pencil sketches.

On September 12, 2018, Lee, Halter and Lee's attorney and Trustee for the Mumford Collection paintings, Richard LiPuma, met Cortez at the Chelsea storage facility of Crozier Fine Arts. It was an historic and moving experience for all the participants. Cortez first walked along the tables of laid-out works with his jaw half dropped, almost in shock. He occasionally uttered remarks, more to himself than to anyone else: how Jean-Michel had gone to Los Angeles in 1982 to work with Gagosian, how he hadn't expected these paintings to be in such good condition, and sometimes as he looked at a particular painting, he just uttered "Wow!" (This reminded Lee of Richard Marshall's initial reaction.)

Cortez stopped and studied the *Big Red Head* painting for several minutes, his keen practiced eyes moving to every corner. As he examined it, he leaned toward LiPuma and said, "This one's gonna make people talk. I wish I had this painting. You're probably sitting on over twenty million dollars with this one alone."

Cortez could not contain himself when he arrived at the painting known as *Red Face and Lizard*. (All the paintings were originally untitled when Basquiat sold them to Mumford.) Again, he spent more time here than with the others. Tears welled up in his eyes, and LiPuma had to ask if he was okay. Cortez then interpreted the painting for LiPuma, explaining that Jean-Michel must have been in real pain when he had painted this one. "These are terrible images of a monster, and the house, which is the mind of the red-faced character, is falling off the edge of the world into the abyss. This is very disturbing stuff."

After his initial review, Cortez spent time with each painting, making a more detailed examination. Then, as the group became more comfortable with each other, the discussion devolved to stories of the old days, memories of the Mudd Club, the wild parties, the celebrity interactions, and a virtual verbal postcard in remembrance of the glory of New York City in the 1980s. A couple of hours later, as Cortez left the viewing room at Croziers, he again confided in LiPuma. "These are great works, and I just want to let you know I'm planning to give them a favorable review." True to his word, Cortez then wrote an opinion letter certifying the authenticity of the collection of paintings, and he also wrote a separate certification letter for each individual work and the poem.

### The Epitome of Cool

Through Lee, I was introduced to Jason Halter whom I found to be an affable, knowledgeable, and trustworthy person who was actively engaged in helping Lee. Lee had told me that Jason also owned his own Basquiat works. On the phone one day, we struck up a conversation.

19

"Hello, Jason, Lee referred me to you." I opened.  "how's it going?"

"It's a hard slog out there with unauthenticated paintings," he admitted.

"Tell me about it, my friend," I replied.  "I can't get arrested with my six.  It's so damn frustrating when I know that they're right."

"Believe me, I know first-hand," he replied.  "I've had my own genuine Basquiat drawings for several years, and I still have them".

"Lee told me about your coup with Diego Cortez," I offered.

"Yeah, Diego and I have developed a good rapport," he told me.

"That's terrific," I told him. "Do you think he'd look at mine?"

"Diego just does not like to opine on Jean-Michel's works." Jason replied.  "Let me see what I can do."

Months passed without Jason being able to get Diego to undertake the assignment.  Diego was a notoriously private person who had defected from the New York art scene and initially lived in North Carolina.  Aloof and guarded, it was well known that what I wanted Diego simply did not want to do.  Even though I pestered Jason every week about Diego, I had given up hope.

Then, we caught lightening in a bottle.  Jason called to tell me that he had finally gotten Diego to look at photos of our six paintings and our website with all the documentation that we had posted confirming authenticity.  Jason told him that the six paintings were found in the same storage facility with the 19 paintings that he had already certified.  That seemed to be the winning argument.  We set an appointment to meet in New York.

On March 1, 2019, I met Jason and Diego at Crozier Fine Arts in lower Manhattan.  I arrived early like I did whenever I went to court.  Jason came from Toronto, while Diego travelled New Orleans where he was then living.

Jason walked into the viewing room accompanied by a bespectacled gentleman in his early 70s with a scruffy white beard and a pair of blue eyes exuding warmth and raw intelligence.

"Pierce, please meet Diego," Jason began.

"It is a privilege to meet you, sir," I remarked.  And it really was an honor.  But for Diego Cortez (born James Curtis), it is highly unlikely that the Basquiat would have become the celebrated phenom of American art.

"Are these the paintings?" he asked, pointing to our six works on two tables.

20

"Yes," Jason answered as I once again held my breath while another expert examined our paintings.

"The photos don't do them justice," Cortez offered after spending several minutes methodically looking at the front and verso of each painting. "They really are special, some of his best work in this time period."

"What is it about them that you especially like?" I asked.

"A lot of people don't appreciate how good Jean-Michel was at drawing," he noted. "These pieces reflect the strong graphic work with a central iconic figure which typifies his work from this period."

You could knock me over with a feather. Cortez was not finished.

"These works also capture the power of his intensity of line which has subsequently engaged so many collectors and museums around the world with his work."

After about two hours with the paintings, Diego, Jason, and I went to lunch. Ordinarily reserved and taciturn, Diego opened up, telling some war stories about Jean-Michel, Patti Astor, and Basquiat's father Gerard.

"The authentication board was an unruly group," mild-mannered Diego offered. "Most of them were art dealers trying to get the family to allow them to sell his paintings. I was the only one who was not trying to make a buck."

"Have you thought about writing a book about your life and times and all the people you worked with?" I asked.

From the articles that I read, Diego was an influential player in New York City's art and music scene. One major exhibition feathered more than 100 artists, including Robert Mapplethorpe, Keith Haring, Andy Warhol, and Basquiat.

"Yes, I have," he swiftly responded. "I have a ton of materials."

"Sort of like Patti Smith's memoir, *Just Kids*, about her life with Robert Mapplethorpe and the New York art and music scene in the 1970s and 1980s?" Jason suggested.

Diego nodded.

We said our good-byes, with Diego returning to New Orleans, Jason to Toronto, and me to Los Angeles. I got his unqualified letters of authentication similar to the ones that Lee received. Diego and I spoke on the phone one more time about him writing his book. Sadly, as I was writing this essay, Diego passed away in Burlington, North Carolina; he never wrote his book. Like me, he was 74.

21

Diego's longtime collaborator Patti Astor told *ARTnews:* "Another one of the great warriors is gone." In his *New York Times* obituary, one friend noted: "Diego was full of unquenchable passion." Another described Diego as "the epitome of cool."

For me, his authentication letters were an apparent lifesaver.

But not really. Even with Diego's imprimatur, my art sellers had not yet landed a sale. Lee was having a similar experience. One day, we were conversing about this mystifying situation.

"Counselor," he began. Lee loved to tweak me about my day job.

"Could you lose a court case with all this evidence that we have accumulated?" he wanted to know.

It was a fair question. We had a cornucopia of solid proof: a storage receipt for Mumford's unit in which the paintings were found, a sworn declaration from the auctioneer who bought the locker's contents and his photographs of them, statements from two people who spoke to Mumford and heard him confirm that he bought the paintings from Basquiat in 1982, a sworn declaration about two Mumford phone messages also confirming this fact, a poem written and initialed by Basquiat, expert reports by Dr. Saggese and Jim Blanco attesting to Basquiat creating the paintings for a variety of reasons, and, the *pièce de resistance*: certifications of authenticity by the most renowned Basquiat authority in the world.

"You know, Lee," I responded after reflecting for a moment. "I can always lose a trial. But in the Case of the 25 Basquiats, I see a jury finding them not just authentic but declaring them to be masterpieces."

### Is There Even A Glass?

In the early summer of 2019, I got a break. An established Los Angeles art gallery agreed to mount an exhibition of our six paintings in May 2020. The marketing materials were prepared, the media plan was drafted, and my hopes were renewed. Things were looking up.

But not for long.

In mid-March, 2020, the City of Los Angeles—responding to the metastasizing public health crisis posed by the coronavirus pandemic—put its residents on lockdown. My law firm closed, sending 200 employees off to the uncertain virtual world. Businesses and schools were shuttered, and life as we knew it was put on an indefinite hold.

The global art world was severely impacted as auction sale revenues plummeted and paralyzing uncertainty took hold. Art Basel summed up the immediate impact: "The COVID-19 crisis has had an unprecedented impact on the art market, shuttering galleries and museums.

22

---

**Deleted:** could

**Deleted:** the same

**Deleted:** by Mumford and Basquiat

**Deleted:** By

**Deleted:** I had been working on the Basquiat project for two years.¶
Despite several hundred thousand dollars of expenses and countless hours of my time, I had nothing tangible to show for my efforts. The same was true for Lee who had been on the case since 2012. It seemed like a global cone of disinterest had descended on Mumford's collection¶
¶
¶
Then

**Formatted:** Indent: First line: 0.5"

Exhibitions, art fairs, and auctions have either been postponed or have moved online." Our forthcoming Basquiat exhibition was canceled—twice over the next year.

In June 2020, I decided to get an appraisal of our six paintings. Ron Parker recommended Patricia Dillon, a highly-regarded appraiser, professor, and lawyer with Putnam Fine Art and Antique Appraisals in Charleston, South Carolina. A delightful, charming intellectual who is certified by the Appraisers Association of America, Patricia has done 150 appraisals of paintings, works on paper, sculpture, photographs, and furniture for museums, historic sites, and major collectors. In the business, she is widely-respected as an appraiser's appraiser in light of her academic and professional lecturing for major universities like Harvard, College of Charleston, and New York University, Sotheby's, and appraisal and conservation societies.

Patricia devoured all the materials on my website and did extensive independent research about the significance of our collection and its value based comparable sales for the past few years. She asked for additional information on provenance, and despite the COVID-19 crisis, she traveled from Charleston to New York City to view the paintings. Patricia delivered her report in September 2020. [we don't think the appraised values should be published. This could adversely impact future sales efforts, especially in light of Dr. DeGroft's recent comments that this appraisal is or will be obsolete after the Orlando exhibition].

> **Deleted:** As an appraiser, she assumed authenticity, noting that no red flags had been unearthed in her study. She valued our six works at $25,000,000 if sold together and $19,700,000 if sold separately

Patricia was impressed by the quality of our paintings.

"The instant collection is a varied group of spirited works, typical in subject and technique preferred by Basquiat. Appraiser has found each work to be in very good condition. Overall, the quality of the works is comparable with other Basquiat works that command substantial prices. Provenance research indicates that the works were completed in and around 1982, a year that many experts feel was particularly prolific for Basquiat's work."

Patricia had keen insights into how our paintings fit into Basquiat's overall body of work.

"Factors that enhance the value of each of the instant works include dynamic composition flush with typical Basquiat iconography. The works often depict deeply emotional turmoil intertwined with social and political messaging and fantastical presentation. These statements speak directly to the current political atmosphere, are typical to the Basquiat oeuvre and will remain current for many years forward."

Lee then engaged Patricia to appraise the 19 Basquiats. She wrote a comprehensive, insightful report as she did for me. Given that Lee had about three times as many paintings and two were very large, her appraised value of the 19 was a multiple of that of the six paintings.

Needless to say, Lee and I were thrilled to receive this further validation from such an authoritative source. At least a half dozen experts had blessed the 25 paintings. Their authenticity and value had been proven beyond a reasonable doubt.

23

But nothing happened, no one made an offer or even viewed the paintings, as the world
expectantly awaited a coronavirus vaccine. My frustration reached new heights as my spirits hit
new lows. An optimist by nature, I was starting to think that the glass was neither half full nor
half empty—there was no glass.[As mentioned before, Lee and I are concerned about the focus
on failed sales attempts. We don't think this should be part of the story, and it could have an
adverse impact on future sales attempts]

Formatted: Highlight

### Serendipity

It was now March 2021. Nearly four years into my Basquiat case. Despite all my (and
Lee's) successes in securing solid proof of provenance, unimpeachable scientific support, and
consensual validation by respected connoisseurs as well as the smart, aggressive, and tireless
sales efforts of our dedicated art sellers, I was no closer to selling our Basquiats than the day I
started to pursue what increasingly looked like an impossible dream. I was not yet prepared to
throw in the towel on the Adventure of the Lost Basquiats, but I was running out of options.

My dear mother was fond of saying that "things happen for a reason." For half century of
adult life, I was never quite sure what she meant. Then I found out.

In late March, I received an email from a stranger. His name was Dr. Aaron de Groft, the
Director of the Orlando Museum of Art. He did not waste any time getting to the point.

"Dear Mr. O'Donnell:

"Would you be willing to speak about the Pollock? We would love to celebrate it and
showcase it here in Orlando where we lead the country in tourism with an excess of 73
million tourists. We would love to promote it internationally. . . . I have read much about
the work. It is right. I would be happy to fly to LA to talk with you in person. I am
happy to talk. Thank you very much".

I was flabbergasted. Finally, as I had hoped would happen one day, someone at a
respected art museum thought that the Pollock was authentic and wanted "to celebrate it."

Before I responded, I did some research on Dr. De Groft and his museum. He was the
new and only fourth director in the nearly 100 years of the institution. Recently hired after a
global talent search, Dr. De Groft had three degrees in art history, 25 years of experience as an
art curator and museum director, and a specialty in Old Masters and modern and contemporary
art. For 15 years, he ran the prestigious Muscarelle Museum at the College of William & Mary,
mounting dozens of notable exhibitions featuring works by Michelangelo, Rembrandt,
Carvaggio, Botticelli, important contemporary African-American artists, Titian, Reubens,
Cézanne, da Vinci, and German expressionist and modern artists.

The Orlando Museum of Art was also impressive. The major cultural institution in
central Florida, it is one of the leading art museums in the South. Housed in an 80,000 square
foot facility, the museum has a diverse collection of primarily modern and contemporary art by

the greatest artists working in the twentieth and twenty-first century. Annually, with about 200,000 visitors, it mounts about six to eight major exhibitions on-site and a similar number of off-site exhibitions.

