**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| Liberty Mutual Insurance Company and Great American Insurance Company,<br><br>Plaintiffs,<br><br>v.<br><br>Orlando Museum of Art, Inc., and Pierce O'Donnell, Taryn Burns, and William Force, and Basquiat Venice Collection Group, an unregistered de facto partnership.<br><br>Defendants. | Case No.: 6:24-cv-2180 |

**DEFENDANT, ORLANDO MUSEUM OF ART, INC.'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' DECLARATORY JUDGMENT COMPLAINT**

Defendant Orlando Museum of Art, Inc. ("OMA"), by and through undersigned counsel, hereby files its Answer and Affirmative Defenses to the Declaratory Judgment Complaint (the "Complaint") filed by Plaintiffs Liberty Mutual Insurance Company and Great American Insurance Company (collectively, "Plaintiffs"), and states as follows:

**Nature of the Case**

1. This declaratory judgment action arises out of a claim for indemnity made by BVCG following the June 2022 FBI seizure of a collection of paintings off the walls of OMA purported to be by the famed artist Jean-Michel Basquiat which

BVCG had loaned to OMA as part of the exhibition "Heroes and Monsters: Jean-Michel Basquiat, the Thaddeus Mumford, Jr. Venice Collection" which was slated to be held at OMA between February 12, 2022 and June 30, 2023. Plaintiffs insured OMA in Florida at all relevant times, subject to limitations, conditions and exclusions contained in the policy.[1] BVCG was endorsed as an additional insured under the policy underwritten by plaintiffs in connection with the Basquiat exhibition.

**RESPONSE:** OMA admits that in June 2022, the FBI seized a collection of paintings off the walls of OMA purported to be by the famed artist Jean-Michel Basquiat which BVCG had loaned to OMA as part of the exhibition "Heroes and Monsters: Jean-Michel Basquiat, the Thaddeus Mumford, Jr. Venice Collection" which was slated to be held at OMA between February 12, 2022 and June 30, 2023. The alleged insurance policy speaks for itself, and OMA denies any allegations contrary thereto. OMA is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 1 of the Complaint, and therefore, denies same.

2. The FBI seized all of the paintings pursuant to a seizure warrant which set forth facts evidencing that they were posthumous forgeries and that therefore there was probable cause to believe that the paintings were evidence, fruits, and/or

[1] A copy of the policy is attached as **Exhibit A**.

instrumentalities of violations of 18 U.S.C. § 371 (conspiracy) and 18 U.S.C. § 1343 (wire fraud). Upon information and belief, the paintings remain undamaged and in the FBI's care, custody, and control pending completion of additional investigations.

**RESPONSE:** The alleged warrant speaks for itself, and OMA denies any allegations contrary thereto. OMA is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 2 of the Complaint, and therefore, denies same.

3. After the FBI's seizure of the artworks, the Orlando Art Museum brought suit in this Court, captioned *Orlando Museum of Art, Inc. v. Aaron De Groft, et al.,* and bearing Civil Action Number 2023-CA-014410-O, which involves the same issues of operative facts and accordingly merits the consolidation of the present action and the OMA's action currently pending before this court pursuant to Fla R. Civ. P. 1.270(a), so as to avoid unnecessary delays, costs or the possibility of inconsistent verdicts, as well as in the interest of saving judicial resources.

**RESPONSE:** OMA admits that it filed the alleged lawsuit. The filings in the alleged lawsuit speak for themselves, and OMA denies any allegations contrary thereto. OMA neither admits nor denies the remaining allegations in paragraph 3 of the Complaint because such allegations call for a legal conclusion and do not require a response. To the extent any response is required, OMA denies the remaining allegations in paragraph 3 of the Complaint.

4. Plaintiffs seek a declaration that forgeries do not constitute "covered property" under the policy and that accordingly plaintiffs owe no duty to OMA or BVCG to indemnify them for the loss of the paintings. That is, coverage is unavailable because the property alleged to have been lost does not constitute covered property inasmuch as the property was inauthentic. As they are (or were, if no longer extant) fakes, they have no value, or only nominal value, and should be destroyed, subject to FBI and DOJ protocols.

**RESPONSE:** OMA neither admits nor denies the allegations in paragraph 4 of the Complaint because such allegations call for a legal conclusion and do not require a response. To the extent any response is required, OMA denies the allegations in paragraph 4 of the Complaint.

5. Coverage is equally unavailable because of intentional or negligent misrepresentations by BVCG representing the works were authentic in connection with the loan. BVCG represented that they were loaning authentic artworks to which BVCG had good title when in fact BVCG knew or should have known that they were not authentic.

**RESPONSE:** OMA neither admits nor denies the allegations in paragraph 5 of the Complaint because such allegations call for a legal conclusion and do not require a response. To the extent any response is required, OMA denies the allegations in paragraph 5 of the Complaint.

6. Similarly, OMA, at the time that it requested that plaintiffs issue BVCG a certificate of insurance for the works, knew or should have known that they were not authentic given, *inter alia,* that its own curatorial staff had raised doubts about the provenance BVCG had provided for the works and because it had received a subpoena from the FBI in connection with the Mumford collection in July 2021 and intentionally concealed those facts to plaintiffs at the time coverage of BVCG's works was requested.

**RESPONSE:** OMA neither admits nor denies the allegations in paragraph 6 of the Complaint because such allegations call for a legal conclusion and do not require a response. To the extent any response is required, OMA denies the allegations in paragraph 6 of the Complaint. OMA affirmatively alleges that, to the extent any of the alleged actions were undertaken, they were undertaken solely by OMA's former Director/CEO, Aaron De Groft ("De Groft"), without the knowledge of or authority from OMA's Board of Trustees (the "OMA Board"). OMA affirmatively alleges that it was expressly instructed not to disclose the FBI subpoenas to BVCG, and also that OMA was similarly not at liberty to disclose the FBI subpoenas to Plaintiffs.

7. The declaratory relief process sought in this action is not extraordinary and is consistent with the decision of the Supreme Court of Florida in *Higgins v. State Farm,* 894 So.2d 5 (Fla. 2004), in which the court held that in conformance

with the recent trend of the law, declaratory judgment statutes have now been construed to authorize an action to declare the existence or nonexistence of any right, or of *"any fact upon which the existence or nonexistence of such right does or may depend, and whether such right now exists or will arise in the future."*

**RESPONSE:** OMA neither admits nor denies the allegations in paragraph 7 of the Complaint because such allegations call for a legal conclusion and do not require a response. To the extent any response is required, OMA denies the allegations in paragraph 7 of the Complaint.