It took a few days before Dr. De Groft and I connected.

"Hello, Dr. De Groft, this is Pierce O'Donnell," I began. "It is a privilege to speak with you."

"The privilege is all mine," he replied with a tinge of a Southern accent. "Please call me Aaron."

"And Pierce, please," I told him. "Thank you for your email. I must tell you that I thought that I was imagining everything."

"You're not because I've read your e-catalogue on *The Comstock Pollock*," Aaron quickly injected. "Your painting is not only genuine, but I believe that it is one of the very best drip paintings that Pollock ever created."

"Umm, thank you," I said in a low voice as I tried to process just what Aaron was telling me. I had lived with this painting for a decade and had spent so much time and money, battling to have it publicly recognized as authentic and exceptional. That moment had finally come.

"You should be proud of what you have accomplished," Aaron added. "I would like to introduce this unknown masterpiece to the world in a way befitting its grandeur."

Aaron then outlined his ideas for a world premiere beginning in late September of 2021, including massive publicity, a catalogue, and multiple months of exhibiting it to tens of thousands of visitors. The exhibition would be part of a larger event for launching a campaign to celebrate the museum's 100th anniversary in 2024.

"I have a lot of experience debuting lost art, Pierce," Aaron mentioned. "From Titian to Rembrandt to da Vinci. Your Pollock will captivate the art world."

I was on sensory overload—my brain was overwhelmed. I told Aaron that I was very interested and would get back to him soon.

The significance of a major exhibition was hardly lost on me. This could be the elusive final validation—in lieu of a catalogue raisonné entry and Pollock-Krasner Foundation authentication—that would get the painting (recently appraised at $170 million) sold.

"Aaron, this is Pierce," I opened on a call the next day. "I want to thank you for your call and invitation."

"I hope that you will let us do this," Aaron stated. "I promise that we will mount a world-class exhibition."

25

"Aaron, I definitely want to partner with you and your museum," I made clear. "But I can't commit to September. I have some issues to first resolve with my partner."

"Oh, I see," Aaron replied, disappointment resonating in his voice.

"But, I think we would be good to go in January," I quickly added.

"That will work . . . work very fine," Aaron told me.

"Now, I do have some other paintings that you might be interested in for your September event."

"Talk to me," Aaron urged.

I told him the condensed version of the story of the Mumford Basquiats, the efforts by Lee and me to get them authenticated and sold, and the roadblocks that we had encountered. As I spoke, I emailed him photos of our six paintings.

"Oh my God!" Aaron exclaimed. "These are sensational."

"I have a website with all the research, expert reports, and key documents," I offered. "Let me send you the link and password."

The next morning, Aaron called me. His voice was excited.

"Pierce, I was up all night devouring your website contents," he started. "I want to do a major exhibition showcasing your spectacular Basquiats in September. They are gems."

Twice in one week this man had changed my life. While I instantly knew the significance of his museum vouching for our Basquiats—as it was vouching for the Pollock—I was nonetheless awed and humbled. No one knew the loneliness, heartache, and gnawing sense of failure that had haunted my decade-long efforts to persuade the hostile art world to embrace these paintings.

I enthusiastically accepted Aaron's invitation. After we discussed some of the particulars, including getting the other 19 Basquiats into the exhibition, Aaron had a question for me.

Deleted: and

"Pierce, Jackson Pollock and Jean-Michel Basquiat are the two greatest, most significant artists in American history," he stated. "How did one person, you, manage to be so involved with both?"

"Bad luck," I wryly replied. "Until I met you."

It did not take long for the museum and me to work out the details of a loan agreement for

26

the six paintings. I also talked with Lee and Rich about showcasing their 19 paintings at the same time. They were in.

As part of his due diligence, Aaron traveled to New York to examine the paintings. He then gave us his impressions:

> These are astounding masterpieces in one of the last times Basquiat
> was painting for himself. After the year 1982, Basquiat was always
> painting for someone else. The exceptional quality and depth of
> these raw-energy cardboard and plywood works from the Mumford
> Collection are the purist form of Basquiat much like when he was
> painting in and painting on…Brooklyn. We made a discovery never
> mentioned or observed and recorded before by anyone. Basquiat
> used spray painting on these cardboards from the Mumford
> Collection, thus tying these California pictures directly to Brooklyn.
> … I will say once again that these works in the Mumford Collection
> are masterpieces and, as of yet, there are no comparable works like
> this now, or before them. I would say they are singularly unique. Let
> me know how I can help to debut these masterpieces to the world.

The debut is now set for the Orlando Museum of Art in February 2022 when the world will soon discover the astounding masterpieces that Jean-Michel Basquiat created for his friend Thad Mumford in Los Angeles in 1982.

My mother was right. Never underestimate the beneficent role of serendipity in human affairs. What a concatenation of unlikely events! Thanks to Mumford forgetting about his purchase and not paying his storage locker fees, Billy recognizing and rescuing the paintings from a trash dumpster, Lee putting up the money to buy them and all his incredible detective work from finding the poem to Diego Cortez, my stubborn pursuit of evidence and expert opinions, and, finally, Dr. Aaron De Groft reading my e-catalogue for *The Comstock Pollock*, the Mumford and Basquiat Venice Collection may have remained lost forever.

The historical parallels here are striking. Basquiat acknowledged Jackson Pollock's influence on his painting. Decades later, Pollock was still shaping Basquiat's legacy. A lost Pollock's discovery directly led to discovery of 25 lost Basquiat paintings.

On a warm, partly cloudy day in early October 2021, a specially-outfitted art transport truck carrying the 25 Basquiats arrived at the Orlando Museum of Art. It was almost 40 years since Jean-Michel painted them for Thaddeus. The implausible journey of four decades from Venice to Orlando was now over. The works had been found.

28

29

Page 18: [1] Deleted        Richard LiPuma  11/7/2021 7:15:00 AM

# EXHIBIT 30

| From: | Aaron H. DeGroft[/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=33cbae2830b34d6dbfc8b696f7edd140-Aaron H. De] |
|---|---|
| Sent: | Sat 1/22/2022 3:10:37 PM (UTC-05:00) |
| To: | O'Donnell, Pierce[podonnell@███████████] |
| Subject: | Re: ███████████ Essay |

Her and my belief was from studying how and what Basquiat wrote. No problem in modifying this. You know Mumford typed it however. Right.

Get Outlook for iOS

---

**From:** O'Donnell, Pierce <podonnell@████████████>
**Sent:** Saturday, January 22, 2022 7:39:00 AM
**To:** Aaron H. DeGroft <adegroft@███████████>
**Subject:** Fwd: ██████████ Essay

Sent from my iPhone

Pierce O'Donnell
Attorney at Law
Biography

podonnell@█████████████

Greenberg Glusker LLP
2049 Century Park East, Suite 2600
Los Angeles, CA 90067
GreenbergGlusker.com
This message is intended solely for the use of the addressee(s) and is intended to be privileged and confidential within the attorney client privilege. If you have received this message in error, please immediately notify the sender at Greenberg Glusker and delete all copies of this email message along with all attachments. Thank you.

Begin forwarded message:

> **From:** "O'Donnell, Pierce" <podonnell@████████████>
> **Date:** January 22, 2022 at 6:38:12 AM CST
> **To:** Lee Mangan <lmangan227@████████>
> **Cc:** Richard LiPuma <rich@███████>
> **Subject:** Re: ████████ **Essay**

Aaron said he was changing this to written by JMB.

Sent from my iPhone

> On Jan 21, 2022, at 10:31 PM, Lee Mangan
> <lmangan227@███████> wrote:
>
>
> Just want to know how this person determined in their catalogue
> essay that the poem written by Basquiat was written by Mumford?
>
>
> Sent from my iPhone

# EXHIBIT 31

| From: | Aaron De Groft ███████████ |
|---|---|
| Sent: | 7/11/2021 1:36:10 PM |
| To: | ███████████ [Pierce O'Donnell] [/] |
| Subject: | [Chat #155] |

I am now convinced this work that sold as Mumford is forged for multiple reasons not the least of which is the signature. The "E" has a spine. He never signed that way. Also there are so many more things wrong with it. After being immersed in Basquiat 24/7 for almost six months, I got it. That is why we stick with the poem of twenty five. It is our document evidence attesting to the covenant between Mumford and Basquiat. Last night I watched a long interview with Mumford. He was Basquiat…in his world…talk in 10? Had my phone off all day writing and working. Just turned it back on. Heading back to Museum after lunch break. Your essay is wonderful my friend.

-----METADATA INFORMATION-----

**Device Owner:**

███████████ Aaron DeGroft

**ICCID:**

89148000006400175681

# EXHIBIT 32

| | |
|---|---|
| **From:** | Aaron H. DeGroft[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=33CBAE2830B34D6DBFC8B696F 7EDD140-AARON H. DE] |
| **Sent:** | Thur 11/4/2021 2:41:23 PM (UTC-04:00) |
| **To:** | |
| **Subject:** | Pierce O'Donnell's story of how they became involved with the Basquiat and the history of the works |
| **Attachment:** | 11.1.21 Revised Lost and Found-1.docx |

That provenance page with the purchase of the works on one day and the transfer to the trust is inaccurate and Rich Lipuma is fixing it.



# EXHIBIT 33

| From: | Pierce O'Donnell █████████████ |
|---|---|
| Sent: | Thur 7/29/2021 2:06:56 AM (UTC-04:00) |
| To: | "aaron.degroft@█████████ [Aaron De Groft (owner)]" |
| Subject: | [Chat #199] |

For example, more time allows to find major corporate, institutional and individual sponsors. A book deal with Rizzoli or Abrams or Phaidon etc. A blockbuster video narrated by you about the Mumford Collection to be run on your website, YouTube, social media etc. any other ideas that make the works and OMA untouchable and celebrated.

-----METADATA INFORMATION-----
**Device Owner:**
█████████████ Aaron DeGroft
**ICCID:**
89148000006400175681

# EXHIBIT 34

| | |
|---|---|
| **From:** | O'Donnell, Pierce[podonnell@████████████] |
| **Sent:** | Sat 1/22/2022 7:40:36 AM (UTC-05:00) |
| **To:** | Aaron H. DeGroft[adegroft@████████] |
| **Subject:** | Re: Basquia |

Yes. And separated at birth my brother 👑

Sent from my iPhone

Pierce O'Donnell
Attorney at Law
Biography

podonnell@████████████

Greenberg Glusker LLP
2049 Century Park East, Suite 2600
Los Angeles, CA 90067
GreenbergGlusker.com
This message is intended solely for the use of the addressee(s) and is intended to be privileged and confidential within the attorney client privilege. If you have received this message in error, please immediately notify the sender at Greenberg Glusker and delete all copies of this email message along with all attachments. Thank you.

> On Jan 21, 2022, at 10:27 PM, Aaron H. DeGroft <adegroft@████████> wrote:

I really like talking to you. I am out tonight.

Get Outlook for iOS

---

**From:** Aaron H. DeGroft <adegroft@████████>
**Sent:** Friday, January 21, 2022 9:38:25 PM
**To:** O'Donnell, Pierce <podonnell@████████████; Lee Mangan <lmangan227@████████; Richard LiPuma <rich@████████>
**Subject:** Re: Basquiat

Pierce are we brothers born on different coasts?

Get Outlook for iOS

---

**From:** O'Donnell, Pierce <podonnell@████████████>
**Sent:** Friday, January 21, 2022 9:36:23 PM
**To:** Aaron H. DeGroft <adegroft@████████; Lee Mangan <lmangan227@████████████>
Richard LiPuma <rich@████████>

**Subject:** Fwd: Basquiat

FYI

Pierce O'Donnell
Attorney at Law
Biography

podonnell@

Greenberg Glusker LLP
2049 Century Park East, Suite 2600
Los Angeles, CA 90067
GreenbergGlusker.com
This message is intended solely for the use of the addressee(s) and is intended to be privileged
and confidential within the attorney client privilege. If you have received this message in error,
please immediately notify the sender at Greenberg Glusker and delete all copies of this email
message along with all attachments. Thank you.

Begin forwarded message:

**From:** Pierce O'Donnell <podonnell@
**Subject:** Basquiat
**Date:** January 21, 2022 at 6:35:45 PM PST
**To:** <

Brett

It was fun talking with you today. As I told you, I have created a
website containing the results of my due diligence over the course of
four and one-half years. Here it is:

https://www.bvcg.org

As I thought more about our conversation and folks who may have
raised questions but have never seen our paintings or read any of our
numerous expert reports ands other documents, I was reminded of a
quote of John Adams. In 1770, the future President was defending
(successfully) the British soldiers accused of murdering protesters in
the so-called Boston Massacre. Commenting on the strong evidence
proving that his clients were not guilty, Adams told the jury in his
closing argument:

 "Facts are stubborn things; and whatever may  be our wishes, our
inclinations, or the dictates        of our passion, they cannot alter the
state of  facts and evidence."

Brett, everyone is entitled to his/her opinion, but not his/her version of the facts.

Thanks.