8. In essence, the purpose of this action is to obtain a judicial interpretation of the policy, as it relates to the facts involved herein, and, pursuant to such interpretation, a declaration that plaintiff insurers have no obligation to provide coverage for counterfeit artworks.

**RESPONSE:** OMA neither admits nor denies the allegations in paragraph 8 of the Complaint because such allegations call for a legal conclusion and do not require a response. To the extent any response is required, OMA denies the allegations in paragraph 8 of the Complaint.

**Jurisdiction, Parties and Venue**

9. This is an action for a declaration of rights, which involves a dispute having a value of in excess of $50,000, exclusive of costs, interest, and attorney's

fees. This Court thus has subject matter jurisdiction over this matter under Fla. Stat. §26.012.

**RESPONSE:** OMA neither admits nor denies the allegations in paragraph 9 of the Complaint because such allegations call for a legal conclusion and do not require a response. To the extent any response is required, OMA admits the allegations in paragraph 9 of the Complaint for jurisdictional purposes only.

10. This Court has personal jurisdiction over defendants because they have conducted substantial business in Florida and loaned their paintings to OMA in Florida.

**RESPONSE:** OMA neither admits nor denies the allegations in paragraph 10 of the Complaint because such allegations call for a legal conclusion and do not require a response. To the extent any response is required, OMA admits the allegations in paragraph 10 of the Complaint for jurisdictional purposes only.

11. Venue is proper because a substantial part of the events giving rise to this lawsuit occurred in this district, and OMA is located there.

**RESPONSE:** OMA neither admits nor denies the allegations in paragraph 11 of the Complaint because such allegations call for a legal conclusion and do not require a response. To the extent any response is required, OMA admits the allegations in paragraph 11 of the Complaint for venue purposes only.

12. Many allegations underlying the circumstances of loss are drawn from the related civil complaint brought by OMA against BVCG and its principals, amongst others, captioned *Orlando Museum of Art, Inc. v. Aaron De Grofi, et al,* bearing Civil Action Number 2023-CA-014410-O and the criminal case brought in the United States District Court for the Central District of California captioned *USA v. Barzman,* bearing Case No. CR 2:23-cr-00169-MEMF.

**RESPONSE:** The filings in the alleged lawsuits speak for themselves, and OMA denies any allegations contrary thereto.

13. At all material times, plaintiff Liberty Mutual Insurance Company was and is incorporated under the laws of Massachusetts, with a principal place of business at 175 Berkeley Street, Boston, MA 02116, is authorized to do business and issue policies in the state of Florida and is engaged in the business of providing insurance coverage to Florida businesses.

**RESPONSE:** OMA is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 13 of the Complaint, and therefore, denies same. To the extent any response is required, OMA admits the allegations in paragraph 13 of the Complaint for jurisdictional purposes only.

14. At all material times, plaintiff Great American Insurance Company was and is incorporated in Ohio, is authorized to do business and issue policies in the

state of Florida and is engaged in the business of providing insurance coverage to Florida businesses.

**RESPONSE:** OMA is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 14 of the Complaint, and therefore, denies same. To the extent any response is required, OMA admits the allegations in paragraph 14 of the Complaint for jurisdictional purposes only.

15. Defendant Pierce O'Donnell is an individual who has his primary place of residence in Texas and is a principal of the unregistered *de facto* partnership BVCG. This Court has personal jurisdiction over O'Donnell under Fla. Stat. §§ 48.193(1)(a)(2), (7), because he caused injury to plaintiffs in Florida and because he breached a contract in Florida by failing to perform acts required by the contract to be performed in Florida.

**RESPONSE:** OMA is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 15 of the Complaint, and therefore, denies same. To the extent any response is required, OMA admits the allegations in paragraph 15 of the Complaint for jurisdictional purposes only.

16. The exercise of personal jurisdiction over O'Donnell satisfies the requirements of due process because he committed a tort outside of Florida that caused an injury in Florida that he should have anticipated would be suffered in Florida because he directed his tortious conduct to Florida. He also entered into, and

breached, an agreement that required performance in Florida. Based on his conduct, he reasonably should have anticipated being haled into a Florida court regarding his actions.

**RESPONSE:** OMA neither admits nor denies the allegations in paragraph 16 of the Complaint because such allegations call for a legal conclusion and do not require a response. To the extent any response is required, OMA admits the allegations in paragraph 16 of the Complaint for jurisdictional purposes only.

17. Defendant Taryn Burns is an individual who has her primary place of residence in California and is a principal of the unregistered *de facto* partnership BVCG. This Court has personal jurisdiction over her under §§ 48.193(1)(a)(2), (7), Fla. Stat., because she entered into, and breached a contract in Florida by failing to perform acts required by the contract to be performed in Florida.

**RESPONSE:** OMA is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 17 of the Complaint, and therefore, denies same. To the extent any response is required, OMA admits the allegations in paragraph 17 of the Complaint for jurisdictional purposes only.

18. The exercise of personal jurisdiction over Burns satisfies the requirements of due process because she committed a tort outside of Florida that caused an injury in Florida that she should have anticipated would be suffered in Florida because she directed her tortious conduct to Florida. She also committed

tortious acts within Florida, and entered into, and breached, an agreement that required performance in Florida. Based on her conduct, she reasonably should have anticipated being haled into a Florida court regarding her actions.

**RESPONSE:** OMA neither admits nor denies the allegations in paragraph 18 of the Complaint because such allegations call for a legal conclusion and do not require a response. To the extent any response is required, OMA admits the allegations in paragraph 18 of the Complaint for jurisdictional purposes only.

19. Defendant William Force is an individual who has his primary place of residence in California and is a beneficial owner of the assets of BVCG. This Court has personal jurisdiction over him under Fla. Stat §§ 48.193(1)(a)(2), (7), because he committed tortious acts in Florida and breached a contract in Florida by failing to perform acts required by the contract to be performed in Florida.

**RESPONSE:** OMA is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 19 of the Complaint, and therefore, denies same. To the extent any response is required, OMA admits the allegations in paragraph 19 of the Complaint for jurisdictional purposes only.

20. The exercise of personal jurisdiction over Force satisfies the requirements of due process because he committed a tort outside of Florida that caused an injury in Florida that he should have anticipated would be suffered in Florida because he directed his tortious conduct to Florida. He also committed

tortious acts within Florida, and entered into, and breached, an agreement that required performance in Florida. Based on his conduct, he reasonably should have anticipated being haled into a Florida court regarding his actions.

**RESPONSE:** OMA neither admits nor denies the allegations in paragraph 20 of the Complaint because such allegations call for a legal conclusion and do not require a response. To the extent any response is required, OMA admits the allegations in paragraph 20 of the Complaint for jurisdictional purposes only.