Pierce

# EXHIBIT 35

From:      O'Donnell, Pierce [podonnell@ ████████████████ ]
on behalf of    O'Donnell, Pierce <podonnell@ ████████████ [podonnell@ ████████████ ]
Sent:      6/10/2021 10:17:38 AM
To:      Aaron De Groft [aaron.degroft@ ████████████ ]
CC:      Pierce O'Donnell ████████████████████
Subject:      Re: Titian

Very good. Thanks

Sent from my iPhone

Pierce O'Donnell
Attorney at Law
Biography

podonnell@ ██████████████

Greenberg Glusker LLP
2049 Century Park East, Suite 2600
Los Angeles, CA 90067
GreenbergGlusker.com

This message is intended solely for the use of the addressee(s) and is intended to be privileged and confidential within the attorney
client privilege. If you have received this message in error, please immediately notify the sender at Greenberg Glusker and delete all
copies of this email message along with all attachments. Thank you.

On Jun 9, 2021, at 7:56 PM, Aaron De Groft <aaron.degroft@ ████████████ wrote:

One of the lawyers who represents 50 percent ownership.

He was here last week checking me out. He is concerned I would broker the painting but then authenticate it. I
told him I would be represented by legal counsel (you). I can set up the sale then it would be up to you and them
to sell it. I can still authenticate it at arms length. You good with that? This is of course after Basquiat and
Pollock to build the lost art resume. Right?

Get Outlook for iOS

# EXHIBIT 36

| | |
|---|---|
| **From:** | Aaron De Groft[aaron.degroft@ ▮▮▮▮ |
| **Sent:** | Thur 6/24/2021 1:36:03 AM (UTC-04:00) |
| **To:** | O'Donnell, Pierce[podonnell@ ▮▮▮▮ |
| **Subject:** | Re: We talking this week? |

Just lost a long email to you. Titian boys are trying to be in the game with regards to details on the lone. No worries.

You tired or up for a quick call?  No worries. Can be tomorrow. I am in bed in 30 or so but wide awake now.

Get Outlook for iOS

---

**From:** O'Donnell, Pierce <podonnell@ ▮▮▮▮
**Sent:** Thursday, June 24, 2021 1:13:14 AM
**To:** Aaron De Groft <aaron.degroft@ ▮▮▮▮
**Subject:** Re: We talking this week?

What are Titian boys doing or saying?

Sent from my iPhone

Pierce O'Donnell
Attorney at Law
Biography

podonnell@ ▮▮▮▮

Greenberg Glusker LLP
2049 Century Park East, Suite 2600
Los Angeles, CA  90067
GreenbergGlusker.com
This message is intended solely for the use of the addressee(s) and is intended to be privileged and confidential within the attorney client privilege. If you have received this message in error, please immediately notify the sender at Greenberg Glusker and delete all copies of this email message along with all attachments. Thank you.

> On Jun 23, 2021, at 7:04 PM, Aaron De Groft <aaron.degroft@ ▮▮▮▮
> wrote:
>
>
> No worries. Comes with my territory meaning normal. These boys with the
> Titian also have me jumping through hoops as well. All good. It will all work out
> my friend.

Aaron H. De Groft, PH.D.
Director & CEO
Orlando Museum of Art

███████████

Sent from my iPhone

> On Jun 23, 2021, at 8:11 PM, O'Donnell, Pierce
> <podonnell@███████████ wrote:

Good.

I won't rest until this is signed by Rich. Sorry that you have to spend
time on this ….

> > On Jun 23, 2021, at 3:26 PM, Aaron De Groft
> > <aaron.degroft@███████████ wrote:
> >
> > FYI
> > I already answered these questions and will do so again.
> > Easy to do.
> >
> > Aaron H. De Groft, PH.D.
> > Director & CEO
> > Orlando Museum of Art
> >
> > ███████████
> >
> >
> > Sent from my iPhone

Pierce O'Donnell
Attorney at Law
Biography

███████ podonnell@███████████

Greenberg Glusker LLP
2049 Century Park East, Suite 2600
Los Angeles, CA 90067
GreenbergGlusker.com
This message is intended solely for the use of the addressee(s) and is intended to
be privileged and confidential within the attorney client privilege. If you have

received this message in error, please immediately notify the sender at Greenberg Glusker and delete all copies of this email message along with all attachments. Thank you.

Begin forwarded message:

**From:** Richard LiPuma
<rich@▮▮▮▮▮▮▮▮▮>
**Date:** June 23, 2021 at 4:40:18 PM EDT
**To:** Aaron De Groft
<aaron.degroft@▮▮▮▮▮▮▮▮▮>
**Cc:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Subject: Re: We talking this week?**

Hi Aaron: I have not heard from the attorneys, so not counting on a conference call today or tomorrow. I really appreciated your email comments!
I have the Loan Agreement, but still a few minor issues to resolve-- (1) the timing is open-ended. My client would like to suggest we schedule for 1 year (e.g., 8/1/2021 - 8/1/2022); and extensions with Owners' consent. Does that make sense for your purposes. Let's discuss. (2) paragraph 2, first sentence still says that I "certify" the paintings are in good enough condition to transport. I understand you are taking proper precautions, and I am grateful for that. I just don't want to certify in writing that the paintings could be shipped by ordinary transportation. (3) Also note I had previously sent you insurance values based on the appraisal, and that wasn't included in this draft. Do those values work? Do I need to re-send?

Thanks for everything! Looking forward to working with you!
Rich

On Wed, Jun 23, 2021 at 1:53 PM Aaron De Groft <aaron.degroft@▮▮▮▮▮▮▮ wrote:

Get Outlook for iOS

--
Richard LiPuma
LiPuma Law Associates, LLC
1635 Foxtrail Drive
Loveland, CO 80538
███████████

rich@████████████

This message and its contents are
confidential. If you received this message in
error, do not use or rely upon it. Instead,
please inform the sender and then delete it.
Thank you.

# EXHIBIT 37

| | |
|---|---|
| **From:** | Aaron De Groft [aaron.degroft@█████████] |
| **on behalf of** | Aaron De Groft <aaron.degroft@█████████    [aaron.degroft@█ |
| **Sent:** | 7/6/2021 10:39:13 PM |
| **To:** | Pierce O'Donnell [PODonnell@█████████] |
| **Subject:** | Also just so you know... |

Tomorrow and the next day we have two special sessions of Board committees where our architect makes presentations on our downtown expansion. This in prep for our most important Board meeting in the history of OMA on fishing or cutting bait on our downtown space with a binding agreement on that concept. A lot riding on this week as well as next.

As well I hope we can early next week solidify our business agreement if that is ok with you.

I hope you are well my friend. Of course Pollock also in the works on all of this.

Thanks.

Get Outlook for iOS

# EXHIBIT 38

| From: | Aaron De Groft ███████ |
|---|---|
| Sent: | 7/13/2021 9:57:38 PM |
| To: | ██████████ [Pierce O'Donnell] [/] |
| Subject: | [Chat #161] |

Thanks for the talk tonight. Rich and Lee need to be acutely aware that the introduction of the Basquiats to the world and the subsequent sale of the works coins not happen without the entire thing on your back, my back and all the costs being Norge back of the OMA. We are one the same page my friend. Thank you. Same goes for the Pollock. What did ██████████████ do to further this. Nothing but you did I did and the OMA did. They have not lifted a finger. Thus if a sale by our efforts. They need to share. Simple as that. Thanks.

-----METADATA INFORMATION-----
**Device Owner:**
████████████ Aaron DeGroft
**ICCID:**
89148000006400175681

# EXHIBIT 39

From:         Aaron De Groft[aaron.degroft@ ████████]

Sent:         Fri 7/2/2021 11:02:07 PM (UTC-04:00)

To:           ████████████████████ ; ████

Subject:      I cannot wait to tell you both about how a guy called me today from Palm Beach.

And told me our Basquiats are fakes. I crushed him...he cried proverbially.

Have a great 4th!  We are going to Sarasota.

Get Outlook for iOS

# EXHIBIT 40

| | |
|---|---|
| **From:** | Aaron De Groft[aaron.degroft@ ███████] |
| **Sent:** | Fri 7/2/2021 10:35:26 PM (UTC-04:00) |
| **To:** | Aaron H. DeGroft[adegroft@ ███████]; Rich LiPuma[rich@ ███████] |
| **Cc:** | ███████████████ |
| **Subject:** | Re: Basquiat Mumford Collection |

Just so you know, we have made so many discoveries that the works are the best of his career. You will come to understand why because of my efforts. Your works are worth double. Do not give that up. I will show you why. In our exhibition and catalogue. I am deadly serious. We can talk about this. Not just my bravado. Real. This was the last time he painted for himself. Afterwards he was owned by everyone. Your provenance is iron rock solid.

Aaron H. De Groft, PH.D.
Director & CEO
Orlando Museum of Art
██████████████

Sent from my iPhone

> On Jul 2, 2021, at 4:21 PM, Aaron H. DeGroft <adegroft@ ███████ > wrote:
>
>
> Thanks so much Rich!  Have a great 4th!



**From:** Richard LiPuma <rich@ ███████ >
**Sent:** Friday, July 2, 2021 1:47 PM
**To:** Aaron H. DeGroft <adegroft@ ███████ >; Aaron De Groft
<aaron.degroft@ ███████ >
**Subject:** Basquiat Mumford Collection

I'm attaching parts of our Collection Information.that you might not have seen yet ...
I also have hi-res photos and some documents that Pierce probably shared with you
already. Let me know if you need anything else.

R



Crozier Prof Service Agmt.pdf
Crozier Storage Agmt.pdf
D Cortez Opinion of Authenticity.pdf
Provenance Memorandum.pdf

--

Richard LiPuma
LiPuma Law Associates, LLC
1635 Foxtrail Drive
Loveland, CO 80538

rich@

This message and its contents are confidential. If you received this message in error, do
not use or rely upon it. Instead, please inform the sender and then delete it. Thank you.

# EXHIBIT 41

**From:** ████████████ [/O=EXCHANGELABS/OU=EXCHANGE
ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=431D5128817D476C881723109E
467F45-████████]

**Sent:** Mon 7/19/2021 2:34:54 PM (UTC-04:00)

**To:** ████████████: Aaron H. DeGroft[adegroft@███████]

**Subject:** RE: FBI Inquiry re Collection (Basquiat)

Also this came up in the news section of the FBI Art Theft/Crimes webpage, not sure it's connected to our pieces in particular but the article is dated July 9, 2021 so it's very recent:



O R L
A N D
O M °A

ASSOCIATE CURATOR
ORLANDO MUSEUM°ART

2416 N. Mills Ave.
Orlando, FL 32803

**FOLLOW US:** Facebook | Twitter | Instagram

**From:** ████████████
**Sent:** Monday, July 19, 2021 2:03 PM
**To:** Aaron H. DeGroft <adegroft@█████
**Cc:** ████████████
**Subject:** FW: FBI Inquiry re Collection (Basquiat)

Aaron, here is a Miami Herald article with a quote by FBI agent ████ Seems like he is real.

O R L
A N D
O M °A

CHIEF CURATOR
ORLANDO MUSEUM°ART

2416 N. Mills Ave.
Orlando, FL 32803

**LEARN WHAT'S NEW AT THE ORLANDO MUSEUM OF ART:** *Subscribe to our newsletter »*
**EMPOWER YOUR COMMUNITY. YOUR DONATION RECEIVES A 15% MATCH:** *United Arts of Central Florida's Collaborative Campaign »*

**FEATURED EXHIBITIONS:**
*A Boundless Drop to a Boundless Ocean »* on view through 5.2.21
*Louis Dewis: An Artist's Life in France »* on view through 5.2.2021
*Voices & Conversations: Expressions of Individuality and Community »* on view through 5.2.2021
*American Journey: Two Centuries of Art and Culture »* on view through 6.30.21

**UPCOMING EXHIBITION:**

*Florida Prize in Contemporary Art 2021* » on view 6.4.21 through 8.22.21

**FOLLOW US:** Facebook | Twitter | Instagram

---

**From:** ▮▮▮▮▮▮▮
**Sent:** Monday, July 19, 2021 11:14 AM
**To:** Aaron H. DeGroft <adegroft@▮▮▮▮▮▮;  ▮▮▮▮▮▮▮▮
**Subject:** FBI Inquiry re Collection (Basquiat)

Dear Mr. De Groft and ▮▮▮▮▮:
I tried to call up to the museum but see it's closed today.
I'm on the FBI's Art Crime Team and we were alerted to a potential issue with respect to an upcoming collection to be exhibited - "Heroes and Monsters: Jean-Michel Basquiat Venice Collection" for 9/24/2021. Would you please reach back at your earliest convenience? I request you maintain my inquiry in confidence and not relay it to the owner/consignor(s).
I thank you and best regards,

▮▮▮▮▮▮▮▮

**Federal Bureau of Investigation (FBI)**

▮▮▮▮▮▮▮▮▮▮

**FBI MIAMI FIELD DIVISION**
**2030 SW 145ᵗʰ Ave.**
**Miramar, FL 33027**
**USA**

▮▮▮▮▮▮

**WARNING:** Please note this constitutes an Agreement between the Sender and Recipient whereby the Recipient consents and agrees to abide by the prohibitions specified below. The Recipient must contact the Sender immediately if he/she does not agree to the Agreement and the prohibitions expressed herein; the Recipient's silence shall be interpreted as acceptance of the Agreement and to acknowledge and agree to the prohibitions. The content of this email is confidential and to be used solely to further its aims and objectives. Emails are discoverable and permanently archived when non-transitory and/or determined to be records. Further, under Florida law, Email addresses are public records; any Email sent to the recipient or sender of this communication may be subject to release in response to a request for public records, except as excluded by F.S. 119.071, 1002.00(3)(d) or any other law of the State of Florida, or excluded under the Department of Justice "Touhy" regulation (Law Enforcement/Investigatory File privileges). Emails may fall under the protection of the Electronic Communications Privacy Act, 18 USC Sections 2510, 2511, and 2521. The information contained in this Email is confidential and may be privileged. Your activity in the use and/or dissemination of the content herein may be subject to review for obstructing an ongoing investigation with potential adverse civil or criminal consequence. The recipient of this Email affirms it is intended for the named addressee(s) and agrees that the contents may not be disclosed to anyone without the sender's written consent and is prohibited otherwise. Any action, including retransmission, dissemination, publication wherever, or other use or activity, in reliance upon the content of this Email by the recipient(s) is prohibited and must be affirmatively consented to in writing by the sender. Any action, including retransmission, dissemination, publication wherever, or other use or activity, in reliance upon the content of this Email by any persons or entities other than the intended recipient(s) is prohibited. Statements and opinions expressed in this Email may not represent those of the government. The recipient of this Email consents to, affirms, and agrees to abide by the prohibitions expressed in the provisions included herein. If a provision or portion of a provision of this Agreement becomes invalid, unenforceable, or illegal, in any jurisdiction, that shall not affect the validity or enforceability in that or other jurisdiction of any other provision or portion of a provision in this Agreement. If you received this in error, please contact the sender immediately and delete the Email and attachments from any computer.