21. Defendant BVCG is a joint venture and thus a *de facto* partnership and has its principal place of business in California. This Court has personal jurisdiction over BVCG under Fla. Stat.§§ 48.193(1)(a)(2), (7), because it committed tortious acts in Florida and breached a contract in Florida by failing to perform acts required by the contract to be performed in Florida.

**RESPONSE:** OMA is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 21 of the Complaint, and therefore, denies same. To the extent any response is required, OMA admits the allegations in paragraph 21 of the Complaint for jurisdictional purposes only.

22. The exercise of personal jurisdiction over BVCG satisfies the requirements of due process because it reasonably should have anticipated being haled into a Florida court because performance of the parties agreement took place in Florida.

**RESPONSE:** OMA neither admits nor denies the allegations in paragraph 22 of the Complaint because such allegations call for a legal conclusion and do not require a response. To the extent any response is required, OMA admits the allegations in paragraph 22 of the Complaint for jurisdictional purposes only.

23. Defendant OMA is a Florida 501(c)(3) nonprofit corporation located in Orlando, Florida.

**RESPONSE:** OMA admits the allegations in paragraph 23 of the Complaint.

24. OMA is governed by a Board of Trustees. The responsibilities of the Board include ensuring adequate financial resources, sound fiscal management, and selecting and supervising the Executive Director.

**RESPONSE:** OMA's Articles of Incorporation and Bylaws speak for themselves, and OMA denies any allegations contrary thereto.

25. Plaintiffs insured OMA under insurance policy numbers FAA20607001 and ART E743620-00-00, effective from July 20, 2021 to July 20, 2022, issued by plaintiffs to "Orlando Museum of Art, Inc," subject to limitations, conditions and exclusions.

**RESPONSE:** The alleged insurance policies speak for themselves, and OMA denies any allegations contrary thereto.

26. The policy is a museum collection and temporary loan policy and contains standard insurance market terms, conditions, and exclusions applicable to the museum industry.

**RESPONSE:** The alleged insurance policies speak for themselves, and OMA denies any allegations contrary thereto.

27. All conditions precedent to this action have occurred, have been satisfied, or have been waived.

**RESPONSE:** OMA is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 27 of the Complaint, and therefore, denies same.

## Facts

### The "Mumford Collection"

28. According to BVCG, in late 1982 Jean-Michel Basquiat spent some time in Los Angeles preparing for a show with Gagosian gallery. The work from this show is well documented and Gagosian had another show memorializing Larry Gagosian and Basquiat's relationship at the start of his career.

**RESPONSE:** OMA admits the allegations in paragraph 28 of the Complaint, upon information and belief.

29. Upon information and belief, O'Donnell and Burns, in their capacity as directors of BVCG, misrepresented that in 1982 Basquiat painted 25[2] works on cardboard (which are the subject of this coverage dispute) and sold them for $5,000 to Thaddeus Q. Mumford Jr., a television producer. Then, they misrepresented that Mumford had placed the paintings in his storage unit, the contents of which were auctioned off 30 years later to Michael Barzman (a convicted felon who pled guilty last year for lying to the FBI), and ultimately acquired (for no consideration) by BVCG, which has been on a quest to legitimize them ever since.

**RESPONSE:** OMA admits the allegations in paragraph 29 of the Complaint, upon information and belief.

30. BVCG's story, and its repeated efforts to authenticate the works, have been refuted, not only by the FBI, but also by Mumford himself, who confirmed to the FBI in a signed declaration that he never knew Jean-Michel Basquiat and has never owned any Basquiat artwork. BVCG's story was fraudulent and designed to inflate the value of the paintings for resale in anticipated multimillion dollar transaction(s) on the private market.

**RESPONSE:** OMA admits the allegations in paragraph 30 of the Complaint, upon information and belief.

---

[2] At various times, the number of works in the Mumford Collection has been listed as 20, 25, 26 and 28 in different documents provided by the defendants.

31. According to BVCG, Basquiat was kept on a tight leash by his dealer Larry Gagosian and was therefore looking for opportunities to earn a bit of extra money. Mumford — who, according to the story, was a friend of Basquiet — purchased some of his artworks for $5,000 after learning of his circumstances.

**RESPONSE:** OMA admits the allegations in paragraph 31 of the Complaint, upon information and belief.

32. Hence the "Mumford Collection," consisting of twenty-eight, twenty-six, twenty-five, or twenty works (depending on which of defendants' documents one reads) was born.

**RESPONSE:** OMA admits the allegations in paragraph 32 of the Complaint, upon information and belief.

33. The works, said to have been done primarily on cardboard so as not to use up the canvas that Gagosian had purchased for the artist to complete paintings for the exhibition, were apparently not to his taste — so BVCG's story goes — so Mumford promptly put them in storage and forgot about them.

**RESPONSE:** OMA admits the allegations in paragraph 33 of the Complaint, upon information and belief.

**The Sale of the Storage Locker and the Initial Purchase of the Collection**

34. The story continues: in or about 2012, Mumford defaulted on his storage unit payments, and the contents were therefore auctioned and then purchased

by Michael Barzman, who then sold the collection to William Force, Lu Quan, Taryn Burns, and Lee Mangan.

**RESPONSE:** OMA admits the allegations in paragraph 34 of the Complaint, upon information and belief.

35. Although records are sparse and at times inconsistent, it does not appear Force, Quan, Burns, or Mangan paid more than $20,000.00 for the entire collection.

**RESPONSE:** OMA admits the allegations in paragraph 35 of the Complaint, upon information and belief.

36. Concurrently with the sale of the collection Barzman signed a declaration titled "Transfer of Ownership"[3] identifying the provenance of 20—not 25—paintings as *via* Thaddeus Mumford Jr.

**RESPONSE:** OMA admits the allegations in paragraph 36 of the Complaint, upon information and belief.

37. On August 14, 2012, Taryn Burns and William Force file articles of incorporation for Art Force LLC with the Florida Secretary of State.

**RESPONSE:** The Florida Secretary of State records speak for themselves, and OMA denies any allegations contrary thereto.

---

[3] [3] Mr. Barzman signed at least two "Transfers of Ownership" which each purportedly transfer ownership on May 18, 2012 to different buyers.

38. Taryn Burns executed a declaration stating that on October 1, 2012, she purchased 26 paintings by Basquiat from Barzman.

**RESPONSE:** OMA admits the allegations in paragraph 38 of the Complaint, upon information and belief.

39. The Burns declaration does not provide any information concerning the purchase price for the 26 paintings.

**RESPONSE:** OMA admits the allegations in paragraph 39 of the Complaint, upon information and belief.

40. On October 1, 2012, Thaddeus Mumford met with the LAPD Art Theft Detail and reported that Lee Mangan and William Force contacted Mumford's attorney and that Mumford told them he had never owed the paintings and that Mangan and Force offered Mumford approximately $1,000,000.00 to claim that the paintings belonged to him.