# EXHIBIT 42

| From: | Aaron H. DeGroft [/O=EXCHANGELABS/OU=EXCHANGE  ADMINISTRATIVE  GROUP |
| | (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=33CBAE2830B34D6DBFC8B696F7EDD140-AARON  H. DE] |
| Sent: | 7/19/2021 2:54:41 PM |
| To: | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| Subject: | RE: FBI Inquiry re Collection (Basquiat) |

Just talked to him.  We marshal on.



ORLAND OMA°

AARON H. De GROFT, PH.D.

DIRECTOR & CEO

ORLANDO MUSEUM°ART

2416 N. Mills Ave.
Orlando, FL 32803

From: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Sent: Monday, July 19, 2021 2:46 PM
To: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Aaron H. DeGroft <adegroft@▮▮▮▮▮▮▮
Subject: RE: FBI Inquiry re Collection (Basquiat)

▮▮▮▮▮▮▮▮▮ gave a paper on Trends in Art Crime at the 2020 Art Law Conference of the Federal Bar Association:
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Here is his bio:

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



O R L
A N D
O M °A

ASSOCIATE CURATOR

ORLANDO MUSEUM°ART

2416 N. Mills Ave.
Orlando, FL 32803

**FOLLOW US:** Facebook | Twitter | Instagram

---

**From:** ▮▮▮▮▮▮
**Sent:** Monday, July 19, 2021 2:03 PM
**To:** Aaron H. DeGroft <adegroft@▮▮▮▮
**Cc:** ▮▮▮▮▮▮
**Subject:** FW: FBI Inquiry re Collection (Basquiat)

Aaron, here is a Miami Herald article with a quote by FBI agent ▮▮▮ Seems like he is real.



O R L
A N D
O M °A

CHIEF CURATOR

ORLANDO MUSEUM°ART

2416 N. Mills Ave.
Orlando, FL 32803

**LEARN WHAT'S NEW AT THE ORLANDO MUSEUM OF ART:** *Subscribe to our newsletter »*
**EMPOWER YOUR COMMUNITY. YOUR DONATION RECEIVES A 15% MATCH:** *United Arts of Central Florida's Collaborative Campaign »*

**FEATURED EXHIBITIONS:**
*A Boundless Drop to a Boundless Ocean »* on view through 5.2.21
*Louis Dewis: An Artist's Life in France »* on view through 5.2.2021
*Voices & Conversations: Expressions of Individuality and Community »* on view through 5.2.2021
*American Journey: Two Centuries of Art and Culture »* on view through 6.30.21

**UPCOMING EXHIBITION:**

*Florida Prize in Contemporary Art 2021 »* on view 6.4.21 through 8.22.21

**FOLLOW US:** Facebook | Twitter | Instagram

---

**From:** ▮▮▮▮▮▮
**Sent:** Monday, July 19, 2021 11:14 AM
**To:** Aaron H. DeGroft <adegroft@▮▮▮▮▮; ▮▮▮▮▮▮
**Subject:** FBI Inquiry re Collection (Basquiat)

Dear Mr. De Groft and ▮▮▮▮
I tried to call up to the museum but see it's closed today.
I'm on the FBI's Art Crime Team and we were alerted to a potential issue with respect to an upcoming collection to be exhibited - "Heroes and Monsters: Jean-Michel Basquiat Venice Collection" for 9/24/2021. Would you please reach back at your earliest convenience? I request you maintain my inquiry in confidence and not relay it to the owner/consignor(s).

I thank you and best regards,



Federal Bureau of Investigation (FBI)

FBI MIAMI FIELD DIVISION

2030 SW 145ᵗʰ Ave.

Miramar, FL 33027

USA

WARNING: Please note this constitutes an Agreement between the Sender and Recipient whereby the Recipient consents and agrees to abide by the
prohibitions specified below. The Recipient must contact the Sender immediately if he/she does not agree to the Agreement and the prohibitions
expressed herein; the Recipient's silence shall be interpreted as acceptance of the Agreement and to acknowledge and agree to the prohibitions. The
content of this email is confidential and to be used solely to further its aims and objectives. Emails are discoverable and permanently archived when non-
transitory and/or determined to be records. Further, under Florida law, Email addresses are public records; any Email sent to the recipient or sender of
this communication may be subject to release in response to a request for public records, except as excluded by F.S. 119.071, 1002.00(3)(d) or any other
law of the State of Florida, or excluded under the Department of Justice "Touhy" regulation (Law Enforcement/Investigatory File privileges). Emails may
fall under the protection of the Electronic Communications Privacy Act, 18 USC Sections 2510, 2511, and 2521. The information contained in this Email is
confidential and may be privileged. Your activity in the use and/or dissemination of the content herein may be subject to review for obstructing an
ongoing investigation with potential adverse civil or criminal consequence. The recipient of this Email affirms it is intended for the named addressee(s)
and agrees that the contents may not be disclosed to anyone without the sender's written consent and is prohibited otherwise. Any action, including
retransmission, dissemination, publication wherever, or other use or activity, in reliance upon the content of this Email by the recipient(s) is prohibited
and must be affirmatively consented to in writing by the sender. Any action, including retransmission, dissemination, publication wherever, or other use
or activity, in reliance upon the content of this Email by any persons or entities other than the intended recipient(s) is prohibited. Statements and
opinions expressed in this Email may not represent those of the government. The recipient of this Email consents to, affirms, and agrees to abide by the
prohibitions expressed in the provisions included herein. If a provision or portion of a provision of this Agreement becomes invalid, unenforceable, or
illegal, in any jurisdiction, that shall not affect the validity or enforceability in that or other jurisdiction of any other provision or portion of a provision in
this Agreement. If you received this in error, please contact the sender immediately and delete the Email and attachments from any computer.

# EXHIBIT 43

| From: | Aaron De Groft ███████████ |
|---|---|
| Sent: | 7/27/2021 8:37:12 PM |
| To: | ███████████ [Pierce O'Donnell] [/] |
| Subject: | [Chat #190] |

I just received a federal subpoena. Need to talk ASAP.


**-----METADATA INFORMATION-----**

**Device Owner:**

████████████ Aaron DeGroft

**ICCID:**

89148000006400175681

# EXHIBIT 44

| From: | Pierce O'Donnell ███████████ |
| Sent: | Wed 7/28/2021 12:17:48 AM (UTC-04:00) |
| To: | "aaron.degroft@ ████████ [Aaron De Groft (owner)]" |
| Subject: | [Chat #191] |

We will get through this TOGETHER!!!

-----METADATA INFORMATION-----
**Device Owner:**
███████████ Aaron DeGroft
**ICCID:**
89148000006400175681

# EXHIBIT 45

| From: | Pierce O'Donnell ███████ |
|---|---|
| Sent: | 7/29/2021 1:30:20 AM |
| To: | "aaron.degroft@███████ [Aaron De Groft (owner)]" [/] |
| Subject: | [Chat #197] |

Aaron I have some gestating ideas how we can profitably use the extra time to make YOUR revelation of the 25 lost masterpieces even more of a sensation and put you and OMA in the stratosphere.

-----METADATA INFORMATION-----

**Device Owner:**

████████ Aaron DeGroft

**ICCID:**

89148000006400175681

# EXHIBIT 46

| From: | Pierce O'Donnell ███████████ |
| Sent: | 7/29/2021 2:06:56 AM |
| To: | "aaron.degroft@███████████ [Aaron De Groft (owner)]" [/] |
| Subject: | [Chat #199] |

For example, more time allows to find major corporate, institutional and individual sponsors. A book deal with Rizzoli or Abrams or Phaidon etc. A blockbuster video narrated by you about the Mumford Collection to be run on your website, YouTube, social media etc. any other ideas that make the works and OMA untouchable and celebrated.

-----METADATA INFORMATION-----
**Device Owner:**
███████████ Aaron DeGroft
**ICCID:**
89148000006400175681

# EXHIBIT 47

| From: | Aaron De Groft[aaron.degroft@ ████████ |
| Sent: | Wed 8/4/2021 10:27:29 PM (UTC-04:00) |
| To: | ████████ [Pierce O'Donnell] |
| Subject: | [Chat #204] |

No updates. We are moving forward and all good. I talked to Dunn extensively and his essay is a going to be 100 times better than we envisioned. His new deadline is mid September. I am going to bed early. Talk tomorrow. We are going to review three volume Basquiat catalogue on inter library loan tomorrow at the UCF library that we have to view onsite. . Our Due diligence. They will not let us take it home. No worries. Out Board Exec committee is approving our legal expenditures. LA folks will not discuss with our legal team the details of their inquiry at this time. Not bad news, just is what it is for now. Say they will in the future after document dump. That is about it. Half my kids gone back home. Other half goes tomorrow.

-----METADATA INFORMATION-----
**Device Owner:**
████████ Aaron DeGroft
**ICCID:**
89148000006400175681

# EXHIBIT 48

| From: | Aaron H. DeGroft[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=33CBAE2830B34D6DBFC8B696F 7EDD140-AARON H. DE] |
|---|---|
| Sent: | Wed 11/3/2021 5:11:27 PM (UTC-04:00) |
| To: | Pierce O'Donnell[podonnell@ ███████████] |
| Subject: | Fwd: Basquiat - Michael Barzman Label Images |

FYI.

Get Outlook for iOS

---

**From:** Aaron H. DeGroft <adegroft@ ████████>
**Sent:** Wednesday, November 3, 2021 5:11:05 PM
**To:** ████████████████
**Cc:** ███████████████; ███████████████████
**Subject:** Re: Basquiat - Michael Barzman Label Images

Given the purple paint has a sharp edge, it looks the colored piece is adhered to the back.

Get Outlook for iOS

---

**From:** ██████████████████
**Sent:** Wednesday, November 3, 2021 5:06:37 PM
**To:** Aaron H. DeGroft <adegroft@ ████████>
**Cc:** ████████████████████████
**Subject:** Basquiat - Michael Barzman Label Images

Hi Aaron,

I've attached the images we spoke about earlier today of the Michael Barzman shipping label on the back of the Basquiat piece, *Cat & Fire Truck*, for your review and records.

It looks to me like the label was adhered to the box underneath the paint on the back of the work, however I'm not qualified to make that official assessment.

All the best,

████████



**FOLLOW US:** Facebook | Twitter | Instagram | OMA Website

# EXHIBIT 49

| | |
|---|---|
| **From:** | O'Donnell, Pierce[podonnell@ ▮▮▮▮▮ ] |
| **Sent:** | Thur 10/7/2021 11:10:54 PM (UTC-04:00) |
| **To:** | Aaron H. DeGroft[adegroft@ ▮▮▮▮ ] |
| **Subject:** | Re: Basquiats in the Museum safely |

😎😎😎😎😎😎
Hooray!!!!!!

Sent from my iPhone

Pierce O'Donnell
Attorney at Law
Biography
▮▮▮▮▮

podonnell@ ▮▮▮▮▮

Greenberg Glusker LLP
2049 Century Park East, Suite 2600
Los Angeles, CA 90067
GreenbergGlusker.com

This message is intended solely for the use of the addressee(s) and is intended to be privileged and confidential within the attorney client privilege. If you have received this message in error, please immediately notify the sender at Greenberg Glusker and delete all copies of this email message along with all attachments. Thank you.

On Oct 7, 2021, at 1:59 PM, Aaron H. DeGroft <adegroft@ ▮▮▮▮ wrote:

They arrived in the crates and are acclimate in storage until Monday morning when we will uncrate them for the high res photography.

We documented their arrival on photos and in video.

Thanks so much! What a great opportunity for us all. Once the fingerprints are verified, FBI game over.

Get Outlook for iOS

# EXHIBIT 50

| | |
|---|---|
| **From:** | O'Donnell, Pierce[podonnell@ ▮▮▮▮▮] |
| **Sent:** | Mon 11/1/2021 11:25:41 PM (UTC-04:00) |
| **To:** | Aaron H. DeGroft[adegroft@ ▮▮▮▮] |
| **Subject:** | Letter re Fingerprints |
| **Attachment:** | Dear Aaron re FBI.docx |

Dear Aaron:

Please find enclosed my communication concerning analysis of the fingerprints.  Thank you.

Pierce

**Pierce O'Donnell**
Attorney at Law
Biography

podonnell@ ▮▮▮▮

**Greenberg Glusker LLP**
2049 Century Park East, Suite 2600
Los Angeles, CA 90067
**GreenbergGlusker.com**
This message is intended solely for the use of the addressee(s) and is intended to be privileged and confidential within the attorney client privilege. If you have received this message in error, please immediately notify the sender at Greenberg Glusker and delete all copies of this email message along with all attachments. Thank you.