**RESPONSE:** OMA admits the allegations in paragraph 40 of the Complaint, upon information and belief.

41. On October 11, 2012, Quan met with Force and Burns and they agreed to add a fourth partner as an owner of the Mumford Collection, Mangan.

**RESPONSE:** OMA admits the allegations in paragraph 41 of the Complaint, upon information and belief.

42. Also on October 11, 2012, Matthew Steakley sold thirteen paintings from the collection to Quan for $10,500.00.

**RESPONSE:** OMA admits the allegations in paragraph 42 of the Complaint, upon information and belief.

43. Upon information and belief, on November 1, 2012, Quan executed an affidavit that listed Mangan, Force, and Quan as owners of the collection.

**RESPONSE:** OMA admits the allegations in paragraph 43 of the Complaint, upon information and belief.

44. Upon information and belief, Quan's affidavit does not include any information concerning what consideration, if any, Mangan and Force gave to Quan for their ownership interest in the collection.

**RESPONSE:** OMA admits the allegations in paragraph 44 of the Complaint, upon information and belief.

45. Burns and Quan then made a catalogue of the Mumford Collection and "depending on which partner was representing the collection to a potential buyer, the catalog would be produced by Burns under Art Force, LLC, Force and Burns' company, or Art Possible, LLC, Mangan's company."

**RESPONSE:** OMA admits the allegations in paragraph 45 of the Complaint, upon information and belief.

46. In the spring of 2014, Special Agent Elizabeth Rivas, then head of the FBI Art Crimes Division, met with Mumford in Los Angeles where he again denied ever purchasing works by Basquiat and that he felt pressured by Burns and Force to sign documents saying he had purchased artworks them.

**RESPONSE:** OMA admits the allegations in paragraph 46 of the Complaint, upon information and belief.

**BVCG is Created to Market and Sell Six Works from the Mumford Collection**

47. On or about July 20, 2017, BVCG was formed as a joint venture for the marketing and sale of the so-called "Mumford Collection."

**RESPONSE:** OMA admits the allegations in paragraph 47 of the Complaint, upon information and belief.

48. Pursuant to the joint venture agreement, Lu Quan and William Force assigned all of their right, title, and interest in the paintings to Burns and O'Donnell, who then contributed them to BVCG.

**RESPONSE:** The joint venture agreement speaks for itself, and OMA denies any allegations contrary thereto.

49. Pursuant to the joint venture agreement, Force, Burns, O'Donnell, and Quan each owned a twenty-five percent beneficial interest in the net proceeds from the sale of the paintings, with Burns and O'Donnell holding title to the Collection.

**RESPONSE:** The joint venture agreement speaks for itself, and OMA denies any allegations contrary thereto.

50. On or about May 20, 2018, Burns, O'Donnell, Force, and Quan entered into the first amendment to the joint venture agreement.

**RESPONSE:** The first amendment to the joint venture agreement speaks for itself, and OMA denies any allegations contrary thereto.

51. Pursuant to the first amendment to the joint venture agreement, Force, Burns, and O'Donnell's beneficial interest in the proceeds from the sale of the paintings increased from twenty five percent to thirty-three and one third percent.

**RESPONSE:** The first amendment to the joint venture agreement speaks for itself, and OMA denies any allegations contrary thereto.

52. Pursuant to the first amendment to the joint venture agreement, Quan withdrew from the joint venture and confirmed that he no longer had a beneficial interest in the proceeds from the sale of the paintings.

**RESPONSE:** The first amendment to the joint venture agreement speaks for itself, and OMA denies any allegations contrary thereto.

53. The first amendment to the joint venture agreement is silent with respect to what consideration, if any, Quan received in exchange for withdrawing from the venture and forfeiting his twenty five percent share in the proceeds of the sale of the paintings to the remaining joint venturers.

**RESPONSE:** The first amendment to the joint venture agreement speaks for itself, and OMA denies any allegations contrary thereto.

54. Despite purportedly owning approximately $19 million in authentic Basquiat paintings, BVCG did not secure insurance for the six works from the Mumford Collection, apparently relying instead on the insurance policy of the storage facility where the works were stored.

**RESPONSE:** OMA is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 54 of the Complaint, and therefore, denies same.

55. Storage facility agreements typically limit liability to $0.60 per pound unless additional coverage is purchased separately.

**RESPONSE:** OMA is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 55 of the Complaint, and therefore, denies same.

**BVCG and the OMA Begin Discussions Concerning an Exhibition of the Paintings**

56. Sometime in 2020 or early 2021, OMA director and chief curator Aaron De Groft and Pierce O'Donnell began discussing the possibility of exhibiting a work purportedly by Jackson Pollock, *Pink Spring,* 1950, at the OMA.

**RESPONSE:** OMA admits the allegations in paragraph 56 of the Complaint, upon information and belief.

57. According to O'Donnell, at the time he was not in a position to exhibit *Pink Spring* due to a disagreement with his partner on the work, but that O'Donnell had a collection of newly discovered Basquiat paintings.

**RESPONSE:** OMA admits the allegations in paragraph 57 of the Complaint, upon information and belief.

58. The authenticity of *Pink Spring* has also been publicly called into question, and was the subject of a lawsuit brought by BVCG's Pierce O'Donnell in 2016.

**RESPONSE:** OMA admits the allegations in paragraph 58 of the Complaint, upon information and belief.

**Red Flags Begin to Appear Around the Mumford Collection**

59. During the planning stages of the exhibition, OMA curatorial staff raised concerns about the provenance of the Mumford Collection.

**RESPONSE:** OMA admits the allegations in paragraph 59 of the Complaint. OMA affirmatively alleges that the concerns were raised to De Groft, and not to the OMA Board.

60. For example, curatorial staff at OMA emailed museum director Aaron De Groft about contradictions in provenance documents concerning the number of paintings in the Mumford Collection.

**RESPONSE:** The alleged email speaks for itself, and OMA denies any allegations contrary thereto.

61. The FBI also emailed De Groft and OMA's chief curator informing them that the FBI was investigating an issue with the paintings.

**RESPONSE:** The alleged email speaks for itself, and OMA denies any allegations contrary thereto.

62. On July 20, 2021, O'Donnell wrote to Special Agent Elizabeth Rivas because he was "informed by Dr. Aaron De Groft, Director of the Orlando Museum of Art, about an inquiry from the **FBI** about the Museum's forthcoming exhibition of the Mumford Collection" and asking to speak with her about the collection.