Dear Aaron:

I want to thank you for the update on the activities relating to the Basquiat exhibition. I am impressed with all the efforts by your talented staff and you to make this a truly exceptional debut for these 25 works. As I have said many times, please never hesitate to let me know how I can help you.

There is one thing, however, that troubles me and I am sure will trouble Rich Lipuma who manages the other 19 Basquiat paintings. When I first spoke with you in the spring, I told you that we found some fingerprints on the verso of some of the paintings. I also told you that the resolution of the photos was not high enough for making a comparison with known fingerprints.

We agreed that when you had your top art photographer take his high-resolution photographs for the catalogue and marketing, particular attention would be paid to the fingerprints and any palmprints. You had this done, and we can see that you captured some fingerprints in the paint on the front and verso and at least one palmprint. You told me that the next step would be for the museum to engage a top forensic fingerprint expert to determine if a match could be made with Basquiat's known fingerprints. We expressly authorized the museum to do so.

Tonight, when I asked you the status of that project, you informed the museum was considering contacting the FBI about the museum doing this analysis and perhaps asking the FBI if it would do the analysis for the museum. I am writing to express my strong opposition to any such move.

First, as a trial lawyer for 45 years who has dealt with federal law enforcement (including the FBI), I firmly believe that reaching out to the FBI at this point for *any* reason is ill advised. It is now over a month or more they have had whatever massive amount of information that you gave them. They have not come back. In the vernacular, that sleeping dog should not be disturbed. I am aware of numerous instances where the FBI has come in with guns blazing, they got the evidence that they requested, and they never came back. Hopefully and righteously, your case is one of them. There is no good that can come from contacting them.

Second, informing the FBI in advance that you are going to do this analysis (or are thinking of doing it) is also ill advised. You never do something like this until you know the answer. As we discussed, a positive match may be something that you decide to share with the FBI, *but only if and when you get it*. If the analysis comes back negative or inconclusive, that is really not a matter of material consequence vis a vis the paintings' authenticity, but it could raise concerns with the FBI after it has decided to move on. It is rare that fingerprints are good enough to even try to make a match. Fortunately in the case of these paintings, all the evidence supports not just authenticity but the fact that these are masterpieces.

Third, as owners of the paintings, we do not authorize providing the prints from our paintings to the FBI for it to do its own analysis for the reasons stated above. We have authorized the museum to provide the prints to any private consultant(s) of its choice, and we are eager to see the results.

I would be pleased to discuss this with the museum's lawyers.  I can be reached at
███████████.  Thank you.

Pierce

7514114_00056161

# EXHIBIT 51

| | |
|---|---|
| **From:** | Aaron H. DeGroft[/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=33cbae2830b34d6dbfc8b696f7edd140-Aaron H. De] |
| **Sent:** | Mon 11/1/2021 11:29:31 PM (UTC-04:00) |
| **To:** | O'Donnell, Pierce[podonnell@ ███████████] |
| **Subject:** | Re: Letter re Fingerprints |

I understand the position to not get into the weeds.

Get Outlook for iOS

---

**From:** Aaron H. DeGroft <adegroft@ ████████>
**Sent:** Monday, November 1, 2021 11:28:55 PM
**To:** O'Donnell, Pierce <podonnell@ ████████>
**Subject:** Re: Letter re Fingerprints

Just for clarification and the record, I and neither the museum wanted to reach out to the fbi to ask about the fingerprints analysis. This was suggested by the lawyers. I was against. It. A small thing but important.

Get Outlook for iOS

---

**From:** O'Donnell, Pierce <podonnell@ ████████>
**Sent:** Monday, November 1, 2021 11:25:41 PM
**To:** Aaron H. DeGroft <adegroft@ ████████>
**Subject:** Letter re Fingerprints

Dear Aaron:

Please find enclosed my communication concerning analysis of the fingerprints.  Thank you.

Pierce

Pierce O'Donnell
Attorney at Law
Biography
████████████
podonnell@ ████████

Greenberg Glusker LLP
2049 Century Park East, Suite 2600
Los Angeles, CA  90067
GreenbergGlusker.com
This message is intended solely for the use of the addressee(s) and is intended to be privileged and confidential

within the attorney client privilege. If you have received this message in error, please immediately notify the sender at Greenberg Glusker and delete all copies of this email message along with all attachments. Thank you.

# EXHIBIT 52

| From: | Aaron H. DeGroft[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=33CBAE2830B34D6DBFC8B696F 7EDD140-AARON H. DE] |
|---|---|
| Sent: | Tue 11/2/2021 12:16:07 PM (UTC-04:00) |
| To: | Richard LiPuma[rich@████████]; Aaron De Groft[aaron.degroft@████████]; ████████ |
| Subject: | RE: Basquiat - Fingerprints |

Rich,

To be clear I am not sending the prints to the FBI. The issue that was raised by my Board Chair was to call our lawyers to get their advice on how we should handle the fingerprint analysis. In my mind
It was already figured out. I reached out and spoke to the three very experienced and Federal Court qualified to testify, analysts. We have about seven or eight prints from the works and we have to
Sources for Basquiats fingerprints all ready to go. The lawyers suggested to our Board Chair that they call the authorities to let them know that we were going to have the fingerprints analysed.

I very disagreed with this and want to get the analysis done and when the results came back that they are Basquiat's, we then notify them as such. My Board Chair disagreed with me on that.

The fingerprints are you property and I would not release them with out asking you and Pierce.

Best wishes,

Aaron



ORL
AND
OM °A

AARON H. De GROFT, PH.D.
DIRECTOR & CEO
ORLANDO MUSEUM*ART

2416 N. Mills Ave.
Orlando, FL 32803

From: Richard LiPuma <rich@████████

**Sent:** Tuesday, November 2, 2021 10:53 AM
**To:** Aaron H. DeGroft <adegroft@           ; Aaron De Groft <aaron.degroft@              ;

**Subject:** Basquiat - Fingerprints

Aaron: Pierce advised me that your lawyers are considering sending scans of fingerprints to the FBI, and he opposes this. I tend to agree with him, but I need to understand the issues a little better. When we spoke, I understood that you would have the fingerprints analyzed by an independent qualified expert. Was that done? If so, what were the results?

Please advise me about the reasoning behind the advice to share fingerprints with the FBI. I would prefer to know ahead of time whether they matched Basquiat's known prints. Let's discuss at your convenience. Feel free to call on my cell -              . (FYI I have appointments at 9, 10:30, and 3:30, but if I don't pick up, leave a message and I'll get back to you ASAP.  Thanks.

Rich

--
Richard LiPuma
LiPuma Law Associates, LLC
1635 Foxtrail Drive
Loveland, CO 80538

rich@

This message and its contents are confidential. If you received this message in error, do not use or rely upon it. Instead, please inform the sender and then delete it. Thank you.

# EXHIBIT 53

| | |
|---|---|
| **From:** | ███████████████████ |
| **Sent:** | Thu 12/23/2021 1:14:29 PM (UTC-05:00) |
| **To:** | ███████████████ |
| **Subject:** | Basquiat exhibition |
| **Attachment:** | event-featured-OMAorlando-1626728403.jpeg |
| **Attachment:** | f5dd1cb2-1379-f46f-ca75-742956047da3.png |

Dear ██████,

I recently saw the press for a forthcoming Basquiat exhibition at Orlando Museum.
The two images being shared publicly so far seem like fake Basquiats.

wanted to ask you if you actually had these works seen by a professional
or by the Basquiat Estate?

I used to be an advisor and worked with Emanuel Javogue who owned and organized
various Basquiat exhibitions in the 1990s and early 2000s. I could tell which works
where fake and which where real. These works attached do not look like "real'
Basquiats. They look like copies based on "Skull" (1982) and the other is a composite
of various works. Basquiat never painted hands the way it is being shown here.


Just concerned about those works by the late Thaddeus Mumford Jr.

sincerely

████████████

# EXHIBIT 54

From: ██████████ /O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=9DC86B886BC843A0AB3F8D166E5CDEA0-
██████████

Sent: Tue 12/28/2021 11:35:25 PM (UTC-05:00)

To: Aaron H. DeGroft[adegroft@██████

Subject: RE: Basquiat exhibition

Aaron,

I am all in. If there is no proof their bad, their good.

I was reading Pierce's narrative again today. My impression is the less said the better. His voluminous details in many places just raise questions. We should keep the story simple. As in your previous outline of key points.

██████

O R L    ██████████████████
            CHIEF CURATOR
A N D    ORLANDO MUSEUM°ART
O M °A   2406 N. Mills Ave.     ██████████
            Orlando, FL 32803

**LEARN WHAT'S NEW AT THE ORLANDO MUSEUM OF ART:** _Subscribe to our newsletter »_

**FOLLOW US:** Facebook | Twitter | Instagram

From: Aaron H. DeGroft <adegroft@████████
Sent: Tuesday, December 28, 2021 8:22 PM
To: ████████
Subject: Re: Basquiat exhibition

We got it covered in spades. You will come to know me ████████. I do not lose. It is not an option. How I lead my love for right or wrong. I try to make these arguments that are hermetic to me. I take a lot of risks and always have but with hedged bets that I know are right. Fortune favors the bold and the brave. I remember someone wise and sage told me that my previous board did not not how far out on the limb I would go. I answered that I never felt vulnerable because I always had plan B. I am the luckiest person I know. Hope it does not all blow up. Need your help. You are stuck with me.

Get Outlook for iOS

From: Aaron H. DeGroft <adegroft@████████
Sent: Tuesday, December 28, 2021 7:58:01 PM
To: ████████
Subject: Re: Basquiat exhibition

Bingo! You are the quiet smart one of us.

Get Outlook for iOS

From: ████████
Sent: Tuesday, December 28, 2021 7:57:03 PM
To: Aaron H. DeGroft <adegroft@████████
Subject: RE: Basquiat exhibition

Aaron,

I thanked ▬▬▬▬ for sharing his thoughts. I do not think we need to take it any further. His concern is only for the museum's interest and we have it covered.

▬▬▬▬



CHIEF CURATOR
ORLANDO MUSEUM'ART

2416 N. Mills Ave.
Orlando, FL 32803    ▬▬▬▬

**LEARN WHAT'S NEW AT THE ORLANDO MUSEUM OF ART:** *Subscribe to our newsletter »*

**FOLLOW US:** Facebook | Twitter | Instagram

**From:** Aaron H. DeGroft <adegroft@▬▬▬
**Sent:** Tuesday, December 28, 2021 7:33 PM
**To:** ▬▬▬▬
**Subject:** Re: Basquiat exhibition

Sorry for the typos. Typing furiously on my phone.

Get Outlook for iOS

**From:** Aaron H. DeGroft <adegroft@▬▬▬
**Sent:** Tuesday, December 28, 2021 7:30:17 PM
**To:** ▬▬▬▬
**Subject:** Re: Basquiat exhibition

▬▬▬▬,

Thanks. We knew this was going to happen. No worries. We have mounds of evidence that they are right most of all Diego Cortez who authenticated all of the in person and in writing. He was of course the head of the Basquiat estate authentication committee. We have ▬▬▬▬ from the Zguggenheim and Jordan's Sagasee the foremost Basquiat scholar in America. We have the provenance, the poem and two interviews with Mumford. Besides the hands he refers to are not painted as he states but illustrated in marked. He make a weak and lane argument about skulls especially referring to the $110 million mega monster on canvas. Let's talk and we together can form a short and to the point response. I would say this person really knows nothing about Basquiat but wants to feel important. I have heard all the dilettante naysayers about my Titian and crushed them all with facts as we will do here.

I hope you and your family had a Merry Christmas and will have a Happy Nee Year. Museum was bustling last week and we killed it in the store.

Expect more of the naysayers. They think it is easy. It is not. You have seen the works with your eyes. Even though they are early. How do you feel about them? Honestly? They have too much encoded stuff that virtually no one has written about the hobo code is one. Only one person besides us and we made the connection with the Dreyfus symbols book which Basquiat actually owned. Damn.

Thanks for sharing this with me. No worries.

Get Outlook for iOS

From: █████████████████████
Sent: Tuesday, December 28, 2021 11:57:14 AM
To: Aaron H. DeGroft <adegroft@████████
Subject: FW: Basquiat exhibition

Aaron, I am forwarding this note to you alone and will not share it, just so you have it if there is any further comments from this source. ████████ is an artist based in Miami and New York, past Florida Prize winner and apparently has some history working with Basquiat paintings.

████████

O R L    ████████████
A N D    CHIEF CURATOR
         ORLANDO MUSEUM°ART
O M °A   2416 N. Mills Ave.
         Orlando, FL 32803    ████████████

LEARN WHAT'S NEW AT THE ORLANDO MUSEUM OF ART: *Subscribe to our newsletter »*

FOLLOW US: Facebook | Twitter | Instagram

From: ███████████████████████    On Behalf Of ███████████
Sent: Thursday, December 23, 2021 1:14 PM
To: ████████████████████
Subject: Basquiat exhibition

Dear ████████,

I recently saw the press for a forthcoming Basquiat exhibition at Orlando Museum. The two images being shared publicly so far seem like fake Basquiats.

wanted to ask you if you actually had these works seen by a professional or by the Basquiat Estate?

I used to be an advisor and worked with Emanuel Javogue who owned and organized various Basquiat exhibitions in the 1990s and early 2000s. I could tell which works where fake and which where real. These works attached do not look like "real' Basquiats. They look like copies based on "Skull" (1982) and the other is a composite of various works. Basquiat never painted hands the way it is being shown here.