**RESPONSE:** The alleged email speaks for itself, and OMA denies any allegations contrary thereto.

63. On July 27, 2021, the FBI emailed De Groft two grand jury subpoenas for documents and records, one to De Groft individually and one to OMA, in connection with the Mumford collection.

**RESPONSE:** The alleged documents speak for themselves, and OMA denies any allegations contrary thereto.

64. Sometime in November 2021, after the Mumford Collection was shipped to OMA, curatorial staff identified a shipping label on the back of one of the

cardboard works from the Mumford Collection which included the name Michael Barzman.

**RESPONSE:** OMA admits the allegations in paragraph 64 of the Complaint. OMA affirmatively alleges that the alleged shipping label was identified to De Groft, not to the OMA Board.

65. In February 2022, the New York Times reported that a FEDEX box used as a support for one of the works from the Mumford Collection contained a typeface that FEDEX was not used by FEDEX until 1994 when FEDEX redesigned the company's logo and typefaces.

**RESPONSE:** The alleged article speaks for itself, and OMA denies any allegations contrary thereto.

**BVCG's Loan and Insurance of the Mumford Collection**

66. On October 20, 2021, O'Donnell and Burns entered into a loan agreement with OMA, permitting the museum to exhibit six artworks purported to be original pieces by Basquiat.

**RESPONSE:** The alleged loan agreement speaks for itself, and OMA denies any allegations contrary thereto.

67. As part of this agreement, OMA agreed to insure the artworks under its fine arts insurance policy issued by plaintiffs and added BVCG as an additional insured.

**RESPONSE:** The alleged loan agreement speaks for itself, and OMA denies any allegations contrary thereto.

68. BVCG's narrative surrounding the artworks provenance and authenticity was called into question before BVCG and OMA entered into the loan agreement. Upon review, OMA and other parties had learned that the provenance was implausible and that no documentation convincingly supported the authenticity of the pieces.

**RESPONSE:** OMA admits that OMA's curatorial staff raised concerns to De Groft, not to the OMA Board, before OMA entered into the loan agreement. OMA denies the remainder of the allegations in paragraph 68 of the Complaint.

69. In the loan agreement, BVCG represented that it would be loaning six artworks by Jean-Michel Basquiat, valued at approximately $19.7 million.

**RESPONSE:** The loan agreement speaks for itself, and OMA denies any allegations contrary thereto.

70. The loan agreement was signed by Pierce O'Donnell and Taryn Bums on behalf of BVCG.

**RESPONSE:** The loan agreement speaks for itself, and OMA denies any allegations contrary thereto.

71. BVCG, through its managing members, in particular, Pierce O'Donnell, provided OMA with information about the artworks' provenance, falsely claiming

the works had been created by Basquiat in 1982, sold to Mumford and stored for decades before their rediscovery.

**RESPONSE:** OMA admits that the alleged information was provided to De Groft, and not to the OMA Board. OMA denies the remainder of the allegations in paragraph 71 of the Complaint.

72. In fact, the contained in the loan agreement representations were false, constituting material misrepresentations about the authenticity and value of the property being loaned.

**RESPONSE:** The loan agreement speaks for itself, and OMA denies any allegations contrary thereto.

73. OMA then sought a certificate of insurance from plaintiffs evidencing coverage for BVCG's loan.

**RESPONSE:** The alleged certificate of insurance speaks for itself, and OMA denies any allegations contrary thereto.

74. At the time OMA sought coverage for BVCG's loan, OMA was aware of the numerous red flags that had been raised in connection with the Mumford Collection.

**RESPONSE:** OMA admits that at the time OMA sought coverage for BVCG's loan, OMA's curatorial staff raised concerns to De Groft, not to the OMA

Board. OMA denies the remainder of the allegations in paragraph 74 of the Complaint.

75. OMA did not disclose to plaintiffs any of the information it had questioning the authenticity of the Mumford Collection.

**RESPONSE:** OMA admits that De Groft, and not the OMA Board, did not allow any information questioning the authenticity of the Mumford Collection to be disclosed to Plaintiffs. OMA denies the remainder of the allegations in paragraph 75 of the Complaint.

76. Plaintiffs reasonably relied on BVCG and OMA's material misrepresentations concerning authenticity and value in issuing the certificate of insurance naming BVCG as an additional insured.

**RESPONSE:** OMA is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 76 of the Complaint, and therefore, denies same.

**The FBI Investigation**

77. Federal authorities, including the FBI, initiated an investigation into the authenticity of the artworks displayed by OMA. The investigation revealed that the artworks were likely forgeries, created by Barzman, and that the provenance provided by BVCG was fabricated.

**RESPONSE:** OMA admits the allegations in paragraph 77 of the Complaint, upon information and belief.

78. BVCG's representatives made repeated attempts to validate the authenticity of the artworks through various means, including persuading individuals to provide statements supporting the authenticity of the works and arranging for the works' public display at reputable institutions such as OMA. For example, according to Mumford himself, BVCG's Taryn Burns and William Force had in the past attempted to strongarm him into signing documents that he originally purchased the works from Basquiat, but he would not do so.

**RESPONSE:** OMA admits the allegations in paragraph 78 of the Complaint, upon information and belief.

79. In June 2022, the FBI seized the artworks from OMA, asserting that they were not authentic Basquiat pieces and were part of a forgery scheme.

**RESPONSE:** OMA admits that the FBI seized the artworks from OMA in June 2022. OMA is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 79 of the Complaint, and therefore, denies same.

80. In April 2023, Barzman admitted to participating in the creation of these forged artworks and providing false provenance.

**RESPONSE:** OMA admits the allegations in paragraph 80 of the Complaint, upon information and belief.

81. Despite knowing or having reason to know that the artworks' provenance was questionable, BVCG and its representatives misrepresented the pieces to be original Basquiat works, thereby inflating their value. In fact, they are counterfeits, and therefore have no value whatsoever.

**RESPONSE:** OMA admits the allegations in paragraph 81 of the Complaint, upon information and belief.

82. The scheme was hatched in 2012: Barzman and his accomplice would forge the paintings, falsify their provenance, and then sell them on eBay. The pair were seemingly capitalizing on the recent announcement that the Authentication Committee of the Estate of Jean-Michel Basquiat would be disbanding that same year.

**RESPONSE:** OMA admits the allegations in paragraph 82 of the Complaint, upon information and belief.

83. After acquiring the paintings, the BVCG and its owners perpetuated the original fraud by misrepresenting that the paintings and provenance were authentic, ultimately deceiving plaintiffs and obtaining the certificate of insurance under false pretenses.

**RESPONSE:** OMA admits the allegations in paragraph 83 of the Complaint, upon information and belief.

84. The scheme required the participation of Aaron De Groft, who was the Executive Director and CEO of OMA, and who was fired when the scheme came to light.