Just concerned about those works by the late Thaddeus Mumford Jr.

sincerely

████████████

# EXHIBIT 55

| From: | Aaron H. DeGroft[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=33CBAE2830B34D6DBFC8B696F 7EDD140-AARON H. DE] |
|---|---|
| Sent: | Thur 12/9/2021 7:25:46 PM (UTC-05:00) |
| To: | ███████████████████████████ ; ███████ |
| Subject: | Talking to Basquiat owners tonight. I would like to give them a bulleted marketing plan. |

Let's talk tomorrow. Considerate a cheerleading plan. They are asking about it especially if the works may go to Abu Dabai. Thanks!  Just got off the phone with them.

Get Outlook for iOS

# EXHIBIT 56

| From: | O'Donnell, Pierce[podonnell@ ⬛⬛⬛⬛] |
|---|---|
| Sent: | Mon 2/14/2022 2:22:05 PM (UTC-05:00) |
| To: | Aaron H. DeGroft[adegroft@ ⬛⬛⬛] |
| Subject: | Fwd: Basquiats |
| Attachment: | Ex 2 Barzman Transer of Ownership.pdf |

I put this issue to rest.

Pierce O'Donnell
Attorney at Law
Biography

podonnell@

Greenberg Glusker LLP
2049 Century Park East, Suite 2600
Los Angeles, CA  90067
GreenbergGlusker.com
This message is intended solely for the use of the addressee(s) and is intended to be privileged and confidential within the attorney client privilege. If you have received this message in error, please immediately notify the sender at Greenberg Glusker and delete all copies of this email message along with all attachments. Thank you.

Begin forwarded message:

**From:** Pierce O'Donnell <podonnell@ ⬛⬛⬛⬛>
**Subject: Basquiats**
**Date:** February 14, 2022 at 11:21:24 AM PST
**To:** Brett Sokol ⬛⬛⬛
**Cc:** Lee Mangan <lmangan227@ ⬛⬛⬛>, Richard LiPuma <rich@ ⬛⬛⬛>

Brett

The text below is from Rich LiPuma who is the attorney for and manager of the MJL Family Trust, LLC which owns the 19 paintings.  Lee Mangan bought the paintings from Barzman through his company Art Possible, LLC and later transferred them to the trust as noted below by Rich.

As for FedEx, there is no logo on the back of Crown Face II—just text. So, the issue is when was "FedEx" used by the company.  The excerpt below from Wikipedia shows what Lee was told when he investigated this issue.  This nickname " edEx" was used long before the official corporate name change.  Given this fact, the documentary proof that the painting was among those purchased by Barzman from the Mumford storage locker at Oriz. Bros, and the preposterous notion that a forger would try to fool experts 25 times using cardboard and not paint only a couple of large (and far more valuable) canvases

and then somehow slipped them into Mumford's locker, there can be no credible argument that Crown Face II or any of the other paintings are not authentic. The overwhelming evidence is that they are genuine Basquiat works.

Please let me know if you need anything else. Thanks.

Pierce


***

First, I'm attaching the Transfer of Ownership from Barzman to Art Possible (which was solely owned by Lee, then we put the paintings in the MJL Family Trust for estate planning purposes). Second, regarding the FedEx stamp:

1. That was on the painting when it came from Mumford's storage unit.

2. There is no logo at all. The stamp contains only TEXT -- "Align top of **FedEx Shipping Label** here."

3. We contacted FedEx and were told there is NO WAY to verify the date of the stamp because the name FedEx was used for a long period of time.

4. According to Wikipedia: "The name "FedEx" is a syllabic abbreviation of the name of the company's original air division, Federal Express, which was used from 1973 until 2000....In 1994, Federal Express shortened its name to "FedEx" for marketing purposes, *officially adopting a nickname that had been used for years*." (emphasis added)

7514114_00058626

# Transfer of Ownership

May 18, 2012

To:

  Art Possible LLC
  Pompano Beach Florida

From:

  Michael Barzman
  Los Angeles California

Receipt/Transfer of Ownership of 20 Paintings on Cardboard attributed to Jean-Michel Basquiat. Description of Paintings attached.

Provenance:

  Thad Mumford Jr. Beverly Hills California 1983/1984
  Michael Barzman Los Angeles California  5/17/2012
  Art Possible LLC, Pompano Beach Florida 5/18/2012

Michael Barzman
Los Angeles, California

34

7514114_00058627

# EXHIBIT 57

| From: | Aaron H. DeGroft[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=33CBAE2830B34D6DBFC8B696F 7EDD140-AARON H. DE] |
|---|---|
| Sent: | Mon 2/14/2022 5:38:36 PM (UTC-05:00) |
| To: | ████████████ ▪ ████████ ; |
| Subject: | Further to our conversation. |

Evidence has been found and shared that Federal Express was using and referring to itself in the 1970s. NYT writer agreed. Think we are good on that one. Thanks!

Get Outlook for iOS

# EXHIBIT 58

**Sent:**        Tue 2/1/2022 2:01:57 AM (UTC-05:00)

**To:**          ███████████████████

**Subject:**     You want to come to my Basquiat show opening.

New York Times and Forbes here on Wednesday. This is all part of the plan of exhibiting and selling masterpieces. You all could not to do this without me. Face it. If we sell thii or s $100 million I need 30 percent.  I have a high end LA lAwyer who I I worki f with to sell these $200 million BasquiIats and another $200 million Pollock. I can do this ██████  You boys need to o P sun up for my expertise  and access. I know you will do th math. One more dollar than the day before is a good. Let's not get greedy. Let me sell these Basquiats and Pollock and then Titian is up next with a track record. Then I will retire with mazeratis and Ferraris. Fuck the world shenanigans we when you have  money.  Tell the girls. You have to all to have to play well. We are in the galactic atmosphere of Art sales. They snd you boys need to act like it. You are on my d we orld now.

Get Outlook for iOS

# EXHIBIT 59

**From:** ███████████████

**Sent:** Sat 2/5/2022 10:10:47 PM (UTC-05:00)

**To:** ███████████████

**Subject:** WKMG-TV News 6

Hi ████, hope you're well. We're hearing of an FBI investigation into the authenticity of the Basquiat works soon to be on exhibition at the OMA... can you confirm? We're told the FBI visited and removed some of your computers... is that factual? Thanks, ██

██████████████

Anchor / Reporter
WKMG-TV (CBS) News 6 Getting Results!
Orlando, FL





# EXHIBIT 60

| From: | O'Donnell, Pierce[podonnell@ ██████████] |
|---|---|
| Sent: | Mon 2/7/2022 10:49:36 PM (UTC-05:00) |
| To: | Aaron H. DeGroft[adegroft@ ████] |
| Cc: | Lee Mangan[lmangan227@ █████]; Richard LiPuma[rich@ ██████] |
| Subject: | Final version of email to Journalist |
| Attachment: | Introduce yourself as director of OMA.docx |

Per our discussion, here is the final version of the email to send him in the morning. Many thanks.

Pierce O'Donnell
Attorney at Law
Biography
██████████
podonnell@ ██████████

**Greenberg Glusker LLP**
2049 Century Park East, Suite 2600
Los Angeles, CA 90067
GreenbergGlusker.com

This message is intended solely for the use of the addressee(s) and is intended to be privileged and confidential
within the attorney client privilege. If you have received this message in error, please immediately notify the sender at
Greenberg Glusker and delete all copies of this email message along with all attachments. Thank you.

7514114_00058466

Good morning:

I am Aaron De Groft, the Director and Chief Executive Officer of the Orlando Museum of Art.

I am responding to your inquiry about our Jean-Michel Basquiat Exhibition of the Thaddeus Q. Mumford Collection: *Heroes & Monsters*.

As I understand, you had two questions: whether the FBI visited the museum and whether they seized computers.

I can tell you that neither of these things ever happened.

Neither the FBI nor other law enforcement agencies have ever come to the museum. Nor did they take or seize any computers or other items.

These things never happened.

While the FBI has never been to the museum, we will be visited by tens of thousands of guests over the next year. They will come to see our extraordinary, unprecedented collection of 25 never-before-exhibited original paintings by Basquiat. He is now considered one of the greatest American artists. The paintings are among Basquiat's masterpieces.

OMA is proud to be the museum to debut them to the world later this week.

I would like to invite you and your quests to attend our VIP opening on Thursday evening. I would be so pleased if you could attend.

And I want to messenger over to you our beautiful 160-page catalogue with seven articles by distinguished experts, the 25 paintings, and an analysis on each of them. All the experts have examined the paintings and found them to be authentic, exceptional, and among his greatest works. As an art historian, curator, and museum director for 35 years, my own independent due diligence reached the same conclusion—these are all genuine Basquiat creations and one of the greatest art discoveries in recent history. Orlando will be proud to be the city that introduces them to the world—especially during Black History Month.

If you have any more questions, please email me or call me at .

Thank you.

Aaron De Groft, Ph.D
Director and Chief Executive Officer
Orlando Museum of Art

7514114_00058467

# EXHIBIT 61

| | |
|---|---|
| From: | Aaron H. DeGroft[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=33CBAE2830B34D6DBFC8B696F 7EDD140-AARON H. DE] |
| Sent: | Tue 2/8/2022 11:57:55 AM (UTC-05:00) |
| To: | ████████████████████████████████ |
| Cc: | ███████████████████████ |
| Subject: | Orlando Museum of Art |

Good morning:

I am Aaron De Groft, the Director and Chief Executive Officer of the Orlando Museum of Art.

I am responding to your inquiry about our Jean-Michel Basquiat Exhibition of the Thaddeus Q. Mumford Collection: Heroes & Monsters.

As I understand, you had two questions: whether the FBI visited the museum and whether they seized computers.

I can tell you that neither of these things ever happened.

Neither the FBI nor other law enforcement agencies have ever come to the museum. Nor did they take or seize any computers or other items.

These things never happened.

While the FBI has never been to the museum, we will be visited by tens of thousands of guests over the next year. They will come to see our extraordinary, unprecedented collection of 25 never-before-exhibited original paintings by Basquiat. He is now considered one of the greatest American artists. The paintings are among Basquiat's masterpieces.

OMA is proud to be the museum to debut them to the world later this week.

I would like to invite you and your quests to attend our VIP opening on Thursday evening. I would be so pleased if you could attend.

And I want to messenger over to you our beautiful 160-page catalogue with seven articles by distinguished experts, the 25 paintings, and an analysis on each of them. All the experts have examined the paintings and found them to be authentic, exceptional, and among his greatest works. As an art historian, curator, and museum director for 35 years, my own independent due diligence reached the same conclusion—these are all genuine Basquiat creations and one of the greatest art discoveries in recent history. Orlando will be proud to be the city that introduces them to the world—especially during Black History Month.

If you have any more questions, please email me or call me at ████████.
Thank you.

Aaron De Groft, Ph.D.
Director and Chief Executive Officer
Orlando Museum of Art



# EXHIBIT 62

| | |
|---|---|
| **From:** | Aaron H. DeGroft[/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=33cbae2830b34d6dbfc8b696f7edd140-Aaron H. De] |
| **Sent:** | Sat 2/12/2022 4:13:43 AM (UTC-05:00) |
| **To:** | Jordana Moore Saggese ▮▮▮▮▮▮▮ ; podonnell@▮▮▮▮▮▮▮ [podonnell@▮▮▮▮▮▮▮ |
| **Subject:** | Re: Cease and Desist Request |

You want us to put out there you got $60 grand to write this? Ok then. Shut up. You took the money. Stop being holier than thou. You did this not me or anybody else. Think Maryland would like to know? Be quiet now is my best advice. These are real and legit. You know this. You are threatening the wrong people. Do your academic thing and stay in your limited lane.

Get Outlook for iOS

---

**From:** Aaron H. DeGroft <adegroft@▮▮▮▮▮
**Sent:** Saturday, February 12, 2022 3:59:25 AM
**To:** Jordana Moore Saggese ▮▮▮▮▮▮▮ ; podonnell@▮▮▮▮▮▮▮
<podonnell@▮▮▮▮▮
**Subject:** Re: Cease and Desist Request

Jordana,

You are already stuck in oblivion. Trust me. I have been involved with academic fools. Got three decades on you. You are only an obscure footnote. Do not worry about your non existent Basquiat reputation. If you every threaten me again that would be bad. Wake up. Who are you. A nobody. I say this with utmost respect for academics who do not have a clue as to the world. you did not give us. Respect. You have nothing to you do with this. You poked the wrong bear. Learn from this with all your bravado. Seriously who do you think are making demands. A joke. I hope i meet you one day to shake your hand. Do not ever do this again. You are out of your league.

Get Outlook for iOS

---

**From:** Aaron H. DeGroft <adegroft@▮▮▮▮▮
**Sent:** Friday, February 11, 2022 6:35:40 PM
**To:** Jordana Moore Saggese ▮▮▮▮▮▮▮ ; podonnell@▮▮▮▮▮▮▮
<podonnell@▮▮▮▮▮
**Subject:** Re: Cease and Desist Request

Sorry I should have signed this more professionally as you did. Next time address me as Dr. De Groft. I have way more books than you do.

Aaron H. De Groft, PH.D.
Director & CEO

Orlando Museum of Art

Get Outlook for iOS

---

**From:** Aaron H. DeGroft <adegroft@ ████████ >
**Sent:** Friday, February 11, 2022 5:04:17 PM
**To:** Jordana Moore Saggese ████████ ; podonnell@ ████████
<podonnell@ ████████
**Subject:** Re: Cease and Desist Request

---

Dear Dr. Saggesse,,

You already authenticated the works and the only mention of you in our exhibition catalogue is
in an appropriate footnote. Besides, Diego Cortez is on film and in hand written individual letters
authenticating them. We do not need you in this regard.  Thank you for your contribution to the
great body of discovery and understanding of early Basquiat. Besides they are more than real.
The fingerprints you missed have told us that as well as the hobo code used

Best wishes,

Aaron.