**RESPONSE:** OMA admits, upon information and belief, that the scheme required the participation of De Groft. OMA admits that De Groft was terminated. OMA denies the remaining allegations in paragraph 84 of the Complaint.

85. BVCG's Pierce O'Donnell easily persuaded De Groft to lend credibility to the collection despite numerous red flags by promising him a significant cut of the proceeds of the anticipated multimillion dollar sales. Because of the advice and pressure of BVCG, De Groft jettisoned his professional, ethical, and fiduciary duties to OMA before even seeing them in person and agreed to exhibit the paintings.

**RESPONSE:** OMA admits the allegations in paragraph 85 of the Complaint, upon information and belief.

86. As part of the agreement to exhibit the forged paintings, OMA offered to insure them and add BVCG as an additional insured.

**RESPONSE:** The alleged agreement speaks for itself, and OMA denies any allegations contrary thereto.

87. After the counterfeits were seized by the FBI, BVCG put in a claim that the works were a total loss, and claimed a value of $19.7 million dollars.

**RESPONSE:** OMA is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 87 of the Complaint, and therefore, denies same.

88. Defendants do not have any valid claim to proceeds from this "loss" since there is no loss to begin with. The paintings have not been damaged or destroyed. They are being held by a federal agency as part of the FBI's investigation into an art forgery claim, and are, upon information and belief, undamaged.

**RESPONSE:** OMA is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 88 of the Complaint, and therefore, denies same.

89. The defendants knew or should have known that the paintings were counterfeits, and had no value whatsoever.

**RESPONSE:** OMA admits the allegations in paragraph 89 of the Complaint, upon information and belief.

**The Policy**

90. The policy, subject to its terms, exclusions and other provisions, generally provides coverage for "Insureds" for the period of July 20, 2021 to July 20, 2022.

**RESPONSE:** The alleged policy speaks for itself, and OMA denies any allegations contrary thereto.

91. The policy identifies the insured's address in Orlando, Florida.

**RESPONSE:** The alleged policy speaks for itself, and OMA denies any allegations contrary thereto.

92. The Policy generally provides, via Section I., "Property Insured," that coverage exists as to: fine arts and collectible objects of every description including but not limited to paintings, etchings, drawings, photographs (including their frames, glasses, shadow boxes and vitrines), rare books and manuscripts, numismatic objects, rugs, tapestries, antiques, sculpture, statuary, ceramics, pottery, porcelain, memorabilia, natural history objects or historical artifacts, archeological objects, video artwork, packing crates, installation and re-installation material, and technical equipment including video monitors, projectors, EDP hardware and software of a non-artistic value used in association with, or as part of an exhibit used in direct association with an installation or exhibition, and other bona fide works of art, or rarity, historic value, or artistic merit, all constituted as follows:

(a) Property of the Insured;

(b) Property of others on loan to the Insured;

(c) Property of others offered as gifts to the Insured or for sale to the Insured and while awaiting formal acceptance;

(d) The Insured's interest in residuary gifts and jointly owned property, but only to the extent of the Insured's interest therein at time of loss or damage;

(e) The Insured's Reference Library including but not limited to portfolios, books, exhibition catalogs, manuscripts, letters, documents, slides, photographs, negatives, videos and computer data. all of the above being insured while on a "wall to wall" basis from the time said property is removed from its normal repository, incidental to shipment,

until returned thereto or other point designated by the owner or their agent prior to return shipment, including while in transit and while on exhibition or otherwise worldwide.

2. Owners/Lenders as Loss Payees/Additional Insureds: Owners and lenders of Property Insured under this policy shall be Loss Payees and/or Additional Insureds, as their respective interests may appear.

4. Perils Insured: All risks of direct physical loss or damage from any external cause, except as hereinafter excluded. Loss if any, payable to the Insured or order.

5. Limits of Liability: The Insurer shall not be liable under this section of this policy for more than the sums stated on the Declarations Page or as otherwise stated elsewhere in this policy.

12. Misrepresentation and Fraud: This Policy shall be void if the Insured has intentionally concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or in case of any fraud, attempted fraud or false swearing by the Insured (touching any matter) relating to this insurance, or the subject thereof, whether before or after a loss.

***

**RESPONSE:** The alleged policy speaks for itself, and OMA denies any allegations contrary thereto.

**Plaintiffs' Reservation of Rights**

93. On or about January 30, 2024, BVCG filed a claim under the policy issued by plaintiffs, seeking compensation for an alleged total loss of the artworks due to the FBI's confiscation.

**RESPONSE:** OMA is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 93 of the Complaint, and therefore, denies same.

94. Plaintiffs subsequently issued a reservation of rights letter, specifying that the policy may be voided due to fraud or misrepresentation and explicitly reserving plaintiffs' right to deny coverage under these terms.

**RESPONSE:** OMA is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 94 of the Complaint, and therefore, denies same.

95. Pursuant to the terms of the policy, plaintiffs maintain the right to deny coverage where there has been intentional concealment or misrepresentation of material facts regarding the authenticity of insured items. The policy's fraud clause further voids coverage if there is evidence of fraudulent misrepresentation by the insured or additional insured parties.

**RESPONSE:** The alleged policy speaks for itself, and OMA denies any allegations contrary thereto.

96. Given the fraudulent actions by BVCG, including misrepresentations about the authenticity and value of the artworks, and OMA's participation in and acquiescence in the fraud, plaintiffs seek a declaration that the policy does not cover the counterfeits, nor the claim for compensation due to confiscation by law enforcement based on forgery of the counterfeits.

**RESPONSE:** OMA neither admits nor denies the allegations in paragraph 96 of the Complaint because such allegations call for a legal conclusion and do not require a response. To the extent any response is required, OMA denies the allegations in paragraph 96 of the Complaint.

97. BVCG's representations were false and material misrepresentations, intended to induce the plaintiffs to add BVCG as an additional insured.

**RESPONSE:** OMA neither admits nor denies the allegations in paragraph 97 of the Complaint because such allegations call for a legal conclusion and do not require a response. To the extent any response is required, OMA denies the allegations in paragraph 97 of the Complaint.

98. De Groft, while an officer of OMA, knew or should have known that the works were counterfeits.

**RESPONSE:** OMA admits the allegations in paragraph 98 of the Complaint, upon information and belief.

99. Had plaintiffs known that the paintings were counterfeits, and that the provenance was concocted by BVCG, they would not have insured them.

**RESPONSE:** OMA is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 99 of the Complaint, and therefore, denies same.