Get Outlook for iOS

---

**From:** Jordana Moore Saggese ████████
**Sent:** Friday, February 11, 2022 4:57:42 PM
**To:** podonnell@ ████████ <podonnell@ ████████ ; Aaron H. DeGroft
<adegroft@ ████████
**Subject:** Cease and Desist Request

---

Dear Mr. DeGroft and Mr. O'Donnell,
It has come to my attention that my name has been used in association with the works in your
exhibition at the Orlando Museum of Art. However, as I have stated before I am in no way
authorized to authenticate unknown works by Jean-Michel Basquiat and want no involvement
with this show. I do not want to be further associated with any promotion of these works for
financial gain or otherwise. Any use or continued use of my name in association with these
works will be considered defamatory and I reserve the right to pursue punitive damages if this
continues.

Respectfully,



Jordana Moore Saggese
Associate Professor of American Art
Department of Art History & Archaeology

Phone ▮▮▮▮▮▮▮▮   Email ▮▮▮▮▮▮▮▮▮
Office 4220 Parren J. Mitchell Art-Sociology Building

The Jean-Michel Basquiat Reader: Writings, Interviews, Critical Responses

# EXHIBIT 63

| | |
|---|---|
| **From:** | O'Donnell, Pierce[podonnell@█████████████] |
| **Sent:** | Wed 2/16/2022 7:46:24 PM (UTC-05:00) |
| **To:** | Aaron H. DeGroft[adegroft@███████] |
| **Subject:** | Fwd: FedEx typefaceh |
| **Attachment:** | FedEX.docx |

We are working on this.

**Pierce O'Donnell**
Attorney at Law
Biography

podonnell@████████████

**Greenberg Glusker LLP**
2049 Century Park East, Suite 2600
Los Angeles, CA 90067
GreenbergGlusker.com

This message is intended solely for the use of the addressee(s) and is intended to be privileged and confidential within the attorney client privilege. If you have received this message in error, please immediately notify the sender at Greenberg Glusker and delete all copies of this email message along with all attachments. Thank you.

Begin forwarded message:

**From:** Pierce O'Donnell <podonnell@███████████████>
**Subject: FedEx typefaceh**
**Date:** February 16, 2022 at 4:45:13 PM PST
**To:** Jim Blanco ████████████████
**Cc:** Richard LiPuma <rich@█████████, Lee Mangan
<lmangan227@███████>

Jim
Here is the excerpt from today's NYT article.
I sent you a photo of the imprint on the back the painting (Colorful Face).
My colleague Rich LiPuma is sending you an email about his preliminary
research and examples of the three types of Univers fonts.

We think that Mr. Leader is dead wrong.
First, this is not Univers 67 Bold Condensed typeface
Second, it is probably a Univers font that was in wide usage in the 1960s to 1980s
etc.
Third, we would like to establish that FedEx used different type fonts in the early
1980s, including this one on the back of the painting.

Can you do a brief call with Rich and me tonight?

Many thanks.

"company imprint: 'Align top of FedEx Shipping Label here.' According to an independent brand expert …the typeface was not used by Federal Express before 1994. He should know: that was the year he personally redesigned the company's logos and its typefaces while working as a senior design director at the Landor Associates advertising firm. `It appears to be set in Univers 67 Bold Condensed,' [ ] Leader said of the label's distinctive purple font. In 1982, 'they were not using Univers at that time.' So the piece of cardboard could not have been produced until 12 years after Basquiat supposedly painted it and six years after the artist's death."

"A brand expert who designed the typeface for FedEx said the box could not have been made earlier than 1994."

7514114_00052832

# EXHIBIT 64

# $10,000
# REWARD

## For The First Person
## Finding FedEx Shipping Box
## (Used in the 1970s or 1980s)

### With the imprint as shown below:



Align top of **FedEx Shipping Label** here.

**Toll-Free Call:** 866-965-8814
**Email:** reward@fedexbx.com
www.fedexbx.com

*Reward offer expires on December 31, 2022*

# EXHIBIT 65

| | |
|---|---|
| **From:** | O'Donnell, Pierce[podonnell@ ███████████ |
| **Sent:** | Wed 2/16/2022 2:50:35 PM (UTC-05:00) |
| **To:** | Aaron H. DeGroft[adegroft@ ███████ |
| **Cc:** | Lee Mangan[lmangan227@ ██████; Richard LiPuma[rich@ ██████ |
| **Subject:** | Re: Having fun yet...just out.  Board chair and several others on call with PR specialist right now. |

Hang in there. Typical media feeding frenzy.

No bristling.  There are not only good but masterpieces.

 Any public statement should short and sweet.  "We stand by our decision—after extensive investigation and expert analysis—to exhibit these original works by Jean-Michel Basquiat.  We invite the world to come see them."

> On Feb 16, 2022, at 11:37 AM, Aaron H. DeGroft <adegroft@ █████████  wrote:
>
> https://www.orlandoweekly.com/Blogs/archives/2022/02/16/questions-and-doubt-overshadow-orlando-museum-of-arts-basquiat-show-heroes-and-monsters
>
>
>
> <image001.png>

Pierce O'Donnell
Attorney at Law
Biography
podonnell@ ████████

Greenberg Glusker LLP
2049 Century Park East, Suite 2600
Los Angeles, CA  90067
GreenbergGlusker.com

This message is intended solely for the use of the addressee(s) and is intended to be privileged and confidential within the attorney client privilege. If you have received this message in error, please immediately notify the sender at Greenberg Glusker and delete all copies of this email message along with all attachments. Thank you.

# EXHIBIT 66

| From: | Aaron H. DeGroft[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=33CBAE2830B34D6DBFC8B696F 7EDD140-AARON H. DE] |
|---|---|
| Sent: | Mon 2/21/2022 12:55:03 PM (UTC-05:00) |
| To: | ██████████████████████ █████████████ |
| Attachment: | Ltr. to Sokol.docx |

Given Blancos report I hope whoever spoke to the Times about the FedEx box feels like a naive fool.

We are getting a new story that we will blow up nationally. You can be sure of that.

Get Outlook for iOS

# EXHIBIT 67

| From: | O'Donnell, Pierce[podonnell@ ▓▓▓▓▓▓▓▓▓▓▓ |
|---|---|
| Sent: | Fri 2/25/2022 7:36:55 PM (UTC-05:00) |
| To: | Aaron H. DeGroft[adegroft@ ▓▓ |
| Cc: | Lee Mangan[lmangan227@ ▓▓▓▓▓▓ ; Richard LiPuma[rich@ ▓▓▓▓▓▓▓ ; |
| Subject: | Declaration of Talin Maltepe |
| Attachment: | Declaration of Talin Maltepe [Executed].pdf |

Talin Maltepe is a respected art gallery owner in Toronto who has been involved with Basquiat works. Her attached dynamite declaration recounts that she personally spoke with Mumford via telephone in the spring of 2017, and he confirmed the purchase of the 25 paintings and putting them in his storage locker--precisely what we have been saying for years. Significantly, Talin is available for an interview with the Sentinel before she talks with anyone else. We can arrange it this weekend. The combination of my letter today, my comments to the reporter, your comments, and Talin's blockbuster interview will go a long way to countering the insufferably arrogant NYT. Please pass this email and attachment along to your folks. Thanks.

Pierce O'Donnell
Attorney at Law
Biography

podonnell@ ▓▓▓▓▓▓▓

Greenberg Glusker LLP
2049 Century Park East, Suite 2600
Los Angeles, CA 90067
GreenbergGlusker.com
This message is intended solely for the use of the addressee(s) and is intended to be privileged and confidential within the attorney client privilege. If you have received this message in error, please immediately notify the sender at Greenberg Glusker and delete all copies of this email message along with all attachments. Thank you.

# EXHIBIT 68

| | |
|---|---|
| **From:** | O'Donnell, Pierce[podonnell@ ▇▇▇▇▇ |
| **Sent:** | Tue 3/1/2022 7:52:36 PM (UTC-05:00) |
| **To:** | Aaron H. DeGroft[adegroft@ ▇▇▇ |
| **Cc:** | Lee Mangan[lmangan227@ ▇▇▇; Richard LiPuma[rich@ ▇▇▇ |
| **Subject:** | Re: |

Aaron

Hello.

I am working diligently to get one or two more declarations from respected documentarians who spoke to Mumford in the fall of 2017 about interviewing him.  I already sent you an excellent declaration from Talin Maltepe, a respected Toronto galleries who spoke to Mumford in 2017 and told her that he bought the paintings from Basquiat etc.

I assure you that we are on this.

Thanks.

> On Mar 1, 2022, at 4:39 PM, Aaron H. DeGroft <adegroft@ ▇▇▇ > wrote:
>
> What unknown party if you do not mind me asking. I am trying to preserve my job and want to know what I need to know. You guys business is yours but we are the public institution and we all getting our ass kicked with nothing but lies.
>
> Get Outlook for iOS

**Pierce O'Donnell**
Attorney at Law
Biography

podonnell@ ▇▇▇

Greenberg Glusker LLP
2049 Century Park East, Suite 2600
Los Angeles, CA  90067
GreenbergGlusker.com

This message is intended solely for the use of the addressee(s) and is intended to be privileged and confidential within the attorney client privilege. If you have received this message in error, please immediately notify the sender at Greenberg Glusker and delete all copies of this email message along with all attachments. Thank you.

From: Lee Mangan <lmangan227@ ▇▇▇
Sent: Tuesday, March 1, 2022 7:30:58 PM
To: Aaron H. DeGroft <adegroft@ ▇▇▇
Cc: Pierce O'Donnell <podonnell@ ▇▇▇; Richard LiPuma <rich@ ▇▇▇
Subject: Re:

With a little more luck, like we have not had enough with Diego Et Al already, a recording or serious notes shall be provided by a party none of us has ever met or spoken to that shall shock even the best (worst) of the world!

Sent from my iPhone

On Mar 1, 2022, at 6:23 PM, Aaron H. DeGroft <adegroft@█████████ wrote:


So do I assume that Taryn and ████ are no longer friendly. Also one of your brokers the white haired guy still has on his website that he is selling the works and illustrates some. Do not know if that matters to you all or not. I just get meaningless comments about it from busy bodies. Not my business or theirs.


Get Outlook for iOS

# EXHIBIT 69

| From: | Aaron H. DeGroft[/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=33cbae2830b34d6dbfc8b696f7edd140-Aaron H. De] |
|---|---|
| Sent: | Thur 3/24/2022 9:15:17 PM (UTC-04:00) |
| To: | Lee Mangan[lmangan227@       ; Pierce O'Donnell[podonnell@ |
| Subject: | Fwd: Interview request ARTnews |

I need help with these inconsistencies before we respond or we caa as n just turn this all over to you all. Help. I am going to visit my sick mother.

Get Outlook for iOS

---

From: Tessa Solomon
Sent: Thursday, March 24, 2022 9:00:58 PM
To:                 ; Aaron H. DeGroft <adegroft@
Subject: Interview request ARTnews

Thank you for this opportunity:
Can you send a copy of the written admission from the NYT admitting their incorrect reporting?

How has the Orlando community reacted to the exhibition? Have you seen an increase in visitors?

We have contacted FedEx, and according to their expert currently on staff (whose responsibilities include archiving), the "peel here" verbiage ( visible on *One More King/Czar* ) was not used by them until the 1990s. Can you comment on this?

We have obtained a signed declaration from Taryn Burns stating that she and her partners William Force and Lu Quan purchased 26 Basquiat works from the Ortiz Locker. We are happy to provide this if it is not currently in your records. This differs from the provenance stated in the Orlando Museum of Art's Catalog. Which is the correct version, and was the museum aware of the criminal backgrounds of those mentioned earlier and Leo/Lee Mangan (John Mangan, III) before opening the exhibition?

The Poem that Basquiat purportedly wrote also has a contradictory provenance. One version from www.bvcg.com, stating a researcher at the Smithsonian found it, and another version via the museum's catalog: it was given directly to the owners via Mumford on a visit to his house. Could you please comment?

Consultant Scott Ferguson from Art Encounters authenticated the Mumford Venice Collection; he has also Authenticated *Helicopter*, which has the exact Mumford provenance. We have both of these documents and are happy to share them with the museum. Is *Helicopter* the 26th work

mentioned by Tayrn Burns in her declaration?

Can you provide provenance for the Pollock "Pink Spring"?

Thank you for your time answering these questions,

Tessa Solomon
Writer I ARTnews
www.artnews.com

███████████

On Thursday, March 24, 2022, ██████████████████████████ > wrote:

Good Afternoon Tessa,

Thank you for reaching out to us! We are happy to respond to questions that you have about the Basquiat Exhibition. Could you please send us a list of detailed questions?

In the meantime, I am sending you our media package which includes hi-res images and installation photos via dropbox.

Looking forward to hearing back from you,

███████



**LEARN WHAT'S NEW AT THE ORLANDO MUSEUM OF ART:** *Subscribe to our newsletter »*

**FOLLOW US:** Facebook | Twitter | Instagram | OMA Website

---

**From:** Tessa Solomon ███████████████████
**Date:** Wednesday, March 23, 2022 at 5:01 PM
**To:** Aaron H. DeGroft <adegroft@ ███████, ██████████
██████████
**Subject:** Interview request ARTnews

Dear Dr. De Groft and ███████,

I am a writer with ARTnews, and my editor has asked me to do a story about the 'Heroes and Monsters' exhibition at your museum.