## Claims for Relief

### Count I: Declaratory Judgment

100. There is a bona fide, actual, present, practical need for the declaration because defendants have made a claim under OMA's policy seeking indemnity from plaintiffs for an over $19 million purported loss, which plaintiffs dispute is a covered loss under OMA's policy.

**RESPONSE:** OMA neither admits nor denies the allegations in paragraph 100 of the Complaint because such allegations call for a legal conclusion and do not require a response. To the extent any response is required, OMA denies the allegations in paragraph 100 of the Complaint.

101. Plaintiffs have a justifiable question regarding the existence of their obligations under the policy.

**RESPONSE:** OMA is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 101 of the Complaint, and therefore, denies same.

102. Plaintiffs purported obligation to defendants depends on the facts concerning the paintings' authenticity and defendants' misrepresentations in connection with securing the certificate of insurance from the plaintiffs.

**RESPONSE:** OMA neither admits nor denies the allegations in paragraph 102 of the Complaint because such allegations call for a legal conclusion and do not require a response. To the extent any response is required, OMA denies the allegations in paragraph 102 of the Complaint.

103. Defendants have an actual, present, adverse, and antagonistic interest in the authenticity of the paintings and their misrepresentations in order to obtain the certificate of insurance because they have made their claim for indemnity from the plaintiffs and continue to persist in their position that the paintings are authentic while plaintiffs dispute their authenticity.

**RESPONSE:** OMA is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 103 of the Complaint, and therefore, denies same.

104. Plaintiffs are in doubt regarding the existence of their obligations under the policy due to BVCG, O'Donnell, Burns, and OMA's misrepresentations regarding authenticity of the paintings.

**RESPONSE:** OMA is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 104 of the Complaint, and therefore, denies same.

105. The policy does not provide coverage because the paintings are inauthentic.

**RESPONSE:** The alleged policy speaks for itself, and OMA denies any allegations contrary thereto.

106. The declaration would resolve a present and ascertainable controversy as to the authenticity of the paintings and BVCG's right to coverage under the policy.

**RESPONSE:** OMA neither admits nor denies the allegations in paragraph 106 of the Complaint because such allegations call for a legal conclusion and do not require a response. To the extent any response is required, OMA denies the allegations in paragraph 106 of the Complaint.

107. The relief sought is not merely the giving of legal advice by this Honorable Court or the answer to questions propounded from curiosity.

**RESPONSE:** OMA neither admits nor denies the allegations in paragraph 107 of the Complaint because such allegations call for a legal conclusion and do not require a response. To the extent any response is required, OMA denies the allegations in paragraph 107 of the Complaint.

108. The dispute between the parties is sufficiently ripe because a declaration by this Court would settle the parties' legal obligations and would afford relief from the uncertainty, insecurity, and controversy giving rise to these proceedings.

**RESPONSE:** OMA neither admits nor denies the allegations in paragraph 108 of the Complaint because such allegations call for a legal conclusion and do not require a response. To the extent any response is required, OMA denies the allegations in paragraph 108 of the Complaint.

109. Plaintiffs are entitled to a declaratory judgment confirming that defendants' claim for the loss of the paintings is not covered under the policy because the paintings are inauthentic.

**RESPONSE:** OMA neither admits nor denies the allegations in paragraph 109 of the Complaint because such allegations call for a legal conclusion and do not require a response. To the extent any response is required, OMA denies the allegations in paragraph 109 of the Complaint.

WHEREFORE, plaintiffs respectfully request that this Honorable Court enter judgment in its favor, declaring that Liberty Mutual Insurance Company and Great American Insurance Company have no obligation under the insurance policy to indemnify BVCG in connection with the seizure of the paintings and granting such other and further relief as this court deems just.

**Count II: Declaratory Judgment**

110. There is a bona fide, actual, present, practical need for the declaration because defendants have made a claim under OMA's policy for the complete loss of the paintings, seeking indemnity from plaintiffs for an over $19 million purported loss, which plaintiffs dispute is a covered loss under OMA's policy.

**RESPONSE:** OMA neither admits nor denies the allegations in paragraph 110 of the Complaint because such allegations call for a legal conclusion and do not require a response. To the extent any response is required, OMA denies the allegations in paragraph 110 of the Complaint.

111. Plaintiffs have a justifiable question regarding the existence of their obligations under the policy, since there has not been a complete loss of the paintings.

**RESPONSE:** OMA is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 111 of the Complaint, and therefore, denies same.

112. Plaintiffs are in doubt regarding the existence of their obligations under the policy, since, upon information and belief, the paintings have neither been damaged nor destroyed.

**RESPONSE:** OMA is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 112 of the Complaint, and therefore, denies same.

113. The declaration would resolve a present and ascertainable controversy as to plaintiffs' obligations under the policy and BVCG's right to coverage for a total loss of the paintings.

**RESPONSE:** OMA neither admits nor denies the allegations in paragraph 113 of the Complaint because such allegations call for a legal conclusion and do not require a response. To the extent any response is required, OMA denies the allegations in paragraph 113 of the Complaint.

114. For an insurance claim to be paid there needs to be a loss of insured property.

**RESPONSE:** OMA neither admits nor denies the allegations in paragraph 114 of the Complaint because such allegations call for a legal conclusion and do not require a response. To the extent any response is required, OMA denies the allegations in paragraph 114 of the Complaint.

115. BVCG has made a claim for the complete loss of the paintings.

**RESPONSE:** OMA is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 115 of the Complaint, and therefore, denies same.

116. There has not been a complete loss of the paintings because, upon information and belief, they have neither been damaged nor destroyed.

**RESPONSE:** OMA neither admits nor denies the allegations in paragraph 116 of the Complaint because such allegations call for a legal conclusion and do not require a response. To the extent any response is required, OMA denies the allegations in paragraph 116 of the Complaint.

117. A claim for complete loss is null if there is no loss.

**RESPONSE:** OMA neither admits nor denies the allegations in paragraph 117 of the Complaint because such allegations call for a legal conclusion and do not require a response. To the extent any response is required, OMA denies the allegations in paragraph 117 of the Complaint.

118. Plaintiffs are entitled to a declaratory judgment stating that plaintiffs have no obligation with respect to BVCG's claim for a total loss of the paintings because there has been no loss of the paintings, since, upon information and belief, the paintings remain in the custody of the FBI and have been neither damaged or destroyed.

**RESPONSE:** OMA neither admits nor denies the allegations in paragraph 118 of the Complaint because such allegations call for a legal conclusion and do not require a response. To the extent any response is required, OMA denies the allegations in paragraph 118 of the Complaint.

WHEREFORE, plaintiffs respectfully request that this court enter judgment in its favor, declaring that Liberty Mutual Insurance Company and Great American Insurance Company have no obligation under the insurance policy to indemnify BVCG, and granting such other and further relief as this court deems just.