We are interested in how the exhibition has been received and whether the New York Times article has impacted at all, if any.

We have reached out to the New York Times, and they do not have a correction regarding their reporting of the FedEx issue. They could only provide me with a correction posted on March 2, 2022, regarding Sagghese's work and her inability to attribute nine of the Basquiat paintings. We want to report your side of the story too.

We are also interested in your reaction regarding the blog that focuses on the Orlando Museum of Art by Anita Senkowski and her findings. In particular, the provenance discrepancies and additional FedEx type on the front side of "One More King," which was not analyzed by handwriting expert, James Blanco.

We are publishing this week, so please let me know the best way to contact you.

Tessa Solomon

Writer I ARTnews

www.artnews.com

# EXHIBIT 70

| From: | O'Donnell, Pierce[podonnell@ ████████████ |
|---|---|
| Sent: | Mon 3/28/2022 3:35:06 PM (UTC-04:00) |
| To: | Aaron H. DeGroft[adegroft@ ████████ |
| Subject: | Responses to reporter |
| Attachment: | OMA Art news.docx |

Hi

I suggest that you answer a few of the questions the way I suggest in the attached document. It tells your story and forces her to print it. I would email it to her. Unleash the dogs!!! Thanks

Pierce O'Donnell
Attorney at Law
Biography



podonnell@

**Greenberg Glusker LLP**
2049 Century Park East, Suite 2600
Los Angeles, CA 90067
GreenbergGlusker.com
This message is intended solely for the use of the addressee(s) and is intended to be privileged and confidential within the attorney client privilege. If you have received this message in error, please immediately notify the sender at Greenberg Glusker and delete all copies of this email message along with all attachments. Thank you.

7514114_00057681

Questions for Aaron to answer:

**Can you send a copy of the written admission from the NYT admitting their incorrect reporting?**

Yes

**How has the Orlando community reacted to the exhibition? Have you seen an increase in visitors?**

Terrific response. We had 4,000 people the first two opening nights

The immediate response on opening night was that this extraordinary exhibition had brought the entire community together in ways that had not been seen in decades.

The visitors' reactions have been very positive. They are grateful—and OMA is proud— that we could bring this unique, extraordinary collection by the hottest artist on the planet to Orlando.

Since the exhibition opened, we have had about over a 100% increase in attendance.

**We have contacted FedEx, and according to their expert currently on staff (whose responsibilities include archiving), the "peel here" verbiage (visible on *One More King/Czar*) was not used by them until the 1990s. Can you comment on this?**

Pierce O'Donnell, the owners' representative will be addressing this issue.

The museum and I have no doubt that *One More King/Czar* painted by Basquiat.
I want to be clear as I can that this painting is undoubtedly an authentic painting by Basquiat. The leading Basquiat expert in the world, Diego Cortez, authenticated this and all the other paintings in the Mumford Collection. So did Dr. Joanna Moore Saggese, the most eminent Basquiat scholar. And James Blanco, an experienced document examiner, likewise confirmed that these paintings are by the hand of Basquiat. Significantly, no respected Basquiat expert who has personally seen the works has come forward to question the collection's authenticity. These paintings are all good, many are masterpieces, and the museum and I stand by them.

We need to have some perspective. A rare discovery like the Mumford Collection will always attract questioning and skepticism. That is the art world. Over my 35-year career, I have helped discover lost or misidentified works by Titian, Rembrandt, Michelangelo, and others. Controversy comes with the job. In this case, the criticisms pale into insignificance compared to the overwhelming evidence that these paintings are the genius of Jean-Michel Basquiat. We welcome the pubic to come see for themselves.

**Was the museum aware of the criminal backgrounds of those mentioned earlier and Leo/Lee Mangan (John Mangan, III) before opening the exhibition?**

We were aware that some of the owners had had legal issues in their past. But, before we decided to exhibit the collection, we conducted extensive independent due diligence on the paintings' authenticity and quality. There is not the slightest question in my mind—or any of the Basquiat experts mentioned above—that these paintings were by the hands of Basquiat. Please remember: we are exhibiting paintings and not the owners.

Thank you.

# EXHIBIT 71

| From: | O'Donnell, Pierce[podonnell@ █████████ |
| Sent: | Thur 3/10/2022 8:11:47 PM (UTC-05:00) |
| To: | Aaron H. DeGroft[adegroft@ ██████ |
| Subject: | Basquiat sale prices |
| Attachment: | ████████████ copy.pdf |

Amazing!

Pierce O'Donnell
Attorney at Law
Biography
██████████

podonnell@ ████████

Greenberg Glusker LLP
2049 Century Park East, Suite 2600
Los Angeles, CA 90067
GreenbergGlusker.com
This message is intended solely for the use of the addressee(s) and is intended to be privileged and confidential within the attorney client privilege. If you have received this message in error, please immediately notify the sender at Greenberg Glusker and delete all copies of this email message along with all attachments. Thank you.

7514114_00058376

# Jean-Michel Basquiat

1960 – 1988

Read More

Browse (140)

So

7514114_00058377



PURCHASE PRICE
**$20,900**

SALE PRICE
**$110,487,500**

GROSS APPRECIATION
▲ **5,286x** (33 years)



PURCHASE PRICE
**$8,079**

SALE PRICE
**$3,610,000**

GROSS APPRECIATION
▲ **446.84x** (22 years)





PURCHASE PRICE
**$110,000**

SALE PRICE
**$26,042,500**

GROSS APPRECIATION



PURCHASE PRICE
**$5,500**

SALE PRICE
**$1,036,187**

GROSS APPRECIATION

▲ **188.4x** (28 years)





PURCHASE PRICE
**$70,000**

SALE PRICE
**$13,136,521**

GROSS APPRECIATION

▲ **187.66x** (23 years)



GROSS APPRECIATION

▲ **153.04x** (23 years)



PURCHASE PRICE
**$120,505**

SALE PRICE
**$17,663,828**

GROSS APPRECIATION

▲ **146.58x** (25 years)



PURCHASE PRICE
$66,000

SALE PRICE
$8,803,303

GROSS APPRECIATION
▲ **133.38x** (23 years)



PURCHASE PRICE
**$60,250**

SALE PRICE
**$6,612,500**

GROSS APPRECIATION

▲ **109.75x** (25 years)



PURCHASE PRICE
**$43,125**

SALE PRICE
**$4,032,945**

GROSS APPRECIATION



**PURCHASE PRICE**
**$120,121**

About

Careers

How It Works

Price Database

Press

Terms of Use

Privacy Policy

Disclaimer

Contact Us

Masterworks.io, LLC
225 Liberty St. 29th Floor,
New York, NY 10281
support@masterworks.io

# EXHIBIT 72

| From: | Lee Mangan[lmangan227@ ███████████ |
|---|---|
| Sent: | Wed 3/23/2022 2:34:39 AM (UTC-04:00) |
| To: | O'Donnell, Pierce[podonnell@ ███████████ |
| Cc: | Richard LiPuma[rich@ ██████████ ██; Aaron H. DeGroft[adegroft@ ██████████ |
| Subject: | Re: Letter to █████ |

How are you pitching this? I am getting pressed to give the offering price from both the Samsung and Hyundai family's. What is that price?

Sent from my iPhone

On Mar 22, 2022, at 6:40 PM, O'Donnell, Pierce <podonnell@ ██████████████ > wrote:

My dear friend ██████████ introduced me to ██████████ who is a co-owner of the Oakland As, a billionaire art collector (along with his two brothers ██████ and ██ ), and Chair of the ███████████ Museum of Modern Art where the ██████ family donated its amazing modern and contemporary art collection. ██████ is the Real Thing.

We had a pleasant conversation this morning, mostly about the best representation of the collection. ██ gave me names of three heavy hitters, and he is introducing them to me via my letter to him. Stay tuned.

Pierce O'Donnell
Attorney at Law
Biography

podonnell@ █████████████

Greenberg Glusker LLP
2049 Century Park East, Suite 2600
Los Angeles, CA 90067
GreenbergGlusker.com
This message is intended solely for the use of the addressee(s) and is intended to be privileged and confidential within the attorney client privilege. If you have received this message in error, please immediately notify the sender at Greenberg Glusker and delete all copies of this email message along with all attachments. Thank you.

Begin forwarded message:

**From:** Pierce O'Donnell <podonnell@ ██████████████
**Subject: Letter**

**Date:** March 22, 2022 at 3:18:12 PM PDT
**To:** ███████████

Click to Download
Letter to ███████ with Attachments copy.pdf
8 MB

Click to Download
- FINAL Heroes and Monsters - Jean-Michel Basqulat Catalogue DIGITAL.pdf
97.2 MB

Click to Download
Letter to ███████ (4304558.1).docx
B

# EXHIBIT 73

| From: | ████████████████ |
| --- | --- |
| Sent: | Sat 5/28/2022 7:10:07 AM (UTC-04:00) |
| To: | Aaron H. DeGroft[adegroft@████████] |
| Subject: | Re: I wanted to touch base about our Pollock show of Pink Spring catalogue that will open in Italy |
| Attachment: | smime.p7s |

My thanks for the offer!
That said, I have re-considered and cannot take this project any further.

In closing, I wish you well.



> On 26 May 2022, at 19:25, Aaron H. DeGroft <<u>adegroft@</u>████████   wrote:
>
> May I call you tomorrow to reconsider. The compensation is $25k plus travel. The painting is good. We have time. Why are you hesitant?  Just so I understand.
>
> Thank you ver much.
>
> Get Outlook for iOS

---

**From:** ████████████████████
**Sent:** Thursday, May 26, 2022 8:17 AM
**To:** Aaron H. DeGroft <<u>adegroft@</u>████████
**Subject:** Re: I wanted to touch base about our Pollock show of Pink Spring catalogue that will open in Italy

Dear Aaron
Having now had a chance to check my files etc, unfortunately I am unable to help in this matter (major surgery next month is also an important factor).

Good luck with the project!

All the best



> On 24 May 2022, at 20:47, ███████████████████
> wrote:

Aaron – Many thanks for your understanding.
As you know, this area is a minefield paved with the best
intentions....
So I need to think hard, check files etc. Furthermore, there's a strong
case for thinking that serious scholarship requires seeing a work in
the flesh before making any opinions.

For now, I'm fine with email, not least because my hearing is
famously bad (tho' I tend to hear well on Zoom etc and also do
WhatsApp).

All the best

█████████

p.s. i've known Harry since I was at the NGA in the 1990s. How time
flies!

> On 24 May 2022, at 20:37, Aaron H. DeGroft
> <adegroft@████████ wrote:

█████████

I am certainly happy to give you your time. I just wanted
to share the compensation and travel coverage for the
essay and for you to see the painting in the flesh as they
say. You are the expert but I have been in this business
for thirty five years and it is not only right but one of his
bests from his best year. There is much evidence from
Lee Krasner handwriting to the will that makes it and
describes it. It has just been "lost" but no longer. I go to
NYC on Thursday for the opening of our Banksy show. I
am happy to call you at your convenience. My friend
████████ has seen the work and while he is
prohibited from public comment, he thinks it is great.
████████ has seen it as has ████ from the
Getty. They all think it is right and it has an interesting
context and provenance. All solid. We are sending it to
Italy for a multi city tour.

Let me know. I will be in Italy in mid June.

Best wishes,

Aaron

Get <u>Outlook for iOS</u>

---

**From:** Aaron H. DeGroft <<u>adegroft@</u>█████
**Sent:** Tuesday, May 24, 2022 3:29:24 PM
**To:** ███████████████
**Subject:** Re: I wanted to touch base about our Pollock show
of Pink Spring catalogue that will open in Italy

Get <u>Outlook for iOS</u>

---

**From:** ███████████████
**Sent:** Monday, May 23, 2022 6:15 PM
**To:** Aaron H. DeGroft <<u>adegroft@</u>█████
**Subject:** Re: I wanted to touch base about our Pollock
show of Pink Spring catalogue that will open in Italy

Dear Aaron
My apologies for not responding sooner.

Having returned from NYC, there's an e-backlog to clear
here – not to mention two urgent deadlines. Also, my
phone was stolen while I was in NY: it's been
predictably time-consuming to replace.

To be transparent, first I need to check my files etc
thoroughly about this painting.

Therefore, can you please hold on until this Thursday or
Friday?

All the best

█████

On 23 May 2022, at 21:39, Aaron H.
DeGroft <<u>adegroft@</u>█████ wrote:


Dear ▆▆▆

May I ring you at your convenience
tomorrow to talk about the scope and
the compensation offered.

I have your number here.  I would be
calling from a 407 area code so as not
to seem a strange number.

Best wishes,

Aaron

<image001.png>

**From:** ▆▆▆▆▆▆▆▆▆▆
**Sent:** Saturday, May 21, 2022 10:54 AM
**To:** Aaron H. DeGroft <adegroft@▆▆▆▆
**Subject:** Re: I wanted to touch base about our
Pollock show of Pink Spring catalogue that will
open in Italy

Dear Aaron

Yes, I would indeed be interested.

Somehow I cannot find our previous
correspondence. Could you please forward it?

Many thanks.

All the best

▆▆▆▆



*Sent from my Samsung Galaxy*

On Sat, 21 May 2022, 03:32 Aaron H. DeGroft,
<adegroft@███████ wrote:

████

Would you consider writing an essay for the
catalogue. I am happy to reach out to you on
real time about this. I hope you wound
consider this about this serious painting of
which you know.

I wish you all best wishes.

Aaron de Groft

Get Outlook for iOS