**Count III: Declaratory Judgment**

119. There is a bona fide, actual, present, practical need for the declaration because defendants have made a claim under OMA's policy for the complete loss of the paintings, seeking indemnity from plaintiffs for an over $19 million purported loss, which plaintiffs dispute is a covered loss under OMA's policy.

**RESPONSE:** OMA neither admits nor denies the allegations in paragraph 119 of the Complaint because such allegations call for a legal conclusion and do not require a response. To the extent any response is required, OMA denies the allegations in paragraph 119 of the Complaint.

120. Upon information and belief, at the time BVCG completed the loan agreement, BVCG was aware that, in fact, the representations set forth therein were false and misleading and designed to induce the plaintiffs to add BVCG as an additional insured.

**RESPONSE:** OMA admits the allegations in paragraph 120 of the Complaint, upon information and belief.

121. At the time OMA requested that plaintiffs provide a certificate of insurance adding BVCG as an additional insured to OMA's policy, OMA's officer Aaron De Groft, and others at OMA knew or should have known that the statements were false, and provided misrepresentations to plaintiffs concerning the authenticity and value if BVCG's paintings.

**RESPONSE:** OMA admits, upon information and belief, that at the time OMA requested that Plaintiff provide a certificate of insurance adding BVCG as an additional insured to OMA's policy, De Groft, and not OMA's Board, knew or should have known that the statements were false, and provided misrepresentations to Plaintiffs concerning the authenticity and value of BVCG's paintings. OMA denies the remaining allegations in paragraph 121 of the Complaint.

122. At the time OMA requested that plaintiffs provide a certificate of insurance adding BVCG as an additional insured to OMA's policy, OMA intentionally concealed material facts and circumstances concerning the authenticity and value of BVCG's paintings.

**RESPONSE:** OMA admits, upon information and belief, that at the time OMA requested that Plaintiffs provide a certificate of insurance adding BVCG as an additional insured to OMA's Policy, De Groft, and no OMA's Board, intentionally concealed material facts and circumstances concerning the authenticity and value of

BVCG's paintings. OMA denies the remaining allegations in paragraph 122 of the Complaint.

123. Plaintiffs' purported obligation to BVCG stems from OMA's policy and the certificate of insurance which was only issued to BVCG based on O'Donnell, Burns, and OMA's misrepresentations as to the authenticity and value of the insured paintings,

**RESPONSE:** The alleged policy and certificate of insurance speak for themselves, and OMA denies any allegations contrary thereto.

124. Plaintiffs relied upon such material misrepresentations when they agreed to provide coverage of the counterfeit paintings.

**RESPONSE:** OMA is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 124 of the Complaint, and therefore, denies same.

125. Had BVCG and OMA provided accurate and complete information, the plaintiffs would not have added BVCG as an additional insured to OMA's policy.

**RESPONSE:** OMA is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 125 of the Complaint, and therefore, denies same.

126. BVCG should not have been added as an additional insured under OMA's policy and any agreement created thereby was null and void.

**RESPONSE:** OMA is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 126 of the Complaint, and therefore, denies same.

127. The declaration would resolve a present and ascertainable controversy as to the obligations of plaintiffs under the policy and defendants' right to coverage.

**RESPONSE:** OMA neither admits nor denies the allegations in paragraph 127 of the Complaint because such allegations call for a legal conclusion and do not require a response. To the extent any response is required, OMA denies the allegations in paragraph 127 of the Complaint.

128. The declaration would resolve a present and ascertainable controversy concerning whether OMA's policy was rendered null and void because of BVCG and OMA's in

**RESPONSE:** OMA neither admits nor denies the allegations in paragraph 128 of the Complaint because such allegations call for a legal conclusion and do not require a response. To the extent any response is required, OMA denies the allegations in paragraph 128 of the Complaint.

129. By misrepresenting to plaintiffs the authenticity and value of the paintings when it requested that BVCG be added as an additional insured to OMA's policy, OMA rendered its policy null and void.

**RESPONSE:** OMA neither admits nor denies the allegations in paragraph 129 of the Complaint because such allegations call for a legal conclusion and do not require a response. To the extent any response is required, OMA denies the allegations in paragraph 129 of the Complaint.

130. Accordingly, plaintiffs are entitled to a declaratory judgment stating that the OMA policy and by extension BVCG's policy, is null and void because the certificate of insurance naming BVCG as an additional insured was issued based on OMA's concealment of material facts and OMA and BVCG's misrepresentations concerning the authenticity and value of BVCG's paintings.

**RESPONSE:** OMA neither admits nor denies the allegations in paragraph 130 of the Complaint because such allegations call for a legal conclusion and do not require a response. To the extent any response is required, OMA denies the allegations in paragraph 130 of the Complaint.

WHEREFORE, plaintiffs respectfully request that this court enter judgment in its favor, declaring that Liberty Mutual Insurance Company and Great American Insurance Company have no obligation under the insurance policy because OMA's policy, and by extension BVCG's is null and void due to intentional concealment and misrepresentation, and granting such other and further relief as this court deems just.

## General Denial

OMA denies the allegations in any paragraph of the Complaint not specifically responded to above, including all *ad damnum* clauses.

## Affirmative Defenses

OMA asserts the following affirmative defenses without assuming the burden of proof on such defenses that otherwise would rest on Plaintiffs:

1. The Complaint fails to state a claim upon which relief may be granted.

2. Plaintiffs' claims are barred, in whole or in part, due to actions of individuals and/or entities other than OMA.

3. To the extent Plaintiffs are entitled to any relief, such relief was necessitated by and is the responsibility of other persons, parties and/or entities other than OMA.

## Reservation of Rights

OMA reserves the right to amend its answer and affirmative defenses to assert additional defenses and/or claims as they become known through continuing investigation and discovery.

Dated: January 30, 2025.

Respectfully submitted,

/s/ Sara A. Brubaker

**E. Ginnette Childs, Esq. (Lead Counsel)**
Florida Bar Number: 0298130
Email: ginny.childs@akerman.com
Secondary Email:

melissa.tejada@akerman.com
Secondary Email:
suzy.miller@akerman.com
**Sara A. Brubaker, Esq.**
Florida Bar Number: 0105769
Email: sara.brubaker@akerman.com
Secondary Email: lynn.cox@akerman.com
**AKERMAN LLP**
Post Office Box 231
Orlando, FL 32802-0231
Phone: (407) 423-4000
Fax: (407) 843-6610

*Attorneys for Defendant, Orlando Museum of Art, Inc.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 30, 2025, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Sara A. Brubaker
**Sara A. Brubaker**
Florida Bar Number: 0105769